**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| PENNENVIRONMENT AND SIERRA CLUB ) | |
| ) | |
| *Plaintiffs*, ) | |
| ) | |
| v. ) | |
| ) | Civil Action No. _____ |
| PPG INDUSTRIES, INC. AND ) | |
| BOROUGH OF FORD CITY ) | |
| ) | |
| *Defendants*. ) | |
| ) | |

## COMPLAINT

### INTRODUCTION

1.    This is a citizens' suit brought against PPG Industries, Inc. (hereafter "PPG") and the Borough of Ford City (hereafter "Ford City") relating to pollutants that are being discharged to the Allegheny River in the vicinity of a site in Armstrong County, Pennsylvania, used and operated by PPG (hereafter "PPG Waste Site"). Suit is brought under Section 505(a)(1) of the Federal Water Pollution Control Act (hereafter "Clean Water Act"), 33 U.S.C. 1365(a)(1), and Section 601(c) of the Pennsylvania Clean Streams Law (hereafter "Clean Streams Law"), 35 P.S. 691.601(c), for the unpermitted and untreated discharge of pollutants from slurry lagoons at the PPG Waste Site, the unpermitted and untreated discharge of pollutants from Outfall 001 at the PPG Waste Site, and violations of the Administrative Order issued to PPG by the Pennsylvania Department of Environmental Protection (hereafter "PADEP") on March 9, 2009.

2.    To remedy PPG's violations, plaintiffs seek declaratory and injunctive relief and the imposition of civil penalties. Plaintiffs also seek the award of litigation costs, including attorneys and expert witnesses' fees.

**JURISDICTION AND VENUE**

3.     This Court has subject matter jurisdiction of claims brought under the Clean Water Act pursuant to Section 505(a) of the Clean Water Act, 33 U.S.C. 1365(a).  This Court has subject matter jurisdiction of claims brought under the Clean Streams Law pursuant to 28 U.S.C. 1367(a).

4.     On January 13, 2012, plaintiffs PennEnvironment and Sierra Club gave notice of their intent to file suit to the Administrator of the Environmental Protection Agency (hereafter "USEPA"), PADEP, and defendants, as required by Section 505(b)(1)(A) of the Clean Water Act, 33 U.S.C. 1365(b)(1)(A).  This notice to PADEP and defendants also satisfied the notice requirements of Section 601(e) of the Clean Streams Law, 35 P.S. 691.601(e).  A copy of this notice with its attachments is attached to the complaint as Exhibit 1.  As required by Section 505(b)(1)(A) of the Clean Water Act and Section 601(e) of the Clean Streams Law, more than 60 days have passed since notice was served.

5.     To the best of plaintiffs' knowledge, neither USEPA nor PADEP has commenced and is diligently prosecuting a civil or criminal action to redress the violations.  To the best of plaintiffs' knowledge, neither USEPA nor PADEP has commenced an administrative civil penalty action satisfying the requirements of Section 309(g)(6) of the Clean Water Act, 33 U.S.C. 1319(g)(6), to redress the violations prior to the issuance of the notice letter.

6.     Venue is appropriate in the Western District of Pennsylvania pursuant to Section 505(c)(1) of the Clean Water Act, 33 U.S.C. 1365(c)(1), because the source of the violations complained of is located within the District.

## PARTIES

### Plaintiffs

7. Plaintiff PennEnvironment sues on behalf of itself and its members. PennEnvironment is a non-profit corporation organized under the laws of the State of Pennsylvania, with offices in both Philadelphia and Pittsburgh. PennEnvironment is a statewide environmental advocacy group that is actively engaged in education, research, lobbying, litigation, and citizen organizing to encourage conservation and environmental protections. PennEnvironment has approximately 15,000 members.

8. Plaintiff Sierra Club sues on behalf of itself and its members. The Sierra Club is a nationwide non-profit environmental membership organization, incorporated in California, with its headquarters and principal place of business in San Francisco, California. The Sierra Club is America's oldest and largest grassroots environmental organization. The Sierra Club has over 608,000 members nationally, with 64 chapters in all 50 states, the District of Columbia, and Puerto Rico. It has approximately 24,000 members living in Pennsylvania, many of whom reside in counties that border the Allegheny River. The purpose of the Sierra Club is to explore, enjoy, and protect the wild places of the earth; to practice and promote the responsible use of the earth's ecosystems and resources; to educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out these objectives. The Sierra Club represents the interests of its members in state and federal litigation, public policy advocacy, administrative proceedings, and before state, local, and federal lawmakers. For decades, the Sierra Club has worked to protect the environmental and ecological health of Pennsylvania's air and water.

