IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PENNENVIRONMENT and SIERRA CLUB,      )
                Plaintiffs,      )
                                )
       vs.      )      Civil Action No. 12-342
                                )
PPG INDUSTRIES, INC. and BOROUGH OF      )
FORD CITY,      )
                Defendants.      )

MEMORANDUM OPINION AND ORDER

      Plaintiffs, PennEnvironment and Sierra Club, bring this citizens suit pursuant to the

Federal Water Pollution Control Act, 33 U.S.C. § 1365(a)(1) (Clean Water Act or CWA), section

7002(a)(1)(B) of the Resource Conservation and Recovery Act, 42 U.S.C. § 6972(a)(1)(B)

(RCRA), and section 601(c) of the Pennsylvania Clean Streams Law, 35 P.S. § 691.601(c)

(CSL), against Defendants, PPG Industries, Inc. (PPG) and the Borough of Ford City (Ford

City), to remedy the alleged imminent and substantial endangerment to health and the

environment presented by contamination of a site in Armstrong County, Pennsylvania used and

operated by PPG (the "Site"), contamination of surface waters and sediments in the Allegheny

River and Glade Run in the vicinity of the Site, and contamination of groundwater associated

with the Site.

      Presently pending before the Court are two motions to dismiss, one filed by PPG and the

other by Ford City.  For the reasons that follow, the motions will be denied.

<u>Facts</u>

      Plaintiffs' complaints allege that from 1899 to 1972, PPG owned land in Cadogan and

North Buffalo Townships that was used by PPG to dispose of waste from its glass manufacturing

plant in Ford City.  (CWA Compl. ¶ 14; RCRA Compl. ¶ 16.)[1]  From 1950 to 1970, PPG

disposed of waste slurry in areas of that land that had formerly been used as a sandstone quarry.

PPG created three slurry lagoons within the quarry, which occupy an area of approximately

77 acres.  (CWA Compl. ¶¶ 14-15; RCRA Compl. ¶¶ 16-17.)  Those slurry lagoons are bordered

by the Allegheny River to the south, Route 128 to the north, Glade Run (a tributary to the

Allegheny River) to the west, and a feature that PPG terms the "Drainage Ditch" to the east.  A

solid waste disposal area used by PPG from the 1920s to the 1970s, a plumbing fixture landfill

used and occupied by Eljer, Inc., and four baseball fields are east of the Drainage Ditch. (CWA

Compl. ¶ 16; RCRA Compl. ¶ 18.)  Plaintiffs have alleged that the slurry lagoons, solid waste

disposal area, plumbing fixture landfill and baseball fields, together measuring approximately

150 acres, constitute what they call the "PPG Waste Site."  (CWA Compl. ¶ 17; RCRA Compl.

¶ 19.)  PPG calls it the "Ford City Site" and contends that it does not include the plumbing

fixture landfill or the ballfields.  The Court will refer to it as "the Site."  The issue of whether the

plumbing fixture landfill and the ballfields are included is discussed below.

On March 8, 1971, PPG and the Pennsylvania Department of Environmental Resources --

now known as the Pennsylvania Department of Environmental Protection ("PADEP") -- entered

into an Agreement and Stipulation concerning discharges of industrial waste from the Site into

the Allegheny River.  (CWA Compl. ¶ 18; RCRA Compl. ¶ 20; PPG Ex. 7.)  The Agreement and

Stipulation required PPG to submit a remediation plan that would either eliminate the continuing

discharges or treat the discharges in perpetuity.  (CWA Compl. ¶ 19; RCRA Compl. ¶ 21.)

Plaintiffs note that it has now been more than 40 years since PPG signed the Agreement and

Stipulation agreeing to stop or treat the discharges.

_____

[1] Civ. A. No. 12-342, ECF No. 1; Civ. A. No. 12-527 ECF No. 1.  All citations herein, other than
to the RCRA Complaint, refer to Civ. A. No. 12-342.

On August 1, 1972, PPG submitted a remediation plan that proposed continuing untreated discharge into the Allegheny River.  (CWA Compl. ¶ 20; RCRA Compl. ¶ 22.)  On October 16, 1972, PPG sold the Site to Ford City for one dollar.  (CWA Compl. ¶ 21; RCRA Compl. ¶ 23; PPG Ex. 5.)  On or about March 16, 1973, PADEP informed PPG that its plan was unacceptable and requested that PPG revise the plan to provide for treatment of the discharge.  On or about May 16, 1973, PPG withdrew its plan.  (CWA Compl. ¶ 22; RCRA Compl. ¶ 24; PPG Ex. 8.)

Plaintiffs allege that, since at least April 16, 1973, PPG has been required to obtain a National Pollutant Discharge Elimination System ("NPDES") permit for the Site and has failed to do so.  (CWA Compl. ¶ 23.)  PADEP informed PPG at least as early as February 21, 1992, that PPG was required to obtain a permit under the CSL, but PPG has failed to do so.  (CWA Compl. ¶ 24; PPG Ex. 11.)  PPG notes that, in response to the notice, it prepared a Remedial Investigation Work Plan which the Department approved in November 1992.  (PPG Ex. 14.)

PPG indicates that, based on the previous studies and work that had been done on the Site to mitigate risk to human health and the environment, it entered the Site into Pennsylvania's Land Recycling Program (commonly known as "Act 2") in 2001.  Pennsylvania's Act 2 program allows owners and operators to "voluntarily" (i.e., without the issuance of a PADEP Order) remediate properties under the supervision of PADEP.  The study and remediation of a property under Act 2 can take place either before or after an owner/operator has formally submitted the property to the Act 2 process.  Nonetheless, PADEP must approve all work plans and remediation plans and has the ability to require changes and revisions in order to assure compliance with Act 2 remediation standards.   PPG submitted the Site to the Act 2 process by filing a Notice of Intent to Remediate ("NIR") in 2001, pursuant to which PPG committed to ensure that the Site, including the leachate from the slurry lagoon area at issue in Plaintiffs'

Complaints, met the Act 2 statutory site-specific remediation standards.  (PPG Exs. 17, 18.)  As part of the Act 2 process, PPG submitted a Remedial Investigation Report for the slurry lagoon area on July 31, 2001 and an Addendum on October 15, 2001. (PPG Exs. 19, 20.)  PADEP approved these reports on October 19, 2001.  (PPG Ex. 21.)

PPG states that, in order to construct the selected remedy, in 2001, it developed and submitted to PADEP an NPDES Permit Application for Discharges Associated with Construction Activities that contained an Erosion and Sedimentation (E&S) Control Plan to address the leachate seeps during the construction phase.  (PPG Ex. 22.)  However, PADEP did not approve this E&S Plan, but instead issued PPG an interim discharge permit on November 19, 2002 that required the collection and treatment of seeps resulting from the leachate from the slurry lagoon area during construction.  (PPG Ex. 23.)

On March 9, 2009, PADEP issued an Administrative Order ("2009 Administrative Order"), in which it stated that "[t]he Department believes that the discharges coming from the site and entering into the Allegheny River and Glade Run pose a significant threat to public health and the environment." (CWA Compl. ¶ 26; RCRA Compl. ¶ 27; PPG Ex. 1 at PADEP 1.) The site referred to in the 2009 Administrative Order includes at least the slurry lagoons and solid waste disposal area.  The 2009 Administrative Order states that "[p]recipitation which infiltrates the Slurry Lagoons and the Landfill at the Site becomes contaminated with *hazardous substances.*"  (CWA Compl. ¶ 27; RCRA Compl. ¶ 28; PPG Ex. 2 ¶ 14.)  In addition, the 2009 Administrative Order states that "[e]nvironmental assessments have found that the Slurry Lagoons at the Site are contaminated with various *hazardous substances* [including] antimony, arsenic, and lead."  (PPG Ex. 2 ¶ 13.)

The Order stated that discharges seep out "at various locations at the Site and then flow

or are conveyed into the waters of the Commonwealth," including the Allegheny River and

Glade Run. Leachate discharged into Glade Run, in turn, is discharged into the Allegheny River.

Leachate seeps through fissures on the cliff face of the south side of the Site and is discharged to

the Allegheny River through culverts under the railroad tracks that are at the base of the cliff.

Leachate also enters the Allegheny River through "Outfall 001," which was constructed by PPG.

(CWA Compl. ¶ 28; RCRA Compl. ¶ 29; PPG Ex. 2 ¶ 15.) The Order also stated that the

discharges, "which are pollutional and have a very high pH and contain metals and other toxic

chemicals, continue unabated as of the date of this Administrative Order." (CWA Compl. ¶ 30;

RCRA Compl. ¶ 31; PPG Ex. 2 ¶ 12.)

The Order required PPG to conduct "interim monitoring and reporting of the quality and

quantity" of certain seeps, to "sample the receiving streams above and below the points of

discharge," and to monitor weekly both the seeps and streams for certain parameters. (PPG Ex.

2 at 4-5 ¶ A.) The Order required PPG to submit an interim abatement plan within 30 days and

to submit a treatment plan within 90 days. (PPG Ex. 2 at 5 ¶¶ C, D.) Subparagraph (ii) of

paragraph D required PPG to identify in its Treatment Plan, inter alia, "the necessary NPDES

permit(s) for the authorization of the discharges associated with the collection and treatment

system" and to "provide a schedule for applying for the necessary permits." (CWA Compl.

¶¶ 31-33.)

On July 2, 2009, PADEP approved PPG's May 26, 2009 Addendum to Interim

Abatement Plan (the "July 2 Addendum"), such that PPG was directed to:

> collect wastewater from the Site and treat that wastewater in a treatment system
> that will be designed to address any accumulated sludge that may result from
> treatment and neutralization. PPG shall install, operate, and maintain the
> collection and treatment system in accordance with the requirements of
> Attachment A. In addition, PPG shall design the collection system using pipes,
> therefore, avoiding the collection and treatment of uncontaminated storm water

runoff.  Finally, PPG shall submit a final design before construction commences.
This will allow the Department to review the final plan.

(CWA Compl. ¶ 34; Pls.' Br. (ECF No. 43) Ex. 1.)  Attachment A to the July 2 Addendum

required that "PPG shall monitor the discharges from any temporary system" and comply with

certain effluent limitations in accordance with the table listed therein.  (ECF No. 43 Ex. 1 Attach.

A.)  Plaintiffs allege that, based on the monthly Effluent Monitoring Data reports submitted by

PPG to PADEP for the period February 2010 through December 2011, they have identified 162

discharge violations and 33 reporting violations.  (CWA Compl. ¶ 31 & Exs. 2, 3.)

Paragraph 3 of Attachment A of the July 2 Addendum states that "[n]o untreated or

ineffectively treated wastewaters shall be discharged into the waters of the Commonwealth…."

Under the CSL, "waters of the Commonwealth" includes "any and all rivers, streams, creeks,

rivulets, impoundments, ditches, water courses, storm sewers, lakes, dammed water, ponds,

springs and all other bodies or channels of conveyance of surface and underground water, or

parts thereof, whether natural or artificial, within or on the boundaries of this Commonwealth."

35 P.S. § 691.1.  (CWA Compl. ¶ 34.)

In addition, Plaintiffs allege that the discharge from Outfall 001 is being treated only for

pH and not any other pollutant.  Thus, they allege that PPG is discharging untreated or

ineffectively treated wastewaters into the Allegheny River.  (CWA Compl. ¶ 35.)

In June 2009, PPG submitted a Treatment Plan (PPG Ex. 28), which PADEP approved on

November 9, 2011.  (CWA Compl. ¶ 36; PPG Ex. 30).  PPG notes that the Treatment Plan

provided for the submission to PADEP of a Treatment Plan Report evaluating potential remedial

strategies for the collection and treatment of seeps discharging from the Site and implementation

of the selected remedy, once approved, on a schedule.  PPG submitted this report in December

2012.  (PPG Ex. 31.)  PPG states that the report "is currently under review by PADEP."  (PPG

Br. (ECF No. 25) at 11.)

Plaintiffs allege that PPG's Treatment Plan fails to provide a schedule for the application

for NPDES permits and, based on the monthly progress reports submitted by PPG beginning on

April 1, 2009, through at least January 5, 2012 , PPG took no steps to apply for such permits.

(CWA Compl. ¶ 33.)

Procedural History

On January 13, 2012, Plaintiffs gave notice of their intent to file suit to the Administrator

of the United States Environmental Protection Agency (EPA), the PADEP and Defendants as

required by the CWA, CSL and RCRA.  33 U.S.C. § 1365(b)(1)(A); 35 P.S. § 691.601(e); 42

U.S.C. § 6972(b)(2)(A).  (CWA Compl. ¶ 4 & Ex. 1; RCRA Compl. ¶ 4 & Ex. 1.)  On March 20,

2012, Plaintiffs filed a complaint against Defendants under the CWA and the CSL (the "CWA

Complaint").  The case was docketed at Civ. A. No. 12-342.  Count I alleges that that PPG has

unlawfully discharged pollutants into navigable waters without an NPDES permit and continues

to do so in violation of Sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342.  Count

II alleges that PPG has violated and continues to violate sections 301(a) and 402(p)(2)(B), 33

U.S.C. §§ 1311(a), 1342(p)(2)(B), by discharging storm water associated with industrial activity

without a permit authorizing such discharge.  Count III alleges that PPG has violated and

continues to violate Sections 301 and 307 of the CSL, 35 P.S. §§ 691.301, 691.307, by

discharging industrial waste into the Allegheny River, Glade Run, and groundwater associated

with the Site without authorization or a permit obtained from PADEP, which constitutes a

nuisance under Section 307(c).  Count IV alleges that PPG has violated and continues to violate

Section 401 of the CSL, 35 P.S. § 691.401, by discharging pollutants and discharging waste

containing high levels of pH, into the Allegheny River, Glade Run, and groundwater without a

permit issued by PADEP authorizing such discharges.  Count V alleges that PPG has violated the

CWA in that the Treatment Plan it submitted in June 2009 fails to provide a schedule for the

application for NPDES permits and, based on the monthly progress reports submitted by PPG

beginning on April 1, 2009, through at least January 5, 2012, PPG took no steps to apply for such

permits and Plaintiffs allege, on information and belief, that PPG has failed to provide a schedule

for the application of NPDES permits and has taken no steps to apply for such permits.  Count

VI alleges that PPG's acts as alleged in Count V also violate section 611 of the CSL, 35 P.S.

§ 691.611.  Count VII alleges that PPG has discharged, and continues to discharge, untreated and

ineffectively treated wastewater, in violation of the July 2 Addendum, and Count VIII alleges

that these acts also violate section 611 of the CSL.  Count IX alleges that PPG has violated the

CWA by committing 162 discharge violations between February 2010 and December 2011, in

violation of the 2009 Administrative Order, and Count X alleges that these acts also violate

section 611 of the CSL.  Count XI alleges that PPG has violated the CWA by committing 33

reporting violations between February 2010 and December 2011, in violation of the 2009

Administrative Order, and Count XII alleges that these acts also violate section 611of the CSL.

On April 20, 2012, Plaintiffs filed another complaint against Defendants under the RCRA

(the "RCRA Complaint").  They allege that PPG is a generator and/or transporter of the solid or

hazardous waste at the Site, as well as an owner and/or operator of the site, and has contributed

to the past or present handling, storage, treatment, transportation, or disposal of the solid or

hazardous waste at the Site, thereby presenting an imminent and substantial endangerment to

health or the environment.[2]  This case was docketed at Civ. A. No. 12-527.  On May 25, 2012,

---

[2] Both complaints state that Plaintiffs are not pursuing a claim or specific relief against Ford City, but that it is joined as an indispensable party under Rule 19(a).  (CWA Compl. ¶ 13 & at 23-24; RCRA Compl. ¶ 15 and at 11.)

Plaintiffs filed a motion to consolidate the two cases (ECF No. 11).  On May 29, 2012, an order was entered granting this motion and consolidating the cases at No. 12-342 (ECF No. 12).

