IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PENNENVIRONMENT and SIERRA CLUB,      )
               Plaintiffs,      )
                        )
      vs.                     )     Civil Action No. 12-342
                        )     Member Cases: 12-527, 13-1395,
PPG INDUSTRIES, INC., BOROUGH OF FORD      )     13-1396, 14-229
CITY, and BUFFALO & PITTSBURGH      )
RAILROAD, INC.,      )
              Defendants.      )

MEMORANDUM OPINION AND ORDER

       Plaintiffs, PennEnvironment and Sierra Club, bring these citizen suits pursuant to section

505 of the Federal Water Pollution Control Act, 33 U.S.C. § 1365(a)(1) (Clean Water Act or

CWA), section 7002(a)(1)(B) of the Resource Conservation and Recovery Act, 42 U.S.C.

§ 6972(a)(1)(B) (RCRA), and section 601(c) of the Pennsylvania Clean Streams Law, 35 P.S.

§ 691.601(c) (CSL), against Defendants, PPG Industries, Inc. (PPG), the Borough of Ford City

(Ford City), and Buffalo & Pittsburgh Railroad, Inc. (BPRI), to remedy the alleged imminent and

substantial endangerment to health and the environment presented by contamination of a site in

Armstrong County, Pennsylvania used and operated by PPG (the "Site"), contamination of

surface waters and sediments in the Allegheny River and Glade Run in the vicinity of the Site,

and contamination of groundwater associated with the Site.[1]

       Presently pending before the Court are cross-motions for summary judgment on the issue

of Plaintiffs' standing, filed by Plaintiffs and PPG. For the reasons that follow, Plaintiffs'

motion for partial summary judgment will be granted and PPG's motion will be denied.

---

[1] As explained infra, Plaintiffs have indicated that they are not pursuing claims against or seeking
specific relief from Ford City or BPRI, but have joined these defendants as indispensable parties.

<u>Facts</u>

The Site is located in North Buffalo and Cadogan Townships in Armstrong County, Pennsylvania.  It is bordered by Route 128 to the north, the Allegheny River to the south, Glade Run, a tributary of the Allegheny River, to the west and a feature that PPG terms the "Drainage Ditch" which flows southward and discharges into the Allegheny River to the east.  (CWA Compl. ¶ 15.)[2]  From 1949 until 1970, PPG used parts of the property to dispose of slurry waste and solid waste from its former glass manufacturing facility across the river in Ford City, Pennsylvania.  (2009 Administrative Order at PADEP3).[3]

PPG created three slurry lagoons in an area formerly used as sandstone quarry in which it deposited the slurry waste. (Treatment Plan Report, Former Ford City Facility Slurry Lagoon Area, prepared by Shaw Environmental, Inc. (Dec. 2012) ("Shaw Treatment Plan Report") at 2).[4] Collectively, the lagoons and surrounding area comprise an area of approximately 77 acres called the "slurry lagoon area" ("SLA") on the western part of the property.  PPG also disposed of solid waste in a landfill at the Site called the "solid waste disposal area" ("SWDA") beginning in the 1920s until 1967.  (2009 Administrative Order at PADEP3.)  The Allegheny River lies to the south of both the SLA and SWDA.  Glade Run, a tributary to the Allegheny River, lies to the west of the SLA.  (Treatment Plan Report at 1.)

In June 1994, the Pennsylvania Department of Environmental Protection (PADEP) conducted sampling and a survey of the streams in and around the Site.  (ECF No. 119 Ex. 10.) The report of the survey stated that sediment samples collected from Glade Run downstream of the SLA contained high levels of lead, chromium, arsenic, barium, copper, nickel, aluminum and

---

[2] Civ. A. No. 12-342, ECF No. 1.
[3] Pls.' App. (ECF No. 119) Ex. 13.
[4] ECF No. 119 Ex. 22.

zinc. (Id. at PPG008633.) The report found that, of those metals, the lead, arsenic, barium, and chromium sediment analysis exhibited hazardous waste characteristics. The report also stated that there were no benthic macroinvertebrates present in the substrate collected from Glade Run downstream of the SLA. The report compared sediment samples from Glade Run downstream of the SLA with samples taken upstream of the SLA and found that the downstream samples exhibited higher levels of lead, chromium, copper, nickel, aluminum, and zinc. (Id. at PPG008634). The report concluded that the discolored seeps have a visible impact on the stream and that the slurry lagoon is having an adverse impact on the stream water quality and aquatic life. (Id. at PPG008635).

In a subsequent memorandum, PADEP noted that "the slurry lagoon seeps are having an adverse impact on aquatic life in on-site stream." (ECF No. 119 Ex. 11.) The memorandum found that the data from PPG's own risk assessment submitted to PADEP indicated that both lead and antimony in sediments may "impact aquatic life and benthic organisms potentially exposed to slurry lagoon sediments." (Id. at PADEP000612.)

2009 Administrative Order

On March 9, 2009, PADEP issued an Administrative Order to PPG regarding the site which contained factual findings and imposed certain performance obligations. (2009 Administrative Order at PADEP2-9). In the letter accompanying the Administrative Order, PADEP stated that "[t]he Department believes that the discharges coming from the site and entering into the Allegheny River and Glade Run pose a significant threat to public health and the environment." (ECF No. 119 Ex. 12.)

The Administrative Order described the process by which precipitation becomes contaminated with hazardous substances: "Precipitation which infiltrates the Slurry Lagoons and

the Landfill at the Site becomes contaminated with *hazardous substances*, as defined under the

Hazardous Sites Cleanup Act (HSCA), [* * *] and then is discharged into the waters of the

Commonwealth. This contaminated precipitation is known as 'Leachate.'" (2009 Administrative

Order at PADEP4). The Order further stated that "PPG is allowing contaminated Leachate and

other liquids to be discharged from the Site into waters of the Commonwealth, resulting in

pollution of those waters of the Commonwealth." (Id. at PADEP5). The Administrative Order

stated that the industrial waste discharges from the Site "are pollutional and have a very high pH

and contain metals and other toxic chemicals." (Id. at PADEP4).

The Administrative Order imposed, inter alia, the following Performance Obligations

on PPG:

> a. PPG shall conduct weekly monitoring and reporting of seeps, for flow, total
> suspended solids, oil and grease, iron, aluminum, lead, chromium, antimony,
> arsenic, and pH and report results to PADEP on a monthly basis;
> b. Until such time as discharges, leachate, and seeps are collected and conveyed
> to an industrial waste treatment facility and the discharge from said facility
> is authorized by an NPDES permit, PPG shall implement interim abatement
> measures;
> c. PPG shall submit to the Department for review and approval a treatment plan
> and schedule ("Treatment Plan") to collect and treat all industrial waste
> discharges, Leachate and seeps from the Site into the waters of the
> Commonwealth.

(Id. at  PADEP6-7 ¶¶ A, C, D.)  Additionally, the sampling and monitoring are required to

comply with the sample collection, preservation and laboratory analysis in 40 CFR Part 136

(requirements for reports submitted under a National Pollutant Discharge Elimination System

("NPDES")).  (Id. at PADEP6 ¶ A.)

Per the 2009 Administrative Order, PPG has been submitting these Monthly Progress

Reports to PADEP, with the sampling and monitoring results, beginning in April 2009.  (PPG

App. Ex. B.)[5]

<u>Interim Abatement System and Treatment Plan</u>

On July 2, 2009, PADEP approved PPG's revised interim abatement plan and issued an

Addendum to the Administrative Order. (ECF No. 119 Ex. 16 at PADEP16-19). Attachment A

to the Addendum required that the interim system comply with several additional requirements,

including a prohibition on the discharge of untreated or ineffectively treated wastewaters. (<u>Id.</u> at

PADEP18). The Addendum imposed monitoring requirements for ten parameters: flow,

suspended solids ("TSS"), oil and grease, aluminum, arsenic, iron, lead, chromium, antimony,

and pH. (<u>Id.</u>) The Addendum also imposed effluent limitations for three of those parameters:

TSS, oil and grease, and pH, while the other parameters were required to be monitored and

reported. The results of the sampling and monitoring are required to be submitted to

PADEP (both Chief of the Operations Section and Chief of the Permits Section in the Water

Management Program) within 28 days following the end of the calendar month on the enclosed

form, a discharge monitoring report ("DMR"). (<u>Id.</u>)

PPG's interim abatement system under the Administrative Order and Addendum became

operational in 2010. (Shaw Treatment Plan Report at 6.) PPG collects flow from several seeps,

as well as the flow through the drainage ditch, and directs it to an interim treatment system (also

called the interim abatement system or "IAS"), where the pH is adjusted. (<u>Id.</u>)

Plaintiffs state that some seepage water are directed to the Interim Treatment System and

treated for pH before being discharged through Outfall 001, but that additional seeps remain

uncollected. (Treatment Plan Report at 46; Kilburg Dep. at 39:1-20.)[6]

Pursuant to the monitoring requirements of the July 2009 Addendum, PPG monitors the

_____

[5] ECF No. 141.
[6] Pls.' Resp. App. (ECF No. 147) Ex. 1; Ex. 18.

discharges from the treatment system for the presence of aluminum, arsenic, iron, lead, chromium, and antimony, all of which, Plaintiffs note, are consistently documented in the discharges. (ECF No. 119 Ex. 19 at PADEP2937-2972). PPG responds that PENTOXSD modeling showed that applicable Pennsylvania Water Quality Standards in the Allegheny River were fully protected using conservative estimates of aluminum, iron, lead, chromium, and antimony concentrations in the discharges from the interim treatment system on the Site. (Shaw Treatment Plan Report at 50-51.)[7]

PPG states that it has submitted the required monthly DMRs to PADEP, containing the required sampling and monitoring results, beginning in February 2010 (containing January 2010 data as the treatment and collection system was installed at the end of January). (ECF No. 141 Ex. D.) Plaintiffs dispute this assertion on the basis that the monthly DMRs contain 268 discharge violations, which they contend are material to issues of PPG's liability.

PPG states that the monthly DMRs contain exactly the same information as the exemplar DMR provided by the United States Environmental Protection Agency ("EPA") under the NPDES permits program. (ECF No. 141 Ex. E.) Plaintiffs dispute this statement, contending that the exemplar DMR resembles the DMRs submitted by PPG to PADEP in format only and that the DMRs that PPG is required to submit do not include all of the information that would be required on DMRs submitted pursuant to an NPDES permit. For example, PPG's DMRs pertain only to Outfall 001, require monitoring for only ten parameters and include effluent limitations for only three parameters. Furthermore, a DMR submitted pursuant to an NPDES permit provides information regarding the level of pollutants in a discharge to the applicable receiving water. The data submitted by PPG in its DMRs reflects the level of pollutants at the point of

---

[7] PPG Resp. App. (ECF No. 144) Ex A.

discharge from the interim abatement system via Outfall 001, not the point of discharge to the Allegheny River. For example, Outfall 001 feeds culverts at the level of the railroad tracks and does not discharge directly to the Allegheny River. (Shaw Treatment Plan Report, App. M.)[8] The pH at the culverts prior to discharge to the Allegheny River is considerably higher than the pH recorded at Outfall 001. (Pls.' Second Supp. Notice Letter, Attach. 6.)[9] Moreover, the requirements of the Administrative Order were issued without the procedures required for the application and grant of an NPDES permit, which mandate the disclosure of additional information not part of the DMRs and afford opportunities for public participation.

PPG conducted sampling of sediments from the Allegheny River, Glade Run, and the drainage ditch/Stream 2 on March 27-28, 2012. (Sediment Sample Locations, Key Environmental, Inc. at PPG004028).[10] Analysis of the samples demonstrated the presence of arsenic, cadmium, copper, iron, lead, and manganese. TestAmerica Analytical Report, Job Number: 180-9352-1, PPG Ford City Site (April 19, 2012) at PPG003799-3838).[11] PPG notes that Plaintiffs' exhibit is dated March 25, 2013 (not March 25, 2012), which indicates that it was prepared almost a year after the April 19, 2012 Test Results. Thus, PPG claims that Plaintiffs have not shown that the Test Results provide sediment sample results from the Allegheny River, Glade Run, and the Drainage Ditch. Nevertheless, as Plaintiffs observe, PPG has not denied that the sediment samples reflect the sampling locations analyzed in the Report and they contend that PPG's counsel represented that the March 25, 2013 map represented the locations of the samples in the April 19, 2012 report. (Pls.' Reply App. Ex. 3.)[12]

[8] ECF No. 147 Ex. 1.
[9] ECF No. 105.
[10] ECF No. 119 Ex. 20.
[11] ECF No. 119 Ex. 21.
[12] ECF No. 155.