9. Members of PennEnvironment and the Sierra Club reside in the vicinity of, or own property or recreate in, on, or near the waters of the Allegheny River affected by the discharge of

pollutants from the PPG Waste Site. The quality of the waters of Pennsylvania, especially the portions of the Allegheny River affected by the discharge, directly affects the health, economic, recreational, aesthetic, and environmental interests of PennEnvironment and the Sierra Club's members. PPG's discharge of pollutants without a permit authorizing and limiting such discharge, and in violation of the March 9, 2009 Administrative Order issued by PADEP (hereafter "Administrative Order") has adversely affected, is adversely affecting, and will continue adversely to affect, the health, economic, recreational, aesthetic, and environmental interests of PennEnvironment and the Sierra Club's members.

10.     PennEnvironment and the Sierra Club's ability to protect and improve the waters of Pennsylvania requires accurate and complete information regarding the discharge of pollutants. PPG's actions in failing to obtain a permit for such discharges and to comply with the discharge, monitoring, and reporting obligations in such a permit, and its failure to comply with the reporting requirements of the Administrative Order, interfere with the efforts of PennEnvironment and the Sierra Club to assess the compliance status of Pennsylvania dischargers with water pollution control laws and report such status to their members. Those failures also interfere with the efforts of PennEnvironment and the Sierra Club to propose legislation to amend the Clean Water Act or the Clean Streams Law and to bring litigation to prevent violations by PPG and thereby protect the waters of the Allegheny River affected by the discharge from the PPG Waste Site. The interests of PennEnvironment and the Sierra Club have been, are being, and will be adversely affected by PPG's failure to obtain a permit authorizing and limiting its discharge of pollutants from the PPG Waste Site, to comply with the discharge, monitoring, and reporting requirements of such a permit, and to comply with the reporting requirements of the Administrative Order.

11.     PPG's actions in failing to obtain a permit authorizing and limiting its discharges and to comply with the discharge, monitoring, and reporting obligations for such a permit, and its failure to comply with the reporting requirements of the Administrative Order, interfere with the efforts of PennEnvironment and the Sierra Club's members to protect their health, economic, recreational, aesthetic, and environmental interests by interfering with their ability to take action on their own behalf.

**Defendants**

12.     Defendant PPG, formerly known as the Pittsburgh Plate Glass Company, is a corporation organized under the laws of Pennsylvania, with its headquarters in Pittsburgh, Pennsylvania.

13.     Defendant Ford City is a borough of the Commonwealth of Pennsylvania. Ford City is named as a defendant pursuant to Rule 19(a) of the Federal Rules of Civil Procedure. Plaintiffs are not pursuing a claim or specific relief against Ford City other than what is necessary for plaintiffs to maintain the claims and obtain the relief plaintiffs seek against PPG.

**FACTS**

**The PPG Waste Site**

14.     From 1899 to 1972, PPG owned ten parcels of land (the "Property") in the Townships of Cadogan, Manor, and North Buffalo, and in Ford City. Part of the Property, located in Cadogan and North Buffalo Townships, was used by PPG to dispose of waste products from its glass manufacturing plant in Ford City, known as Works Number 5. From approximately 1950 to 1970, PPG disposed of glass polishing waste slurry via a pipe system from Works Number 5 across the Allegheny River into an area of the Property that PPG formerly used as a sandstone quarry.

15.     PPG created three slurry lagoons within the quarry by constructing a series of earthen containment dikes in order to contain the waste slurry.  The slurry lagoons, which were covered with four inches of soil and seeded in 1971 and 1972, occupy an area of approximately 77 acres.  The slurry lagoons are bordered by the Allegheny River to the south, Route 128 to the north, Glade Run (a tributary to the Allegheny River) to the west, and a feature that PPG terms the "Drainage Ditch," which flows southward and discharges to the Allegheny River, to the east.  A small pond known as Scripps Pond is located in the east-central part of the lagoon area.

16.     East of the Drainage Ditch are: (1) a solid waste disposal area, which was created and used by PPG to dispose of solid wastes from the 1920's to 1970's and, as of 1991, contained approximately 20 million cubic feet of waste; (2) a plumbing fixture landfill, which was used and occupied by Eljer, Inc.; and (3) four baseball fields.

17.     The slurry lagoons, solid waste disposal area, plumbing fixture landfill, and four baseball fields comprise the PPG Waste Site.  The PPG Waste Site measures approximately 150 acres and lies in both the Cadogan and North Buffalo townships.

18.     On March 8, 1971, PPG and the Pennsylvania Department of Environmental Resources (now PADEP) entered into an Agreement and Stipulation regarding the discharge of industrial wastes from the PPG Waste Site into the Allegheny River.

19.     The Agreement and Stipulation stated that the discharge was a violation of Pennsylvania's Clean Streams Law, and the rules and regulations promulgated thereunder, and required PPG to complete a study of the problems created by the discharge of industrial wastes and to submit a remediation plan that would either eliminate the continuing discharges or treat the discharges in perpetuity.  PPG was also required to pay a fine of $250 if it failed to submit the

remediation plan by August 31, 1971.