On February 28, 2013, PPG filed a motion to dismiss the complaints (ECF No. 24), accompanied by a brief and several volumes of exhibits (ECF Nos. 25-28).  Ford City then filed a motion to dismiss which incorporated the arguments made by PPG in its motion and also argued that the RCRA Complaint contained no allegations that it had any involvement with the waste at issue (ECF No. 29).

On March 20, 2013, Plaintiffs moved for an extension of time in which to reply (ECF No. 33), contending that PPG's motion, the first and lengthiest argument of which concerned the doctrine of primary jurisdiction, was either: 1) a motion for summary judgment for which they needed to take discovery in order to properly respond; or 2) a motion under Rule 12(b)(1) for which they would need to conduct discovery to respond to factual challenges to the Court's subject matter jurisdiction; in the alternative they argued that PPG should be directed to re-file its motion under Rule 12(b)(6) without submitting matters and arguments outside the pleadings. PPG filed a response to this motion on April 2, 2013 (ECF No. 37) and Plaintiffs filed a reply brief on April 9, 2013 (ECF No. 38).

On April 10, 2013, the Court entered an order stating that:

IT IS HEREBY ORDERED that the motions to dismiss will not be treated as motions for summary judgment or motions challenging the Court's subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), but will be treated as motions pursuant to Federal Rule of Civil Procedure 12(b)(6) and Plaintiffs do not need to conduct discovery in order to respond to the substance of the motions under the appropriate standard of review;

IT IS FURTHER ORDERED that some of materials submitted by PPG will be considered because they are public records which indicate that the PADEP has been involved in the development and implementation of procedures for the remediation of the Ford City Site at issue in this case, but the substance of the documents will not be considered to establish the details of the remediation or the

extent to which it has progressed or succeeded, and other materials which are not
public records will not be considered at all.

(ECF No. 39.)  On April 24, 2013, Plaintiffs filed their response to the motion to dismiss (ECF

No. 43) and on May 14, 2013, PPG filed a reply brief (ECF No. 45).

Standard of Review

The Supreme Court has issued two decisions that pertain to the standard of review for a

motion to dismiss for failure to state a claim upon which relief could be granted under Federal

Rule of Civil Procedure 12(b)(6).  The Court held that a complaint must include factual

allegations that "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S.

662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "[W]ithout some

factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she

provide not only 'fair notice' but also the 'grounds' on which the claim rests." Phillips v.

County of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008).  In determining whether a plaintiff has

met this standard, a court must reject legal conclusions unsupported by factual allegations,

"[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory

statements;" "labels and conclusions;" and "'naked assertion[s]' devoid of 'further factual

enhancement.'" Iqbal, 556 U.S. at 678 (citations omitted). Mere "possibilities" of misconduct are

insufficient.  Id. at 679.  District courts are required to engage in a two part inquiry:

> First, the factual and legal elements of a claim should be separated. The District
> Court must accept all of the complaint's well-pleaded facts as true, but may
> disregard any legal conclusions…. Second, a District Court must then determine
> whether the facts alleged in the complaint are sufficient to show the plaintiff has a
> "plausible claim for relief." … In other words, a complaint must do more than
> allege the plaintiff's entitlement to relief. A complaint has to "show" such an
> entitlement with its facts.

Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009) (citations omitted).

"Although a district court may not consider matters extraneous to the pleadings, 'a

10

document *integral to or explicitly relied* upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment.'" U.S. Express Lines, Ltd. v. Higgins, 281 F.3d 383, 388 (3d Cir. 2002) (quoting In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997)).  In addition, "[c]ourts ruling on Rule 12(b)(6) motions may take judicial notice of public records." Anspach ex rel. Anspach v. City of Phila., 503 F.3d 256, 273 n.11 (3d Cir. 2007).  Plaintiffs have agreed that the following PPG exhibits are either integral to their allegations or are public records: Exs. 1, 2, 5, 7, 8, 11, 14, 21, 23, 27, 28, 29 (progress reports through January 2012), 30 and 32.  (ECF No. 43 at 3 n.4.)

Pursuant to the case law, Plaintiffs' agreement and this Court's order of April 10, 2013, the Court will take judicial notice of those documents submitted by PPG that are integral to Plaintiffs' claims or that constitute public records which indicate that PADEP has been involved in the development and implementation of procedures for the remediation of the Site at issue in this case, but the substance of the documents will not be considered to establish the details of the remediation or the extent to which it has progressed or succeeded, and other materials which are not integral to their claims and are not public records will not be considered at all.  Individual discussion of these documents will occur as needed below.

However, it is noted that PPG's final ground for dismissal concerns the issue of standing. "A motion to dismiss for want to standing is … properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter." Ballentine v. United States, 486 F.3d 806, 810 (3d Cir. 2007) (citations omitted).[3]  The first issue a court must decide in reviewing a Rule 12(b)(1)

---

[3] This Court's order of April 10, 2013 erroneously stated that the motions to dismiss did not raise subject matter jurisdiction arguments because Plaintiffs did not refer to the standing argument in their motion for extension of time, nor did PPG address this issue in its response and Plaintiffs did not mention it in their reply brief.  Nevertheless, as explained in the text, it is not necessary to refer to documents outside the pleadings to resolve the issue of standing in this case.

motion is whether the challenge to the court's subject matter jurisdiction is a facial or factual

attack.  "In reviewing a facial attack, the court must only consider the allegations of the

complaint and documents attached thereto, in the light most favorable to the plaintiff.  In

reviewing a factual attack, the court may consider evidence outside the pleadings."  <u>Gould Elec.,</u>

<u>Inc. v. United States</u>, 220 F.3d 169, 176 (3d Cir. 2000) (footnote and citations omitted).  "Facial

attacks ... contest the sufficiency of the pleadings, and the trial court must accept the complaint's

allegations as true."  <u>Turicentro, S.A. v. American Airlines, Inc.</u>, 303 F.3d 293, 300 n.4 (3d Cir.

2002) (citation omitted).

Plaintiffs assert that PPG only challenges the legal sufficiency of the complaints and thus

its attack is a facial one for which the Court must consider the allegations of the complaint as

true.  PPG contends that "resolution of the matter turns on the factual determination of whether

PADEP has primary jurisdiction over the issues alleged by Plaintiffs with respect to [the Site]."

(ECF No. 25 at 13-14.)  PPG has muddied the waters by confusing standing with primary

jurisdiction (which, as explained below, is not a jurisdictional issue).  PPG's attack on Plaintiffs'

standing to maintain this suit is a facial one which does not require reference to materials outside

the complaint.

The Court of Appeals has explained that:

> In evaluating whether a complaint adequately pleads the elements of
> standing, courts apply the standard of reviewing a complaint pursuant to a Rule
> 12(b)(6) motion to dismiss for failure to state a claim: "Court[s] must accept as
> true all material allegations set forth in the complaint, and must construe those
> facts in favor of the nonmoving party." <u>Ballentine</u>, 486 F.3d at 810 (citing <u>Warth</u>
> <u>v. Seldin</u>, 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)); <u>see also</u>
> <u>Baldwin v. Univ. of Pittsburgh Med. Ctr.</u>, 636 F.3d 69, 73 (3d Cir. 2011) ("A
> dismissal for lack of statutory standing is effectively the same as a dismissal for
> failure to state a claim."). The Supreme Court most recently explained this
> standard in <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 127 S.Ct. 1955, 167
> L.Ed.2d 929 (2007), and <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 129 S.Ct. 1937, 173
> L.Ed.2d 868 (2009): "[A] complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.' " Iqbal, 129 S.Ct. at 1949 (quoting Twombly, 550 U.S. at 570, 127 S.Ct. 1955)….

While the plausibility standard does not impose a "probability requirement," it does demand "more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 129 S.Ct. at 1949 (citing Twombly, 550 U.S. at 556, 127 S.Ct. 1955). Pursuant to Iqbal's clarification of the plausibility determination as a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense," id., this Court has found that "[s]ome claims require more factual explication than others to state a plausible claim for relief." West Penn Allegheny Health Sys., Inc. v. UPMC, 627 F.3d 85, 98 (3d Cir.2010). We have reasoned that, "[f]or example, it generally takes fewer factual allegations to state a claim for simple battery than to state a claim for antitrust conspiracy." Id.

"A complaint has to 'show' such an entitlement with its facts." Fowler v. UPMC Shadyside, 578 F.3d 203, 211 (3d Cir. 2009). With respect to 12(b)(1) motions in particular, "[t]he plaintiff must assert facts that affirmatively and plausibly suggest that the pleader has the right he claims (here, the right to jurisdiction), rather than facts that are merely consistent with such a right." Stalley v. Catholic Health Initiatives, 509 F.3d 517, 521 (8th Cir. 2007).

In re Schering Plough Corp. Intron/Temodar Consumer Class Action, 678 F.3d 235, 243-44 (3d Cir. 2012).[4]

Defendants argue that: 1) Counts I-VIII of the CWA Complaint and the imminent and substantial danger claim in the RCRA Complaint should be dismissed or stayed based on the doctrine of primary jurisdiction abstention; 2) Counts I, II, III, IV, VII and VIII should be dismissed to the extent that they encompass NPDES permitting requirements for nonpoint sources, which are not within the scope of CWA citizen suits; 3) Counts I, II, III, IV, VII and VIII should be dismissed to the extent they allege a failure to obtain a CWA permit for a point source discharge because PPG does have authorization to discharge through Outfall 001 (and

---

[4] Plaintiffs cite a case from the Ninth Circuit which stated that Twombly and Iqbal are "ill-suited" to the issue of standing.  Maya v. Centex Corp., 658 F.3d 1060, 1068 (9th Cir. 2011). However, as Defendants observe, the Court of Appeals for the Third Circuit in Schering Plough has incorporated Twombly and Iqbal into its standing analysis, and that decision is binding on this Court.

PPG did not have to obtain a permit other than for Outfall 001 because Ford City was the owner or operator of the Site at all relevant times, and the CWA, enacted in 1972, cannot be applied retroactively) and PPG is complying with the 2009 Administrative Order by treating for pH (and to the extent Plaintiffs are challenging the treatment of other pollutants, they are not covered by the Order and thus Plaintiffs are attacking PADEP's judgment); 4) Counts V and VI must be dismissed because CWA allows for citizen suits to enforce effluent standards and limitations, not arising out of failure to contain a schedule for the application of NPDES permits and, in any event, the Plan did contain a schedule and PADEP approved it; 5) Counts IX and X must be dismissed for failure to comply with mandatory notice requirements in that there is no list of discharge violations for July 2010 or November 2010; 6) Counts IX and X must also be dismissed because they concern only past violations, not ongoing ones; 7) Counts XI and XII must be dismissed because they concern only past reporting violations, not ongoing ones; 8) the RCRA Complaint fails to state an imminent and substantial danger claim as to plumbing fixture landfill or the baseball fields (PPG had no involvement with them); and 9) Plaintiffs lack standing to pursue RCRA and CWA claims because citizen suits do not automatically confer standing and groups do not have unique, particularized interest beyond that possessed by the public at large.  Ford City incorporates PPG's arguments and also argues that the RCRA Complaint contains no allegations that it had any involvement, let alone the active involvement required for liability, with the waste at issue.

Plaintiffs respond that: 1) the doctrine of primary jurisdiction does not apply; 2) Counts I and II are properly asserted under the CWA which regulates only point source discharges and Counts III, IV, VII and VIII are properly asserted under the CSL which regulates both point source and nonpoint source discharges; 3) Plaintiffs do not complain of only one point source

discharge (Outfall 001), but also allege discharges from the "Drainage Ditch," culverts and seeps, all of which are point sources, and these allegations are sufficient to withstand a motion to dismiss, Plaintiffs are alleging that PPG must have an NPDES permit to discharge pollutants through each point source on the Site, not just for Outfall 001, the 2009 Administrative Order is not an NPDES permit or a substitute for one, PPG's argument that it is not the owner or operator of the Site contradicts the allegations of the complaints and documents of record (and under the CWA, PPG can be held liable for discharging pollutants whether it owns or operates the Site or not), Plaintiffs are seeking to hold PPG liable for discharges after the CWA became effective, and whether PPG is complying with the 2009 Administrative Order is a matter in dispute; 4) Counts V and VI arise out of the 2009 Administrative Order and are not moot because nothing in PADEP's November 9, 2011 letter (assuming it can be considered) substantively addresses PPG's proposed Treatment Plan; 5) Plaintiffs provided adequate notice of the violations in Counts IX and X and PPG's contention to the contrary cites a few typographical errors that in no way prevented PPG from being able to identify the relevant violations; 6) Counts IX and X properly allege ongoing discharge violations; 7) Counts XI and XII properly allege ongoing reporting violations; 8) the RCRA Complaint extends to the full property, including the ballfields and the plumbing fixture landfill area; and 9) Plaintiffs have properly pled that they have standing, both as organizations which have suffered injury from PPG's pollution and as representatives of thousands of members who reside in the vicinity of, or own property or recreate in, on or near the waters of the Allegheny River affected by the discharge of pollutants from the Site.  Finally, with respect to Ford City's motion to dismiss, Plaintiffs respond that they do not state any causes of action against Ford City, but it is named as an indispensable party pursuant to Federal Rule of Civil Procedure 19(a) based on its status as owner of the Site.

In its reply brief, PPG argues that: 1) Plaintiffs cannot allege that leachate seeps and uncontrolled storm water discharges are point source discharges, because this is a legal issue and under the law, these discharges are nonpoint source discharges for which no permit is necessary, and requiring a permit to address PPG's historical disposal or industrial activities would constitute retroactive application of the CWA; 2) Counts I-IV alleged only one point source, Outfall 001, and since this discharge has been mandated by PADEP's 2009 Order and July 2 Addendum, it is "permitted" or "authorized" within the meaning of the CWA, and even if the Court determined that PPG is liable for failing to have a formal NPDES permit, the only relief the Court could provide would be either for PPG to obtain a permit -- which PADEP has already done -- or for PPG to eliminate the discharges from the Site -- which would conflict with PADEP's order; 3) Plaintiffs cannot allege that there are "ongoing violations" as they have cited only discrete instances of effluent exceedances, and there are no ongoing reporting violations; 4) with respect to the Eljer landfill, Plaintiffs have failed to allege that PPG handled, stored, treated, transported, or disposed of solid waste or hazardous waste in these areas, thus the RCRA claims are missing this essential element; 5) under controlling Third Circuit precedent, Plaintiffs lack both representational standing, particularly because they have not alleged how a favorable decision would redress their individual members' alleged injuries, and standing in their own right, because they allege only an injury to their organizational missions, which is insufficient, nor can they establish "informational" injury based on reports that PPG submitted a few days late to PADEP; and 6) Plaintiffs falsely contend that the records to which PPG refers are not public records and erroneously argue about subject matter jurisdiction when PPG is contending that the Court should decline to exercise its jurisdiction based on the doctrine of primary jurisdiction, and their arguments fail because PADEP is actively involved in enforcement and oversight of the

Site.

Standing

As noted above, the issue of standing challenges the Court's subject matter jurisdiction.

Ballentine, 486 F.3d at 810.  Therefore, this issue must be addressed first.  See Steel Co. v.

Citizens for a Better Environment, 523 U.S. 83, 93-102 (1998).

The Supreme Court has held that:

> In every federal case, the party bringing the suit must establish standing to prosecute the action. "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). The standing requirement is born partly of "'an idea, which is more than an intuition but less than a rigorous and explicit theory, about the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government.'" Allen v. Wright, 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (quoting Vander Jagt v. O'Neill, 699 F.2d 1166, 1178–1179 (C.A.D.C. 1982) (Bork, J., concurring)).

Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 11 (2004).  The Court explained that:

> our standing jurisprudence contains two strands: Article III standing, which enforces the Constitution's case-or-controversy requirement, see Lujan v. Defenders of Wildlife, 504 U.S. 555, 559–562, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); and prudential standing, which embodies "judicially self-imposed limits on the exercise of federal jurisdiction," Allen, 468 U.S., at 751, 104 S.Ct. 3315. The Article III limitations are familiar: The plaintiff must show that the conduct of which he complains has caused him to suffer an "injury in fact" that a favorable judgment will redress. See Lujan, 504 U.S., at 560–561, 112 S.Ct. 2130. Although we have not exhaustively defined the prudential dimensions of the standing doctrine, we have explained that prudential standing encompasses "the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." Allen, 468 U.S., at 751, 104 S.Ct. 3315. See also Secretary of State of Md. v. Joseph H. Munson Co., 467 U.S. 947, 955–956, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984). "Without such limitations—closely related to Art. III concerns but essentially matters of judicial self-governance—the courts would be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights." Warth, 422 U.S., at 500, 95

S.Ct. 2197.

Id. at 11-12.  An association may have standing in its own right or as a representative of its members who have been injured in fact.  Pennsylvania Psychiatric Society v. Green Spring Health Servs., Inc., 280 F.3d 278, 283 (3d Cir. 2002) (citations omitted).

However, the manner in which standing must be supported depends upon the stage of the litigation at which the issue is raised:

> At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we "presum[e] that general allegations embrace those specific facts that are necessary to support the claim." [Lujan v.] National Wildlife Federation, 497 U.S. [871], 889, 110 S.Ct. [3177,] 3189 [(1990)]. In response to a summary judgment motion, however, the plaintiff can no longer rest on such "mere allegations," but must "set forth" by affidavit or other evidence "specific facts," Fed.Rule Civ.Proc. 56(e), which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be "supported adequately by the evidence adduced at trial." Gladstone [Realtors v. Village of Bellwood], 441 U.S. [91], at 115, n. 31, 99 S.Ct. [1601,] 1616 n.31 [(1979)].

Defenders of Wildlife, 504 U.S. at 561.

In a case involving an association (FOE) that brought a citizen suit under the CWA alleging noncompliance with an NPDES permit, the Supreme Court explained that:

> In Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), we held that, to satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).

Friends of the Earth, Inc. v. Laidlaw Envt'l Servs (TOC), Inc., 528 U.S. 167, 180-81 (2000).

"The relevant showing for purposes of Article III standing … is not injury to the environment but injury to the plaintiff." Id. at 181.  In addition, "a plaintiff must demonstrate standing separately for each form of relief sought." Id. at 185.  The Court observed that "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." Id. at 183 (citations omitted).  The Court held that FOE demonstrated on a fully developed record that it had standing to seek both injunctive relief and civil penalties when it submitted affidavits from various members indicating that they used the North Tyger River and the area around it for fishing, camping, swimming, picnicking and other activities, but could not do so any longer because of Laidlaw's discharges into the river. Id. at 181-84. See also Interfaith Cmty. Org. v. Honeywell Int'l, Inc., 399 F.3d 248, 254 (3d Cir. 2005) (although a plaintiff must have suffered an invasion of a concrete and particularized legally protected interest, "an identifiable trifle is enough.")

PPG cites Public Interest Research Group of New Jersey, Inc. v. Magnesium Elektron, Inc., 123 F.3d 111 (3d Cir. 1997).  In that case, the Court of Appeals held that the plaintiff (PIRG) did not meet the standing requirement when it alleged that its members' enjoyment of the Delaware River was lessened because they "knew" that it had been polluted, noting that this was a "generalized grievance" that was not a judicially cognizable injury. Id. at 120-21.  Plaintiffs respond that Magnesium Elektron: 1) is not good law because it was implicitly overruled by the Supreme Court's holding in Laidlaw that the relevant issue is injury to the plaintiff, not the environment; and 2) was a case about representational standing, but the Court must first determine whether they have standing in their own right, which they have met by citing their members' alleged injuries based on discharges that are alleged to cause serious harm to the

environment.

Plaintiffs have demonstrated that <u>Magnesium Elektron</u> is distinguishable from this case, because they are not merely alleging that their members' enjoyment of the environment has been lessened because they "know" that it has been polluted.  In addition, that case was decided at the post-trial stage, not upon a motion to dismiss.[5]

PennEnvironment has approximately 15,000 members and Sierra Club has 24,000 members living in Pennsylvania, many of whom reside in counties that border the Allegheny River, and members of both groups "reside in the vicinity of, or own property or recreate in, on, or near the waters of the Allegheny River affected by the discharge of pollutants from the PPG Waste Site." (CWA Compl. ¶¶ 7-9.)  Plaintiffs have alleged that "PPG's discharge of pollutants … has adversely affected, is adversely affecting, and will continue adversely to affect, the health, economic, recreational, aesthetic, and environmental interests of PennEnvironment and the Sierra Club's members" and that their "ability to protect and improve the waters of Pennsylvania requires accurate and complete information regarding the discharge of pollutants," and PPG's actions interfere with their efforts.  (CWA Compl. ¶¶ 9, 10.)  As Plaintiffs note, the allegations of the CWA Complaint are nearly identical to allegations made (by the same lead counsel) and found to be sufficient in the <u>Laidlaw</u> case.  (ECF No. 43 Ex. 11 ¶¶ 8, 9.)  They contend that there is "nothing 'improbable' about the proposition that a company's continuous and pervasive illegal

---

[5] PPG also argues that this Court has cited <u>Magnesium Elektron</u> with approval as recently as 2011 in <u>PennEnvironment v. Genon Northeast Mgmt. Co.</u>, Civ. A. No. 07-475.  In the Court's first citation to <u>Magnesium Elektron</u>, it was noted that, although generalized grievances shared by the public at large are insufficient to confer standing, "where an environmental plaintiff has demonstrated that his or her use of the affected area has been curtailed or that the aesthetic and recreational value of the area has been or will be lessened, an injury in fact will be found." ECF No. 81 at 19 (Oct. 8, 2010).  Subsequently, in an opinion *granting* the plaintiffs' motion for partial summary judgment, the Court found that the testimony of several individuals "all but mirrored" that set forth in <u>Laidlaw</u> and was sufficient.  ECF No. 117 (Mar. 21, 2011).

discharges of pollutants into a river would cause nearby residents to curtail their recreational use

of that waterway and would subject them to other economic and aesthetic harms."  Laidlaw, 528

U.S. at 184.  See also Building & Constr. Trades Council of Buffalo, N.Y. & Vicinity v.

Downtown Dev., Inc., 448 F.3d 138, 146 (2d Cir. 2006) (accepting similar allegations as

sufficient for standing purposes).

In addition, Plaintiffs allege in the RCRA Complaint that PPG's discharges may present

an imminent and substantial endangerment to human health and the environment, citing

PADEP's 2009 Administrative Order which details the "significant threat to public health and

the environment."  (RCRA Compl. ¶ 27.)  The complaints cite the Order's statement that "[t]he

industrial waste discharges from the Site, which are pollutional and have a very high pH and

contain metals and other toxic chemicals, continue unabated as of the date of this Administrative

Order."  (RCRA Compl. ¶ 31; CWA Compl. ¶ 30.)  The complaints specify, inter alia, that

leachate seeps from PPG's slurry lagoons "at various locations" into the Allegheny River and

Glade Run, including "through fissures on the cliff face on the south side of the PPG Waste Site"

and "through an outfall constructed by PPG."  (RCRA Compl. ¶ 29; CWA Compl. ¶ 28.)  As a

consequence, Plaintiffs allege that PPG's pollution "present[s] or may present an imminent and

substantial endangerment to human health and/or the environment due to the level of

contaminants including arsenic, chromium, lead, manganese, copper, zinc, mercury, antimony,

barium, beryllium, iron, vanadium, aluminum, total dissolved solids or salts, and semi-volatile

organic compounds." (RCRA Compl. ¶ 32.)  They contend that these allegations are more than

sufficient to confer standing.  See Village of Riverdale v. 138th Street Joint Venture, 527 F.

Supp. 2d 760, 765 (N.D. Ill. 2007) (finding sufficient the allegations that the defendants'

"activities have caused, and continue to cause, the release of solid wastes to air, soils, subsurface

soils, sediments, surface water and groundwater and physical structures at the Subject Property,

which release presents an imminent and substantial endangerment to health or the environment,

within the meaning of 42 U.S.C. § 6972(a)(1)(B).")

Plaintiffs argue that they do not need to identify specific members who have been injured

at this stage of the proceedings.  See Building & Constr. Trades Council, 448 F.3d at 145 (there

is no authority for the proposition that an association must "name names" in a complaint in order

properly to allege injury in fact to its members.)[6]  They further contend that they have adequately

pled the relief they seek: an injunction against unpermitted discharges (CWA Compl. at 23 ¶ C),

remediation of the contaminated sediments in the Allegheny River and Glade Run (id. ¶ D;

RCRA Compl. at 10 ¶ C), remediation of the Site (id. ¶ B), an injunction against contamination

of surface water and groundwater (id. ¶¶ D-E) and civil penalties (CWA Compl. at 23 ¶ E.)

They note that this is more than was pled in Village of Riverdale, 527 F. Supp. 2d at 767, which

was held to be sufficient.

Plaintiffs contend that they not just alleged a generalized grievance that inures to the

benefit of all citizens, but have instead alleged specific and concrete ways in which PPG's CWA

violations interfere with their particular interests.  Specifically, they have alleged that PPG's

discharges have interfered with their efforts to conserve, protect and restore Pennsylvania's

waterways.  Moreover, they allege that PPG's failure to obtain permits and comply with those

permits' discharge, monitoring and reporting violations: "interfere with the efforts of

PennEnvironment and the Sierra Club to assess the compliance status of Pennsylvania

dischargers with water pollution control laws and report such status to their members";

---

[6] In the alternative, they have supplied five affidavits of members who assert that PPG's actions
have harmed their organizations' ability to protect and preserve Pennsylvania's rivers and
streams and their own ability to enjoy the environment.  (ECF No. 43 Exs. 6-10.)

"interfere with the efforts of [Plaintiffs] to propose legislation to amend the Clean Water Act or the Clean Streams Law"; and interfere with Plaintiffs' efforts to "bring litigation to prevent violations by PPG and thereby protect the waters of the Allegheny River affected by the discharge from the PPG Waste Site."  (CWA Compl. ¶ 10.)  They argue that this kind of informational injury has been recognized by various courts.  See American Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Comm'n, 389 F.3d 536, 546 (6th Cir. 2004) ("the injury alleged is not that the defendants are merely failing to obey the law, it is that they are disobeying the law in failing to provide information that the plaintiffs desire and allegedly need. This is all that plaintiffs should have to allege to demonstrate informational standing where Congress has provided a broad right of action to vindicate that informational right."); Sierra Club v. Simkins Indus., Inc., 847 F.2d 1109, 1113 (4th Cir. 1988) ("As a result of [CWA monitoring and reporting] violations, information on any harmful level of pollutants … during this time period is forever lost to environmental planners and policymakers and those who might undertake to remedy the effects of any pollution.")

PPG responds that these alleged "informational injuries" appear to arise out of instances in which it submitted reports to PADEP a few days after they were due (CWA Compl. Ex. 3), making them both "implausible" under Iqbal and unredressable in any event, since the reports have in fact been submitted.  However, PPG cites no authority in support of this "de minimis injury" argument.  Plaintiffs have alleged that PPG consistently fails to submit its reports on time, as required by the July 2 Addendum, and this is sufficient to confer standing for this informational injury.

As Plaintiffs note, they have made allegations found sufficient in other cases to establish their standing, both individually and as representatives of their members.  PPG has not cited a

case in which environmental organizations such as PennEnvironment and Sierra Club were

deemed to lack standing in situations comparable to this case. Rather, the cases cited by PPG

either were decided on motions for summary judgment or merely state general legal principles

but do not address circumstances such as those presented in this case. Therefore, the motion to

dismiss the complaints for lack of standing is denied.

Primary Jurisdiction

Defendants argue that Counts I-VIII of the CWA Complaint and the imminent and

substantial danger claim of the RCRA Complaint should be dismissed or stayed based on the

doctrine of primary jurisdiction. Plaintiffs deny that the doctrine applies.

Despite the name, "primary jurisdiction" is not a doctrine which would deprive a federal

court of jurisdiction over a case. Rather, it is:

> a doctrine specifically applicable to claims properly cognizable in court that
> contain some issue within the special competence of an administrative agency. It
> requires the court to enable a "referral" to the agency, staying further proceedings
> so as to give the parties reasonable opportunity to seek an administrative ruling.
> Referral of the issue to the administrative agency does not deprive the court of
> jurisdiction; it has discretion either to retain jurisdiction or, if the parties would
> not be unfairly disadvantaged, to dismiss the case without prejudice.

Reiter v. Cooper, 507 U.S. 258, 268-69 (1993) (footnote and citations omitted). The Court of

Appeals has noted that courts have applied a four-factor test for determining whether a court

should abstain on primary jurisdiction grounds:

> (1) Whether the question at issue is within the conventional experience of judges
> or whether it involves technical or policy considerations within the agency's
> particular field of expertise; (2) Whether the question at issue is particularly
> within the agency's discretion; (3) Whether there exists a substantial danger of
> inconsistent rulings; and (4) Whether a prior application to the agency has been
> made.

Raritan Baykeeper v. NL Indus., Inc., 660 F.3d 686, 691 (3d Cir. 2011) (quoting Global Naps,

Inc. v. Bell Atlantic-N.J., 287 F. Supp. 2d 532, 549 (D.N.J. 2003)). In Baykeeper, the district

court abstained from a citizen suit brought to bring about the remediation of contaminated sediments in the Raritan River based on the involvement and expertise of the New Jersey Department of Environmental Protection (NJDEP).  The court relied on both the primary jurisdiction doctrine and abstention pursuant to Burford v. Sun Oil Co., 319 U.S. 315 (1943).

The Court of Appeals first noted that both RCRA and CWA contain statutory provisions precluding citizen suits if the Administrator of the EPA or a state is "diligently prosecuting an enforcement action through formal proceedings."  660 F.3d at 690-91 (citing 42 U.S.C. § 6972(b)(2)(B) & (C) and 33 U.S.C. § 1365(b)(1)(B)).  The parties agreed that none of the statutory exceptions to citizen suits applied.  The court then held that the district court erred in abstaining under the primary jurisdiction doctrine because: 1) while NJDEP had expertise in environmental matters, federal courts are nonetheless competent to decide such cases, as evidenced by Congress's enactment of environmental statutes authorizing citizen suits in federal court; 2) neither the RCRA nor the CWA charged NJDEP with enforcing federal environmental laws; 3) there was minimal risk of inconsistent rulings, particularly given that NJDEP's most recent ruling concerning the topic was issued in 2004; and 4) application had previously been made to NJDEP and this factor favored the defendants, but this factor alone was insufficient to outweigh the others that disfavored abstention on primary jurisdiction grounds.  Id. at 691-92. The court noted that its decision was:

> consistent with the decisions of our sister circuits. The First Circuit explained that federal courts must "exercise great caution in considering abstention," and that "the circumstances justifying abstention will be exceedingly rare," because declining to hear a case for a reason not enumerated in the RCRA "would substitute our judgment for that of Congress about the correct balance between respect for state administrative processes and the need for consistent and timely enforcement of RCRA." Chico Serv. Station, Inc. [v. Sol P.R. Ltd.], 633 F.3d [20,] 31, 32 [(1st Cir. 2011)]. Similarly, the Seventh Circuit observed that, while "there may be room for applying the doctrines of abstention or primary jurisdiction ... in cases in which a state has a formal administrative proceeding in

progress that the citizens' suit would disrupt," abstention in RCRA ordinarily would amount to "an end run around the RCRA." PMC, Inc. v. Sherwin–Williams Co., 151 F.3d 610, 619 (7th Cir. 1998). The same logic also applies to CWA actions, since that statute similarly provides for citizen suits except under specific, enumerated circumstances, none of which apply here.