In December 2012, PPG submitted a Treatment Plan Report under the Administrative Order, which discussed remedial alternatives and the selection of a proposed remedial alternative involving limited enhancements to the current interim abatement system. (Shaw Treatment Plan Report at 87-89.)[13] Plaintiffs note that the Treatment Plan Report reported that leachate discharged from the seeps has a pH of 9.0-12.0 standard units and contains aluminum, arsenic, chromium, iron, lead, and antimony, all of which are present in the waste material in the SLA. (Id. at 39.)

Plaintiff Organizations and Members

Plaintiff PennEnvironment is a non-profit organization in the State of Pennsylvania whose mission is to protect and preserve Pennsylvania's environment through education, research, lobbying, litigation, and citizen organizing. (Masur Aff. ¶¶ 3-4.)[14] PennEnvironment has approximately 15,000 members who make financial contributions, while approximately 100,000 individuals subscribe to its e-mail action network. (Id.) David Masur has served as the director of PennEnvironment since 2002. (Masur Aff. ¶ 2.)

Members of PennEnvironment live in and around Ford City, Pennsylvania, and in the vicinity of the Allegheny River. Members also recreate in and around the Allegheny River. (Masur Aff. ¶ 8.)

PennEnvironment engages citizens to assist in lobbying efforts and is involved in litigation to protect the State's waterways. (Masur Aff. ¶¶ 6-7.) PennEnvironment monitors pollution and water quality in the State and sends out email updates to members biweekly. (Masur Dep. at 24.)[15] PennEnvironment also issues reports on these topics, including a 2012

---

[13] ECF No. 119 Ex. 22.
[14] ECF No. 119 Ex. 23.
[15] ECF No. 119 Ex. 29. Because the parties have cited different portions of Mr. Masur's

report, "Wasting Our Waterways 2012: Toxic Industrial Pollution and the Unfulfilled Promise of the Clean Water Act." (Masur Aff. ¶ 9.) These efforts depend on accurate and complete information about water quality. (Masur Aff. ¶ 11; Masur Dep. at 92-93.)

PennEnvironment states that PPG's failure to obtain an NPDES permit for its discharges from the Site deprives it of complete and accurate information and an opportunity for public participation in efforts to protect the quality of the Allegheny River, foreclosing a mechanism "by which the public can both be educated and engaged, use data, and take action to try and clean up the river." (Masur Dep. at 92; see also Masur Aff. ¶ 11.)

PPG responds that Mr. Masur admitted that, prior to the commencement of this suit, PennEnvironment did not engage any of its members in a campaign or lobbying efforts on "how to get their voices heard" regarding the Site, nor has PennEnvironment ever lobbied PADEP or any other authority regarding the Site. (Masur Dep. at 37:15-25, 38:1-21, 39:6-13.)[16] Plaintiffs state that Mr. Masur testified that PennEnvironment "engage[s] [its] members around broader issues" related to the case. (Masur Dep. at 38:8-10.) They also indicate that PennEnvironment and the Sierra Club submitted comments to PADEP regarding the inadequacy of PPG's Treatment Plan Report. (Pravlik Letter Mar. 27, 2013.)[17] And they reiterate that the information submitted by PPG to PADEP is not equivalent to the information that would be available pursuant to the application for and issuance of an NPDES permit.

PPG states that at no time has PennEnvironment ever researched the Site through PADEP's public databases or requested, formally or informally, PPG's monthly progress reports or DMRs submitted to PADEP. (Masur Dep. at 36:17-25, 37:1-2, 40:21-25, 41:1-10, 88:18-20,

---

deposition, he appears five times in the record.
[16] ECF No. 141 Ex. J.
[17] ECF No. 147 Ex. 2.

89:19-25, 90:1-3.) PennEnvironment disputes this claim, stating that it and Sierra Club, through their counsel, have requested and obtained these materials from PADEP. (Pravlik Aff. ¶ 8.)[18]

PPG notes that PennEnvironment does not report on all water quality issues in biweekly updates to its e-mail subscriber list (which is broader than the organization's actual members) and decides which issues to report based on waterways that PennEnvironment's local members "care deeply about." (Masur Dep. at 25:22-25, 26:3-12, 28:10-24.)[19] PennEnvironment has never been unable to send out an e-mail update because of lack of information specific to the Site. (Id. at 95:1-9.) For the referenced "Wasting Our Waterways 2012: Toxic Industrial Pollution and the Unfulfilled Promise of the Clean Water Act" report, Mr. Masur admitted that the information for this report did not come from NPDES permit reporting requirements, but rather from the Toxic Release Inventory (TRI), which he acknowledged has certain "threshold requirements for reporting" that "vary based on the emission and, potentially, how toxic it is." (Id. at 97:23-25, 98:1-7, 99:4-17.)

PPG states that PennEnvironment first circulated to its members information regarding the Site in a press release distributed after this lawsuit was first filed in March 2012. (Masur Dep. at 45:20-25, 46:1-25, 47:1-12;[20] Masur Aff. ¶ 9.) Plaintiffs respond that the press release was distributed on January 4, 2012, three months prior to the filing of the lawsuit, on March 30, 2012. (Masur Dep. at 45:20-46:11.) PPG notes that PennEnvironment has been able to educate its members on environmental issues despite their lack of acquired information on the Site. (Masur Dep. at 95:1-9, 24-25, 96:1-3, 15-19, 97:2-8.)

Plaintiffs reply that they have been unable to provide their members with "accurate and

---

[18] ECF No. 147 Ex. 16.
[19] ECF No. 144 Ex. B.
[20] ECF No. 141 Ex. J.

complete information" about PPG's discharges because it did not obtain an NPDES permit. (Masur Aff. ¶ 11; Masur Dep. at 83:12-84:22, 85:8-22; 90:4-15.)

PPG states that PennEnvironment first became aware of the Site in approximately 2008 from local news outlets, one being the Pittsburgh Post-Gazette. (Masur Dep. at 42:24-25; 43:1-18.) Plaintiffs emphasize that the organization was aware of the Site prior to discussions regarding the lawsuit. (Masur Dep. at 60:22-23.)

PPG notes that PennEnvironment has admitted it had "no plans" to file a lawsuit against PPG with respect to the Site until it was contacted by the law firm of Terris Pravlik and Millian, LLP ("TPM"). (Masur Dep. at 60:19-25, 61:1-5.)[21] Plaintiffs respond that, as early as February 1, 2010, Masur spoke with TPM attorney Alicia Alcorn regarding PennEnvironment's interest in filing citizen suits and his assessment that enforcement actions could be brought for sites in western Pennsylvania. (Alcorn Aff. ¶ 4.)[22]

The Retainer Agreement between PennEnvironment and TPM states that PennEnvironment will not be liable for any of TPM's fees or expenses incurred in connection with this suit. (PennEnvironment Retainer Agreement ¶¶ 2-3.)[23] The Retainer Agreement further provides that the PennEnvironment "shall make all good-faith efforts to assist the Firm [TPM] in locating individuals who are willing to participate in the lawsuit in order to satisfy standing requirements." (Id. ¶ 8.)

PPG notes that PennEnvironment did not have any knowledge of any individual members who claimed to be harmed or injured by the pollution from the Site prior to the filing of the Complaints or before it sent the Notice of Intent to Sue Letter to PPG. (Masur Dep. at 111:9-13,

---

[21] ECF No. 141 Ex. J.
[22] ECF No. 147 Ex. 17.
[23] ECF No. 141 Ex. N.

113:2-6.)[24]  After suit was filed, PennEnvironment sent two e-mails, the first dated November 13, 2012 and the second dated March 11, 2013, in which it requested "members who want to assist us" with regard to the Site. (ECF No. 141 Ex. O; Masur Dep. at 26:13-25, 27:1-5.)

Plaintiffs respond that it is not material whether the members were identified when suit was filed.  TPM has previously served as counsel to organizations in CWA and RCRA suits who filed cases prior to determining specific members who were willing to participate.  (Pravlik Aff. ¶¶ 3-5.)

PPG states that, as to the organization itself, Mr. Masur testified that the only "harm" to the organization is that its interests in monitoring polluters and collecting information are harmed by PPG's failure to obtain an NPDES permit for the discharges from the Site and PPG's failure to following the monitoring and reporting obligations in CWA permits. (Masur Dep. at 83:21-25, 84:1-7, 85:8-22; see also Masur Aff. ¶ 11.) Plaintiffs point out that Mr. Masur testified that, as stated in his affidavit, PennEnvironment's interest in obtaining accurate and complete information about water quality to report to its members and to pursue organizing efforts, and legislative and litigation efforts, is harmed by PPG's failure to obtain an NPDES permit and comply with the requirements of the CWA.  (Masur Dep. at 83:12-84:22, 85:8-22, 90:4-15; Masur Aff. ¶ 11.)  Mr. Masur further testified that PPG's failure to do so has deprived PennEnvironment of opportunities for public education and advocacy through participation in the permitting process as required under the CWA and state regulations.  (Masur Dep. at 92:1-93:23.)[25]

Plaintiff Sierra Club is a national non-profit organization dedicated to exploring, enjoying, and protecting the wild places of the Earth; to practicing and promoting the responsible

---

[24] ECF No. 141 Ex. J.
[25] ECF No. 147 Ex. 21.

use of the Earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives.  The Sierra Club has approximately 2.1 million members and supporters. (Au Aff. ¶ 3.)[26]

The Pennsylvania Chapter of the Sierra Club is a subunit of the Sierra Club, with approximately 24,000 members.  (Au Aff. ¶ 4.) Thomas Y. Au has served as Conservation Chair of the Pennsylvania chapter since 2008. (Au Aff. ¶ 2.)

Sierra Club states that members of the Pennsylvania Chapter live, exercise, work, raise children, farm, garden, fish, bird watch, hike, camp, and recreate on a regular basis in western Pennsylvania and along the Allegheny River, including the stretch of the river near the Site and the areas surrounding the Site. (Au Aff. ¶ 6.)  Many members are concerned about the detrimental effects of pollution from the Site on the Allegheny River.  (Au Aff. ¶ 9.)

PPG responds that, at his Rule 30(b)(6) deposition, Mr. Au could not identify any individual member of the Sierra Club who claimed to have sustained harm from the Site at the time the Complaints were filed or before it sent the Notice of Intent to Sue Letter to PPG.  (Au 30(b)(6) Dep. at 139:6-11, 16-25, 140:1-25, 141:1-3.)[27]  It was not until a year after this case was filed that Sierra Club sent an email to its members requesting the participation of members who were "willing and able to assist the Sierra Club" with this litigation in order to satisfy "the legal standard of 'standing.'"  (ECF No. 141 Ex. L at 2, 3.)  Plaintiffs respond that the material issue is whether the injury existed, not whether Mr. Au could identify individual Sierra Club members

---

[26] ECF No. 119 Ex. 24.
[27] ECF No. 141 Ex. G.  Mr. Au was deposed twice: on September 25, 2013, he was deposed on the issue of standing ("Au Standing Dep.").  Then on September 26, 2013, he provided a Rule 30(b)(6) deposition on behalf of the Sierra Club ("Au 30(b)(6) Dep.").  Because the parties have referred to different excerpts from these two depositions in their cross-motions and appendixes thereto, Mr. Au appears in five separate places in the record.

who were harmed on a particular date.

The Sierra Club conducts research, advocacy, public education, and litigation regarding water quality issues in Pennsylvania. The Sierra Club has established a Water Issues Committee that publishes a newsletter five or six times a year to provide information to members about water quality issues in Pennsylvania. (Au Aff. ¶¶ 5, 7.) Mr. Au states that the Sierra Club's research, advocacy, and public education efforts require access to accurate information about water quality in Pennsylvania, including information disclosed by dischargers pursuant to their applications for and compliance with discharge permits. (Au. Aff. ¶ 10.) Without the information that it could obtain from PPG's application for and operation under an NPDES permit and related monitoring and reporting, the Sierra Club cannot provide its members with complete information about the quality of waterways in the vicinity of the Site, including the Allegheny River. (Au Aff. ¶ 10.)