20.     PPG submitted a proposed remediation plan on August 1, 1972, that contemplated continuing untreated discharge into the Allegheny River.  Plaintiffs do not know whether PPG paid the $250 fine for this late submission.

21.     On October 16, 1972, PPG sold the PPG Waste Site to Ford City for one dollar.

22.     On or about March 16, 1973, PADEP informed PPG that its proposed remediation plan was unacceptable and requested that PPG revise the plan to provide for the treatment of the discharge.  On or about May 16, 1973, PPG withdrew its proposed remediation plan.

23.     Since at least April 16, 1973, PPG has been required under Section 402(k) of the Clean Water Act, 33 U.S.C. 1342(k), to obtain a National Pollutant Discharge Elimination System (NPDES) permit issued by USEPA or the Commonwealth of Pennsylvania under a delegation from USEPA, for the discharge of pollutants into the Allegheny River from the PPG Waste Site.  PPG has not obtained such a permit.

24.     At least as of February 21, 1992, PADEP informed PPG that a permit was required under the Clean Streams Laws for its continuing discharges.  PPG has not obtained such a permit. In a letter issued on that date, PADEP stated that PPG's "disposal of waste to the ground and to the waters of the Commonwealth" was in violation of, *inter alia*, Sections 301 and 307 of the Clean Streams Law, 35 P.S. 691.301, 691.307.  Section 301 states that "[n]o person or municipality shall place or permit to be placed, or discharged or permit to flow, or continue to discharge or permit to flow, into any of the waters of the Commonwealth any industrial wastes, except as hereinafter provided in this act."  Section 307 prohibits, in part, the "discharge of industrial wastes in any manner, directly or indirectly, into any of the waters of the Commonwealth unless such discharge is

7

authorized by the rules and regulations of the department or such person or municipality has first obtained a permit from the department."

25.     On March 9, 2009, nearly 40 years after the 1971 Agreement and Stipulation, PADEP issued the Administrative Order, charging PPG with violations of the Clean Streams Law and setting forth certain Performance Obligations for PPG.  Exhibit 1, Plaintiffs' Attachment 2 at PADEP 3-15. The Administrative Order is not a permit issued under the authority of the NPDES.

**Contamination of the Allegheny River**

26.     On March 9, 2009, PADEP wrote to PPG regarding the Administrative Order that "[t]he Department believes that the discharges coming from the site and entering into the Allegheny River and Glade Run pose a significant threat to public health and the environment."  Exhibit 1, Plaintiffs' Attachment 1 at PADEP 1.  The "site" referred to in the Administrative Order includes at least the slurry lagoons and solid waste disposal area of the PPG Waste Site, described in paragraphs 14-17 above.

27.     The Administrative Order (para. 14) states that "[p]recipitation which infiltrates the Slurry Lagoons and the Landfill at the Site becomes contaminated with *hazardous substances*, as defined under the Hazardous Sites Cleanup Act (HSCA), Act of October 18, 1988, P.L. 756, No. 108, *as amended*, 35 P.S. §§ 6020.101 – 6020.1305 * * *" (emphases in original).  Exhibit 1, Plaintiffs' Attachment 2 at PADEP 4.  The Administrative Order (para. 13) also states that "[e]nvironmental assessments have found that the Slurry Lagoons at the Site are contaminated with various *hazardous substances*, as defined under the Hazardous Sites Cleanup Act (HSCA), Act of October 18, 1988, P.L. 756, No. 108, *as amended*, 35 P.S. §§ 6020.101-6020.1305" (emphases in original), including antimony, arsenic, and lead, and that "[t]he source of this contamination is

attributed to PPG's waste disposal activities that occurred at the Site * * *." Exhibit 1, Plaintiffs' Attachment 2 at PADEP 4.

28.    The Administrative Order (para. 15) states that the leachate discharges seep out of the slurry lagoons "at various locations at the Site and then flow or are conveyed into the waters of the Commonwealth," including the Allegheny River and Glade Run. Exhibit 1, Plaintiffs' Attachment 2 at PADEP 5. The leachate seeps through fissures on the cliff face of the south side of the PPG Waste Site and is discharged into the Allegheny River through culverts located under the railroad tracks at the base of the cliffs. Leachate from the slurry lagoons also enters the Allegheny River through an outfall constructed by PPG, known as "Outfall 001." Leachate discharged into Glade Run, in turn, discharges into the Allegheny River.

29.    In addition to affecting the waters of the Allegheny River and Glade Run, the pollutants in the leachate have likely resulted in the contamination of sediments in the Allegheny River and Glade Run in the vicinity of the PPG Waste Site, as well as groundwater in the vicinity of the PPG Waste Site.