Id. at 694-95.

Although PPG acknowledges the standards set forth in Baykeeper, it does not explain why the case is distinguishable.  As a preliminary matter, it does not argue that any of the statutory provisions apply.[7]

With respect to the first factor, PPG argues that this case presents "highly technical" issues that would be better addressed by the PADEP, specifically:

> determining the appropriate treatment technology for the collection and treatment of the leachate seeps, the extent of contamination at the Ford City Site, its risk to human health and the environment, the appropriate remediation, the acceptable level of any remaining contamination, the issuance of a NPDES permit and the setting of effluent limits.

(ECF No. 25 at 25.)  Plaintiffs respond that PPG significantly overstates what the Court will be required to do in adjudicating their claims.  They state that the CWA Complaint will not require the Court to issue an NPDES permit, set effluent limits, or independently determine appropriate treatment technology.  Instead, the Court will be required to determine whether PPG has violated the CWA and the CSL, to declare that PPG has committed these violations and enjoin PPG from discharging pollutants without a permit.  Plaintiffs indicate that, with respect to the RCRA Complaint, the Court will be required to determine whether the Site presents an "imminent and substantial endangerment" under the statute, which will require an assessment of the contamination at the Site, and the Court may also be asked to determine the appropriate

---

[7] Plaintiffs note that the CSL also has a statutory provision precluding citizen suits if PADEP is "diligently prosecuting a civil action in a court of the United States or a state to require compliance with this act or any rule, regulation, order or permit issued pursuant to this act…" 35 P.S. § 691.601(e).  Defendants have not invoked this provision.

remediation and whether the remaining contamination is acceptable.  However, Plaintiffs note

that other courts have been competent to make such findings based on the expert testimony and

evidence offered by the parties and order necessary relief. See, e.g., Interfaith Cmty. Org. v.

Honeywell Int'l, Inc., 263 F. Supp. 2d 796 (D.N.J. 2003) (assessing expert testimony and making

factual findings and legal conclusions, including as to site remediation, under RCRA), aff'd, 399

F.3d 248, 267 (3d Cir. 2005) (rejecting Honeywell's argument "that the District Court lacked the

ability to 'appreciate the inherent complexity and difficulty' of making 'sound' remedial

decisions"); see also O'Leary v. Moyer's Landfill, Inc., 523 F. Supp. 642, 647 (E.D. Pa. 1981)

(rejecting primary jurisdiction argument against CWA and RCRA citizen suit and holding: "[n]or

are the problems central to this litigation beyond the ordinary competence of a court, especially

given the helpful participation as witnesses of experts from the relevant agencies").

Plaintiffs further contend that, pursuant to Baykeeper, delineating the specific relief they

seek is not necessary in evaluating this factor: "While NJDEP has expertise in environmental

matters, federal courts are nonetheless competent to decide cases such as the one before us.

Congress decided as much when it wrote the RCRA and CWA to authorize citizen suits in

federal courts."  660 F.3d at 691.  See also Maine People's Alliance v. Mallinckrodt, Inc., 471

F.3d 277, 293 (1st Cir. 2006) ("[F]ederal courts have proven, over time, that they are equipped to

adjudicate individual cases, regardless of the complexity of the issues involved"); Interfaith

Cmty. Org. v. PPG Indus., Inc., 702 F. Supp. 2d 295, 311 (D.N.J. 2010) (RCRA citizen suit in

which the court held "Congress clearly contemplated that the environmental issues posed here

are within the competency of the courts when it created a citizen suit provision"); Merry v.

Westinghouse Elec. Corp., 697 F. Supp. 180, 183 (M.D. Pa. 1988) (statutory enforcement

schemes do not pose questions beyond normal competency of courts).  As for the CSL, it also

has an explicit citizen suit enforcement provision, 35 P.S. § 691.601(c).

PPG argues that the EPA has delegated the primary administration and enforcement of RCRA and the CWA NPDES program to PADEP (through the CSL) for matters arising under these statutes in Pennsylvania.  In addition, it notes that the EPA (Region 3) and PADEP have entered into a Memorandum of Understanding whereby the EPA gives PADEP the discretion to cooperatively implement RCRA's corrective action clean up requirements at sites through Act 2. (PPG Ex. 32.)  Thus, PPG contends that PADEP is charged with enforcing these statutes such that this matter is "particularly" within the discretion of PADEP.

Plaintiffs respond that the Court of Appeals held in <u>Baykeeper</u> that:

> Although NJDEP generally has discretion over environmental matters, neither the RCRA nor the CWA charges NJDEP with enforcing those particular statutes. Indeed, each statute authorizes federal courts to address environmental issues. Accordingly, this matter is not particularly within the discretion of NJDEP.

660 F.3d at 691-92.  NJDEP, just like PADEP, has approval from the EPA to participate in the NPDES program.  47 Fed. Reg. 17331 (Apr. 22, 1982).

PPG argues that there is a substantial danger of inconsistent rulings, particularly if the Court were to impose a burden on it above and beyond what PADEP has imposed.  However, the court in <u>Baykeeper</u> noted that "a more stringent remediation standard … is not a reason to invoke the primary jurisdiction doctrine."  660 F.3d at 692 (quoting <u>Interfaith Cmty./ PPG</u>, 702 F. Supp. 2d at 312).

PPG makes several arguments as to why the fourth factor weighs in its favor.  First, it argues that the 2009 Administrative Order encompasses the same issues as Plaintiffs' CWA/CSL Claims in Counts I-VIII and the claim in the RCRA Complaint.  Plaintiffs respond that this overstates the breadth of the 2009 Administrative Order which, by its terms, concerns discharges from the Site. (PPG Ex. 2 at 5 ¶ D) (requiring development of Treatment Plan to "collect and

treat all industrial waste discharges, Leachate, and seeps from the Site into the waters of the

Commonwealth").  Plaintiffs argue that the RCRA Complaint concerns remediation of the Site

itself, not just management of the discharges and thus the 2009 Administrative Order cannot be a

basis for application of the primary jurisdiction doctrine with respect to their RCRA Complaint.

Second, PPG argues that this factor weighs in favor of primary jurisdiction because

PADEP has "undertaken activities and investigations" at the Site since 1971.  (ECF No. 25 at 28-

29.)  Plaintiffs do not dispute that PADEP has a long-running interest in the Site, though PPG

itself acknowledges that those activities have at times reached a "standstill." (Id. at 29.)

However, they argue that the fact that PADEP has attempted, since 1971, to have PPG either

eliminate or treat discharges from the Site cannot credibly be a basis for determining that the

primary jurisdiction doctrine should be applied.  The fact that the agency is still working on the

same goal 42 years later is evidence of the necessity of this citizen suit, rather than its

redundancy.  See Interfaith Cmty./Honeywell, 399 F.3d at 265-66 ("20 years of permanent clean-

up inaction" by the NJDEP justified court-ordered remediation).

Third, PPG states that it has submitted an NIR under Act 2 with respect to the Slurry

Lagoon Area and Solid Waste Disposal Area.  Plaintiffs respond that PPG's submission of an

NIR under Act 2 does not weigh in favor of the application of primary jurisdiction since Act 2 is

a voluntary remediation statute.  See 35 P.S § 6026.102(2) ("Incentives should be put in place to

encourage responsible persons to voluntarily develop and implement cleanup plans without the

use of taxpayer funds or the need for adversarial enforcement actions by the [PADEP] which

frequently only serve to delay cleanups and increase their cost").  In addition, they note that

PADEP acknowledged receipt of the NIR on May 22, 2001, nearly 12 years ago.  (PPG Ex. 18.)

PPG characterizes the NIR as "pending" (ECF No. 25 at 17) and states that it will continue to

carry out remediation under Act 2 after it has received approval on a final treatment system for the leachate seeps (id. at 23).  Plaintiffs note that PPG had nearly eight years to carry out remediation between PADEP's receipt of the notice of intent to remediate and the issuance of the 2009 Administrative Order.  Plaintiffs contend that PPG's voluntary notice of intent to remediate, still pending after a decade, does not support the application of the primary jurisdiction doctrine on the grounds of overriding PADEP involvement.

Finally, PPG argues that there is "no question that relevant agency proceedings have been initiated" since the issuance of the 2009 Administrative Order.  (ECF No. 25 at 28.)  PPG notes that the PADEP is currently reviewing the Treatment Plan it submitted in December 2012 that addresses the remediation of the leachate seeps.  Thus, it contends that this case differs from Baykeeper, in which the state agency had not taken action on the site nor required the defendants to undertake any further investigation or remediation prior to the filing of the lawsuit.

Plaintiffs respond that those agency proceedings have no bearing on their RCRA Complaint and that, as to the CWA Complaint, while the 2009 Administrative Order represents more recent oversight by PADEP of the Site, it cannot undo 42 years of delay.  Moreover, there was still more than a two-year delay between PPG's submission of the June 2009 Treatment Plan (PPG Ex. 28) and PADEP's November 9, 2011, approval letter (PPG Ex. 30). Plaintiffs submit that, viewing the period over which PADEP and PPG have been negotiating remediation of the site, this factor weighs in their favor.  Moreover, they contend that, even if the Court were to determine that this factor weighs in PPG's favor, that is not sufficient for the application of the primary jurisdiction doctrine because the other three factors weigh decisively against the application of primary jurisdiction.  Baykeeper, 660 F.3d at 692 ("this single factor cannot outweigh the others that disfavor abstention on primary jurisdiction grounds").

PPG cites three cases from district courts within the Tenth Circuit to support its position: McCormick v. Halliburton Co., 2012 WL 1119493 (W.D. Okla. Apr. 3, 2012), Davies v. National Cooperative Refining Association, 963 F. Supp. 990 (D. Kan. 1997), and Friends of Santa Fe County v. LAC Minerals, Inc., 892 F. Supp. 1333 (D.N.M. 1995).  In McCormick, a district court invoked the doctrine of primary jurisdiction to abstain from hearing an RCRA citizen claim involving pollution of the groundwater by ammonium perchlorate because of the involvement of the Oklahoma Department of Environmental Quality ("ODEQ").  The court, applying a different version of the primary jurisdiction factors, concluded that: 1) the RCRA claim raised issues outside the conventional experience of judges and within the special expertise of the ODEQ, namely the extent of the threat, whether immediate remediation was required and what type of remedy was best suited to the site; 2) the court's involvement would create a great potential for conflicting orders if it approved of a different work plan or remediation plan; 3) Halliburton and the ODEQ had entered into a Consent Order pursuant to which Halliburton was obligated to cooperate with the ODEQ in investigating and remediating the matter; 4) the ODEQ had been diligent in responding once Halliburton notified it of the perchlorate; and 5) because the plaintiffs were requesting injunctive relief, there was an even greater likelihood that the court's order could interfere with the administrative agency's proceedings.  Id. at *2-3.  The court cited several previous cases from within the Tenth Circuit, including Davies and Santa Fe. Id. at *2.

Plaintiffs respond that the Court of Appeals in Baykeeper explicitly distinguished both Davies and Santa Fe: in Santa Fe the state environmental agency conducted extensive hearings, in which the plaintiffs participated, which required the defendants to undertake specific investigation and remediation efforts, but they were not satisfied with the agency's decision; and

in <u>Davies</u>, the plaintiffs sought relief that would have directly conflicted with a state environmental agency action when the defendant agreed in a settlement to continue pumping an aquifer as part of its remediation efforts but the plaintiffs complained that the pumping was contributing to pollution on their property.  "Here, by contrast, Raritan Baykeeper's suit does not amount to a 'collateral attack' on an NJDEP decision, nor does it seek a remedy that necessarily conflicts with any agency order."  660 F.3d at 692.

As Plaintiffs note, this case resembles <u>Baykeeper</u> and not the Tenth Circuit district court cases on which PPG relies.  Plaintiffs do not allege that an action by PPG which has been authorized by PADEP is contributing to pollution, nor are they mounting a collateral attack on PADEP's decisions.  Moreover, the standards applied in <u>McCormick</u>, <u>Santa Fe</u> and <u>Davies</u> are not the same as the standards applied by the Court of Appeals in <u>Baykeeper</u>, and the latter are binding on this Court.  Thus, the "type of relief requested" is not a factor to be considered, the question is not whether the defendant "could" be subject to conflicting orders but whether there is a "substantial danger" of this occurring, the possibility of a more stringent remediation standard is not a reason to abstain, and the court in <u>Baykeeper</u> emphasized the citizen suit provisions of the RCRA and CWA whereas the district court cases appeared more willing to rely on the "special expertise" of state environmental agencies.  <u>See also</u> <u>Interfaith Cmty./PPG</u>, 702 F. Supp. 2d at 312 (declining to follow <u>Davies</u>' application of primary jurisdiction abstention).  It is also noted that the decision in <u>McCormick</u> applied only to the RCRA claim, not any of the other claims asserted in the case.

Applying the relevant factors, PPG has not demonstrated that this case is "one of those exceptional cases that calls for primary jurisdiction abstention."  <u>Baykeeper</u>, 660 F.3d at 692. While PADEP has expertise in environmental matters, this Court is competent to decide the case,

as evidenced by Congress's enactment of environmental statutes authorizing citizen suits in federal court, and to grant Plaintiffs' requested forms of relief.  Second, although PADEP manages the NPDES program in Pennsylvania, neither the RCRA nor the CWA charges PADEP with enforcing federal environmental laws.  Third, PPG has not shown a "substantial likelihood of inconsistent rulings," particularly when its concern appears to be based on the possibility of a more stringent remediation standard emanating from this Court.  Finally, although PADEP proceedings have been initiated, the fact that the agency has been involved in this matter for 42 years and it is still unresolved does not necessarily favor PPG, but even if it did this factor alone would be insufficient to outweigh the others that disfavor abstention on primary jurisdiction grounds.  Therefore, PPG's motion to dismiss this case based on the abstention doctrine of primary jurisdiction is denied.

### Point Source Discharges/Nonpoint Source Discharges

PPG moves to dismiss Counts I, II, III, IV, VII and VIII to the extent they encompass NPDES permitting requirements for nonpoint source discharges, which are not within the scope of citizen suits.  Plaintiffs respond that these claims are appropriately asserted, either limited to point source discharges under the CWA or encompassing both point and nonpoint source discharges as permitted under the CSL.

As the Supreme Court recently stated:

> Congress passed the Clean Water Act in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 86 Stat. 816, 33 U.S.C. § 1251(a). A central provision of the Act is its requirement that individuals, corporations, and governments secure National Pollutant Discharge Elimination System (NPDES) permits before discharging pollution from any point source into the navigable waters of the United States. See §§ 1311(a), 1362(12); EPA v. California ex rel. State Water Resources Control Bd., 426 U.S. 200, 205, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976).

Decker v. Northwest Envtl. Def. Ctr., 133 S.Ct. 1326, 1331 (2013).

To that end, Section 301(a) of the CWA provides that in the absence of a permit, except

under specified circumstances, "the discharge of any pollutant by any person shall be unlawful."

33 U.S.C. § 1311(a).  The "discharge of a pollutant" is defined by the CWA as "any addition of

any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12)(A). The term

"point source" means:

> any discernible, confined and discrete conveyance, including but not limited to
> any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling
> stock, concentrated animal feeding operation, or vessel or other floating craft,
> from which pollutants are or may be discharged. This term does not include
> agricultural stormwater discharges and return flows from irrigated agriculture.

33 U.S.C. § 1362(14).  Finally, the term "pollutant" means "dredged spoil, solid waste,

incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological

materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and

industrial, municipal, and agricultural waste discharged into water."  33 U.S.C. § 1362(6).

Section 1365(a) "authorizes private enforcement of the provisions of the Clean Water Act and its

implementing regulations."  Decker, 133 S.Ct. at 1334 (citation omitted).