PPG responds that the Sierra Club has not engaged in any advocacy with respect to the Site before or after this suit was filed in March 2012 except for a meeting in PADEP in June of 2013. (Au Standing Dep. at 45:25, 46:1-25, 47:1.)[28] Mr. Au testified that it was not until after an executive committee meeting on September 24, 2011 that the Sierra Club decided to take any action regarding the Site after it was approached by PennEnvironment. He indicated that he attended a Pennsylvania Chapter of the Sierra Club executive committee meeting on September 24, 2011 and that recorded minutes of that meeting were prepared. (Au 30(b)(6) Dep. at 149:9-12, 150:8-10, 15-19, 152:3-11;[29] ECF No. 141 Ex. I.) It was not until after this meeting that Sierra Club decided to take any action regarding the Site after it was approached by

---

[28] ECF No. 141 Ex. H.
[29] ECF No. 141 Ex. G.

PennEnvironment and TPM. (Au 30(b)(6) Dep. at 109:18-25; see also Masur Dep. at 60:5-25.[30])

The minutes from the meeting indicate that:

> At a former [PPG] factory in Ford City Armstrong County, a lagoon in which the
> company dumped glass polishing waste is leaking toxics into the Allegheny
> River. The law firm of Terris, Pravlik, and Millian plans to sue PPG to force it to
> clean up the lagoon and pay civil penalties with attorney fees. The Sierra Club
> has been invited to join the suit for free.

(ECF No. 141 Ex. I at SC-PA000046.) See Au 30(b)(6) Dep. at 154:1-24, 155:1-25, 157:8-25,

158:1-6. Plaintiffs indicate that TPM frequently agrees that plaintiff organizations will not be

responsible for costs and expenses in CWA and RCRA suits in order to reduce financial barriers

to bringing them. (Pravlik Aff. ¶ 6.)

PPG states that, at no time has the Pennsylvania Chapter of the Sierra Club ever

requested or obtained any records or PPG's monthly progress reports or discharge monitoring

reports from PADEP regarding the Site, despite being aware that PPG has been submitting these

reports on the Site to PADEP regarding its seep sampling. (Au Standing Dep. at 36:5-13, 56:2-8,

59:25, 60:1-4, 63:14-25, 64:1-2.)[31] However, Mr. Au testified that the Sierra Club was aware

that PPG had been submitting monthly progress reports to PADEP regarding its seep sampling.

(Id. at 55:24-25, 56:1-5, 58:2-6, 21-23, 59:5-24.)

Further, the information contained in the Sierra Club's newsletters on water quality issues

is solicited "from members and outside experts or parties who might have an interest" and

"academic studies, publication, government sources, newspaper articles, and activities from our

members." See Au Standing Dep. at 30:2-12; 50:11-16.[32] The Sierra Club does not report on all

contaminated sites in Pennsylvania affecting water quality in these newsletters and decides

---

[30] ECF No. 141 Ex. J.
[31] ECF No. 141 Ex. H.
[32] ECF No. 144 Ex. C.

which ones to include in the newsletters based on "items that are of public interest that are chronicled in newspapers or where a government agency has issued a report or where there's a threat that's gone on notice." (Id. at 41:11-20.) The Sierra Club has never even attempted to include information on the Site in a newsletter. (Id. at 53:3-6.) With respect to particular sites that present water quality issues, the Sierra Club's main ways in engaging in advocacy are funding studies and working with PADEP. (Id. at 45:18-24.) The Sierra Club has not attempted to meet with PADEP or engage in any other types of advocacy regarding the Site prior to this litigation. (Id. at 46:17-25; 47:1.)

Plaintiffs reply that both the Sierra Club and PennEnvironment have engaged in advocacy regarding the Site by submitting comments to PADEP regarding the inadequacy of PPG's Treatment Plan Report. (Pravlik Letter Mar. 27, 2013.) They have also requested and obtained materials concerning the Site submitted by PPG to PADEP. (Pravlik Aff. ¶ 8.) They indicate that they have been injured in their ability to obtain full and complete information about PPG's discharges from the Site and to provide input into the permitting process as a result of PPG's failure to apply for and obtain an NPDES permit. Although Mr. Au testified in his individual capacity that he could not recall whether Sierra Club has attempted to include information regarding the Site in one of its newsletters (Au Standing Dep. at 53:3-6), Plaintiffs maintain that whether Sierra Club researched the Site through the PADEP website or requested materials from PADEP or attempted to include the information it did have in newsletters is not material to the issue of whether it has been injured because the information submitted by PPG to PADEP is not equivalent to the information that would be available pursuant to an application for and issuance of an NPDES permit.

In January, 2009, the Sierra Club posted on its website information regarding the Site

based on an article written by Don Hopey on the results of a water quality research project led by Dr. Conrad Volz. (Au 30(b)(6) Dep. at 109:11-17.)[33]  PPG states that the Sierra Club has not engaged in any advocacy with respect to the Site before or after this suit was filed in March 2012 except for a meeting in PADEP in June of 2013. (Au Standing Dep. at 45:25; 46:1-25; 47:1.)[34] Plaintiffs respond that the Sierra Club publicized the results of a study conducted on the Site. Sierra Club also participated in the filing of five Complaints regarding PPG's discharges from the Site.  The Sierra Club, along with PennEnvironment, submitted comments to PADEP regarding the inadequacy of PPG's Treatment Plan Report.  (Pravlik Letter Mar. 27, 2013.)

PPG indicates that, when Mr. Au was questioned about TPM's direct solicitation of the Sierra Club, he made the following admission:

Q. So with respect to those discussions you were approached about joining a suit? The Sierra Club didn't just go out and retain counsel to pursue a case, you were approached, first to join a suit?

A. No lawsuit had been filed at the time.

Q. That's fine, --

A. Yeah.

Q. – but the fact is the Sierra Club didn't come to its own conclusion to contact the Terris firm, you were asked to join a contemplated lawsuit.

A. Yes, that's correct.

(Au 30(b)(6) Dep. at 153:21-25, 154:1-8.)[35]

PPG states that the minutes recite that Sierra Club demanded the condition that it would only agree to be part of this lawsuit if TPM agreed to defend and hold harmless any individual plaintiff involved in other litigation as a result of the PPG litigation. (Au 30(b)(6) Dep. at 155:1-

---

[33] ECF No. 147 Ex. 19.
[34] ECF No. 141 Ex. H.
[35] ECF No. 141 Ex. G.

25, 157:8-25, 158:1-6.)  Plaintiffs respond that the meeting minutes demonstrate that a member of the Sierra Club Executive Committee moved to add a provision to the motion to approve the Chapter's participation in litigation related to the Site that would require an indemnification agreement with counsel. (ECF No. 147 Ex. 3.) The Executive Committee's action required final approval by Sierra Club's national organization.

The Retainer Agreement entered into between the Sierra Club and TPM signed on October 26, 2011 contains an indemnification provision stating that "[TPM] agrees to defend, indemnify, and hold harmless from and against claims and damages levied against any individual member of [the Sierra Club] who is named as a plaintiff in connection with litigation which is the subject of this retainer agreement." (ECF No. 141 Ex. K ¶ 12.)  The Retainer Agreement also provides that Sierra Club will not be liable for any of TPM's fees or expenses incurred in connection with this suit. (Id. ¶¶ 2-3.)  It further states that Sierra Club "shall make all good-faith efforts to assist the Firm in locating individuals who are willing to participate in the lawsuit in order to satisfy standing requirements."  (Id. ¶ 8.)  Plaintiffs note that TPM has represented Sierra Club chapters in previous citizen suits and has previously represented the Public Interest Research Group of Pennsylvania, the predecessor to PennEnvironment.  (ECF No. 147 Ex. 8.) Mr. Masur approached Mr. Au on July 29, 2011 and introduced him to a TPM attorney.  (ECF No. 147 Exs. 9, 10.)

PPG contends that, after the conclusion of Mr. Au's standing deposition on September 25, 2013, at the start of his Rule 30(b)(6) deposition on September 26, 2013, he attempted to add to his individual standing testimony by stating that Clean Water Act requires separate and different monitoring requirements than those contained in the 2009 Administrative Order because the monitoring requirements are contained in an issued permit and would be reported as

discharge monitoring reports. (Au 30(b)(6) Dep. at 12:23-25; 13:1-5, 17-23.)[36] Plaintiffs respond that the fact that the CWA imposes separate and different requirements than those in the Administrative Order is material to their injuries.

Thomas Moser

For over 40 years, Thomas Moser has been a resident of Murrysville, Pennsylvania, which is approximately 20 miles south of the Site. (Moser Am. Aff. ¶ 1.)[37] He has been a member of the Sierra Club for over 10 years. (Id. ¶ 3.) Mr. Moser became a member of PennEnvironment in the Spring of 2013, after learning about Sierra Club and PennEnvironment's lawsuit against PPG. (Id. ¶ 3.)

Mr. Moser has a Bachelor of Arts degree in physics, a Master of Science degree in Engineering, a Master of Business Administration degree, and a Master of Science degree in Information Technology Management. (Moser Am. Aff. ¶ 2; Moser Dep. at 14:1-9.[38]) As a result of his science education and interest in conservation, Mr. Moser knows that pollution from industrial sites has harmful effects on the environment, wildlife, and human health. (Moser Am. Aff. ¶ 9.) Mr. Moser is aware that pollution in rivers can spread through an area when ingested by fish, who are then eaten by waterfowl and other wildlife higher on the food chain. (Moser Dep. at 23:9-24:25, 38:22-39:10, 39:25, 40:12-16, 51:15-52:25.)

Mr. Moser witnessed the effects of pollution in the Allegheny River in the 1950s. At that time, he observed dead fish floating in the river and the absence of bald eagles in the area. Mr. Moser is aware that at that time communities were concerned about using water downstream from where sewage had been dumped into the river. He is concerned that the Allegheny River

---

[36] ECF No. 141 Ex. G.
[37] ECF No. 119 Ex. 26.
[38] ECF No. 155 Ex. 7. Mr. Moser's deposition excerpts appear in four different places in the record.

could return to a similar condition if current pollution is not addressed. (Moser Am. Aff. ¶ 8.)

Mr. Moser is also concerned about the effects of pollution on the birds in the area, including the bald eagle population, and worries that they may die or that their ability to reproduce will be affected after consuming fish that have been contaminated by pollution in the river. (Moser Am. Aff. ¶ 10.) He is also concerned about the health effects of consuming fish caught in the river near the PPG Site. His enjoyment of bird watching would increase, and his concern for the birds would be lessened, if pollution from the PPG Site ceased and was cleaned up. Id.

Mr. Moser has enjoyed and recreated in and around the Allegheny River for most of his life. He has a deep aesthetic appreciation for the river and enjoys birding, canoeing, boating, and biking in and around the river. (Moser Am. Aff. ¶ 4.) PPG responds that Mr. Moser is a bird watcher along various parts of the Allegheny River on the trail on the opposite side of the River and north of the Site, while he has never attempted to look for any birds near the Site. (Moser Dep. at 46:20-21, 47:18-23, 48:1-3, 49:6-23, 50:9-22, 51:7-14.)[39] It also notes that Mr. Moser used to bike a trail to the east of the Allegheny River that began at Schenley and traveled north (on the opposite bank of the Allegheny River from the Site) to East Templeton, but that portion of the trail is now closed. (Moser Dep. at 27:18-25.)[40] PPG contends that Mr. Moser does not regularly bike on the portion of the trail located across the River from the Site, by the Rosston Marina – the first time he did was in May of 2013 when he visited the area after learning about

---

[39] ECF No. 141 Ex. Q. PPG has argued that certain statements in the amended affidavits of Mr. Moser, Mr. Klaput and Ms. Kovacovsky should be stricken or disregarded as "sham affidavits" that were filed after and were inconsistent with their deposition testimony. This issue is discussed below.
[40] ECF No. 144 Ex. E.

the lawsuit. (Moser Dep. at 28:1-8, 30:20-25, 31:1-13.)[41]  While Mr. Moser canoes downstream of the Site near Pittsburgh, he does not canoe or go boating in the vicinity of the Site and has no future plans to do so. (Moser Dep. at 57:23-24, 58:1-24, 64:12-25, 65:1-3.)

Plaintiffs indicate that PPG misstates and omits Mr. Moser's testimony regarding his recreational activities in and around the Allegheny River, including in areas in the vicinity of the Site.  Contrary to PPG's assertion, Mr. Moser testified that he has on previous occasions biked along the trail that runs north along the Allegheny River through Ford City. (Moser Dep. at 31:14-20.)[42]  He also testified that he bird watches along trails in the vicinity of the Site and he carries his bird-watching equipment while biking on the trail to the east of the Allegheny River near the Site.  (Id. at 50:12-25.) The portion of the trail near Schenley is downstream from the Site.