30.    The Administrative Order (para. 12) states that "[t]he industrial waste discharges from the Site, which are pollutional and have a very high pH and contain metals and other toxic chemicals, continue unabated as of the date of this Administrative Order." Exhibit 1, Plaintiffs' Attachment 2 at PADEP 4. The waste in the slurry lagoons and the leachate that seeps from the slurry lagoons contain pollutants, including arsenic, chromium, lead, manganese, copper, zinc, mercury, antimony, barium, beryllium, iron, vanadium, aluminum, total dissolved solids or salts, and semi-volatile organic compounds. The slurry lagoons and leachate are also highly caustic, with pH levels reaching as high as 12.69.

9

**Violations of the Administrative Order**

31.     Paragraph A of the Performance Obligations requires PPG to conduct "interim monitoring and reporting of the quality and quantity" of certain seeps, to "sample the receiving streams above and below the points of discharge," and to monitor weekly both the seeps and streams for certain parameters. Exhibit 1, Plaintiffs' Attachment 2 at PADEP 6-7. Attachment A to the July 2 Addendum requires that "PPG shall monitor the discharges from any temporary system" and comply with certain effluent limitations in accordance with the table listed therein. Exhibit 1, Plaintiffs' Attachment 3 at PADEP 18. Based on the monthly Effluent Monitoring Data reports submitted by PPG to PADEP concerning February 2010 through December 2011, plaintiffs have identified 162 discharge violations and 33 reporting violations. Exhibits 2, 3. PPG ascribed the cause of the discharge violations to a "temporary system maintenance issue."

32.     Paragraph D of the Performance Obligations in the Administrative Order requires PPG to submit a Treatment Plan within 90 days of the date of the Administrative Order. Exhibit 1, Plaintiffs' Attachment 2 at PADEP 7.

33.     Subparagraph (ii) of paragraph D requires PPG to identify in its Treatment Plan, *inter alia*, "the necessary NPDES permit(s) for the authorization of the discharges associated with the collection and treatment system" and to "provide a schedule for applying for the necessary permits." Exhibit 1, Plaintiffs' Attachment 2 at PADEP 7. The Treatment Plan submitted by PPG in June 2009 fails to provide a schedule for the application for NPDES permits and, based on the monthly progress reports submitted by PPG beginning on April 1, 2009, through at least January 5, 2012 , PPG took no steps to apply for such permits.

34.     On July 2, 2009, PADEP approved the revised Interim Abatement Plan submitted by

PPG and issued the July 2 Addendum. Exhibit 1, Plaintiffs' Attachment 3 at PADEP 16-19. Paragraph 3 of Attachment A of the July 2 Addendum states that "[n]o untreated or ineffectively treated wastewaters shall be discharged into the waters of the Commonwealth * * *." Exhibit 1, Plaintiffs' Attachment 3 at PADEP 18. Under the Clean Streams Law, "waters of the Commonwealth" includes "any and all rivers, streams, creeks, rivulets, impoundments, ditches, water courses, storm sewers, lakes, dammed water, ponds, springs and all other bodies or channels of conveyance of surface and underground water, or parts thereof, whether natural or artificial, within or on the boundaries of this Commonwealth." 35 P.S. 691.1.

35. In addition, the PADEP letter accompanying the July 2 Addendum notes that its authorization of the revised Interim Abatement Plan "does not permit any discharge (storm water or non-storm water), which contains any pollutant that may cause or contribute to an impact on aquatic life or poses substantial hazard to human health or the environment due to its quantity or concentration." Exhibit 1, Plaintiffs' Attachment 3 at PADEP 16. The discharge from Outfall 001 is being treated only for pH and not any other pollutant. PPG is therefore discharging untreated or ineffectively treated wastewaters into the Allegheny River.

36. On November 29, 2011, PADEP notified PPG that it should "proceed to implement the investigative items identified" in its Treatment Plan. In approving these investigative items, PADEP stated "that all the contamination emanating from this site is PPG's responsibility and the contamination must be collected and treated or collected and removed as appropriate for off-site disposal. Under the Pennsylvania Clean Streams Law and the federal Clean Water Act, PPG is responsible to collect and treat any and all contaminated waste water, groundwater and surface water that enter the surface Waters of the Commonwealth from this site, irrespective of any demonstrable

11

impact on the receiving waters."

## CLAIMS

### First Claim

37.     Section 505(a)(1)(A) of the Clean Water Act, 33 U.S.C. 1365(a)(1)(A), permits any citizen to commence a civil action on his own behalf "against any person * * * who is alleged to be in violation of (A) an effluent standard or limitation under this chapter * * *." Section 505(f)(1) of the Clean Water Act, 33 U.S.C. 1365(f)(1), defines "effluent standard or limitation under this chapter" as meaning, *inter alia*, an unlawful act under Section 301(a) of the Clean Water Act, 33 U.S.C. 1311(a).