PPG argues that the CWA unequivocally only requires NPDES permits for point source

discharges and does not require such a permit for nonpoint source discharges.  It argues that

there can be no basis for a citizen suit for failure to obtain a NPDES permit for nonpoint source

discharges.  See, e.g., Oregon Natural Resources Council v. U.S. Forest Service, 834 F.2d 842,

849 (9th Cir. 1987) ("[W]e do not believe that the Act allows for the enforcement of state water

quality standards, as affected by nonpoint sources, under the citizen suit provision"); Chesapeake

Bay Found., Inc. v. Severstal Sparrows Point, LLC, 794 F. Supp. 2d 602, 619-20 (D. Md. 2011)

("Discharge from migrations of groundwater or soil runoff is not point source pollution,

however, but nonpoint source pollution….  There is no basis for a citizen suit for nonpoint

source discharges under the CWA.") (citations omitted).

The CWA defines a "point source" to be a "discernible, confined and discrete conveyance." See 33 U.S.C. § 1362(14).  However, a "discharge" occurring through migration of groundwater and soil runoff (i.e., uncontrolled stormwater runoff) represents "nonpoint source" pollution because there is no "discernible, confined and discrete conveyance."  See Sierra Club v. El Paso Gold Mines, 421 F.3d 1133, 1141 n.4 (10th Cir. 2005) ("Groundwater seepage that travels through fractured rock would be nonpoint source pollution, which is not subject to NPDES permitting."); Northwest Envtl. Def. Ctr. v. Brown, 640 F.3d 1063, 1070 (9th Cir. 2011) ("Stormwater that is not collected or channeled and then discharged, but rather runs off and dissipates in a natural and unimpeded manner, is not a discharge from a point source."); Santa Fe, 892 F. Supp. at 1359 (holding that seepage of pollutants through soil into groundwater is not a point source, and therefore not subject to NPDES permitting requirements); Sierra Club v. Abston Constr. Co., 620 F.2d 41, 45 (5th Cir. 1980) (finding that gravity flow, resulting in a discharge into a navigable body of water, may be part of a point source discharge only if the water was at least initially collected or channeled); Cordiano v. Metacon Gun Club, Inc., 575 F.3d 199, 220 (2d Cir. 2009) ("Nonpoint sources include pollution from diffuse land use activities such as agriculture, construction and mining that enter the waters primarily through indiscrete and less identifiable natural processes such as runoff, precipitation and percolation.") (citation omitted).  "Control of nonpoint sources continues to be a primarily a state function, with indirect federal participation."  Id. (citation omitted).

PPG argues that one court has specifically held that "seeps," almost identical to the ones Plaintiffs describe in their CWA Complaint, are nonpoint sources.  Santa Fe, 892 F. Supp. at 1359 ("the seeps merely represent evidence that [acid mine drainage] has at some time in [the]

past entered subsurface waters, possibly from the overburden pile or the remediation system. In other words, the seepages are non-point source carriers of pollutants . . . and are therefore not subject to the Act's permitting requirements.").

Plaintiffs agree that the CWA regulates only point source discharges.  (ECF No. 43 at 30.)  However, they note that Count I specifically alleges that PPG is unlawfully discharging pollutants into navigable waters without an NPDES permit in violations of Sections 301(a) and 402 of the CWA.  Count II alleges that PPG has violated sections 301(a) and 402(p)(2)(B), 33 U.S.C. §§ 1311(a), 1342(p)(2)(B), by discharging storm water associated with industrial activity without a permit authorizing such discharge.  Thus, they contend that these claims are already limited to point source discharges.

Contrary to PPG's assertion, Plaintiffs have not merely alleged the existence of storm water discharges (which do not require a permit), but storm water discharges "associated with industrial activity" (which do require a permit), emanating from PPG's glass manufacturing plant.  According to EPA regulations "storm water" "means storm water runoff, snow melt runoff, and surface runoff and drainage."  40 C.F.R. § 122.26(b)(13).  The phrase "storm water discharge associated with industrial activity" means:

> the discharge from any conveyance that is used for collecting and conveying storm water and that is directly related to manufacturing, processing or raw materials storage areas at an industrial plant. The term does not include discharges from facilities or activities excluded from the NPDES program under this part 122. For the categories of industries identified in this section, the term includes, but is not limited to, storm water discharges from industrial plant yards; immediate access roads and rail lines used or traveled by carriers of raw materials, manufactured products, waste material, or by-products used or created by the facility; material handling sites; refuse sites; sites used for the application or disposal of process waste waters (as defined at part 401 of this chapter); sites used for the storage and maintenance of material handling equipment; sites used for residual treatment, storage, or disposal; shipping and receiving areas; manufacturing buildings; storage areas (including tank farms) for raw materials, and intermediate and final products; and areas where industrial activity has taken

place in the past and significant materials remain and are exposed to storm water. For the purposes of this paragraph, material handling activities include storage, loading and unloading, transportation, or conveyance of any raw material, intermediate product, final product, by-product or waste product. The term excludes areas located on plant lands separate from the plant's industrial activities, such as office buildings and accompanying parking lots as long as the drainage from the excluded areas is not mixed with storm water drained from the above described areas.

40 C.F.R. § 122.26(b)(14).  The regulation then goes on to list eleven "categories of facilities" that are considered to be engaging in "industrial activity."

Determining whether a storm water discharge is "associated with industrial activity" and therefore requires a permit is not necessarily straightforward or an easy process.  Compare Decker, 133 S.Ct. at 1336-38 (deferring to the EPA's interpretation, although it was not necessarily "the best one," that channeled storm water runoff from logging roads was not "associated with industrial activity" because the conveyances at issue were "directly related" only to the harvesting of raw materials, rather than to "manufacturing, processing, or raw materials storage areas at an industrial plant") with id. at 1343 (Scalia, J., dissenting) (noting that the EPA's own regulation interpreting the phrase "associated with industrial activity" refers to "facilities classified as Standard Industrial Classification 24," which includes the industry of "logging."); Brown, 640 F.3d at 1083-84 (same)  In considering a complaint on a motion to dismiss, it is certainly plausible that Plaintiffs' allegation that PPG's glass manufacturing plant generated "storm water discharge associated with industrial activity" states a claim under the CWA.  PPG has not provided sufficient analysis of the issue to say otherwise.  Whether this claim survives full discovery and a motion for summary judgment or trial is another matter.  Therefore, the motion to dismiss Counts I and II on the basis that they allege nonpoint source discharges is denied.

Plaintiffs acknowledge that Counts III and IV do allege both point and nonpoint source

discharges, but argue that they are pled under the CSL, which is more expansive than the CWA and is not limited to point source discharges. Specifically, Count III alleges that PPG has violated Sections 301 and 307 of the CSL, 35 P.S. §§ 691.301, 691.307, by discharging industrial waste into the Allegheny River, Glade Run and groundwater without a permit. Count IV alleges that PPG has violated Section 401 of the CSL, 35 P.S. § 691.401, by discharging pollutants and waste into the Allegheny River, Glade Run and groundwater without a permit.

The CSL provides that:

No person or municipality shall place or permit to be placed, or discharged or permit to flow, or continue to discharge or permit to flow, into any of the waters of the Commonwealth any industrial wastes, except as hereinafter provided in this act.

35 P.S. § 691.301. Plaintiffs argue that, because the act uses the terms "place," "discharge" and "flow," each must have a distinct meaning. None of these words are defined in the CSL, although "discharge" is defined in the CSL's implementing regulations as "[a]n addition of any pollutant to surface waters of this Commonwealth from a point source." 25 Pa. Code § 92a.2. The word "flow" is not defined in the regulations.

Under both federal and Pennsylvania principles of statutory construction, meaning should be given to each word in a statute, if possible, and no word should be construed in such a manner as to make it superfluous. Duncan v. Walker, 533 U.S. 167, 174 (2001); Tavarez v. Klingensmith, 372 F.3d 188, 190 (3d Cir. 2004); 1 Pa. C.S. §§ 1921(a), 1922(2); Freundt v. Commonwealth Dep't of Transp., Bureau of Driver Licensing, 883 A.2d 503, 506 (Pa. 2005). Plaintiffs contend that because "discharge" is defined as adding pollutants from a point source, "flow" must therefore mean issuing pollutants from a nonpoint source. They argue that this distinction is supported by the ordinary meanings of the terms: "discharge" means "a sending or coming forth, as of water from a pipe; ejection; emission" or "allow (a liquid, gas, or other

38

substance) to flow out from where it has been confined." Random House Dictionary of the English Language, Unabridged 409 (Random House, Inc. 1973); Oxford English Dictionaries Online, http://oxforddictionaries.com/us.  "Flow," on the other hand, means "to move along in a stream, as water or other liquid"; "to cover with water or other liquid; flood"; "(of a fluid, gas, or electricity) move along or out steadily and continuously in a current or stream"; or "to issue or move in a stream" or "to move with a continual change of place among the constituent particles <molasses flows slowly>",  Random House Dictionary at 546; Oxford Dictionaries Online; Merriam-Webster Online, http://www.meriam-webster.com.

Plaintiffs observe that this reading is further supported by the PADEP 2009 Administrative Order, which found that PPG's discharge, which includes "[p]recipitation which infiltrates the Slurry Lagoons and the Landfill at the Site[,] becomes contaminated with *hazardous substances* … and then is discharged into the waters of the Commonwealth" and termed this discharge the "Leachate."  (PPG Ex. 2 ¶ 14.)  PADEP further found that "[t]he Leachate discharges seep out of the Slurry Lagoons and the Landfill at various locations at the Site and then flow or are conveyed into the waters of the Commonwealth."  (Id. ¶ 15.)  The Order covers both the leachate that seeps and flows to waters of the Commonwealth and the leachate that seeps and is conveyed to waters of the Commonwealth.  Thus, Plaintiffs contend, the Order is not limited to only point source discharges from the Site.  The Order concluded that the discharges constitute industrial waste and pollutants (as defined in 35 P.S. § 691.1 and 25 Pa. Code § 91.1, respectively) and that they "result or may result in pollution of waters of the Commonwealth, in violation of Sections 401 and/or 402 of The Clean Streams Law, 35 P.S. §§ 691.401, 691.402."  (Id. ¶ 16.)  The Order further stated that Sections 301 and 307 of the CSL, 35 P.S. §§ 691.301, 691.307, prohibit discharge of industrial waste unless authorized by

rules, regulations, or permit and that "PPG's discharges of industrial waste into the Allegheny River and Glade Run are not authorized by the rule and regulations of the Department, and PPG does not have a permit for those discharges from the Department."  (Id. ¶¶ 17-18.)

In its reply brief, PPG argues that Plaintiffs are relying on CSL implementing regulations to contend that it is responsible for nonpoint source discharges without an NPDES permit, but the CWA does not require permits for nonpoint source discharges, and they argue that Plaintiffs have cited no authority that PADEP requires authorization or permits for nonpoint source discharges.  The Court concludes that Plaintiffs have raised the issue that the CSL is not limited to point source discharges, but rather also extends to nonpoint source discharges that "flow" as this word would otherwise be surplussage in the statute.  PPG has not responded to this argument.  Therefore, its attempt to limit the CSL to point source discharges is rejected and its motion to dismiss Counts III and IV on the basis that they allege nonpoint source discharges is denied.

### Failure to Obtain an NPDES Permit

PPG argues that, in essence, Counts I-IV allege that it failed to obtain an NPDES permit for a point source discharge for Outfall 001.  However, PPG maintains that it has authorization from PADEP to discharge through Outfall 001 pursuant to the 2009 Administrative Order.  The Order directed PPG to create this point source and treat the discharge pursuant to its authorization for the Interim Abatement Plan.  (PPG Exs. 2, 27.)  Accordingly, PPG argues that Counts I through IV must be dismissed because it does in fact have authorization/permit for Outfall 001 from PADEP.

Plaintiffs respond that they allege not only discharges through Outfall 001, but also from the "Drainage Ditch," culverts and seeps, all of which they contend constitute point sources

under the CWA, 33 U.S.C. § 1362(14).  In addition, even where the seeps do not discharge directly into navigable waters, they feed contaminated waters that flow into points sources, such as the Drainage Ditch, culverts and Outfall 001.  Moreover, they argue that the 2009 Administrative Order is not an NPDES permit or a substitute for such a permit.  Indeed, the 2009 Administrative Order states that PPG lacks a permit for its discharges (PPG Ex. 2 ¶ 18) and orders PPG to take certain measures until such time as the discharges from across the site are collected and conveyed to an industrial waste treatment facility and the discharge therefrom is authorized by an NPDES permit (Id. at 4-5 ¶¶ A, C).  Plaintiffs argue that, if the 2009 Administrative Order were deemed to be an NPDES permit, there obviously would have been no reason for PADEP to require an NPDES permit.

Moreover, they contend that the 2009 Administrative Order could never be the substitute or equivalent of an NPDES permit.  Specific procedural and substantive requirements are required for issuance of an NPDES permit and none of them have been satisfied here.  For example, public notice and comment must be provided for a draft NPDES permit.  See 33 U.S.C. §§ 1342(a)(3), 1342(b)(3); 40 C.F.R. § 123.25(26)-(33)(listing requirements for an approved state program), § 124.6(a)(draft permit required unless NPDES permit application denied), § 124.6(d)(draft NPDES permit must include effluent limitations), § 124.10(a)(1)(ii)(public notice of draft permit required), § 124.10(b)(at least 30 days for public comment required), § 124.11 (interested persons may submit comments and request hearing), § 124.17 (requires response to public comments by issuing agency). NPDES permits are required to have effluent limitations, inter alia, in both their final and draft form.  40 C.F.R. §§ 122.44, 123.25(15), 124.6(d).  Pennsylvania has incorporated these provisions into its NPDES program.  See 25 Pa. Code § 92a.3.  See also 25 Pa. Code § 92a.53 (requirement for a fact sheet providing basis for

requirements in draft or final NPDES permit); § 92a.82 (public notice and comment on draft

NPDES permits), § 92a.86 (response to public comments published with notice of issuance of

final NPDES permit).

Plaintiffs note that nothing in the 2009 Administrative Order indicates that it is an

NPDES permit that was issued following public notice and comment on a draft that included

effluent limitations.  Furthermore, PPG has not offered any public records in support of its

motion to dismiss that would demonstrate that the 2009 Administrative Order was issued after

issuance of a draft that included effluent limitations and that was subject to public notice and

comment.  Plaintiffs further indicate that they searched the Pennsylvania Bulletin, the publication

where notice of the issuance of a draft or final permit must be provided (25 Pa. Code § 92a.86),

and it revealed that no notice was provided of the 2009 Administrative Order or any other

documents related to PPG and Ford City in 2009.  (ECF No. 43 Exs. 2-4 (results of the searches

of the Pennsylvania Bulletin.)  Plaintiffs argue that, in the posture of a motion to dismiss, this

Court must accept as true the allegations in the CWA Complaint that the 2009 Administrative

Order is not an NPDES permit (CWA Compl. ¶ 25) and that PPG lacks an NPDES permit for its

discharges (CWA Compl. ¶¶ 37-56).  Plaintiffs indicate that, at most, the 2009 Administrative

Order is an authorization to discharge through Outfall 001 the pollutants that have been collected

and treated.  It is not an authorization to discharge pollutants through a route other than Outfall

001.

Plaintiffs contend that, even if the July 2, 2009 Addendum were considered as part of the

2009 Administrative Order, it would not make the 2009 Administrative Order an NPDES permit.

The effluent limitations set forth in Attachment A to the July 2 Addendum cannot be treated as

an NPDES permit because they were not established pursuant to public notice and comment.

See ECF No. 43 Exs. 2-4.  At most, the 2009 Administrative Order and the July 2 Addendum represent an abatement order which is designed to address PPG's discharges on an interim basis and to move PPG toward an NPDES permit.  See 25 Pa. Code § 91.13 ("[t]he Department will require either abatement of the pollution or the submission of a plan and schedule for bringing the source's pollutants into compliance through pollution prevention measures, treatment or other means by a specific date, and shall require progress reports thereon, usually at monthly or bimonthly intervals as the Department will deem appropriate").