PPG states that Mr. Moser had never heard of the Site prior to an e-mail sent by Peter Wray with Sierra Club soliciting members to get involved in the lawsuit to assist with establishing standing. (Moser Dep. at 22:3-11, 23:2-8; see also ECF No. 141 Ex. L.)  Plaintiffs point out that Mr. Moser testified that he has long been familiar with the vicinity of the Site and has regularly used the Allegheny River near the Site and downstream from it. (Moser Am. Aff. ¶ 4; Moser Dep. at 50:4-25, 57:18-22, 58:25-59:3, 64:12-65:18.)  He testified that he first learned that the Site had been owned by PPG from Mr. Wray's e-mail in the spring of 2013. (Id. at 22:3-14.)

PPG states that Mr. Moser had never seen or visited the Site, or the adjacent properties until May or June of 2013, when after learning of this lawsuit, he visited the area of the

_____
[41] ECF No. 141 Ex. Q.
[42] ECF No. 155 Ex. 7.

Allegheny River near the Site.  (Moser Dep. at 28:1-8; 29:16-23; 30:4-17; 36:7-16; 37:17-20.)[43]

Plaintiffs note that Mr. Moser testified that he is familiar with the vicinity of the Site and has

regularly used the Allegheny River near the Site and downstream from it.  (Moser Am. Aff. ¶ 4;

Moser Dep. at 50:4-25, 57:18-22, 58:25-59:3, 64:12-65:18.[44])

PPG contends that Mr. Moser is "concerned about pollution from the Site entering the

Allegheny River," but he could not identify any specific pollution coming from the Site he

believes needs to be cleaned up on the Allegheny River.  (Moser Dep. at 39:15-18;[45] Moser Am.

Aff.  ¶ 9.) A few times each year Mr. Moser bikes a trail to the east of the Allegheny River that

begins at Schenley southwest of the Site and travels north on the opposite bank of the Allegheny

River from the Site in Ford City, PA, which is north of the Site and upstream on the Allegheny

River. (Moser Am. Aff. ¶ 4.)  PPG contends that this is the closest vicinity to the Site in which

Mr. Moser has ever biked. (Moser Dep. at 30:20-25, 31:1-13.)

Plaintiffs respond that Mr. Moser stated that he bikes on the trail east of the Allegheny

River "approximately once or twice a month." (Moser Am. Aff. ¶ 7; Moser Dep. at 50:19-25.)

PPG contends that Mr. Moser has not observed any harmful effects on vegetation or

aquatic life when biking along the trail in the vicinity of the Site. (Id. at 75:9-20.)[46]  Mr. Moser is

also a bird watcher along various parts of the Allegheny River along the trail on the opposite side

of the River and north of the Site, while he has never attempted to look for any birds near the

Site. (Moser Am. Aff. ¶ 5; Moser Dep. at 46:20-21; 47:18-23; 48:1-3; 49:6-23; 50:9-22; 51:7-

14.)

Plaintiffs note that Mr. Moser testified that he bird watches regularly along trails in the

_____

[43] ECF No. 141 Ex. Q.
[44] ECF No. 147 Ex. 22.
[45] ECF No. 141 Ex. Q.
[46] ECF No. 141 Ex. Q.

vicinity of the Site and he carries his bird-watching equipment while biking on the trail to the east of the Allegheny River near the Site. (Moser Dep. at 50:12-25; Moser Am. Aff. ¶ 5.) Furthermore, they note that a report prepared by a consultant for PPG establishes that birds and waterfowl inhabit the river corridor along the Site. (ECF No. 147 Ex. 4 at PPG001988.)

PPG contends that Mr. Moser has not observed any ill effects on the birds from the pollution he believes to be coming from the Site. (Moser Dep. at 56:21-24.) Mr. Moser does not know if fish are being contaminated from the pollution he believes is coming from the Site, nor is he harmed as to his interests in the aquatic life in the Allegheny River as he does not go fishing or eat fish from the River. (Id. at 53:1-17, 23-24.) Plaintiffs point out that Mr. Moser testified that he has not knowingly consumed fish from the Allegheny River near the Site. (Moser Dep. at 53:5-24.) However, Mr. Moser testified that his interest in the wildlife is being harmed by the knowledge that PPG is discharging pollutants into the Allegheny River, which have effects throughout the food-chain, including on the birds of prey that he observes. (Id. at 51:15-52:19;[47] Moser Am. Aff. ¶ 10.)

PPG asserts that Mr. Moser has not suffered from any harm from what he believes to be pollution from the Site and he does not believe it has "harmed him materially." (Id. at 39:11-14; 72:21-22.)[48] Plaintiffs respond that Mr. Moser testified that his enjoyment from recreating in and around the Allegheny River in the vicinity of the Site and his enjoyment of bird watching and biking in the vicinity of the Site has been diminished as a result of PPG's discharges. (Moser Am. Aff. ¶¶ 11-12.)

Plaintiffs indicate that Mr. Moser owns a canoe and uses it on the Allegheny River, downstream from the PPG Site. (Moser Am. Aff. ¶ 6.) His enjoyment of canoeing on the

---

[47] ECF No. 147 Ex. 22.
[48] ECF No. 141 Ex. Q.

23

Allegheny River is diminished due to his concern about the effects of pollution on the river. (Id. ¶ 11.) He is particularly concerned that pollution from the site may move downstream to the areas where he boats and canoes. He is concerned that the pollution may have a harmful effect on wildlife and humans, and may make boats dirty. (Id. ¶¶ 9, 11.) He has observed that oil and other pollutants accumulate on a friend's boat after it is used in the Allegheny River. (Id. ¶ 11.)

PPG responds that Mr. Moser owns a sailboat, but has never taken it on the Allegheny River and has no future plans of sailing on the Allegheny River. (Moser Dep. at 57:18-25; 58:1-24.)[49]

Plaintiffs reply that Mr. Moser's statement that his enjoyment had been diminished was in his original affidavit. (Moser Aff. ¶ 11.)[50] Counsel for PPG questioned Mr. Moser regarding this statement during his deposition, but only asked about his observations of pollution, not his diminished enjoyment. (Moser Dep. at 59:17-23.)[51] Nothing in his deposition contradicted his statement in his affidavit, which existed prior to the deposition and is preserved in his amended affidavit. Further, Plaintiffs note that Mr. Moser testified that he goes boating with a neighbor downstream from the Site several times a year. (Moser Dep. at 58:25-59:3.) His concern regarding the effects of pollutants on boats is based on his direct observation that oil from the Allegheny River accumulates on the boat he uses. (Id. at 59:17-60:3.)[52]

PPG contends that Mr. Moser stated that his enjoyment from biking, bird watching and canoeing has not been diminished and he is looking forward to these activities along the Allegheny River in the future. (Moser Dep. at 56:21-24; 80:20-23.) Plaintiffs respond that Mr. Moser testified that he was unable to visibly detect "ill effects on the birds from pollution."

---

[49] ECF No. 141 Ex. Q.
[50] ECF No. 141 Ex. P.
[51] ECF No. 147 Ex. 22.
[52] ECF No. 155 Ex. 7.

(Moser Dep. 56:21-24.) He also testified that he "enjoy[ed]" biking and bird watching and was looking forward to continuing those activities. (Id. at 80:20-23.) However, Mr. Moser also testified that his enjoyment of those activities was diminished as a result of PPG's discharges and that his enjoyment would increase if the pollution were cleaned up. (Moser Am. Aff. ¶¶ 11-12.)

Robert Klaput

Robert Klaput, a member of both the Sierra Club and PennEnvironment, lives in Bethel Township, which is approximately 6 miles south of Ford City, 8 miles from the Site and 6 miles from the Allegheny River and has lived there since 1975. (Klaput Am. Aff. ¶¶ 1, 3-4; see also Klaput Dep. at 7:12-24.)[53] Mr. Klaput joined both organizations because he is interested in environmental issues, including water quality, conservation and public health, and he makes annual contributions to both organizations to support their missions. (Klaput Am. Aff. ¶ 5.) Mr. Klaput first learned about the Site from his father in the 1970s but had forgotten about it until he received an e-mail from PennEnvironment soliciting its members' participation in this suit. (Klaput Dep. at 24:11-25; 25:1-7.) Plaintiffs note that Mr. Klaput testified that he is familiar with the affected area, as he regularly launches kayaks from a point in the Allegheny River near the Site and in Crooked Creek, directly across the river from the Site. (Klaput Dep. at 28:17-25, 73:13-74:11; Klaput Am. Aff. ¶ 6.)

Plaintiffs state that, contrary to PPG's assertion that Mr. Klaput testified to "no specific concerns" and could not identify specific pollution from the Site, Mr. Klaput described in his deposition his concerns about high pH and metals entering the Allegheny River from the Site. (Klaput Dep. at 30:2-31:13.)[54] Mr. Klaput also testified that, prior to June 9, 2013, he was aware

---

[53] ECF No. 119 Ex. 25; ECF No. 141 Ex. S. Mr. Klaput's deposition excerpts appear in four separate places in the record.
[54] ECF No. 155 Ex. 6.

of the general location and nature of the Site, relative to the areas where he recreates along and near the Allegheny River. (Klaput Dep. at 11:1-7, 29:19-25.) Specifically, Mr. Klaput testified that he is familiar with the affected area and that his concerns about PPG's discharges have led him to alter his activities in the vicinity. Mr. Klaput testified that he regularly launches kayaks from a point in the Allegheny River near the Site and in Crooked Creek, directly across the river from the Site. (Id. at 28:17-25, 73:13-74:11.) This testimony is directly reflected in his amended affidavit, which states, "[a]bout twice each summer, I kayak in Crooked Creek, launching my kayak from the point at which Crooked Creek enters the Allegheny River, directly across from the PPG Site." (Klaput Am. Aff. ¶ 6.) He testified that he is concerned about the effects of pollution in the water on humans who recreate in the river and, consequently, tries to minimize his contact with the water and no longer uses sit-upon kayaks near the Site. (Klaput Dep. at 76:5-25; see also id. at 59:12-19.) His enjoyment of kayaking in the area is diminished by his concern for the effects of pollution on individuals, including children, who he observes recreating in the river. (Id. at 51:13-52:4.)

Mr. Klaput's residence uses well water. Due to the distance and location of his home upstream from the Allegheny River and the Site, the Site has not impacted his well water and he is not concerned about the water quality in his well. (Klaput Dep. at 50:21-25; 51:1-7.)[55] Mr. Klaput has been kayaking for 15 years. PPG contends that he generally kayaks upstream from the Site in Manorville, PA and does not have any specific concerns regarding pollution from the Site – he is only generally concerned about water quality. (Id. at 41:1-18; 44:6-16; 64:20-21.) Plaintiffs point out that Mr. Klaput testified that he kayaks in Crooked Creek and has kayaked in the Allegheny River from Crooked Creek to the first island below Rosston, downstream from the

---

[55] ECF No. 141 Ex. S.

Site. (Klaput Am. Aff. ¶ 7; Klaput Dep. at 43:15-21.[56]) Mr. Klaput uses a launch site in the Allegheny River directly across from the PPG Site two to three times per year. (Id. at 73:13-74:11; see also id. at 28:17-25.) He is specifically concerned about the effects of pollution in the water on humans who recreate in the river and, consequently, tries to minimize his contact with the water and no longer uses sit-upon kayaks near the Site. (Klaput Am. Aff. ¶ 13; Klaput Dep. at 76:5-25; see also id. at 59:12-19.) His enjoyment of kayaking in the area is diminished by his concern for the effects of pollution on individuals, including children, who he observes recreating in the river. (Id. at 51:13-52:4.)

PPG states that Mr. Klaput did not attempt to determine the location of the Site and did not know where it was located until June 9, 2013 when he went out on his kayak on the Allegheny River to take photographs of the Site. (Klaput Dep. at 10:17-22, 28:10-13, 53:15-23, 54:5-8.)[57] Plaintiffs note that prior to June 9, 2013, Mr. Klaput was aware of the general location and nature of the Site, relative to the areas where he recreates along and near the Allegheny River. (Klaput Dep. at 11:1-7, 29:19-25.)[58]

PPG states that this was only time he has ever kayaked near or past the Site and he has no plan to kayak past the Site again or downstream of the Site. (Klaput Dep. at 28:14-16, 55:17-23, 76:20-25.)[59] Plaintiffs respond that Mr. Klaput testified that he launches his kayaks from a point directly across the river from the PPG Site two or three times per year. (Klaput Dep. at 73:13-74:11.) He further testified that he plans to return to kayak at this location. (Id. at 28:17-25.)