38.     Section 301(a) of the Clean Water Act, 33 U.S.C. 1311(a), prohibits the discharge of pollutants into navigable waters of the United States, unless in compliance with various enumerated sections of the Clean Water Act. Section 301(a) prohibits, *inter alia*, such discharges not authorized by, or in violation of, the terms and conditions of an NPDES permit issued pursuant to Section 402 of the Clean Water Act, 33 U.S.C. 1342.

39.     The discharge of pollutants, including arsenic, chromium, lead, manganese, copper, zinc, mercury, antimony, barium, beryllium, iron, vanadium, aluminum, total dissolved solids or salts, and semi-volatile organic compounds into the Allegheny River through contaminated leachate from the lagoon seeps and through Outfall 001 are discharges from a point source into navigable waters of the United States within the meaning of Section 301(a) of the Clean Water Act, 33 U.S.C. 1311(a).

40.     The discharge of pollutants, including arsenic, chromium, lead, manganese, copper, zinc, mercury, antimony, barium, beryllium, iron, vanadium, aluminum, total dissolved solids or salts, and semi-volatile organic compounds into Glade Run through contaminated leachate from the lagoon

seeps are discharges from a point source into navigable waters of the United States within the meaning of Section 301(a) of the Clean Water Act, 33 U.S.C. 1311(a).

41.   The discharge of leachate or wastewater with a high pH into the Allegheny River and Glade Run from the lagoon seeps is a discharge from a point source into navigable waters of the United States within the meaning of Section 301(a) of the Clean Water Act, 33 U.S.C. 1311(a).

42.   PPG has violated and continues to violate Sections 301(a) and 402 of the Clean Water Act, 33 U.S.C. 1311(a) and 1342, by discharging pollutants, including arsenic, chromium, lead, manganese, copper, zinc, mercury, antimony, barium, beryllium, iron, vanadium, aluminum, total dissolved solids or salts, and semi-volatile organic compounds, as well as discharging waste containing high levels of pH, into the Allegheny River and Glade Run without a permit issued pursuant to the Clean Water Act authorizing such discharges.

**Second Claim**

43.   Section 505(a)(1)(A) of the Clean Water Act, 33 U.S.C. 1365(a)(1)(A), permits any citizen to commence a civil action on his own behalf "against any person * * * who is alleged to be in violation of (A) an effluent standard or limitation under this chapter * * *." Section 505(f)(1) of the Clean Water Act, 33 U.S.C. 1365(f)(1), defines "effluent standard or limitation under this chapter" as meaning, *inter alia*, an unlawful act under Section 301(a) of the Clean Water Act, 33 U.S.C. 1311(a).

44.   Section 301(a) of the Clean Water Act, 33 U.S.C. 1311(a), prohibits the discharge of pollutants into navigable waters of the United States, unless in compliance with various enumerated sections of the Clean Water Act. Section 301(a) prohibits, *inter alia*, storm water discharges not authorized by, or in violation of, the terms and conditions of an NPDES permit issued pursuant to

13

Section 402(p) of the Clean Water Act, 33 U.S.C. 1342(p).

45.     Section 402(p) of the Clean Water Act, 33 U.S.C. 1342(p), prohibits unpermitted storm water discharges associated with industrial activity.  Storm water is defined as "storm water runoff, snow melt runoff, and surface runoff and drainage."  40 C.F.R. 122.26(b)(13).  In addition, "[s]torm water discharge associated with industrial activity" includes "areas where industrial activity has taken place in the past and significant materials remain and are exposed to storm water."  40 C.F.R. 122.26(b)(14).

46.     The slurry lagoons at the PPG Waste Site constitute an area where industrial activity has taken place in the past and significant materials from that activity remain at the PPG Waste Site that are exposed to storm water.

47.     PPG has violated and continues to violate Sections 301(a) and 402(p) of the Clean Water Act, 33 U.S.C. 1311(a) and 1342(p), by discharging storm water from the PPG Waste Site without a permit issued pursuant to the Clean Water Act authorizing such discharges.

**Third Claim**

48.     Section 601(c) of the Clean Streams Law, 35 P.S. 691.601(c), states that "any person having an interest which is or may be adversely affected may commence a civil action on his own behalf to compel compliance with this act or any rule, regulation, order or permit issued pursuant to this act * * * against any other person alleged to be in violation of any provision of this act or any rule, regulation, order or permit issued pursuant to this act."

49.     Section 301 of the Clean Streams Law, 35 P.S. 691.301, states that "[n]o person or municipality shall place or permit to be placed, or discharged or permit to flow, or continue to discharge or permit to flow, into any of the waters of the Commonwealth any industrial wastes,

14

except as hereinafter provided in this act."