Moreover, the July 2 Addendum to the 2009 Administrative Order states that:

> This authorization does not permit any discharge (storm water or non-storm water), which contains any pollutant that may cause or contribute to an impact on aquatic life or poses substantial hazard to human health or the environment due to its quantity or concentration.

(ECF No. 43 Ex. 1.)  Plaintiffs note that they have alleged that PPG's discharges of metals and high pH water through Outfall 001 and other locations "may cause or contribute to an impact on aquatic life or pose substantial hazard to human health or the environment due to [their] quantity or concentration."  (CWA Compl. ¶¶ 35, 67.)  Such discharges would not be authorized by the July 2 Addendum.

PPG's argument that Plaintiffs allege only one point source, Outfall 001, does not withstand scrutiny.  Plaintiffs also allege that PPG discharged pollutants from the "Drainage Ditch," from seeps and from culverts.  PPG argues in a footnote in its reply brief that "Plaintiffs only make passing reference to the 'Drainage Ditch' and culverts in the background section of their CWA Complaint, which they did not incorporate by reference into any of the twelve CWA claims."  (ECF No. 45 at 6 n.3.)  This hyper technical argument is rejected.[8]

---

[8] In addition, the Court rejects PPG's repeated argument that Plaintiffs cannot amend their complaints because they did not do so in response to the Court's April 10, 2013 order.  See PPG

PPG's argument that the 2009 Administrative Order is the equivalent of an NPDES permit is unsupported and meritless.  The Order contemplated that PPG would require a permit and none of the administrative procedural or substantive prerequisites of a permit (such as notice and comment) were observed.  Nor are all of PPG's discharges authorized by the Order, as Plaintiffs have alleged that PPG's discharges of metals and high pH water through Outfall 001 and other locations "may cause or contribute to an impact on aquatic life or pose substantial hazard to human health or the environment due to [their] quantity or concentration."

Finally, PPG argues that, if the Court determines that it must obtain an NPDES permit, Plaintiffs lack standing to pursue such a claim because the Court could either order PPG to obtain a permit, which PADEP has already done, or order it to eliminate discharges, but this would conflict with PADEP's order.  However, the case it cites, West Coat Home Builders, Inc. v. Aventis Cropscience USA, Inc., 2009 WL 2612380, at *4 (N.D. Cal. Aug. 21, 2009), not only was decided on a motion for summary judgment but also involved a situation in which the defendant was under a consent order to clean up certain contamination, which is not the same as "relief it is already obtaining outside of this lawsuit" referring to the requirement to obtain an NPDES permit.  This argument is also without merit: as explained above, the possibility of a more severe remediation from the Court does not constitute a "conflict" for purposes of primary jurisdiction abstention.  Moreover, if PPG is discharging pollutants without a permit, it may be liable for damages, not just fall subject to an order to obtain a permit.  Therefore, this argument is rejected.

Ownership of the Site

PPG also argues that it cannot be held liable for any discharges from the Site other than

Reply Br. (ECF No. 45) at 1, 12, 13.

through Outfall 001 because it sold the property to Ford City in 1972, prior to the time CWA

permitting obligations came into effect.  Thus, it contends that any obligation would have fallen

upon Ford City.  In addition, it argues that any attempt to impose liability based on its disposal or

"industrial activities" on the Site prior to the enactment of the CWA in 1972 would constitute

improper retroactive application of the statute.

Plaintiffs respond that this argument is based on facts beyond the allegations of the

complaint, the materials integral to the complaint and public records.  In addition, it contradicts

the 2009 Administrative Order, which found that the Site "is occupied by PPG as a result of

PPG's creation of the Slurry lagoons and landfill at the Site," (PPG Ex. 2 ¶ 20), and that "PPG is

an owner and occupier of the Site.  Pollution and the danger of additional pollution are resulting

from the conditions which exist on the Site." (Id. ¶ 29.)  PADEP further found that the source of

the contamination on site and in adjacent waters "is attributed to PPG's waste disposal

activities."  (Id. ¶13.)  PADEP also found that PPG sold the site to the Borough of Ford City for

the sum of one dollar.  (Id. ¶ 9.) Therefore, Plaintiffs argue that PADEP, the agency charged with

the issuance of NPDES permits in the Commonwealth of Pennsylvania, has determined that PPG

is an "owner and occupier of the Site" and, as such, it is required to have an NPDES permit for

the discharges from the site.  They contend that, for purposes of a motion to dismiss, these facts

must be accepted as true and PPG cannot contradict them.

Furthermore, Plaintiffs observe PPG itself admits to being an owner or operator of the

Site and, as such, submitted the site into the Act 2 process:

> The study and remediation of a property under Act 2 can take place either before
> or after an owner/operator has formally submitted the property to the Act 2
> process….   PPG submitted the Ford City Site to the Act 2 process by filing a
> Notice of Intent to Remediate (NIR) in 2001, pursuant to which PPG committed
> to ensure that the Ford City Site … met the Act 2 statutory site-specific
> remediation standards.

(ECF No. 25 at 8.)  In conjunction with the Act 2 process and in response to the 2009

Administrative Order, PPG claims to have conducted significant work at the Site.  (ECF No. 25

at 6-12.)  Plaintiffs contend that these activities are inconsistent with PPG's claims that it has no

control over the Site.

Plaintiffs contend that the two cases cited by PPG are distinguishable.  In Brossman

Sales, Inc. v. Broderick, 808 F. Supp. 1209, 1211-14 (E.D. Pa. 1992), and Friends of Sakonnet v.

Dutra, 738 F. Supp. 623, 632-33 (D.R.I. 1990), the defendants lost control over the pollution

sources, and lacked the control to abate it or to bring about complete compliance.  That is not the

situation here.  On July 2, 2009, PADEP approved an Interim Abatement Plan submitted by

PPG.  (ECF No. 43 Ex. 1.) Plaintiffs argue that the fact that PADEP approved the plan shows

that both PADEP and PPG think that PPG has sufficient control over the Site "to address

contaminated discharges associated with the Ford City Cadogan Disposal Site."  (Id. at 1.)  In

addition, PPG has admitted to sufficient control over the Site to commit the site to remediation

under Act 2.  (ECF No. 25 at 8.)

Alternatively, Plaintiffs argue that, in the event that PPG is not an owner or operator of

the Site, it is still subject to suit for discharging pollutants in violation of Section 301(a) of the

CWA, 33 U.S.C. § 1311(a).  That section prohibits the discharge of pollutants, and that is all.

Having an NPDES permit is an exception to this prohibition, but Section 301(a) does not require

that a person acquire an NPDES permit.  Instead, a violation of Section 301(a) can be remedied

by halting or eliminating the discharge.  Plaintiffs note that Section 505(a)(1) authorizes citizen

suits against "any person … who is alleged to be in violation of … an effluent standard or

limitation under this Act…." 33 U.S.C. § 1365(a)(1).  An effluent standard or limitation is

defined to be, inter alia, "an unlawful act under subsection (a) of section 301 of this Act." 33

U.S.C. § 1365(f)(1).  Section 301(a) provides that "the discharge of any pollutant by any person shall be unlawful" except in compliance with certain sections of the Act.  33 U.S.C. § 1311(a). A person is defined under the Act to be "an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body."  33 U.S.C. § 1362(5).  Thus, if PPG is discharging pollutants, it is violating Section 301(a) of the Act.  Likewise, the CSL prohibits the discharge of any industrial waste into the waters of the Commonwealth by any person, without limitation.  35 P.S. § 691.301.

The Court rejects PPG's argument that it is not an owner or operator of the Site.  Not only does this contention contradict the allegations of the complaints, but more significantly, it contradicts PADEP's findings and PPG's own actions regarding the Site.

With respect to PPG's retroactivity argument, Plaintiffs respond that their claims are directed to PPG's pollutant discharges that continue to occur every day and have occurred since the enactment of the CWA.  Plaintiffs contend that they are not claiming that PPG was in violation of Section 301(a) of the Act before it was enacted.  Rather, they have alleged that PPG has been in violation of Section 301(a) since it became effective due to PPG's lack of a permit which allows the discharges and prevents a violation of Section 301(a).  See CWA Compl. ¶ 23. Plaintiffs contend that their claims here are no different than claims that could be brought against a factory established before the enactment of the CWA for discharges in violation of Section 301(a) that have occurred since enactment of the statute.  Thus, Plaintiffs are not seeking to apply the CWA or the CSL retroactively.  They note that the 40 years of PPG discharges in violation of Section 301(a) -- as measured since its effective date -- is already such a long period of violation that there is no need to pursue retroactive enforcement even if this were possible.[9]

---

[9] Plaintiffs note that the statute of limitations restricts liability for civil penalties to such

Plaintiffs argue that, to the extent that PPG might be arguing that it cannot be held liable for discharges associated with materials that were created before the enactment of the CWA, the fact that the pollutants in PPG's discharges come from such materials is irrelevant. The CWA defines pollutant to include: "dredged spoil, solid waste, incinerator residue," "wrecked or discarded equipment," "rock," and "sand."  33 U.S.C. § 1362(6).  This definition includes items that necessarily would have been created before the enactment of the Act.  In Committee to Save Mokelumne River v. East Bay Municipal Utility District, 13 F.3d 305 (9th Cir. 1993), acid mine drainage from a property mined from the 1860s through the 1950s, which was carried by rainfall to the river, was determined to be a discharge that violated Section 301(a) due to the lack of an NPDES permit.  See also O'Leary, 523 F. Supp. at 646, 651-655 (noting that "extensive waste-disposal activities have been carried on for many years" at the landfill; describing a landfill with sloped sides from which leachate escapes and travels to the nearby streams and creek; finding that the discharge of the leachate -- rainfall and groundwater that came into contact with landfill material -- violated the CWA).

The Court concludes that Plaintiffs are not seeking retroactive application of the CWA or CSL.  Rather, they are seeking application of those statutes to discharges that have occurred post-enactment.  Accordingly, this argument is rejected.

Counts V and VI

Plaintiffs in Counts V and VI, respectively, allege claims under the CWA's and CSL's citizen suit provisions for the failure of the Treatment Plan, required under the 2009 Administrative Order, to contain a schedule for the application of NPDES permits.  PPG argues

---

violations occurring five years or less preceding their notice of intent to sue.  Public Interest Research Group of N.J., Inc. v. Powell Duffryn Terminals, Inc., 913 F.2d 64, 73-76 (3d Cir. 1990).

that the Court should dismiss these claims because: (1) the CWA's citizen suit provision only

permits citizens to enforce effluent standards and limitations; (2) the alleged violation is moot

because PADEP approved the Treatment Plan (and the schedule contained therein) and thereby

found the Treatment Plan to be in compliance with the 2009 Administrative Order; and (3)

because PPG has provided a schedule for the application of any necessary permits, including

NPDES permits to PADEP under the Treatment Plan Report.  Plaintiffs respond that they have

properly alleged that PPG is violating the 2009 Administrative Order and that their claims are

not moot.

 The CWA provides that any citizen may bring suit against any person only for an alleged

violation of "(A) an effluent standard or limitation under this chapter or (B) an order issued by

the Administrator or a State with respect to such standard or limitation." 33 U.S.C. § 1365(a)(1).

Section 1365(f) defines "effluent standard or limitation" for the purposes of this citizen suit

provision as:

  1. an unlawful act under subsection (a) of section 1311;

  2. an effluent limitation or other limitation under section 1311 or 1312;

  3. a standard of performance under section 1316;

  4. a prohibition, effluent standard or pretreatment standard under section 1317;

  5. certification under section 1341;

  6. a permit or condition thereof issued under section 1342, (including a
requirement applicable by reason of section 1323, which governs pollution
control from federal facilities and is not applicable to this case); or

  7. regulation under section 1345(d).

33 U.S.C. § 1365(f).  PPG argues that the requirement for the Treatment Plan to include a

schedule for the application of a NPDES permit cannot be construed as an effluent standard or

limitation under the plain language of the citizen suit provision for the CWA.  Accordingly, a

citizen's suit for the Treatment Plan to include a schedule for applying for necessary permits is

not authorized and these allegations must be dismissed.

In the alternative, PPG argues that assuming that Plaintiffs could bring a citizen suit for

such a claim, the issue is now moot and therefore, these claims must be dismissed.  The

Treatment Plan did contain a schedule in Section 7.0 and PADEP, in fact, approved the

Treatment Plan by letter dated November 9, 2011.  (PPG Ex. 28 at Section 7.0; Ex. 30.)

Moreover, PPG has in fact submitted a schedule for applying for the necessary permits to

PADEP in conjunction with the proposed remedy currently in the Treatment Plan Report being

reviewed by PADEP.  See PPG Ex. 31 at Section 9.0.  Accordingly, PPG argues that Plaintiffs

have no meaningful relief under these claims and therefore this Court lacks jurisdiction over

them pursuant to the mootness doctrine.  See Sierra Club v. United States Army Corps of Eng'rs,

277 F. App'x. 170, 172-73 (3d Cir. 2008) (when all but .12 acres of wetlands had been filled and

construction was substantially complete, the court could no longer provide any meaningful

relief).

Plaintiffs respond that Section 1365(f) of the CWA defines "effluent standard or

limitation" as including "(1) … an unlawful act under subsection (a) of section 1311 of this title"

and "(2) an effluent limitation or other limitation under section 1311 or 1312 of this title."

Paragraph D of the performance obligations of the 2009 Administrative Order requires PPG to

identify in its Treatment Plan, inter alia, "the necessary permit(s) for the authorization of the

discharges associated with the collection and treatment system" and to "provide a schedule for

applying for the necessary permits."  (PPG Ex. 2 at 5.)  The 2009 Administrative Order is "an

order issued by … a State with respect to such standard or limitations," 33 U.S.C.

§ 1365(a)(1)(B), since it relates to obtaining a permit with effluent standards.

With respect to Count VI, Plaintiffs argue that the CSL permits suit "against any other person alleged to be in violation of any provision of this act or any rule, regulation, order or permit issued pursuant to this act." 35 P.S. § 691.601(c).  The performance obligations in the 2009 Administrative Order, including paragraph D, were issued under the authority of the CSL. (PPG Ex. 2 at 4.)  These performance obligations are part of an order issued pursuant to the CSL. Plaintiffs assert that Count VI is therefore an appropriate CSL claim involving a violation of that order.

Plaintiffs also deny that these claims are moot. The Treatment Plan states that the "[d]esign of selected remedy and submittal of permit applications" are "To Be Determined." (PPG Ex. 28 at 25.)  Plaintiffs argue that this type of indeterminate timeline is not a schedule in any meaningful sense.  Moreover, they argue that, even if there were a clear schedule it would hardly establish mootness.  The Supreme Court has held that '[a] case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur" and that "[t]he 'heavy burden of persuading' the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness."  Laidlaw, 528 U.S. at 189 (citation omitted).

PPG relies on the November 9, 2011 letter from PADEP (PPG Ex. 30), which addresses the Treatment Plan.  While it is a public document, Plaintiffs contend that the Court has indicated in its April 10 Order that it will not consider its substance.  They argue that PPG's Treatment Plan Report (PPG Ex. 31) is not a public document and cannot be considered in the context of PPG's motion.

Moreover, Plaintiffs argue that, even considering the November 9, 2011, letter, it says

little substantively about the Treatment Plan: "PPG may proceed to implement the investigative items identified in the treatability plan as submitted." (PPG Ex. 30 at 1.)  The comments relating to PPG's proposed schedule are similarly limited: "When the evaluation identified in the Treatment Plan and Schedule are complete, please advise the Department as PPG indicates that it will in the Treatment Plan and Schedule. Please submit the results with the recommended remedy 60 days after completion of the work identified in the Treatability Plan." (Id.) Nothing in this letter substantively addresses whether Plaintiffs' claim is moot.