PPG states that, while Mr. Klaput fishes in waterways that flow into the Allegheny River and upstream from the Site, he does not fish from the Allegheny River or near the Site. He

---

[56] ECF No. 147 Ex. 23.
[57] ECF No. 141 Ex. S.
[58] ECF No. 147 Ex. 23.
[59] ECF No. 141 Ex. S.

normally eats the fish he catches and has no concerns about eating the fish. (Klaput Dep. at 46:20-25, 47:5-25, 48:13, 19-21.)[60]  Plaintiffs note that Mr. Klaput stated that he would hesitate to consume fish caught in the vicinity of the Site because of his concerns about contaminants in the fish. (Klaput Am. Aff. ¶ 12; Klaput Dep. at 38:20-39:9.[61])

Similarly, PPG contends that Mr. Klaput normally goes bird-watching upstream from the Site or on Crooked Creek, which flows into the River. He is generally only concerned "ethically" about the well-being of the birds and is looking forward to his next bird-watching trip. (Klaput Dep. at 72:2-20,74:12-13, 75:9-17.)[62]  Plaintiffs point out that Mr. Klaput testified that he is concerned about the effects of pollution from the PPG site on fish in the river and on birds that consume fish from the river. (Klaput Dep. at 72:5-15; Klaput Am. Aff. ¶¶ 11-12.)  He testified that if the Site and pollution were cleaned up, his enjoyment and appreciation of the Allegheny River would be enhanced. (Klaput Am. Aff. ¶ 14.)

He also bikes on the trail on the opposite side of the Allegheny River behind the Rosston Marina. While he generally complained about the need to clean up the Site to enhance his enjoyment of biking, he is looking forward to biking in the future.  (Klaput Dep. at 72:21-24; 73:5-12, 74:12-21, 75:18-20.)  PPG contends that Mr. Klaput's enjoyment of his recreational activities and his appreciation of the Allegheny River is only diminished by the knowledge of pollution to the extent that he is generally concerned for other people and for the environment, as his recreational activities and personal enjoyment of those activities on the River has not been diminished. (Id. at 51:11-25, 52:1-10, 71:1-12; 72:21-24, 73:5-12, 74:12-21, 75:18-20.)

Plaintiffs respond that Mr. Klaput testified specifically that his "enjoyment and

---

[60] ECF No. 141 Ex. S.
[61] ECF No. 155 Ex. 6.
[62] ECF No. 141 Ex. S.

appreciation of the Allegheny River is diminished by the knowledge that pollution is entering the river from the PPG site." (Klaput Am. Aff. ¶ 13.)  He also gave testimony that he has had to change his recreational activities as a result of his concerns about pollution from the Site, as he no longer uses sit-upon kayaks when he launches his kayaks from the launch site directly across the river from the PPG Site.  (Klaput Dep. at 59:12-19.)[63] In the testimony cited by PPG, Mr. Klaput stated that he would "feel much better" about the wildlife and other individuals who recreate in the river if the pollution from the PPG site was removed. (Id. at 74:12-21.)  Further, Mr. Klaput testified that his enjoyment and appreciation of the Allegheny River would be enhanced as a result of cleaning up the contamination from the PPG Site.  (Klaput Am. Aff. ¶ 14.)

PPG contends that Mr. Klaput testified that he has not been personally harmed by the Site and that it only offends his environmental ethics. (Klaput Dep. at 33:10-15, 71:1-2.)[64]  Plaintiffs acknowledge that Mr. Klaput testified that he had not been physically harmed by the pollution from the Site, but indicate that it is not material whether Mr. Klaput has been physically harmed by PPG's discharges from the Site.

Georgann Kovacovsky

Georgann Kovacovsky is a resident of New Bethlehem, Pennsylvania. (Kovacovsky Am. Aff. ¶ 1.)[65]  She grew up in and around Ford City. (Id. ¶ 4.)  Ms. Kovacovsky is a member of both PennEnvironment and Sierra Club. (Id. ¶ 3.)  Ms. Kovacovsky became interested in this lawsuit after receiving the PennEnvironment e-mails dated November 13, 2012 and March 11,

---

[63] ECF No. 147 Ex. 23.
[64] ECF No. 141 Ex. S.
[65] ECF No. 119 Ex. 27.

2013. (Kovacovsky Dep. at 9:23-25, 10:1-20.)[66]  Ms. Kovacovsky has a deep attachment to the

Allegheny River.  (Kovacovsky Am. Aff. ¶ 4.)  Growing up in the area, she frequently swam,

water-skied, and boated in the river.

Ms. Kovacovsky has driven past the PPG Site numerous times over her years spent living

in the area, as often as three to four times per month. (Kovacovsky Dep. at 21:8-12;[67]

Kovacovsky Am. Aff. ¶ 5.)  Driving past the Site, she could see rows of mounds of slag waste at

the site that appeared to be about seven or eight feet high and extended for about 50 feet.  Slurry

lagoons that looked like large, squarish ponds were also visible.  She is concerned that the Site

remains unremediated.  Id.

PPG contends that Ms. Kovacovsky could not identify the "waste" she observed when

driving past the Site and admitted that she had no personal knowledge. (Kovacovsky Dep. at

20:19-22; 23:3-4, 8-16.)[68] To this end, Kovacovsky has never been on the Site, or the adjacent

properties.

Plaintiffs reply that Ms. Kovacovsky's description is almost identical to the description in

her amended affidavit.  She testified to seeing "large, long hills of dumped waste * * * like

mountains kind of, probably seven or eight feet tall."  (Kovacovsky Dep. at 20:15-18)[69] and

identified the presence of "slurry ponds" at the Site (id. at 22:18-20). She also specifically

testified that she knew it was waste dumped by PPG, although PPG's counsel did not

ask her to identify the type of waste further. (Id. at 20:19-22, 23:3-16.)  It is immaterial that Ms.

Kovacovsky has not been on the Site itself.

---

[66] ECF No. 141 Ex. U.  Ms. Kovacovsky's deposition excerpts appear in four separate places in the record.
[67] ECF No. 147 Ex. 24.
[68] ECF No. 144 Ex. F.
[69] ECF No. 155 Ex. 8.

Ms. Kovacovsky enjoys biking on the trail that runs along the Allegheny River through Ford City. (Kovacovsky Am. Aff. ¶ 6.) She has observed off-colored sediments and brown, bubbly areas that appear contaminated along the river. (Id. ¶ 7.) The enjoyment she gets from biking is diminished by seeing these areas along the river and by the knowledge that the sediments in the river are contaminated. (Id.)

PPG contends that Ms. Kovacovsky bikes along the Allegheny River on the trail on the opposite side of the River from the Site that goes from Rosston to Ford City, through Manorville into Kittanning, which are north and upstream from the Site. (Kovacovsky Dep. at 30:15-21, 32:3-5, 34:9-14.)[70] Ms. Kovacovsky is not close to the Allegheny River when she bikes past Rosston on this trail. (Kovacovsky Dep. at 32:3-5.) She could not identify what she described as "sediments" along the river that she observed upstream near the former PPG Ford City manufacturing plan, but could only describe what she saw as a "collection of debris." (Id. at 33:8-25; see also id. at 45:24-25, 46:1-17.[71]) She testified that she is looking forward to biking and hiking in the future. (Id. at 31:3, 39:15-19, 42:19-25, 43:1.)[72]

Plaintiffs reply that Ms. Kovacovsky hikes and bikes along a portion of the trail upstream from the Site, but she also testified that she hikes and bikes on an unofficial trail near the Rosston Marina, within view of the river and directly across from the PPG Site. (Kovacovsky Dep. at 40:13-23, 42:1-2, 8-12.)[73] Ms. Kovacovsky stated in her initial and amended affidavits that she enjoys hiking and biking the trail, but that such enjoyment is diminished by her concerns about pollution. (Kovacovsky Am. Aff. ¶¶ 5, 7; Kovacovsky Aff. ¶¶ 5, 7.[74]) PPG cites no

---

[70] ECF No. 141 Ex. U.
[71] ECF No. 144 Ex. F.
[72] ECF No. 141 Ex. U.
[73] ECF No. 147 Ex. 24.
[74] ECF No. 141 Ex. T.

testimony that contradicts Ms. Kovacovsky's assertion that her enjoyment is less than what it would otherwise be, absent her concerns about PPG's discharges. To the contrary, Ms. Kovacovsky testified, in response to a question from PPG's counsel about the sediments mentioned in her original affidavit, that her aesthetic appreciation of the river is affected by the foreign substances visible in the water. (Kovacovsky Dep. at 33:8-25.)

Ms. Kovacovsky enjoys bird-watching in areas near the Allegheny River. (Kovacovsky Am. Aff. ¶ 6.) She knows that pollution can accumulate through the food chain and her enjoyment of bird-watching is diminished by the knowledge that the birds eat fish and other animals that contain contaminants. (Id. ¶ 8.)

Plaintiffs note that Ms. Kovacovsky testified that she goes biking along an unofficial portion of the trail directly across the river from the Site and, as PPG asserts, she enjoys bird watching during those same trips. (Kovacovsky Dep. at 31:3-9.)[75] PPG cites no testimony that contradicts the assertion that Ms. Kovacovsky is concerned about the effects of the pollution on the birds and fish, or that her enjoyment of bird-watching is diminished by that knowledge.

Ms. Kovacovsky's enjoyment of both biking and bird-watching near the Allegheny River would increase if the sediments were remediated because the birds and other wildlife would be less at risk of getting sick from contamination. (Kovacovsky Am. Aff. ¶ 9.)

PPG contends that Ms. Kovacovsky continues to enjoy biking, bird watching, and hiking along this trail, and is looking forward to doing these activities in the future in the areas around the Allegheny River. (Kovacovsky Dep. at 30:15-21, 31:3, 32:3-5, 34:9-14, 39:15-19, 42:19-25, 43:1.)[76] Plaintiffs reply that PPG cites no testimony that contradicts Ms. Kovacovsky's assertion that her enjoyment is less than what it would otherwise be, absent her concerns about PPG's

---

[75] ECF No. 155 Ex. 8.
[76] ECF No. 141 Ex. U.

discharges or that such enjoyment would increase if the Site were cleaned up. They contend that it is immaterial that Ms. Kovacovsky is looking forward to biking, hiking, and bird-watching near the Site in the future.

Despite growing up and living in the area around the Allegheny River, Ms. Kovacovsky has never eaten fish from the river due to concerns about contaminants in the fish. (Kovacovsky Am. Aff. ¶ 10.) She does not know anyone who consumes fish from the river. If the pollution in the river were cleaned up, she would eat fish from the river and would appreciate having the Allegheny River as a source of local, sustainable seafood.

PPG contends that Ms. Kovacovsky could not identify any admissible reason to support her belief that fish are contaminated. (Kovacovsky Dep. at 49:22-25, 50:1-25, 51:1-25, 52:1-9.)[77] Plaintiffs reply that Ms. Kovacovsky's concerns are based on her knowledge of the Site and her understanding of how pollution accumulates through the food chain. (Kovacovsky Am. Aff. ¶ 8.)

Ms. Kovacovsky is very concerned about the effects of pollution from the PPG Site on the health of the environment and her quality of life. (Kovacovsky Am. Aff. ¶ 11.) Knowledge of the pollution has caused her to question whether she should continue to reside in the area and has caused her not to encourage her daughters to move to the area.

PPG contends that Ms. Kovacovsky was not aware of the alleged pollution from the Site until she received the PennEnvironment e-mails dated November 13, 2012 and March 11, 2013 regarding PennEnvironment's need for members to help establish standing. (Kovacovsky Dep. at 9:23-25, 10:1-20.)[78] Ms. Kovacovsky lives approximately 25 miles northeast from the Site and did not know if she had suffered any ill effects from what she believed to be pollution from the

---

[77] ECF No. 144 Ex. F.
[78] ECF No. 141 Ex. U.

Site.  (Kovacovsky Dep. at 19:11-16, 53:1-6.)[79]

Plaintiffs reply that Ms. Kovacovsky testified that she has known of, and seen, the waste that PPG deposited at the Site, beginning in the 1960s. (Kovacovsky Dep. at  19:22-20:22, 22:13-23:7.)[80]  In the testimony cited by PPG, Ms. Kovacovsky testified that she did not know if she had "personally suffered ill effects" from pollution, although she was not asked if she had suffered effects from PPG's discharges from the Site. (Id. at 53:1-6.) This testimony is not inconsistent with her statements in her affidavit that she is concerned about the effects of pollution from the PPG Site (Kovacovsky Am. Aff. ¶ 11) and that her enjoyment of her recreational activities in the affected area has been diminished as a result of PPG's discharges (id. ¶¶ 7-8).