50. Section 307(a) of the Clean Streams Law, 35 P.S. 691.307(a), further states that "[n]o person or municipality shall discharge or permit the discharge of industrial wastes in any manner, directly or indirectly, into any of the waters of the Commonwealth unless such discharge is authorized by the rules and regulations of the department or such person or municipality has first obtained a permit from the department." Any such discharge "without a permit or contrary to the terms and conditions of a permit or contrary to the rules and regulations of the department is hereby declared to be a nuisance." 35 P.S. 691.307(c).

51. Section 1 of the Clean Streams Law, 35 P.S. 691.1, defines "industrial waste" as "any liquid, gaseous, radioactive, solid or other substance, not sewage, resulting from any manufacturing or industry, or from any establishment, as herein defined * * *. 'Industrial waste' shall include all such substances whether or not generally characterized as waste." The slurry waste at the PPG Waste Site constitutes a "liquid, gaseous, radioactive, solid or other substance * ** resulting from * * * manufacturing or industry, or from any establishment * * *."

52. PPG has violated and continues to violate Sections 301 and 307 of the Clean Streams Law, 35 P.S. 691.301, 691.307, by discharging industrial waste into the Allegheny River, Glade Run, and groundwater associated with the PPG Waste Site without authorization or a permit obtained from PADEP. Under Section 307(c) of the Clean Streams Law, this discharge of industrial waste is a nuisance.

### Fourth Claim

53. Section 601(c) of the Clean Streams Law, 35 P.S. 691.601(c), states that "any person having an interest which is or may be adversely affected may commence a civil action on his own

15

behalf to compel compliance with this act or any rule, regulation, order or permit issued pursuant to this act * * * against any other person alleged to be in violation of any provision of this act or any rule, regulation, order or permit issued pursuant to this act."

54.    Section 401 of the Clean Streams Law, 35 P.S. 691.401 states that "[i]t shall be unlawful for any person or municipality to put or place into any of the waters of the Commonwealth, or allow or permit to be discharged from property owned or occupied by such person or municipality into any of the waters of the Commonwealth, any substance of any kind or character resulting in pollution as herein defined. Any such discharge is hereby declared to be a nuisance."

55.    Applicable regulations state that "[a] person may not discharge pollutants from a point source into surface waters except as authorized under an NPDES permit." 25 Pa. Code 92a.1(b).

56.    PPG has violated and continues to violate Section 401 of the Clean Streams Law, by discharging pollutants, including arsenic, chromium, lead, manganese, copper, zinc, mercury, antimony, barium, beryllium, iron, vanadium, aluminum, total dissolved solids or salts, and semi-volatile organic compounds, as well as discharging waste containing high levels of pH, into the Allegheny River, Glade Run, and groundwater without a permit issued by PADEP authorizing such discharges.  The discharge of these pollutants results in the pollution of the Allegheny River, Glade Run, and groundwater associated with the PPG Waste Site.

## Fifth Claim

57.    Section 505(a)(1)(B) of the Clean Water Act, 33 U.S.C. 1365(a)(1)(B), permits any citizen to commence a civil action on his own behalf "against any person * * * who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation * * *."

16

58.     The Administrative Order issued by PADEP is "an order issued by * * * a State with respect to" an effluent standard or limitation.

59.     Paragraph D of the Performance Obligations in the Administrative Order requires PPG to submit a Treatment Plan within 90 days of the date of the Administrative Order.  Exhibit 1, Plaintiffs' Attachment 2 at PADEP 7.

60.     Subparagraph (ii) of Paragraph D requires PPG to identify in its Treatment Plan, *inter alia*, "the necessary NPDES permit(s) for the authorization of the discharges associated with the collection and treatment system" and to "provide a schedule for applying for the necessary permits." Exhibit 1, Plaintiffs' Attachment 2 at PADEP 7.

61.     The Treatment Plan submitted by PPG in June 2009 fails to provide a schedule for the application for NPDES permits and, based on the monthly progress reports submitted by PPG beginning on April 1, 2009, through at least January 5, 2012, PPG took no steps to apply for such permits.  Plaintiffs allege, on information and belief, that PPG has failed to provide a schedule for the application of NPDES permits and has taken no steps to apply for such permits as of the filing of this complaint.

### Sixth Claim

62.     Section 601(c) of the Clean Streams Law, 35 P.S. 691.601(c), states that "any person having an interest which is or may be adversely affected may commence a civil action on his own behalf to compel compliance with this act or any rule, regulation, order or permit issued pursuant to this act * * * against any other person alleged to be in violation of any provision of this act or any rule, regulation, order or permit issued pursuant to this act."

63.     Section 611 of the Clean Streams Law, 35 P.S. 691.611 states that "[i]t shall be

17

unlawful * * * to fail to comply with any order or permit or license of the department, to violate any * * * order or permit or license of the department, to cause air or water pollution, * * *.  Any person or municipality engaging in such conduct shall be subject to the provisions of sections 601, 602 and 605."