The Court concludes that both the CWA and CSL allow for a citizen suit arising out of a defendant's failure to submit a treatment plan, as ordered by a state, with certain performance obligations.  With respect to PPG's mootness argument, the Court concludes that the PADEP documents which can be examined at this stage of the proceedings do not resolve the issue of whether PPG has met its obligation of providing a schedule and that the Treatment Plan Report (which was submitted to PADEP in December 2012, after this case was filed, and has not yet been approved of by that agency) is not a public document that should be examined at this time. Therefore, Counts V and VI are not moot and PPG's motion to dismiss them is denied.

Notice Requirements

PPG moves to dismiss Counts IX and X for failure to comply with CWA notice requirements.  In Hallstrom v. Tillamook County, 493 U.S. 20 (1989), the Supreme Court held that the notice requirements in RCRA "are mandatory conditions precedent to commencing suit under the RCRA citizen suit provision; a district court may not disregard these requirements at its discretion." Id. at 31. Further, the Supreme Court held that it is a court's nondiscretionary duty to dismiss a citizen suit that has not complied with the notice requirement. Id. (holding that when a party files a citizen suit without having complied with the notice requirement, "the

district court must dismiss the action as barred by the terms of the statute."). As with RCRA, courts have held that the notice provision in the CWA is a "jurisdictional prerequisite." See Public Interest Research Group of New Jersey, Inc. v. Hercules, Inc., 50 F.3d 1239, 1251 (3d Cir. 1995). Thus, in those instances where a plaintiff has failed to comply with the statutory notice provisions of the CWA, the claims are dismissed.

Pursuant to implementing regulations, notice under the CWA must include, at a minimum:

> . . . sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice.

40 C.F.R. § 135.3(a). PPG notes that many courts have held that Hallstrom requires strict compliance with the notice requirements under the various environmental statutes. See e.g., Atlantic States Legal Found. v. United Musical Instruments, 61 F.3d 473, 478 (6th Cir. 1995) (applying Hallstrom to a citizen suit under EPCRA and finding plaintiffs had not strictly complied with the notice requirements); Frilling v. Village of Anna, 924 F. Supp. 821, 833 (S.D. Ohio 1996) (CWA citizen suit plaintiffs "must provide notice of the specific limitations, standards or orders alleged to be violated."); Washington Trout v. McCain Foods, Inc., 45 F.3d 1351, 1354 (9th Cir. 1995) (interpreting Hallstrom to require strict compliance with all aspects of the notice requirement and thus holding a notice letter was deficient where it failed to include the identities, addresses, and phone numbers of the plaintiffs). However, even where courts broadly construe the notice requirements, the notice still must include "sufficient information to *permit the recipient to identify*" the components of the alleged violation. Hercules, 50 F.3d at 1247-48. Failing to provide the required specificity under the CWA citizen suit notice provision frustrates

the purpose of the notice requirement, which is to provide an alleged violator an opportunity to fix any problems.  See Atwell v. KW Plastics Recycling Div., 173 F. Supp. 2d 1213, 1222 (M.D. Ala. 2001).

PPG argues that Plaintiffs failed to provide notice for the July 2010 and November 2010 discharge violations contained in Exhibit 2 of the CWA Complaint.  (CWA Compl. Ex. 2.)  In Attachment 4 of the Notice of Intent to Sue, Plaintiffs do not list any discharge violations for July 2010 and November 2010.  (Id. Ex. 1, Attach. 4.)  PPG argues that Plaintiffs failed to comply with the plain language of the notice requirements in 40 C.F.R. § 135.3(a) for the July 2010 and November 2010 discharge violations because they did not include the dates of these violations in their Notice.  PPG argues that the Court should dismiss the July 2010 and November 2010 discharge violations.

PPG acknowledges that the Third Circuit has not always required strict compliance with the CWA notice requirements.  However, this case is distinguishable from Hercules because the Third Circuit found that the plaintiff's notice that included discharge violations did not prevent subsequently discovered monitoring, reporting or recordkeeping violations "directly related" to the noticed discharge violations.  50 F.3d at 1248.  Additionally, the Third Circuit still required that the "citizen provide enough information to enable the recipient, . . ., to identify the specific effluent discharge limitation which has been violated, including the parameter violated, the date of the violation, the outfall at which it occurred, and the person or persons involved."  Id.  By failing to include the July 2010 and November 2010 dates in Attachment 4 to their Notice letter, Plaintiffs did not provide sufficient information for PPG to identify "the date of the violation" PPG has submitted numerous monthly Effluent Monitoring Data reports to PADEP, which contain the basis for Plaintiffs' alleged discharge violations. See CWA Compl. ¶ 76. Without

providing at least the month in which the discharge violations occurred, PPG would have to comb through these reports to determine Plaintiffs' alleged discharge violations. PPG argues that a failure to provide this type of required information in the notice letter requires the improperly noticed allegations to be dismissed. See e.g., Severstal, 794 F. Supp. 2d at 621-22 (dismissing all of Chesapeake Bay Foundation's CWA claims because they did not list which of the 22 outfalls at which the alleged discharge violations occurred). As such, by not at least providing the month for the date of the July and November 2010 discharge violations, Plaintiffs have failed to provide sufficient notice for the date of these alleged violations.

Plaintiffs respond that PPG was given adequate notice "to permit the recipient to identify" the relevant violations, 40 C.F.R. § 135.3(a). They note that, excluding the transmittal letter, each of the Effluent Monitoring Data reports submitted by PPG is one page in length. See ECF No. 43 Ex. 12. Plaintiffs note that, if PPG had used the other information made available in the notice letter -- the specific standard, the activity alleged to constitute a violation, the person responsible for the alleged violation, and the location of the alleged violation -- PPG would have had to "comb" through a total of 11 sheets of paper to review all of its Effluent Monitoring Data reports from February through December 2010. Moreover, if PPG had reviewed every Effluent Monitoring Data Report from February 2010 through December 2011, PPG would have had to review just 23 sheets of paper. Plaintiffs state that they correctly identified the outfall, the parameter at issue as Total Suspended Solids (TSS), and the exact value of the discharges constituting violations. Moreover, since the discharges were acknowledged as violations in the reports themselves, PPG would have had no problem identifying them. See Ex. 12 at 12, 20. Plaintiffs therefore contend that PPG had more than adequate information to identify the July and November 2010 violations based on Plaintiffs' January 13, 2012, notice letter.

The Court concludes that PPG relies upon another hyper technical argument.  The list of discharge violations sent to PPG with Plaintiffs' Notice of Intent to Sue is essentially identical to the list included with the complaint, except that the first two violations are noted as occurring in "August" instead of "July" 2010 and the last four say "December" instead of "November."  In essence, PPG is citing a typographical error.  The omissions of the July and November 2010 violations cannot be compared to the situation in <u>Severstal</u>, when the plaintiffs simply named a facility, which had 22 outfalls, and provided no further information about the discharges.  PPG has not shown that, assuming it did not know that a mistake was made in the Notice of Intent to Sue, it would have been unduly burdened by having to "comb through" 11 or even 23 sheets of paper to find the correct information.  This argument is rejected.

<u>Whether Violations Are Ongoing</u>

PPG moves to dismiss Counts IX and X on the grounds that they allege only past, and not ongoing, violations of the CWA.  Plaintiffs respond that they have alleged ongoing violations.

The Supreme Court has held that CWA citizen suits may be brought only to abate ongoing, as opposed to wholly past, violations.  <u>Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.</u>, 484 U.S. 49 (1987) ("<u>Gwaltney I</u>").  "Consistent with this requirement, the Court held that jurisdiction will not lie where a plaintiff alleges claims for 'wholly past' violations."  <u>Natural Resources Defense Council v. Texaco Ref. & Mktg., Inc.</u>, 2 F.3d 493, 497 (3d Cir. 1993) ("<u>NRDC</u>")(citing <u>Gwaltney I</u>, 484 U.S. at 57-58); <u>see also</u> <u>Chesapeake Bay Foundation, Inc. v. Gwaltney of Smithfield, Ltd.</u>, 844 F.2d 170 (4th Cir. 1988) ("<u>Gwaltney II</u>").  As stated by the Supreme Court, in order for a court to have jurisdiction, citizen-plaintiffs must "allege a state of either continuous or intermittent violation – that is, a reasonable likelihood that a past polluter will continue to pollute in the future."  <u>Gwaltney I</u>, 484 U.S. at 57.  In order to

satisfy federal subject matter jurisdiction, a plaintiff's allegations of continuing violation must be made in "good faith." Id. at 64.  In Gwaltney II, the Fourth Circuit elaborated on what a plaintiff must show to demonstrate a continuing violation:

> Citizen-plaintiffs may accomplish this [proof of an ongoing violation] either (1) by proving violations continue on or after the date the complaint is filed, or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of recurrence in intermittent or sporadic violations. Intermittent or sporadic violations do not cease to be ongoing until the date when there is no real likelihood of repetition.

844 F.2d at 171-72.  The Court of Appeals for the Third Circuit has adopted the Fourth Circuit's standard in Gwaltney II.  See NRDC, 2 F.3d at 501.

Plaintiffs must make good faith allegations of ongoing violations as to each parameter separately.  See Chesapeake Bay Found. v. Gwaltney of Smithfield, Ltd., 890 F.2d 690, 696 (4th Cir. 1989) (expressly rejecting the idea that the permit should be viewed as a whole in determining whether violations are ongoing for purposes of jurisdiction); see also NRDC, 2 F.3d at 500-01.  Moreover, a single isolated exceedance of a parameter is insufficient to establish an "ongoing violation."  See Allen County Citizens for the Env't, Inc. v. BP Oil Co., 762 F. Supp. 733, 741 (N.D. Ohio 1991).  PPG argues that, similarly, courts can only exercise jurisdiction over CSL claims if they are "ongoing." See, e.g., L.E.A.D. Group of Berks v. Exide Corp., 1999 WL 124473, at *1 (E.D. Pa. Feb. 19, 1999) (dismissing certain discharge violations under both the CWA and CSL because they were not ongoing).

PPG argues that Plaintiffs have not sufficiently pled that the violations in Counts IX and X are ongoing, continuous, or intermittent.  PPG contends that Plaintiffs merely recite standard boilerplate in their CWA Complaint in an attempt to invoke this Court's jurisdiction over the alleged discharge violations.  PPG contends that "[a] closer examination of the factual allegations in the CWA Complaint shows that that they have only pled wholly past violations for

CWA Claims IX and X, and therefore, these claims must be dismissed." (ECF No. 25 at 42.)

First, PPG notes that Plaintiffs state that Counts IX and X are based on exceedances of limits in the approved Interim Abatement Plan pursuant to the 2009 Administrative Order for TSS for the period from February 2010 to December 2011.  (CWA Compl. ¶¶ 76, 79 & Ex. 2.) PPG argues that Plaintiffs have alleged only an isolated number of incidents that resulted in alleged TSS violations from August 2010 to October 2010 in Exhibit 2 of the CWA Complaint. See CWA Compl. Ex. 2.  Moreover, Plaintiffs have only alleged violations that occurred almost two years prior to the filing of the CWA Complaint.  Thus, PPG argues that Plaintiffs have only alleged wholly past violations for which there is no jurisdiction before this Court.

PPG further argues that, even assuming that Plaintiffs had alleged discharge violations that occurred closer in time to the filing of the CWA Complaint, Plaintiffs have only alleged sporadic and discrete violations and not ongoing violations.  See Allen County, 762 F. Supp. at 741 (finding that a small number of discrete effluent exceedances (such as for dissolved oxygen and cyanide) occurring only over a few months prior to the filing of complaint did not constitute an ongoing violation).  PPG argues that Plaintiffs have attempted to conflate the number of violations by listing violations of the average monthly limit for TSS as a violation for each day of the month.  See CWA Compl. Ex. 2.  While this may be proper to determine statutory maximum penalty amounts, Plaintiffs have in fact only alleged violations based on four isolated incidents that caused exceedances on the instantaneous maximum limit in the months of August 2010 to October 2010, which in turn caused an exceedance of the monthly average limit based on those isolated incidents.  For example, in August 2010, there was only one day where the TSS limit exceeded the instantaneous maximum limit in the 2009 Administrative Order.  See CWA Compl. Ex. 2. This single exceedance based on one isolated event, also caused the average

monthly limit to be exceeded for TSS.  Id. However, PPG argues that, in determining whether there is an ongoing violation for jurisdictional purposes, it would be entirely inappropriate to view the exceedance of an average monthly limit as 31 separate violations when the exceedance was based on one isolated incident in that month.  It claims that the court in Adams v. Teck Cominco Alaska, Inc., 2006 WL 2105501, at *7-8 (D. Alaska July 28, 2006), found that a violation of one daily exceedance of a Total Dissolved Solids (TDS) limit in a month that also exceeded the monthly average limit did not demonstrate that there was an ongoing violation of the monthly average limit.  Likewise, there were only two isolated incidents that led to exceedances of the instantaneous maximum and average monthly in September 2010 and one isolated incident that led to exceedances of the instantaneous maximum and average monthly in October 2010.  See CWA Compl. Ex. 2.  Accordingly, instead of the 100+ violations that Plaintiffs have attempted to plead in order to show ongoing violations, PPG argues that Plaintiffs have in fact only alleged several discrete violations of both the instantaneous daily and average monthly limits contained in the 2009 Administrative Order that occurred almost two years prior to the filing of the CWA Complaint.  As such, Plaintiffs have failed to properly plead an ongoing violation for CWA citizen suit jurisdictional purposes.

Plaintiffs respond that at the motion to dismiss stage, the proof of an ongoing violation is premature.  See Gwaltney I, 484 U.S. at 65-66 (plaintiff not required to offer proof "as a threshold matter to invoke the District Court's jurisdiction"). The only issue at this stage is whether they have made a good-faith allegation of ongoing violation.  Gwaltney II, 844 F.2d at 171.  Plaintiffs argue that the Supreme Court determined that in order to protect defendants against frivolous cases, citizens must make good-faith allegations which need only satisfy the pleading requirements of Rule 11 of the Federal Rules of Civil Procedure:

> Next, the [Supreme] Court established that it is the defendant's responsibility to challenge the truthfulness of the allegations of ongoing violations. If the defendant wishes to argue that the allegations are untrue, and the citizen lacks standing to bring the suit, the defendant must move for summary judgment and demonstrate that "the allegations were sham and raised no genuine issue of fact." [Gwaltney,] 108 S.Ct. at 386 (quoting United States v. SCRAP, 412 U.S. 669, 689 (1973)). If the defendant fails to convince the court that there are no genuine issues of fact after the plaintiff offers evidence to support the allegations of ongoing noncompliance, the case goes to trial on the merits. Id.

Sierra Club v. Union Oil Co. of California, 853 F.2d 667, 669 (9th Cir. 1988). In that case, the Ninth Circuit agreed with the district court that the Sierra Club's complaint alleged ongoing violations. The court relied upon the following language from the district court's decision:

> [P]laintiff alleges not only past violations by defendants, but continuing violations as well. The complaint alleges an ongoing pattern of frequent and substantial non-compliance with the Act on the part of defendants. In fact, the complaint explicitly states that the "interests of the Sierra Club members have been, are being, and unless the relief prayed herein is granted, will be, adversely affected by the failure of defendants to comply with their permit." The complaint also alleges "that, without the imposition of appropriate civil penalties and issuance of an injunction, defendants will continue to violate their NPDES permit to the further irreparable injury of plaintiff and the public."

Id. at 670.