PPG contends that Ms. Kovacovsky has never been to the Site, or the adjacent properties. (Kovacovsky Dep. at 23:24-25, 24:8-12, 16-19.)[81] Plaintiffs note that Ms. Kovacovsky testified that she is familiar with the vicinity of the Site and has driven past it regularly for many years. (Kovacovsky Dep. at 21:8-12;[82] Kovacovsky Am. Aff. ¶ 5.)

PPG notes that she has never observed any ill effects on the birds she observes from any pollution. (Kovacovsky Dep. at 31:1, 9, 22-25, 39:14.)[83] Ms. Kovacovsky continues to enjoy biking, bird watching, and hiking along this trail, and is looking forward to doing these activities in the future in the areas around the Allegheny River. (Id. at 31:3, 39:15-19, 42:19-25, 43:1.) Plaintiffs point out that Ms. Kovacovsky also testified that her enjoyment of those activities was diminished as a result of PPG's discharges and that her enjoyment would increase if the pollution

---

[79] ECF No. 144 Ex. F.
[80] ECF No. 155 Ex. 8.
[81] ECF No. 141 Ex. U.
[82] ECF No. 147 Ex. 24.
[83] ECF No. 141 Ex. U.

were cleaned up.  (Kovacovsky Am. Aff. ¶¶ 7-9.)

Procedural History

On January 13, 2012, Plaintiffs gave notice of their intent to file suit to the Administrator of the EPA, the PADEP and Defendants as required by the CWA, CSL and RCRA.  33 U.S.C. § 1365(b)(1)(A); 35 P.S. § 691.601(e); 42 U.S.C. § 6972(b)(2)(A).  (CWA Compl. ¶ 4 & Ex. 1; RCRA Compl. ¶ 4 & Ex. 1.)  On March 20, 2012, Plaintiffs filed a complaint against PPG and Ford City under the CWA and the CSL (the "CWA Complaint").  The case was docketed at Civ. A. No. 12-342.  Count I alleges that that PPG has unlawfully discharged pollutants into navigable waters without an NPDES permit and continues to do so in violation of Sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342.  Count II alleges that PPG has violated and continues to violate sections 301(a) and 402(p)(2)(B), 33 U.S.C. §§ 1311(a), 1342(p)(2)(B), by discharging storm water associated with industrial activity without a permit authorizing such discharge.  Count III alleges that PPG has violated and continues to violate Sections 301 and 307 of the CSL, 35 P.S. §§ 691.301, 691.307, by discharging industrial waste into the Allegheny River, Glade Run, and groundwater associated with the Site without authorization or a permit obtained from PADEP, which constitutes a nuisance under Section 307(c).  Count IV alleges that PPG has violated and continues to violate Section 401 of the CSL, 35 P.S. § 691.401, by discharging pollutants and discharging waste containing high levels of pH, into the Allegheny River, Glade Run, and groundwater without a permit issued by PADEP authorizing such discharges.  Count V alleges that PPG has violated the CWA in that the Treatment Plan it submitted in June 2009 fails to provide a schedule for the application for NPDES permits and, based on the monthly progress reports submitted by PPG beginning on April 1, 2009, through at least January 5, 2012, PPG took no steps to apply for such permits and Plaintiffs allege, on

information and belief, that PPG has failed to provide a schedule for the application of NPDES permits and has taken no steps to apply for such permits. Count VI alleges that PPG's acts as alleged in Count V also violate section 611 of the CSL, 35 P.S. § 691.611. Count VII alleges that PPG has discharged, and continues to discharge, untreated and ineffectively treated wastewater, in violation of the July 2 Addendum, and Count VIII alleges that these acts also violate section 611 of the CSL. Count IX alleges that PPG has violated the CWA by committing 162 discharge violations between February 2010 and December 2011, in violation of the 2009 Administrative Order, and Count X alleges that these acts also violate section 611 of the CSL. Count XI alleges that PPG has violated the CWA by committing 33 reporting violations between February 2010 and December 2011, in violation of the 2009 Administrative Order, and Count XII alleges that these acts also violate section 611of the CSL.

On April 20, 2012, Plaintiffs filed another complaint against PPG and Ford City under the RCRA (the "RCRA Complaint"). They allege that PPG is a generator and/or transporter of the solid or hazardous waste at the Site, as well as an owner and/or operator of the site, and has contributed to the past or present handling, storage, treatment, transportation, or disposal of the solid or hazardous waste at the Site, thereby presenting an imminent and substantial endangerment to health or the environment. This case was docketed at Civ. A. No. 12-527. On May 25, 2012, Plaintiffs filed a motion to consolidate the two cases (ECF No. 11). On May 29, 2012, an order was entered granting this motion and consolidating the cases at No. 12-342 (ECF No. 12).

On September 25, 2013, Plaintiffs filed a second CWA/CSL complaint, including additional instances of alleged pollution and adding BPRI as a defendant. The case was docketed at No. 13-1395. On that same date, Plaintiffs filed a second RCRA complaint, also

adding BPRI as a defendant, docketed at No. 13-1396. On September 30, 2013, an order was entered consolidating these cases at No. 12-342. Finally, on February 18, 2014, Plaintiffs filed a third CWA/CSL complaint against PPG, Ford City and BPRI, docketed at No. 14-229. On April 8, 2014, Plaintiffs filed a motion to consolidate the case and on April 9, 2014, an order was entered consolidating the case at No. 12-342.[84]

On February 28, 2013, PPG filed a motion to dismiss on various grounds, including lack of standing (ECF No. 24). Ford City filed a motion indicating it was joining in PPG's motion to dismiss (ECF No. 29). On August 8, 2013, a Memorandum Opinion and Order was entered, denying the motions (ECF No. 66).

On December 19, 2013, Plaintiffs filed a motion for partial summary judgment on the issue of standing (ECF No. 116). On February 28, 2014, PPG filed its cross-motion for summary judgment on the issue of standing (ECF No. 137). The parties filed response briefs on March 31, 2014 (ECF Nos. 142, 145). On April 21, 2014, Plaintiffs filed a reply brief (ECF No. 153).

Standard of Review

As amended effective December 1, 2010, the Federal Rules of Civil Procedure provide that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates

---

[84] The complaints state that Plaintiffs are not pursuing claims or specific relief against Ford City or BPRI, but that they are joined as indispensable parties under Rule 19(a). (CWA Compl. ¶ 13 & at 23-24; RCRA Compl. ¶ 15 & at 11; Second CWA Compl. ¶¶ 5-6, 17-18 & nn.1-2 & at 30; Second RCRA Compl. ¶¶ 5-6, 19-20 & nn.1-2 & at 15; Third CWA Compl. ¶¶ 19-20 & at 19.)

the absence of a genuine issue of material fact. Once that burden has been met, the non moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In following this directive, a court must take the facts in the light most favorable to the non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's favor. Hugh v. Butler County Family YMCA, 418 F.3d 265, 266 (3d Cir. 2005); Doe v. County of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001). Although PPG questions Plaintiffs' motion at this stage of the proceedings, Plaintiffs have cited authority that moving for partial summary judgment on the issue of standing in an environmental citizen suit is a recognized procedure. See American Canoe Ass'n v. Murphy Farms, Inc., 326 F.3d 505, 514 (4th Cir. 2003).

Plaintiffs argue that: 1) the three named members of the organizations have standing because they have suffered injuries in fact, the injuries are fairly traceable to PPG's actions and the injuries are redressable by a favorable decision; and 2) the organizations themselves have standing both as representatives of their members and in their own right.

PPG argues that the three named individuals were solicited to assist Plaintiffs on standing eight months after this suit was initiated, and two of these individuals had no prior knowledge of the Site until after learning of the lawsuit, but even considering the affidavits filed by these individuals (which PPG moves to strike as sham affidavits because they contradict prior testimony given at their depositions), they indicate only "generalized" environmental concerns and not the level of injury necessary to demonstrate standing.

<u>Standing</u>

Section 505 of the CWA authorizes a citizen suit "against any person … who is alleged to be in violation of an effluent standard or limitation under this chapter" by any "person or persons having an interest which is or may be adversely affected."  33 U.S.C. § 1365(a, g).  Similarly, section 7002 of the RCRA states that "any person may commence a civil action on his own behalf"… "against any person … who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment."  42 U.S.C. § 6972(a)(1)(B).  Finally, the CSL provides that "any person having an interest which is or may be adversely affected may commence a civil action on his own behalf to compel compliance with this act or any rule, regulation, order or permit issued pursuant to this act."  35 P.S. § 691.601(c).

The Supreme Court has held that:

> In every federal case, the party bringing the suit must establish standing to prosecute the action. "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." <u>Warth v. Seldin</u>, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). The standing requirement is born partly of "'an idea, which is more than an intuition but less than a rigorous and explicit theory, about the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government.'" <u>Allen v. Wright</u>, 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (quoting <u>Vander Jagt v. O'Neill</u>, 699 F.2d 1166, 1178–1179 (C.A.D.C. 1982) (Bork, J., concurring)).

<u>Elk Grove Unified Sch. Dist. v. Newdow</u>, 542 U.S. 1, 11 (2004).  The Court explained that:

> our standing jurisprudence contains two strands: Article III standing, which enforces the Constitution's case-or-controversy requirement, see <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 559-562, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); and prudential standing, which embodies "judicially self-imposed limits on the exercise of federal jurisdiction," <u>Allen</u>, 468 U.S., at 751, 104 S.Ct. 3315. The Article III limitations are familiar: The plaintiff must show that the conduct of which he complains has caused him to suffer an "injury in fact" that a

favorable judgment will redress. See Lujan, 504 U.S., at 560–561, 112 S.Ct. 2130. Although we have not exhaustively defined the prudential dimensions of the standing doctrine, we have explained that prudential standing encompasses "the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." Allen, 468 U.S., at 751, 104 S.Ct. 3315. See also Secretary of State of Md. v. Joseph H. Munson Co., 467 U.S. 947, 955–956, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984). "Without such limitations—closely related to Art. III concerns but essentially matters of judicial self-governance—the courts would be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights." Warth, 422 U.S., at 500, 95 S.Ct. 2197.

Id. at 11-12.  An association may have standing in its own right or as a representative of its members who have been injured in fact.  Pennsylvania Psychiatric Society v. Green Spring Health Servs., Inc., 280 F.3d 278, 283 (3d Cir. 2002) (citations omitted).

However, the manner in which standing must be supported depends upon the stage of the litigation at which the issue is raised:

At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we "presum[e] that general allegations embrace those specific facts that are necessary to support the claim." [Lujan v.] National Wildlife Federation, 497 U.S. [871], 889, 110 S.Ct. [3177,] 3189 [(1990)]. In response to a summary judgment motion, however, the plaintiff can no longer rest on such "mere allegations," but must "set forth" by affidavit or other evidence "specific facts," Fed.Rule Civ.Proc. 56(e), which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be "supported adequately by the evidence adduced at trial." Gladstone [Realtors v. Village of Bellwood], 441 U.S. [91], at 115, n. 31, 99 S.Ct. [1601,] 1616 n.31 [(1979)].

Defenders of Wildlife, 504 U.S. at 561.

In a case involving an association (FOE) that brought a citizen suit under the CWA alleging noncompliance with an NPDES permit, the Supreme Court explained that:

In Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), we held that, to satisfy Article III's standing

requirements, a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).

Friends of the Earth, Inc. v. Laidlaw Envt'l Servs (TOC), Inc., 528 U.S. 167, 180-81 (2000). "The relevant showing for purposes of Article III standing … is not injury to the environment but injury to the plaintiff." Id. at 181. In addition, "a plaintiff must demonstrate standing separately for each form of relief sought." Id. at 185. However, courts may not "raise the standing hurdle higher than the necessary showing for success on the merits in an action." Id. at 181. The Court observed that "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." Id. at 183 (citations omitted). See also Interfaith Cmty. Org. v. Honeywell Int'l, Inc., 399 F.3d 248, 254 (3d Cir. 2005) (although a plaintiff must have suffered an invasion of a concrete and particularized legally protected interest, "an identifiable trifle is enough."); American Bottom Conservancy v. U.S. Army Corps of Engineers, 650 F.3d 652, 658 (7th Cir. 2011) ("it is enough to confer standing that their pleasure is diminished even if not to the point that they abandon the site.")