64.   PPG has violated an order of PADEP, as described in paragraphs 59-61 above.

### Seventh Claim

65.   Section 505(a)(1)(B) of the Clean Water Act, 33 U.S.C. 1365(a)(1)(B), permits any citizen to commence a civil action on his own behalf "against any person * * * who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation * * *."

66.   The Administrative Order issued by the PADEP is "an order issued by * * * a State with respect to" an effluent standard or limitation.

67.   Paragraph 3 of Attachment A to the July 2 Addendum provides: "No untreated or ineffectively treated wastewaters shall be discharged into the waters of the Commonwealth * * *." Exhibit 1, Attachment 3 at PADEP 18.  The PADEP letter accompanying the July 2 Addendum notes that its authorization of the revised Interim Abatement Plan "does not permit any discharge (storm water or non-storm water), which contains any pollutant that may cause or contribute to an impact on aquatic life or poses substantial hazard to human health or the environment due to its quantity or concentration."

68.   Only the discharge from Outfall 001 is being treated for pH.  No other discharge is being treated for pH.  PPG is not currently treating any of its discharges for arsenic, chromium, lead, manganese, copper, zinc, mercury, antimony, barium, beryllium, iron, vanadium, aluminum, total

dissolved solids or salts, or other semi-volatile organic compounds.

69.     PPG has discharged, and continues to discharge, untreated and ineffectively treated wastewater, in violation of the July 2 Addendum.

### Eighth Claim

70.     Section 601(c) of the Clean Streams Law, 35 P.S. 691.601(c), states that "any person having an interest which is or may be adversely affected may commence a civil action on his own behalf to compel compliance with this act or any rule, regulation, order or permit issued pursuant to this act * * * against any other person alleged to be in violation of any provision of this act or any rule, regulation, order or permit issued pursuant to this act."

71.     Section 611 of the Clean Streams Law, 35 P.S. 691.611 states that "[i]t shall be unlawful * * * to fail to comply with any order or permit or license of the department, to violate any * * * order or permit or license of the department, to cause air or water pollution, * * *.  Any person or municipality engaging in such conduct shall be subject to the provisions of sections 601, 602 and 605."

72.     PPG has violated an order of PADEP, as described in paragraphs 67-69 above.

### Ninth Claim

73.     Section 505(a)(1)(B) of the Clean Water Act, 33 U.S.C. 1365(a)(1)(B), permits any citizen to commence a civil action on his own behalf "against any person * * * who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation * * *."

74.     The Administrative Order issued by PADEP is "an order issued by * * * a State with respect to" an effluent standard or limitation.

75.     Paragraph A of the Performance Obligations requires PPG to conduct "interim monitoring and reporting of the quality and quantity" of certain seeps, to "sample the receiving streams above and below the points of discharge," and to monitor weekly both the seeps and streams for certain parameters.   Exhibit 1, Plaintiffs' Attachment 2 at PADEP 6-7.  Attachment A to the July 2 Addendum requires that "PPG shall monitor the discharges from any temporary system" and comply with certain effluent limitations in accordance with the table listed therein.  Exhibit 1, Plaintiffs' Attachment 3 at PADEP 18.

76.     Based on the monthly Effluent Monitoring Data reports submitted by PPG to the PADEP, PPG committed 162 discharge violations between February 2010 and December 2011. Exhibit 2.  Plaintiffs allege that these discharge violations are likely to recur on a continuous or intermittent basis either because there is a likelihood of recurring violations of the same parameter or that the source of those violations will cause recurring violations of one or more different parameters.

### Tenth Claim

77.     Section 601(c) of the Clean Streams Law, 35 P.S. 691.601(c), states that "any person having an interest which is or may be adversely affected may commence a civil action on his own behalf to compel compliance with this act or any rule, regulation, order or permit issued pursuant to this act * * * against any other person alleged to be in violation of any provision of this act or any rule, regulation, order or permit issued pursuant to this act."

78.     Section 611 of the Clean Streams Law, 35 P.S. 691.611 states that "[i]t shall be unlawful * * * to fail to comply with any order or permit or license of the department, to violate any * * * order or permit or license of the department, to cause air or water pollution, * * *.  Any person

or municipality engaging in such conduct shall be subject to the provisions of sections 601, 602 and 605."

79.     PPG has violated an order of PADEP, as described in paragraphs 75-76 above.

**Eleventh Claim**

80.     Section 505(a)(1)(B) of the Clean Water Act, 33 U.S.C. 1365(a)(1)(B), permits any citizen to commence a civil action on his own behalf "against any person * * * who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation * * *."

81.     The Administrative Order issued by the PADEP is "an order issued by * * * a State with respect to" an effluent standard or limitation.