Plaintiffs argue that the allegations of ongoing violation in this case are similar, if not stronger, than those upheld in Union Oil. Plaintiffs here have alleged 162 discharge violations and have further alleged, on the basis of those violations, that "these discharge violations are likely to recur on a continuous or intermittent basis either because there is a likelihood of recurring violations of the same parameters or that the source of those violations will cause recurring violations of one or more different parameters." (CWA Compl. ¶ 76.) In addition, they alleged that PPG's discharge of pollutants in violation of the CWA, the CSL, and the 2009 Administrative Order "has adversely affected, is adversely affecting, and will continue adversely to affect the health, economic, recreational, aesthetic, and environmental interests of

PennEnvironment and the Sierra Club's members." (CWA Compl.¶ 9.) Plaintiffs further asked

the Court to issue declaratory relief that "PPG has violated and continues to violate" the CWA,

the CSL, the 2009 Administrative Order and the July 2 Addendum. (CWA Compl. at 22-23

¶¶ A, B.)

Unless a plaintiff fails to allege "a state of either continuous or intermittent violation,"

Gwaltney I, 484 U.S. at 57, or the defendant files a summary judgment motion demonstrating

that the allegations of ongoing or continuing violation are "a sham and raise no genuine issue of

fact," Union Oil, 853 F.2d at 669, the plaintiff has the opportunity to prove the allegation through

a motion for summary judgment or at trial. Plaintiffs argue that they have alleged ongoing

violations that "are likely to recur on a continuous or intermittent basis," and that nothing more is

needed in response to a motion to dismiss.

Plaintiffs disagree that the violations are "isolated" incidents and that "isolated"

incidents are not ongoing violations, particularly when they are intermittent. Nevertheless,

Plaintiffs assert that whether the alleged violations are sufficient "to establish an 'ongoing

violation'" is a matter of proof and Plaintiffs argue that they are not required to present proof in

opposition to a motion to dismiss.

Plaintiffs note that PPG offers no support for its argument that they must establish an

ongoing violation in their complaint. PPG cites two cases for the proposition that a small

number of "discrete" violations do not constitute an ongoing violation. But Plaintiffs note that

Allen County was decided on the defendants' motion for summary judgment, not on a motion to

dismiss. Furthermore, the violation that the court found to be an isolated occurrence was a single

pre-complaint violation followed by a "41 month span of time in which not a single exceedance

of the permit limit for ammonia was reported." 762 F. Supp. 2d at 744. That is not the situation

here, but, even if it were, the appropriate vehicle for such determination is a motion for summary judgment or trial where the evidence can be examined.  Likewise, <u>Adams</u> involved a motion for summary judgment, not a motion to dismiss.  2006 WL 2105501, at *1.  Moreover, Plaintiffs contend that <u>Adams</u> did not hold, as PPG argues, that the violation of a maximum limitation that also causes the violation of a monthly average limitation cannot demonstrate an ongoing violation.  Rather, in that case, the plaintiffs alleged in their 2004 complaint violations of the maximum and average TDS limitation. <u>Id.</u> at *2, 5, 7.  In 2003, before the complaint was filed, the defendant's permit was modified and no longer included a monthly average limitation.  <u>Id.</u> at *7.  In support of their claim that the average violations were nonetheless ongoing at the time of the complaint, the plaintiffs argued that the defendant's continued violation of its maximum limitation somehow showed that it was in ongoing violation of both limitations because the permit change was "intended to serve as both the daily maximum limit and the monthly average limit." <u>Id.</u> at *7-*8. The court declined to interpret the permit in that fashion because, where EPA intended to impose an average limit, it used the words "'monthly average' limit" and it had not done so.  <u>Id.</u> at *8.  There was no post-complaint  violation of a monthly average limitation since no such limit existed; thus the pre-complaint monthly average violations were wholly past.

As the Fourth Circuit explained in <u>Gwaltney II</u>, whether intermittent or sporadic violations are ongoing or wholly past requires evidence, including evidence as to whether "the risk of defendant's continued violation had been completely eradicated when citizen-plaintiffs filed suit." 844 F.2d at 171-72.  Plaintiffs argue that such an examination of the evidence must be made through a summary judgment motion or at trial, not in a motion to dismiss.  At the appropriate time, the existence of post-complaint violations is one of the ways that a plaintiff can establish an ongoing violation at the time of suit.  <u>Id.</u> at 171.

Plaintiffs indicate that they intend to show that unlawful pre-complaint discharges that affect the sediments continue or are ongoing until the sediments are remediated.  Courts have found that violations of the CWA are ongoing against the polluter where the pollutants discharged without a permit or in violation of a permit remain in the waterway.  See, e.g., Raritan Baykeeper v. NL Industries, Inc., 2013 WL 103880, at *20 (D.N.J. Jan. 8, 2013) ("Baykeeper II") ("if NL discharged these pollutants into the river without a permit, it is still in violation of the CWA because remedial measures have not been taken that clearly eliminate the cause of the violation"); Sasser v. EPA, 990 F.2d 127, 128-129 (4th Cir. 1993)(where complaint alleged violation of CWA by discharge of a pollutant from a point source without a permit, "[e]ach day the pollutant remains in the wetlands without a permit constitutes an additional day of violation").  In United States v. Alcoa, Inc., 98 F. Supp. 2d 1031, 1037 (N.D. Ind. 2000), the government, seeking to have illegally discharged pollutants removed from the sediments, argued that the discharged pollutants "settle into the sediment and from there, continue to be released into the water," constituting a "continuing violation" of the CWA. It analogized the discharge case to fill cases, since in both situations, the harm resulted from the pollutant remaining in the sediment.  The court agreed, finding that "the court's authority to grant an injunction 'to require compliance' in Section 309(b) [of the CWA, 33 U.S.C. 1319(b)] is broad enough to include the mandated clean up of contaminated sediments where the sediments are contaminated as a direct result of NPDES Permit violations." Id. at 1038.

The Court concludes that Plaintiffs have properly alleged ongoing violations.  PPG's argument delves into the merits of the case and would be appropriate at the summary judgment stage of this case, but is premature in the context of a motion to dismiss.  Therefore, with respect to Counts IX and X, the motion to dismiss is denied.

<u>Whether Reporting Violations Are Ongoing</u>

PPG moves to dismiss the reporting violations in Counts XI and XII on the grounds that they are for past activity and are not ongoing.  Plaintiffs respond that they have alleged ongoing reporting violations.

Similar to discharge violations under the CWA, reporting violations must also be ongoing in order for a court to have jurisdiction over such claims.  A plaintiff can only demonstrate an ongoing violation either: (1) by proving violations continue on or after the date the complaint is filed; or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of recurrence in intermittent or sporadic violations.  <u>Gwaltney II</u>, 844 F.2d at 171-72. PPG contends that Plaintiffs cannot show that the alleged reporting violations in Counts XI and XII are ongoing because: (1) PPG has not committed a reporting violation since the filing of the CWA Complaint; and (2) there is no likelihood of recurrence of PPG committing a reporting violation.  First, PPG has timely submitted reports under the 2009 Administrative Order since January 2012 to the extent that there may have been previous isolated incidences of late submittals.  See PPG Ex. 33.  Second, Plaintiffs cannot meet their burden of showing that there is a likelihood of recurrence for this reporting obligation because PPG has taken affirmative steps to ensure that this reporting violation will not recur. The reporting violations in question consist of isolated instances where reports required under the 2009 Administrative Order were a day or so late.  Because the required data and reports have been prepared by PPG's consultant, there were a few instances where submission was delayed pending review and approval from several individuals.  Prior to the filing of the CWA Complaint, PPG issued instructions mandating the expeditious review, approval, and submission of these reports and has eliminated this deficiency. There simply have been no instances of untimely reporting since that time.  Accordingly,

because the alleged reporting violations in Counts XI and XII are wholly past violations, they must be dismissed.

Plaintiffs respond that PPG misunderstands what is required under <u>Gwaltney</u> at the pleading stage.  At the pleading stage, Plaintiffs are not required to present their proof.  The presentation of proof is required in response to a motion for summary judgment or at trial.  In addition, PPG has based its argument on matters outside of the complaint – its alleged "affirmative steps to ensure that this reporting violation will not recur" -- which is not appropriate for a motion to dismiss.

Again, PPG's argument must be rejected as beyond the scope of a motion to dismiss.  It relies on matters outside the complaint and documents to which the Court can properly refer to delve into the merits of the case.  Plaintiffs have properly pled ongoing reporting violations.  Therefore, with respect to Counts XI and XII, the motion to dismiss is denied.

<u>RCRA Imminent and Substantial Endangerment Claim</u>

In the RCRA Complaint, Plaintiffs refer to the site at issue as the "PPG Waste Site." (RCRA Compl. ¶ 19.)  In the background to their RCRA claim, Plaintiffs define the "PPG Waste Site" to consist of the slurry lagoons, the solid waste disposal area, the plumbing fixture landfill and four baseball fields.  PPG argues that Plaintiffs have inappropriately included the plumbing fixture landfill (Eljer landfill) and baseball fields in the definition of the "PPG Waste Site" because they fail to make a single allegation with respect to these areas in their RCRA Complaint.

Plaintiffs' RCRA Complaint only asserts one claim for relief; an imminent and substantial endangerment claim under RCRA, 42 U.S.C. § 6972(a)(1)(B).  A fundamental allegation in order to support a claim for relief under RCRA's imminent and substantial

endangerment provision is that the claim may only be brought against a person "who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste" at a particular location. 42 U.S.C. § 6972(a)(1)(B).  PPG argues that Plaintiffs have not alleged that it handled, stored, treated, transported or disposed of solid waste or hazardous waste at the plumbing fixture landfill (Eljer landfill) or ballfields anywhere in their RCRA Complaint and therefore have failed to state a RCRA imminent and substantial endangerment claim with respect to these areas.  PPG notes that Plaintiffs even admit that PPG had no involvement with respect to any waste activities at the Eljer landfill. See RCRA Compl. ¶18 (stating that the plumbing fixture landfill "was used and occupied by Eljer, Inc."). PPG contends that Eljer Industries has taken full responsibility for this landfill area and completed closure activities for this area that were approved by PADEP.  See PPG Ex. 34.  Further, it argues that there is no evidence that PPG ever conducted any landfilling or other waste disposal in the area that became ballfields. (PPG Ex. 3, at 1-5 to 1-6.)

PPG argues that Plaintiffs have attempted to include the Eljer landfill and ballfields in their RCRA Complaint by broadly defining the Site to include these areas but have not provided any factual allegations to support this definition.  These "'[n]aked assertions' devoid of 'further factual enhancement'" by Plaintiffs are insufficient to state a claim with respect to the Eljer landfill and ballfields for a RCRA imminent and substantial endangerment claim.  See Iqbal, 556 U.S. at 678.  PPG argues that this Court must dismiss Plaintiffs' RCRA Complaint to the extent it includes the Eljer landfill and ballfield areas.

Plaintiffs respond that they have stated a RCRA imminent and substantial endangerment claim with respect to the ballfield and the plumbing fixture landfill areas.  Plaintiffs' RCRA Claim extends to the full property, which they have labeled the "PPG Waste Site" in the RCRA

Complaint.  (RCRA Compl. ¶¶ 1,19, 34.)  Plaintiffs have alleged that the full property "may present an imminent and substantial endangerment to human health and the environment" that must be remediated.  Again, PPG asserts the hyper technical argument that the RCRA Complaint does not explicitly refer to the Eljer landfill and ballfield areas, but by alleging that they constitute part of the Site, Plaintiffs have alleged that these areas were affected.

Plaintiffs argue that the RCRA Complaint properly includes the full extent of the property in the RCRA Claim because PADEP found that the contaminants in the PPG waste material are spreading or migrating from the areas in which they were originally deposited. (PPG Ex. 2 ¶¶ 13-15, 21, 23-24, 26, 29.)  Moreover, the original handling of the waste and its disposal at the site is unlikely to have been so precise as to be confined only to the slurry lagoon and solid waste disposal areas, and not to have affected adjoining areas, particularly since the original waste deposits occurred well before the enactment of today's rigorous laws regarding the handling of hazardous and solid waste.

Plaintiffs assert that they properly included the full property in their RCRA Claim. However, they note that, in the event that no conditions that "may present an imminent and substantial endangerment to human health or the environment" exist in either the ballfield or plumbing fixture landfill area (or any other part of the property), PPG will not have to conduct any remediation in those areas.  On the other hand, if the conditions that "may present an imminent and substantial endangerment to human health or the environment" extend from the slurry lagoon and/or solid waste disposal areas into the ballfield and/or plumbing fixture landfill areas, PPG must be required to remediate these areas. However, this issue may not be determined on the basis of a motion to dismiss.

Plaintiffs note that the statement in paragraph 18 of the RCRA Complaint that the

plumbing fixture landfill "was used and occupied by Eljer, Inc." is not an admission that PPG

had no involvement.  It is merely a statement that Eljer, Inc. also had involvement.

PPG cites PPG Exhibits 3 and 34 as support for its claim that there is no evidence that

PPG has any responsibility for disposing of waste in these two areas.  However, Plaintiffs argue

that these two exhibits represent matters outside of the pleadings and may not be considered by

the Court in the context of PPG's motion to dismiss.  Accordingly, neither exhibit presents a

basis for limitation of Plaintiffs' RCRA Claim at this time.

The Court agrees.  The RCRA Complaint defines the Site as including the plumbing

fixture and the ballfields and alleges PPG's involvement, even if Eljer also had involvement.

PPG's attempt to contradict the allegations of the complaint by citing materials outside the

complaint is premature and cannot form a basis to dismiss the RCRA Complaint at this time.

Therefore, PPG's motion to dismiss the RCRA Complaint is denied.

<u>Status of Ford City</u>

Ford City moves for dismissal of the RCRA Complaint on the ground that it states no

cause of action against it.  Plaintiffs respond that it is an indispensable party.

Federal Rule of Civil Procedure 19(a) states that a party must be joined in an action if:

that person claims an interest relating to the subject of the action and is so situated
that disposing of the action in the person's absence may:

(i) as a practical matter impair or impede the person's ability to protect the
interest; or

(ii) leave an existing party subject to a substantial risk of incurring double,
multiple, or otherwise inconsistent obligations because of the interest.

Fed.R.Civ.P. 19(a)(1)(B).  Plaintiffs note that both complaints make clear that Ford City is joined

as an indispensable party based on its status as owner of the Site, even though no relief is sought

from it.  (CWA Compl. ¶ 13 & at 23-24; RCRA Compl. ¶ 15 & at 11.)  PPG sold the property to

Ford City for one dollar in 1972 (CWA Compl. ¶ 21; RCRA Compl. ¶ 23; PPG Ex. 5) and thus, Plaintiffs argue, any decision in this case will affect Ford City's interest in the property.

Ford City's argument is rejected. Although Plaintiffs have not stated any claims against it, any decision in this case will affect its interest in the Site as property owner and thus it is properly joined as an indispensable party under Rule 19. See Steel Valley Auth. v. Union Switch and Signal Div., 809 F.2d 1006, 1013-14 (3d Cir. 1987) (a property owner is a party to be joined if injunctive relief would interfere with its rights); Baykeeper II, 2013 WL 103880, at *21 (same). Therefore, Ford City's motion to dismiss the RCRA Complaint is denied.

In summary, Plaintiffs have standing to proceed with this citizen suit and PPG has not demonstrated that the Court should abstain based on the doctrine of primary jurisdiction. PPG's other arguments for dismissal are unavailing and Ford City should remain in the case as an indispensable party. An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PENNENVIRONMENT and SIERRA CLUB,  )
                    Plaintiffs,  )
                            )
    vs.  )            Civil Action No. 12-342
                            )
PPG INDUSTRIES, INC. and BOROUGH OF  )
FORD CITY,  )
                  Defendants.  )

ORDER

AND NOW, this 8th day of August, 2013, for the reasons provided in the Memorandum Opinion,

IT IS HEREBY ORDERED that the motion to dismiss filed by Defendant PPG Industries, Inc. (ECF No. 24) is denied.

IT IS FURTHER ORDERED that the motion to dismiss filed by Defendant Borough of Ford City (ECF No. 29) is denied.

s/Robert C. Mitchell_____
ROBERT C. MITCHELL
United States Magistrate Judge