The Court held that FOE demonstrated on a fully developed record that it had standing to seek both injunctive relief and civil penalties when it submitted affidavits from various members indicating that they used the North Tyger River and the area around it for fishing, camping,

swimming, picnicking and other activities, but could not do so any longer because of Laidlaw's discharges into the river. 528 U.S. at 181-84. The Court distinguished Lujan v. National Wildlife Federation, 497 U.S. 871, 889 (1990), which contained averments that a member used "unspecified portions of an immense tract of territory, on some portions of which mining activity has occurred or probably will occur by virtue of government action." And it distinguished Defenders of Wildlife, 504 U.S. at 564, which contained "some day intentions to visit endangered species halfway around the world." Id. at 183-84. Thus, although it is far from an exact science, the determination turns on whether an individual uses an "area affected by the challenged activity" rather than "an area roughly in the vicinity of it." Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 629 F.3d 387, 397 (4th Cir. 2011).

PPG cites Public Interest Research Group of New Jersey, Inc. v. Magnesium Elektron, Inc., 123 F.3d 111 (3d Cir. 1997). In that case, the Court of Appeals held that the plaintiff did not meet the standing requirement when it alleged that its members' enjoyment of the Delaware River was lessened because they "knew" that it had been polluted, noting that this was a "generalized grievance" that was not a judicially cognizable injury. Id. at 120-21. Plaintiffs respond that Magnesium Elektron: 1) is not good law because it was implicitly overruled by the Supreme Court's holding in Laidlaw that the relevant issue is injury to the plaintiff, not the environment; and 2) is distinguishable because they are not merely alleging that their injury is based upon mere knowledge of environmental pollution.

Plaintiffs have demonstrated that Magnesium Elektron is distinguishable from this case, because they are not merely contending that their members' enjoyment of the environment has been lessened because they "know" that it has been polluted. Rather, they have submitted sworn statements and deposition testimony from three members about the effect of the pollution on

their recreational activities of the kind found sufficient in <u>Laidlaw</u>, 528 U.S. at 181-82 (averments of camping, picnicking, bird-watching and walking near a river), and <u>Interfaith/Honeywell</u>, 399 F.3d at 256 (affidavits and deposition testimony of walking, fishing and biking near a river contaminated with chromium waste).[85]  In addition, "the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing."  <u>Defenders of Wildlife</u>, 504 U.S. at 562-63 (citation omitted).  Thus, the individuals' statements that their enjoyment of wildlife has been diminished by PPG's actions can also give rise to a cognizable injury.

PPG contrasts this case with cases like <u>Public Interest Research Group of N.J., Inc. v. Powell Duffryn Terminals, Inc.</u>, 913 F.2d 64, 71 (3d Cir. 1990), in which the plaintiffs complained of "the brown color and the bad odor" of the water, and <u>Natural Resources Defense Council v. Texaco Refining & Marketing</u>, 2 F.3d 493, 505 (3d Cir. 1993), in which the plaintiffs observed an "oily sheen" and an "unpleasant smell" near Texaco's refinery.  Yet when Ms. Kovacovsky testified to seeing mounds of slag waste seven or eight feet high and extending for 50 feet and off-colored sediments and brown, bubbly areas along the River (Kovacovsky Am. Aff. ¶¶ 5, 7; Kovacovsky Dep. at 33:8-25), PPG attempts to dismiss her observations because she could not identify specifically the pollution she saw.  Ms. Kovacovsky's testimony is similar to the evidence found to be sufficient in the cases PPG cites and it has provided no basis for distinguishing them.

Plaintiffs correctly note that they did not need to identify specific members who have been injured when the complaints were filed.  <u>See</u> <u>Building & Constr. Trades Council</u>, 448 F.3d

---

[85] It is also fair to question whether <u>Magnesium Elektron</u> remains good law in light of the fact that it predates <u>Laidlaw</u> and that it relies in part on an observation that the plaintiffs "have not shown that the River suffers from particular types of pollution."  123 F.3d at 121.

at 145 (there is no authority for the proposition that an association must "name names" in a complaint in order properly to allege injury in fact to its members.) Thus, PPG's repeated refrain that Plaintiffs' 30(b)(6) representatives could not identify individual members on the date the complaint was filed is irrelevant.

Similarly, PPG's arguments that the plaintiff organizations were "solicited" by TPM, that TPM arranged for the organizations to join the lawsuit without paying fees and expenses, and that TPM agreed to indemnify any individual Sierra Club members who might be sued as a result of their participation in the suit are not relevant to the issue of standing. PPG cites no authority in support of these arguments and, although it cites the observation of the Interfaith/Honeywell court that TPM's litigation tactics were "distasteful," "aggressive" and "unsavory," it omits the fact that the district court nevertheless credited TPM's arguments as to "the reasonableness of its legal and expert fees, expenses and hours charged." Interfaith Cmty. Org. v. Honeywell Int'l, Inc., 726 F.3d 403, 417 (3d Cir. 2013). Plaintiffs also note that the district court acknowledged that TPM's strategies were in response to equally aggressive tactics employed by the opposing party and credited TPM with its ability to achieve and enforce multiple remedies through consent decrees. Interfaith Cmty. Org. v. Honeywell Int'l, Inc., 808 F. Supp. 2d 744, 751-52 (D.N.J. 2011), aff'd in part, rev'd in part, 726 F.3d 403 (3d Cir. 2013).

PPG also contends that the three individuals did not visit the Site until after they were recruited to join this lawsuit, but that contention is not supported by the record. "Further, the idea that the declarant's environmental activism automatically precludes them from ever fulfilling the requirements for standing does not withstand review." Ohio Valley Envtl. Coalition, Inc. v. Coal-Mac, Inc., 775 F. Supp. 2d 900, 911 (S.D.W. Va. 2011).

In addition, Plaintiffs note that where Ms. Kovacovsky lives in relation to the Site is

irrelevant to her injuries if she uses the affected area.  See Laidlaw, 528 U.S. at 182-83 (summarizing testimony from plaintiff member who lived 20 miles from the site and would have used the river near the site if not for concern about harmful pollution, as well as testimony from member who canoed 40 miles downstream of the site and would have done so closer but for concern about harmful pollutants); American Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Comm'n, 389 F.3d 536, 541-42 (6th Cir. 2004) (although a member lived in Ashland, Kentucky rather than Louisa, that fact was not dispositive because he demonstrated an interest in canoeing and fishing in the affected area).  Thus, the fact that Ms. Kovacovsky lives 25 miles away from the Site is not dispositive, as PPG contends.

PPG contends that the amended affidavits submitted on behalf of Mr. Moser, Mr. Klaput and Ms. Kovacovsky are "sham affidavits" that should be disregarded.  Plaintiffs respond that the affidavits are consistent with the individuals' deposition testimony.  Mr. Moser signed his original affidavit on April 15, 2013 (ECF No. 141 Ex. P), he was deposed on September 24, 2013, and he signed an amended affidavit on November 11, 2013 (ECF No. 119 Ex. 26).  The same dates apply to Mr. Klaput, except that he signed his amended affidavit on November 6, 2013 (ECF No. 141 Ex. R, ECF No. 119 Ex. 25).[86]  Ms. Kovacovsky signed her original affidavit on July 31, 2013 (ECF No. 141 Ex. T), she was deposed on October 17, 2013 and she signed an amended affidavit on December 9, 2013 (ECF No. 119 Ex. 27).[87]

Sham Affidavit Doctrine

The Court of Appeals has held that:

---

[86] The original affidavits for Mr. Klaput and Mr. Moser were submitted on April 24, 2013 in support of Plaintiffs' opposition to PPG's motion to dismiss.  (ECF No. 43 Exs. 8, 9.)  The Court did not review them because the allegations of the Complaint were sufficient at that time.
[87] Plaintiffs state that Ms. Kovacovsky's original affidavit was first produced to PPG on August 1, 2013 as part of their supplemental responses to PPG's first request for production of documents.  (ECF No. 149 Ex. F.)

A sham affidavit is a contradictory affidavit that indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment. A sham affidavit cannot raise a genuine issue of fact because it is merely a variance from earlier deposition testimony, and therefore no reasonable jury could rely on it to find for the nonmovant.…[I]f it is clear that an affidavit is offered solely for the purpose of defeating summary judgment, it is proper for the trial judge to conclude that no reasonable jury could accord that affidavit evidentiary weight and that summary judgment is appropriate.

Jiminez v. All American Rathskellar, Inc., 503 F.3d 247, 253 (3d Cir. 2007) (citations omitted).

In order to determine if the affidavits should be disregarded, the Court must consider whether they are inconsistent with the affiants' prior deposition testimony, whether they merely clarify facts and whether the affiants have provided satisfactory explanation for any inconsistencies.

See EBC, Inc. v. Clark Bldg. Sys., Inc., 618 F.3d 253, 268-71 (3d Cir. 2010) (applying same approach to exclude deposition errata sheet which contradicted deposition testimony with "perfunctory" explanation that deponent was "confused and misunderstood some of the questions").

Plaintiffs argue that: 1) the amended affidavits cannot be considered sham affidavits because the original affidavits were submitted prior to the depositions of the three individuals and merely added details reflecting the deposition testimony; and 2) the amended affidavits are not wholly inconsistent with the affiants' deposition testimony, but are in fact consistent with such testimony and even if the amended affidavits contain minor discrepancies, this would not call for the exclusion of the affidavits.

Plaintiffs' timing argument is incorrect as a matter of law. If an affiant makes a statement in an amended affidavit that directly contradicts the person's deposition testimony, the statement would not be immune from review merely because the affiant had previously made the same statement in an affidavit that was made and submitted to the Court (but not considered)

46

prior to the deposition.  And if the amended affidavits merely add details reflecting the affiants' deposition testimony, it seems unnecessary to make such additions because Plaintiffs could simply cite the original affidavits and the deposition testimony.  On the other hand, merely because affidavits are submitted after deposition testimony does not automatically render them sham affidavits.  Rather, they must be examined to determine if they are inconsistent.

The real issue is whether the amended affidavits are consistent with the deposition testimony.  To the extent that they are, they will be considered.  To the extent that they are not— and because Plaintiffs have provided no explanations for any inconsistencies—they will not be considered.

With respect to Mr. Moser, PPG contends that his statement that his enjoyment of the environment has been diminished contradicts his deposition testimony, but its citations do not support this contention.  On page 56 of his deposition, Mr. Moser did not discuss the question of his enjoyment of bird watching at all, and on page 80, he indicated that he was "looking forward" to bird-watching along the Allegheny River again in the fall.  However, this testimony is not inconsistent with the statement in his affidavit that his enjoyment has been diminished by his observation of pollution in the River and he was not specifically asked about his level of enjoyment at his deposition.  He also testified about his concerns regarding the harmful effects of PPG's discharges and other pollution on fish, birds, and other wildlife that live in the affected area, and he testified about going boating with a neighbor downstream from the Site several times a year and observing oil accumulating on the boat.  (Moser Dep. at 38:22-39:10, 25, 40:12-16, 51:15-52:25, 59:17-60:3, 71:10-24.)  In addition, as noted above, an individual need not abandon all activities at a site in order to demonstrate a cognizable injury.  American Bottom Conservancy v. U.S. Army Corps of Engineers, 650 F.3d 652, 658 (7th Cir. 2011); see also San

<u>Francisco Baykeeper v. West Bay Sanitary Dist.</u>, 791 F. Supp. 2d 719, 749 (N.D. Cal. 2011) (diminished use and enjoyment of waterways downstream from where defendant discharged sanitary sewer overflows into river without a permit was sufficient).

With respect to Mr. Klaput, PPG contends that his statement about being concerned regarding water pollution from heavy metals and a high pH is directly contradicted by his deposition testimony, at which he expressed only "general concerns" about water quality and could not identify the specific pollution coming off the Site. However, as Plaintiffs note, Mr. Klaput described his concerns about high pH and heavy metals entering the River from the Site at his deposition (Klaput Dep. at 30:2-31:13) and PPG offers no support for the argument that Mr. Klaput must be able to identify specific forms of pollution in order to have standing. In addition, PPG contends that Mr. Klaput had no knowledge of the Site until he received an email from the Sierra Club, but Mr. Klaput testified that he is familiar with the affected area, that he is concerned about the effects of pollution on individuals including children, and that his concerns have led him to alter his activities by, for example, using only sit-upon kayaks. (Klaput Dep. at 11:1-7, 29:19-25, 51:13-52:4, 59:12-19, 76:5-25.)