82.     Paragraph A of the Performance Obligations requires PPG to conduct "interim monitoring and reporting of the quality and quantity" of certain seeps, to "sample the receiving streams above and below the points of discharge," and to monitor weekly both the seeps and streams for certain parameters.   Exhibit 1, Plaintiffs' Attachment 2 at PADEP 6-7.  Attachment A to the July 2 Addendum requires that "PPG shall monitor the discharges from any temporary system" and comply with certain effluent limitations in accordance with the table listed therein.  Exhibit 1, Plaintiffs' Attachment 3 at PADEP 18.

83.     Based on the monthly Effluent Monitoring Data reports submitted by PPG to the PADEP, PPG committed 33 reporting violations between February 2010 and December 2011. Exhibit 3.  Given PPG's consistent reporting violations over a period of 22 months, plaintiffs allege, on information and belief, that PPG continues to commit reporting violations in violation of Paragraph A of the Performance Obligations and the July 2 Addendum.

**Twelfth Claim**

84.    Section 601(c) of the Clean Streams Law, 35 P.S. 691.601(c), states that "any person having an interest which is or may be adversely affected may commence a civil action on his own behalf to compel compliance with this act or any rule, regulation, order or permit issued pursuant to this act * * * against any other person alleged to be in violation of any provision of this act or any rule, regulation, order or permit issued pursuant to this act."

85.    Section 611 of the Clean Streams Law, 35 P.S. 691.611 states that "[i]t shall be unlawful * * * to fail to comply with any order or permit or license of the department, to violate any * * * order or permit or license of the department, to cause air or water pollution, * * *.  Any person or municipality engaging in such conduct shall be subject to the provisions of sections 601, 602 and 605."

86.    PPG has violated an order of PADEP, as described in paragraphs 82-83 above.

**RELIEF**

Wherefore, plaintiffs respectfully request this Court to grant the following relief:

A.  Issue a declaratory judgment that PPG has violated and continues to violate Sections 301(a) and 402 of the Clean Water Act, 33 U.S.C. 1311(a) and 1342, and Sections 301, 307, and 401 of the Clean Streams Law, 35 P.S. 691.301, 691.307, and 691.401, by discharging pollutants, including arsenic, chromium, lead, manganese, copper, zinc, mercury, antimony, barium, beryllium, iron, vanadium, aluminum, total dissolved solids or salts, and semi-volatile organic compounds, as well as the discharge of leachate, wastewater, and/or storm water with a high pH, into the Allegheny River, Glade Run, and groundwater associated with the PPG Waste Site without a permit issued pursuant the Clean Water Act and Clean Streams Law authorizing such discharge;

22

B.  Issue a declaratory judgment that: (1) PPG has violated and continues to violate Paragraph A of the Performance Obligations of the Administrative Order, and the July 2 Addendum, by committing discharge and reporting violations; (2) PPG has violated and continues to violate Paragraph D of the Performance Obligations of the Administrative Order by failing to provide a schedule for the application of NPDES permits and taking no steps to apply for such permits; and (3) PPG has violated and continues to violate the July 2 Addendum by discharging untreated or ineffectively treated wastewaters.

C.  Enjoin PPG from discharging pollutants into the Allegheny River, Glade Run, or groundwater associated with the PPG Waste Site, except in compliance with a permit(s) issued pursuant to the Clean Water Act and Clean Streams Law authorizing such discharge and in compliance with the requirements of the Administrative Order and July 2 Addendum until such a permit(s) is issued.

D.  Enjoin PPG to remediate contaminated sediments in the Allegheny River and Glade Run and to control any sources that may contribute to the sediment contamination;

E.  Order PPG to pay appropriate civil penalties under Section 309(d) of the Clean Water Act, 33 U.S.C. 1319(d), for its violation of Section 301(a) of the Clean Water Act, 33 U.S.C. 1311(a), and its violation of the Administrative Order and July 2 Addendum.

F.  Award plaintiffs their litigation costs, including reasonable attorneys and expert witnesses' fees, as authorized by Section 505(d) of the Clean Water Act, 33 U.S.C. 1365(d), and Section 601(g) of the Clean Streams Law, 35 P.S. 691.601(g); and

G.  Award such other relief as this Court deems appropriate.

With respect to plaintiffs' Clean Water Act and Clean Streams Law claims, Ford City is

named as a party defendant pursuant to Rule 19(a) of the Federal Rules of Civil Procedure, and no

relief is sought against this defendant.

Respectfully submitted,

/s Thomas J. Farrell

Thomas J. Farrell, PA ID No. 48976
Farrell & Reisinger, P.C.
200 Koppers Building
436 Seventh Avenue
Pittsburgh, PA 15219
(412) 894-1380

Bruce J. Terris
Carolyn Smith Pravlik
Patrick A. Sheldon
Terris, Pravlik & Millian, LLP
1121 12th Street, N.W.
Washington, DC  20005-4632
(202) 682-2100
psheldon@tpmlaw.com

March 20, 2012                                    *Counsel for Plaintiffs*