PPG also contends that Mr. Klaput's statement about his recreational activities on the Allegheny River is directly contradicted by his deposition testimony, at which he indicated that he kayaks upstream from the Site in Manorville or on a creek that does not flow past the Site, that he bikes and bird-watches only on waterways upstream from the Site or on the opposite side of the River and that he has no future plans to canoe or kayak on the River. However, as noted above, Mr. Klaput testified that he launches his kayaks from a site directly across the River from the PPG Site (Klaput Dep. at 73:13-74:11) and PPG offers no support for the contention that being across the River is "too far away" to demonstrate standing. Mr. Klaput also stated that he

would "feel much better" about seeing other individuals using the area if the pollution from the Site was cleaned up and that he has changed his own kayaking habits in order to minimize contact with the water. (Id. at 59:12-19, 74:12-21.)

With respect to Ms. Kovacovsky, PPG contends that her statement about seeing off-colored sediments that appear contaminated along the River conflicts with her deposition testimony, in which she indicated that she is not close to the River when she bikes past Rosston along the trail. However, she also testified that she hikes and bikes on an unofficial trail near the Rosston Marina, within view of the River and directly across from the Site. (Kovacovsky Dep. at 40:13-23, 42:1-2, 8-12.) She also testified that she has driven past the Site and observed PPG's slurry waste since the 1960s. (Id. at 19:22-20:22, 22:13-23:7.) PPG contends that her statement about her enjoyment being diminished is inconsistent with deposition testimony that she is looking forward to biking, hiking and bird-watching in the future. However, at her deposition, she was not asked about her level of enjoyment. In addition, as noted above, an individual need not abandon all activities at a site in order to demonstrate a cognizable injury.

PPG has not demonstrated that the amended affidavits are sham affidavits. Rather, for the most part, the affidavits are consistent with the affiants' deposition testimony. Therefore, they can be considered and, as indicated above, they are sufficient to support the standing of these individuals.

To demonstrate that the injuries of Plaintiffs' members are "fairly traceable" to PPG's actions, they "need only show that there is a 'substantial likelihood' that [PPG's] conduct caused plaintiffs' harm." Powell Duffryn, 913 F.2d at 72. Specifically, traceability may be established "by showing that a defendant has 1) discharged some pollutant in concentrations greater than allowed by its permit 2) into a waterway in which the plaintiffs have an interest that is or may be

adversely affected by the pollutant and that 3) this pollutant causes or contributes to the kinds of injuries alleged by the plaintiffs." Id. (footnote omitted). In this case, PPG's discharges from the Site are not authorized by an NPDES permit or any other permit, therefore the discharge of any pollutants is unlawful. 33 U.S.C. § 1311(a) (without a permit, the discharge of any pollutant shall be unlawful). For RCRA claims, legally cognizable injuries are those that "related directly" to a defendant's site. Interfaith/Honeywell, 399 F.3d at 257. As the district court held in that case, the plaintiffs stated concerns for their health in light of their proximity to the site and indicated that the site has prevented or curtailed their recreational or aesthetic interest in the site, which was sufficient. Interfaith/Honeywell, 188 F. Supp. 2d 486, 500 (D.N.J. 2002).

Plaintiffs contend that: 1) PPG's discharges have contributed to contamination of the areas used and enjoyed by their members as PPG's own monitoring data shows the presence of high pH and arsenic, cadmium, copper, iron, lead and manganese; and 2) the pollutants discharged by PPG (lead, arsenic, cadmium and copper) cause or are contributing to their injuries as these metals have been recognized by both the EPA and Pennsylvania as toxic, 33 U.S.C. § 1362(13); 25 Pa. Code §§ 93.193.8c, table 5. They also argue that the injuries would be redressable by a favorable decision, in that it is likely that their members would receive "some" benefit from a declaratory judgment that PPG has violated the CWA, an order that PPG cease unauthorized discharges and remediate the Site and civil penalties. Massachusetts v. EPA, 549 U.S. 497, 525-26 (2007); Powell Duffryn, 913 F.2d at 73 (injuries remedied "at least in part"). PPG has not responded to these arguments.

Plaintiffs have demonstrated that their injuries are fairly traceable to PPG's discharges at the Site. Further, they have demonstrated that their injuries would be redressable by a favorable decision. Thus, they have met the standard for individual standing.

Associational Standing

As noted above, an association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. Laidlaw, 528 U.S. at 181. In this case, the individuals have standing, the interests at stake in the litigation are germane to PennEnvironment and the Sierra Club's purposes, which include their efforts to conserve, protect and restore Pennsylvania's waterways. Moreover, they have proffered evidence that PPG's failure to obtain permits and comply with those permits' discharge, monitoring and reporting violations interfere with the organizations' efforts to assess the compliance status of Pennsylvania dischargers with water pollution control laws and report such status to their members, interfere with their efforts to propose legislation to amend the CWA or the CSL and interfere with their efforts to bring litigation to prevent violations by PPG and thereby protect the waters of the Allegheny River affected by the discharge from the PPG Waste Site. Finally, neither the claims asserted nor the relief sought requires the participation of the individual members. Where associational plaintiffs do not seek individualized relief for their members that would require individualized proof, the participation of those members is not required. Hunt, 432 U.S. at 343-44. Thus, Plaintiffs have established associational standing. See Interfaith/Honeywell, 399 F.3d at 257-58. See also PennEnvironment v. RRI Energy Northeast Mgmt. Co., 744 F. Supp. 2d 466, 482 (W.D. Pa. 2010) (Hay, M.J.).

Standing in Their Own Right

Finally, Plaintiffs argue that they have standing in their own right because they have been directly injured by PPG's failure to apply for and obtain an NPDES permit, which would provide

much more information about the Site and allow these organizations to report to their members and carry out related legislative and litigation activities.  As noted above, they contend that, although some monitoring and reporting obligations have been imposed on PPG through the Administrative Order and the July 2009 Addendum, these obligations are not as extensive as the obligation that would be imposed through an NPDES permit.  See 40 C.F.R. Parts 122; 25 Pa. Code §§ 92a.46, 92a.61.

Plaintiffs note that the NPDES permitting process would provide opportunities for them to participate in the decision whether to grant the permit and on what terms.  The application and the draft permit must be made available to the public and a comment period provided before final determinations are made by PADEP. 25 Pa. Code § 92a.82.  Following the comment period, PennEnvironment and Sierra Club could request a public hearing on the draft permit.  Id.  Comments received during the comment period would be addressed by PADEP.  25 Pa. Code § 92a.86. The basis for the effluent limitations established in the draft and final permit by PADEP would have to be made available to the public. 25 Pa. Code § 92a.53. Following the issuance of a permit, PPG would be required to submit regular reports to the State (25 Pa. Code § 92a.61), which are available to the public (25 Pa. Code § 92a.81). This information would allow plaintiffs to more fully assess PPG's compliance with the CWA, CSL, the Administrative Order, and the permit itself and afford them opportunities to engage in related public education and advocacy.  PPG's failure to apply for and obtain a permit harms the plaintiffs' advocacy efforts by foreclosing a statutory mechanism "by which the public can both be educated and engaged."

PPG argues that because Plaintiffs have never requested publicly-available information regarding the Site including DMRs and the progress reports PPG submits to PADEP pursuant to

the Administrative Order, they cannot demonstrate any injury for being unable to obtain further information. Plaintiffs respond that they did obtain the publicly-available information through their counsel and that, in any event, the information PPG would have to divulge in order to obtain an NPDES permit is more extensive than what it submits now under the Administrative Order: DMRs in addition to those that sample effluent from Outfall 001, additional seeps at the Site which are not presently subject to any monitoring or reporting obligations, effluent limitations beyond the three parameters (pH, oil and grease and TSS) identified in the Administrative Order.

Plaintiffs contend that an NPDES permit would also include additional effluent limitations. They note that PPG has acknowledged that the effluent guidelines in the USEPA Region One Remediation General Permit ("RGP") "are relevant to consideration" of the discharges from the Site. (Shaw Treatment Plan Report at 53.)[88] For Non-Petroleum Primarily Heavy Metals Sites, the category that PPG considers applicable to the Site, the RGP establishes effluent limitations for five of the metals currently monitored pursuant to the 2009 Administrative Order: antimony, arsenic, chromium, iron, and lead. (Id.; Remediation General Permit at 12-13;[89] Remediation General Permit App. III at 12.[90]) DMRs submitted pursuant to a permit would necessarily include information about PPG's compliance with these and any other applicable effluent limitations. Such information is essential to the plaintiff organizations' ability to monitor compliance and pursue appropriate follow-up legal and legislative action.

PPG also argues that Plaintiffs cannot demonstrate a sufficiently concrete injury because they have not shown that their activities were "infeasible." However, PPG cites no authority in

---

[88] ECF No. 147 Ex. 1.
[89] ECF No. 147 Ex. 6.
[90] ECF No. 147 Ex. 7.

support of this argument. Plaintiff organizations contend that they have been deprived of

information and opportunities for public comment and response on PPG's permit application,

which are required by governing regulations. Although the organizations have continued to

provide their members with information regarding water quality, they have not been able to

provide a full and complete accounting of the Allegheny River near the Site and the adjacent

wetlands because they lack the information that would be disclosed pursuant to a permit

application and issuance and through the resulting DMRs. Standing does not require that the

plaintiff organization's activities be rendered totally "infeasible." In Competitive Enterprise

Institute v. National Highway Traffic Safety Administration, 901 F.2d 107, 123 (D.C. Cir. 1990),

which PPG cited, the District of Columbia Circuit observed that informational injury requires

only evidence of "concrete ways in which their programmatic activities have been harmed."

PPG also argues that Plaintiffs have not shown a "drain" on their resources, relying on Common

Cause v. FEC, 108 F.3d 413, 417 (D.C. Cir. 1997). However, Plaintiffs note that a demonstrable

impact on resources is not a requirement of informational injury, only an example of one. See

Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982) ("Such concrete and demonstrable

injury to the organization's activities—with the consequent drain on the organization's

resources—constitutes far more than simply a setback to the organization's abstract social

interests").

Plaintiffs argue that the injuries that they have cited have been held by courts as

conferring standing. In American Canoe Ass'n, Inc. v. City of Louisa Water and Sewer

Commission, 389 F.3d 536 (6th Cir. 2004), the Sixth Circuit concluded that the plaintiff

associations, including the Sierra Club, had standing based on the defendant's failure to comply

with monitoring and reporting obligations, which resulted in a lack of information that affected

the plaintiffs' organizational activities. The plaintiff organizations in that case alleged that the defendant's failure to fulfill its obligations deprived them of information that, in turn, prevented them from providing information to their members and carrying out related legislative and litigation activities. The Sixth Circuit found that the plaintiff organizations were injured due to the interference with "their ability to propose legislation and to bring litigation based upon the information collected by the defendants." Id. at 546. The court did not require a showing of a "drain" on resources or that plaintiffs' activities had become infeasible. It accepted as sufficient the plaintiffs' demonstration of a negative effect on the activities "essential to their daily organizational activities and to fulfilling their institutional goals." Id.

Plaintiffs have demonstrated the same negative effects resulting PPG's failure to apply for and obtain an NPDES permit as required under the Administrative Order, the CWA, and the CSL. Thus, they have met the requirements for demonstrating standing in their own right.

Therefore, Plaintiffs' motion for partial summary judgment on the issue of standing will be granted and PPG's motion for summary judgment will be denied.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


PENNENVIRONMENT and SIERRA CLUB,   )
                    Plaintiffs,   )
                                 )
     vs.                        )          Civil Action No. 12-342
                                 )
PPG INDUSTRIES, INC., BOROUGH OF FORD  )
CITY, and BUFFALO & PITTSBURGH   )
RAILROAD, INC.,   )
                 Defendants.   )


## ORDER

AND NOW, this 28th day of May, 2014, for the reasons provided in the Memorandum

Opinion,

IT IS HEREBY ORDERED that the Motion for Partial Summary Judgment and

Declaratory Judgment on Article III Standing filed by Plaintiffs, PennEnvironment and Sierra

Club (ECF No. 116), is granted.

IT IS FURTHER ORDERED that the Motion for Summary Judgment on Standing filed

by Defendant PPG Industries, Inc. (ECF No. 137) is denied.


s/Robert C. Mitchell_____
ROBERT C. MITCHELL
United States Magistrate Judge