IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PENNENVIRONMENT and SIERRA CLUB, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 12-342 |
| | ) | Member Cases: 12-527, 13-1395, |
| PPG INDUSTRIES, INC., BOROUGH OF FORD | ) | 13-1396, 14-229 |
| CITY, and BUFFALO & PITTSBURGH | ) | |
| RAILROAD, INC., | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs, PennEnvironment and Sierra Club, bring these citizen suits pursuant to section 505 of the Federal Water Pollution Control Act, 33 U.S.C. § 1365(a)(1) (Clean Water Act or CWA), section 7002(a)(1)(B) of the Resource Conservation and Recovery Act, 42 U.S.C. § 6972(a)(1)(B) (RCRA), and section 601(c) of the Pennsylvania Clean Streams Law, 35 P.S. § 691.601(c) (CSL), against Defendants, PPG Industries, Inc. (PPG), the Borough of Ford City (Ford City), and Buffalo & Pittsburgh Railroad, Inc. (BPRI), to remedy the alleged imminent and substantial endangerment to health and the environment presented by contamination of a site in Armstrong County, Pennsylvania used and operated by PPG (the "Site"), contamination of surface waters and sediments in the Allegheny River and Glade Run in the vicinity of the Site, and contamination of groundwater associated with the Site.[1]

Presently pending before the Court is Plaintiffs' motion for preliminary injunction, which seeks to compel PPG to apply for two National Pollutant Discharge Elimination System ("NPDES") permits regarding its discharges related to the Site and, in the interim, to comply

---

[1] Plaintiffs have indicated that they are not pursuing claims against or seeking specific relief from Ford City or BPRI, but have joined these defendants as indispensable parties.

with the requirements of the Administrative Order issued in 2009 by the Pennsylvania

Department of Environmental Protection (PADEP). For the reasons that follow, the motion will

be granted in part and denied in part.

Facts

The Site is located in North Buffalo and Cadogan Townships in Armstrong County,

Pennsylvania. It is bordered by Route 128 to the north, the Allegheny River to the south, Glade

Run, a tributary of the Allegheny River, to the west and a feature that PPG terms the "Drainage

Ditch" which flows southward and discharges into the Allegheny River to the east. (CWA

Compl. ¶ 15.)[2] From 1949 until 1970, PPG used parts of the property to dispose of slurry waste

and solid waste from its former glass manufacturing facility across the river in Ford City,

Pennsylvania. (2009 Administrative Order at PADEP3).[3]

PPG created three slurry lagoons in an area formerly used as sandstone quarry in which

it deposited the slurry waste. (Treatment Plan Report, Former Ford City Facility Slurry Lagoon

Area, prepared by Shaw Environmental, Inc. (Dec. 2012) ("TPR") at 2).[4] Collectively, the

lagoons and surrounding area comprise an area of approximately 77 acres called the "slurry

lagoon area" ("SLA") on the western part of the property. PPG also disposed of solid waste in a

landfill at the Site called the "solid waste disposal area" ("SWDA") beginning in the 1920s until

1967. (2009 Administrative Order at PADEP3.) The Allegheny River lies to the south of both

the SLA and SWDA. Glade Run, a tributary to the Allegheny River, lies to the west of the SLA.

(TPR at 1.)

In June 1994, PADEP conducted sampling and a survey of the streams in and around the

_____

[2] Civ. A. No. 12-342, ECF No. 1.
[3] PPG Br. Opp'n (ECF No. 178) Ex. A.
[4] PPG Hr'g Ex. T.

Site.  (ECF No. 119 Ex. 10.) The report of the survey stated that sediment samples collected from Glade Run downstream of the SLA contained high levels of lead, chromium, arsenic, barium, copper, nickel, aluminum and zinc.  (Id. at PPG008633.) The report found that, of those metals, the lead, arsenic, barium, and chromium sediment analysis exhibited hazardous waste characteristics.  The report also stated that there were no benthic macroinvertebrates present in the substrate collected from Glade Run downstream of the SLA. The report compared sediment samples from Glade Run downstream of the SLA with samples taken upstream of the SLA and found that the downstream samples exhibited higher levels of lead, chromium, copper, nickel, aluminum, and zinc.  (Id. at PPG008634). The report concluded that the discolored seeps have a visible impact on the stream and that the slurry lagoon is having an adverse impact on the stream water quality and aquatic life. (Id. at PPG008635).

In a subsequent memorandum, PADEP noted that "the slurry lagoon seeps are having an adverse impact on aquatic life in on-site stream." (ECF No. 119 Ex. 11.)  The memorandum found that the data from PPG's own risk assessment submitted to PADEP indicated that both lead and antimony in sediments may "impact aquatic life and benthic organisms potentially exposed to slurry lagoon sediments."  (Id. at PADEP000612.)

2009 Administrative Order

On March 9, 2009, PADEP issued an Administrative Order to PPG regarding the Site which contained factual findings and imposed certain performance obligations.  (2009 Administrative Order at PADEP2-9).  In the letter accompanying the Administrative Order, PADEP stated that "[t]he Department believes that the discharges coming from the site and entering into the Allegheny River and Glade Run pose a significant threat to public health and the environment." (Id. at PADEP 1.)

3

The Administrative Order described the process by which precipitation becomes contaminated with hazardous substances: "Precipitation which infiltrates the Slurry Lagoons and the Landfill at the Site becomes contaminated with *hazardous substances*, as defined under the Hazardous Sites Cleanup Act (HSCA) … and then is discharged into the waters of the Commonwealth. This contaminated precipitation is known as 'Leachate.'" (2009 Administrative Order at PADEP4). The Order further stated that "PPG is allowing contaminated Leachate and other liquids to be discharged from the Site into waters of the Commonwealth, resulting in pollution of those waters of the Commonwealth." (Id. at PADEP5). The Administrative Order stated that the industrial waste discharges from the Site "are pollutional and have a very high pH and contain metals and other toxic chemicals." (Id. at PADEP4).

The Administrative Order imposed, inter alia, the following Performance Obligations on PPG:

> A. PPG shall conduct weekly monitoring and reporting of seeps, for flow, total suspended solids, oil and grease, iron, aluminum, lead, chromium, antimony, arsenic, and pH and report results to PADEP on a monthly basis;
> C. Until such time as discharges, leachate, and seeps are collected and conveyed to an industrial waste treatment facility and the discharge from said facility is authorized by an NPDES permit, PPG shall implement interim abatement measures;
> D. PPG shall submit to the Department for review and approval a treatment plan and schedule ("Treatment Plan") to collect and treat all industrial waste discharges, Leachate and seeps from the Site into the waters of the Commonwealth.

(Id. at PADEP6-7 ¶¶ A, C, D.)

Samuel Harper, who prior to his retirement in October 2013 was the Program Manager for the Water Management Program at PADEP (Harper Aff. ¶ 1),[5] explains that he issued the Administrative Order because of:

---

[5] Pls.' Reply Br. (ECF No. 180) Ex. 7.

PPG's long-standing non-compliance with federal and state law. In particular, the Department was concerned with PPG's discharge of polluted or contaminated leachate or wastewater to the waters of the Commonwealth and of the United States. As early as 1971, the Department had ordered PPG to treat its discharges from the Site or to eliminate the discharges. The site history was reviewed at the time the Administrative Order was issued. In 2009 the PADEP, recognizing that PPG continued to discharge pollutants from the Site into state and federal waters without being authorized by an NPDES permit, issued the Administrative Order directing PPG to apply for and obtain an NPDES permit.

The Administrative Order was issued to address PPG's discharges to the waters of the Commonwealth of Pennsylvania, particularly the Allegheny River and adjacent wetlands, by requiring PPG to obtain and abide by the required NPDES permit(s) for the Site.

At the time that the Administrative Order was issued, PPG was, and had been for decades, required by law to have an NPDES permit for its discharges from the Site. This obligation exists irrespective of PPG's issuance in 2001 of a notice of intent to remediate the Site under Pennsylvania's Land Recycling Program ("Act 2"), which had been available to PPG since early in 1995. Remediation under Act 2 is voluntary. An NPDES permit is not. PPG's obligation to have an NPDES permit continues if PPG decides to abandon voluntary remediation under Act 2.

The Administrative Order also included other requirements, such as the construction of an interim treatment system, to minimize the impact of PPG's polluted discharges in the period before it applied for, obtained, and came into compliance with an NPDES permit. These requirements were not intended to either supplant or delay PPG's compliance with the NPDES permitting system.

The Administrative Order was purely focused on requiring PPG to obtain an NPDES permit. Nothing in the Order was intended to address or relate to Act 2.

(Harper Aff. ¶¶ 3-7.) Plaintiffs note that James Nairn, PPG's expert on Act 2 (Nairn Dep. at 135-36),[6] explained that Act 2 is a voluntary program, pursuant to which PPG can unilaterally decide how little or how much remediation it wishes to undertake, and it could even walk away without taking any action. (Nairn Dep. at 9, 13, 37.) He also indicated that, in his experience, the longest remediation effort took "at least four or five years, maybe longer" (Nairn Dep. at 28),

---

[6] ECF No. 180 Ex. 15.

but Plaintiffs note that it has been 13 years since PPG filed its notice of intent to remediate and it is not close to completing any remediation action.

Interim Abatement System

PPG submitted its construction plan for the Interim Abatement System ("IAS") on April 8, 2009, and submitted the Treatment Plan in June of 2009.  (ECF No. 178 Exs. B, C.)  On July 2, 2009, PADEP issued its approval (pursuant to a May 26, 2009 addendum to the IAS slightly modifying the original IAS). (ECF No. 178 Exs. D, E.)  The Addendum described the location where pH was to be monitored, with pH of the treated discharges to be controlled in the range of 6 to 9 standard units.  (ECF No. 178 Ex. E at 5.)  PADEP's July 2, 2009 approval contained specific effluent limitations for the treated discharges from the IAS, including pH and Total Suspended Solids ("TSS"), and also imposed metal monitoring requirements for this treated discharge. (ECF No. 178 Ex. D at 3-4.)

The IAS has been in operation since 2010, and PPG represents that its operation will continue as long as necessary pending full implementation of the permanent remedy.  (O'Hara Aff. ¶ 18.)[7]  Under the IAS, PPG constructed and has been operating a treatment system that collects and treats specified seeps from the SLA and discharges the treated water through Outfall 001.  (O'Hara Aff. ¶¶ 4-6, 18.)  As required by the Administrative Order, PPG continues to operate the IAS and submits progress reports and discharge monitoring reports ("DMRs") to PADEP.  (O'Hara Aff. ¶¶ 4-5.)  PPG states that its implementation of the IAS complies with PADEP's specific instructions in order to minimize any potential harm pending implementation of the permanent remedy.  (O'Hara Aff. ¶ 18.)

PPG indicates that, at no time since the IAS started operating in 2010 has PADEP ever

_____

[7] ECF No. 178 Ex. F.

penalized PPG for noncompliance with the Administrative Order or PADEP's authorization for the IAS, or indicated to PPG that it is dissatisfied with PPG's efforts to comply. (O'Hara Aff. ¶¶ 4, 16, 18.) Its TPR indicated that pH levels have been in the required 6 to 9 standard units range. (TPR at 48.)

Plaintiffs submit evidence that the pH values have frequently been measured above 9 standard units, and as high as 11.48 standard units. (ECF No. 105 at 36-37; Pls.' Hr'g Ex. 18.) PPG responds that these values were measured at the culverts, which are not owned by PPG and are not regulated as part of the Administrative Order.

Plaintiffs also note that the leachate from the seeps of the SLA is contaminated with at least aluminum, arsenic, chromium, iron, lead and antimony. (TPR at 38-39.) These metals are not eliminated or treated by the IAS and are thus discharged into the Allegheny River.

Plaintiffs' expert, Dr. Bruce Bell, states that, based on data collected by PPG, it is discharging at average flow from Outfall 001 from over 347 to over 1,182 pounds of pollutants, including metals, per day into the Allegheny River. (Bell Aff. ¶ 6.)[8] PPG's engineer, Patrick O'Hara, responds that PPG's discharges average less than 5.0 pounds per day and that the discharge of these metals since inception of the IAS accounts for less than 1.0 pound per day. (O'Hara Aff. ¶ 9.) O'Hara goes on to say that Dr. Bell has inappropriately characterized the silica content as a "pollutant" as a substantial portion of the mass he reports appears to be dissolved silicon or silica, which he avers is not regulated as a "priority pollutant" under the CWA, nor regulated under Pennsylvania's Act 2 program since its presence in the environment is ubiquitous and is not subject to remediation standards; and that PADEP has not requested that PPG monitor or report dissolved silicon/silica from Outfall 001 of the IAS. (O'Hara Aff. ¶¶ 10-

---

[8] ECF No. 174 Ex. 2.

12.) Finally, he states that:

> Silicon/silica in its solid form is an abundant, hard, unreactive, colorless compound and is essentially non-toxic when ingested orally. Silica is one of the most common elements on earth (it is commonly found in nature as quartz, as well as in various living organisms) and it is the primary component of beach sand and makes up a significant component of soils and river sediments in Western Pennsylvania and throughout the world.

(O'Hara Aff. ¶ 13.)

Dr. Bell replies that Mr. O'Hara has not provided the basis for the discharge amounts he recites. (Bell Aff. II ¶ 7.)[9] More importantly, he notes that the CWA regulates all pollutants, including "sand." Moreover, the CWA does not recognize the concept of "priority pollutant." It does, however, recognize "toxic pollutants" such as most of the metals in PPG's discharges. In addition, PADEP has set interim limits on pH and TSS, neither of which is a toxic pollutant. He concludes that "the vast majority of NPDES permits contain effluent limits for pollutants that are not toxic or priority pollutants." (Bell Aff. II ¶ 8.) Plaintiffs also note that PADEP has advised PPG that one of the failings of its TPR is that the seep water contained a significant amount of silicon and PPG's:

> proposed remedy does not include any removal of this material, which may cause precipitation at the outfall or in the River. PPG should revise the Plan to include additional tests to determine the appropriate treatment and removal of silicon to prevent the precipitation of silicon in waters of the Commonwealth.

(ECF No. 178 Ex. G at 1 ¶ 1.)

PADEP's Review of the TPR

PPG submitted the TPR outlining a proposed permanent collection and treatment plan to PADEP for its review, approval and/or comments in December of 2012. (PPG Hr'g Ex. T.) On May 13, 2014, PADEP issued its comments on the TPR. (ECF No. 178 Ex. G.) As expressly set

_____

[9] ECF No. 180 Ex. 6.

forth in its May 13, 2014 letter, PADEP provided numerous technical comments of a specialized nature to PPG to address various questions concerning the remedies proposed for the Site in the TPR. PADEP's comments on the TPR provided a timeframe for advancing the development and engineering of an acceptable remedy for the Site in an orderly fashion, including the approved schedule for when PPG is to apply for a NPDES permit after approval of a permanent remedy. (Id. at 1, 7.) PPG asserts that the purpose of PADEP's review of the TPR is to ensure that a comprehensive collection, treatment and NPDES permitted remedy will be implemented for the Site based upon thorough engineering and technical design considerations. That remedy will include not only segregation and permitting of stormwater currently mixing with affected waters, but collection and treatment of the affected waters including stormwater runoff which are not subject to the IAS prescribed by the Administrative Order. (Id.; See O'Hara Aff. ¶ 16.)

PPG timely submitted its response to PADEP's comments on June 25, 2014 with a supporting memorandum from ARCADIS (a multi-disciplinary environmental engineering firm retained by PPG as a consultant with respect to the design and implementation of the permanent plan for the Site) reporting initial data from ongoing treatability studies. (ECF No. 178 Ex. H.) PPG asserts that the treatability studies will assist PADEP in determining the most appropriate technology to address the discharge and to develop the effluent limitations required for the NPDES permit for the treated discharges from the SLA. (O'Hara Aff. ¶¶ 12, 21.) PADEP and PPG met on July 16, 2014 regarding revisions to the TPR. (O'Hara Aff. ¶ 21.) On July 18, 2014, PPG submitted a confirmation of the understandings reached at the July 16 meeting and identified deadlines for delivery to PADEP of: additional investigatory work requested (in part based upon Plaintiffs' comments); design engineering work for the comprehensive collection system; and treatability information to expedite NPDES treatment and effluent limits

discussions. (ECF No. 178 Ex. I.) PPG timely submitted all of these deliverables to PADEP in August and September, 2014. (O'Hara Aff. ¶ 21.)

On October 27, 2014, PADEP and PPG held a meeting during which the issues regarding the final TPR were limited to a very narrow list. (O'Hara Aff. ¶ 22.) PPG sent emails to PADEP on October 30, 2014 providing a response to the remaining issues and stated it believed it is feasible to submit a fully integrated and revised TPR for PADEP review and approval within 60 days of receiving notice of concurrence from the PADEP regarding the remaining issues or by January 31, 2015, whichever is later. (ECF No. 178 Ex. J; O'Hara Aff. ¶ 23.) At the hearing, PPG submitted a November 7, 2014 email response in which PADEP agreed to PPG's proposed schedule (PPG Hr'g Ex. Q) and PPG's November 10, 2014 response in which it agreed to the frequency of monitoring of the slope inclinometers as requested by PADEP (PPG Hr'g Ex. R). Mr. Harper, who was not very involved in the case even during his last days when he was still working at PADEP, admitted that he never cited PPG for failing to apply for a permit and is unaware of its recent schedule with PADEP.

PPG contends that that submission of the NPDES application after approval of the permanent remedy is appropriate because the application process is a multi-step procedure which requires: (1) Part I application; (2) a Part II application (for construction and operation of the treatment system); and (3) a development plan for effluent limitations. (O'Hara Aff. ¶ 20.) Prior to the submission of even Part I of the application, PADEP must approve the collection configuration and size/capacity of the treatment system. (Id.) PPG indicates that it understands, based on PADEP's comments letter and PPG's meetings with PADEP, that once the TPR is approved, PPG and PADEP will have a pre-application meeting which will be followed by the submission of a full and complete NPDES permit application based on the approved permanent

remedy to be implemented. (O'Hara Aff. ¶¶ 20-21, 23.) The application will encompass all discharges from the SLA, including stormwater runoff. (Id. ¶ 16.)

Plaintiffs reply that "it is not possible to design a wastewater treatment system to comply with an NPDES permit without knowing what effluent limitations will be imposed in the permit. Designing treatment before knowing the effluent limitations that will be the goal of such treatment is essentially putting the cart before the horse." (Bell Aff. II ¶ 11.) With respect to stormwater, Dr. Bell indicates that:

> The Treatment Plan Report does not address stormwater discharges from the site other than stormwater that is collected in the collection system. Nothing in the Treatment Plan Report or subsequent submissions suggests that PPG plans to treat either all stormwater discharged from the site or all stormwater discharged from the site through point sources. Only if all such stormwater was collected and treated through the same system as the leachate would the NPDES permit described by PPG cover the stormwater. PADEP stated in its Comment 6 on the Treatment Plan Report that all discharges of stormwater runoff need to be included in an NPDES permit. PPG Exhibit G, p. 2. In response, PPG states that it is its understanding that an NPDES permit for stormwater would only be necessary for discharges from any "conveyance that is used for collecting and conveying storm water" and that at this time it was not able to identify any such conveyances. PPG Exhibit H, p. 4 of 31. Based on my observations of the site, there are numerous culverts and ditches that discharge stormwater from the site into water of the Commonwealth and the United States including the Drainage Ditch. These are all point sources that require NPDES permitting. Nothing in PPG's Treatment Plan Report or subsequent submissions shows that PPG intends to capture in its proposed collection and treatment system the stormwater that runs off of the SLA and discharges through the culverts…. These culverts are point sources and the stormwater discharged through them requires an NPDES permit.

(Bell Aff. II ¶ 16.)

Plaintiffs contend that, under Pennsylvania law, the issuance of a Water Quality Protection permit occurs in two phases or parts. PADEP Permitting Policy and Procedure Manual, October 1, 1997 ("PADEP Manual"), Section 110.[10] The first part is the Part I (NPDES) Permit, which represents "authorization to 'discharge pollutants' from 'point sources' to

---

[10] ECF No. 180 Ex. 12.

'navigable waters' (i.e., waters of the Commonwealth) under the National Pollutant Discharge Elimination System." (Id. at 2.) Among other things, the Part I (NPDES) Permit "allows the permittee to discharge" and "directs the permittee to achieve an acceptable quality of effluent prior to discharge." (Id. at 3; see also Harper Aff. ¶ 10.)

Issuance of the final Part I Permit is preceded by a public notice and comment period, as well as potential review by the Environmental Protection Agency. (PADEP Manual, Section 201.2, at 47, 51-52, 55.) The second part of the process is the Water Quality Management Part II Permit, which represents "authorization to construct and operate … industrial wastewater treatment facilities." (Id. at 2.) The Part II Permit is intended to ensure that the facilities designed to collect, convey, and treat waste "will individually and collectively perform their intended functions and thereby prevent pollution of waters of the Commonwealth." (Id. at 5.) A Part II Permit must be obtained where there will be "[c]onstruction and operation of wastewater treatment facilities which will discharge to waters of the Commonwealth." (Id. § 202.1, at 84; see also Harper Aff. ¶ 11.) Physical construction of the facilities cannot be initiated until the Part II Permit is issued. (Id. at 86.)

Plaintiffs note that PPG acknowledges the necessity of the Part I and Part II applications. (ECF No. 178 at 8; O'Hara Aff. ¶ 20.) However, PPG also invokes a separate phase involving "a development plan for the effluent limitations" (ibid.), which it does not explain. Plaintiffs maintain that the Part I (NPDES) Permit sets the effluent limitations for the discharge at issue. (Harper Aff. ¶ 11.) Thus, they argue that delaying application for the Part I (NPDES) Permit delays the establishment of the effluent limitations for PPG's discharges from the Site. This in turn delays design of the treatment facilities needed to produce an effluent that complies with those effluent limitations. (Bell Aff. II ¶ 11.)

PPG insists that it cannot apply for the Part I (NPDES) Permit without PADEP's approval of the TPR and PADEP's corresponding approval of the size/capacity, scope, and configuration of the permanent treatment system for the SLA. First, as Mr. Harper explains, the approval of the TPR is not a prerequisite to PPG's application for an NPDES permit and does not "define the parameters" of that application. (Harper Aff. ¶ 10.)  Second, this argument puts the cart before the horse, as PPG is essentially arguing that it must configure its permanent treatment system before PADEP establishes the effluent limits that the treatment system must meet.  In other words, the process proposed by PPG "would be to design and construct a treatment system without any idea of the ultimate goals for that system." (Harper Aff. ¶ 11; Bell Aff. II ¶ 11.)

PPG contends that, if it were required to submit a NPDES permit application (PPG Hr'g Ex. P) now, it would be blank as to many of its critical components, would have no impact on the current discharges from the IAS, and would serve no practical purpose other than to needlessly complicate PADEP's process. (O'Hara Aff. ¶¶ 15, 17.)  PPG's expert, James Kilburg, testified similarly at the hearing.

Plaintiffs respond that PPG:

> has all of the data needed to submit an NPDES permit application now and, to the extent that it thinks it needs additional data, such data can be acquired in the 60-day hiatus between the requested court order and the submission of the application.  The application calls for a general description of the treatment system.  PPG has a treatment system in place and can complete that portion of the application by describing it.  The fact that PPG may have to make significant changes to the types and level of treatment in order to satisfy the effluent limitations that will be established in an NPDES permit is not an impediment to the submission of an NPDES application.  Otherwise, no one would be able to submit an application without knowing its outcome.

(Bell Aff. II ¶ 15.)

PPG states that Plaintiffs have also been involved throughout this process with PADEP as their attorneys have been copied on all correspondence that PADEP has sent to PPG, including

PADEP's comments on the TPR, and their counsel participated in a joint meeting with PADEP and PPG. (ECF No. 178 Ex. G at 7.) PPG notes that the TPR and the investigation required for it demonstrate that any discharges from the Site are not causing water quality standards to be exceeded in the Allegheny River. (O'Hara Aff. ¶ 14.) PPG contends that the submission of a NPDES permit now, rather than when PADEP deems it appropriate, will have absolutely no practical effect upon the treatment system or the quality of the Allegheny River. (Id. ¶ 17.)

Plaintiffs reply that the discharges do cause harm to benthic organisms in the River even if the water quality standards are not exceeded. (Bell Aff. II ¶ 9.) Moreover, the CWA requires the imposition of either technology-based effluent standards or water-quality based ones, whichever are more stringent. Dr. Bell states that, based on the modeling in the TPR, technology-based standards would be more stringent, thus the fact that PPG's discharges do not cause violations of water-based quality standards is irrelevant and an NPDES permit would impose technology-based standards. (Bell Aff. II ¶ 10.) Plaintiffs note that, in 2011, PADEP told PPG it "is responsible to collect any and all contaminated waste water, ground water and surface water that enter the surface Waters of the Commonwealth from this site, irrespective of any demonstrable impact on the receiving waters." (ECF No. 180 Ex. 14.) Finally, as explained below, Plaintiffs note that requiring PPG to file an NPDES permit application now would have an effect because it would trigger a mandatory response from PADEP within a scheduled timeframe.

The State of Any Discharges from the Site

PPG states that it understands that PADEP is satisfied with its efforts to comply with the interim effluent standards and monitoring requirements established by the 2009 Administrative Order and the May 2009 Discharge Approval. (O'Hara Aff. ¶¶ 4, 6, 18-19.) PPG has been

monitoring and reporting data to PADEP and submitting monthly written progress reports detailing its compliance with the Administrative Order pending approval of the final TPR. (Id. ¶ 4.) At no time during the process with PADEP over the last several years or through PPG's submission of its progress reports and DMRs has PADEP advised PPG that it considers it to be in violation of the 2009 Administrative Order or the pH limitations contained therein. (Id. ¶¶ 4, 18.) PPG's DMRs confirm that it is currently in compliance with the pH limitation imposed on the outfall for the IAS. (Id. ¶¶ 5-6.) PPG's DMRs, monthly progress reports and work required by the approved Treatment Plan also confirm that the current discharges from the Site are not impacting the water quality of the Allegheny River. (Id. ¶ 14.)

Plaintiffs respond that Mr. O'Hara does not state that PADEP is aware of the results of the monitoring of the railroad culverts. They further state that, to the best of their knowledge, PADEP only became aware of the pH values at the culvers as a result of Plaintiffs' notice of intent to sue regarding the violations, which was sent in November 2013. (Pravlik Aff. ¶ 26.)[11]

PPG notes that PADEP has been to the Site numerous times since the issuance of the Administrative Order and the start-up of the IAS and is fully aware that Outfall 001 is located at the neutralization tank of the IAS and is designated as the location for monitoring the pH effluent limitation. (O'Hara Aff. ¶¶ 4-6.) Further, PADEP knows that PPG has been monitoring for metals but not explicitly treating for metals during this interim abatement phase. (Id. ¶¶ 4-6, 9.) PADEP is also aware of PPG's monitoring of the railroad culverts about which Plaintiffs complain (which was not part of the Administrative Order or the approved IAS but was undertaken as part of the approved Treatment Plan investigation). (Id. ¶ 18.) At no time since the issuance of the Administrative Order or the operation of the approved IAS has PADEP

---

[11] ECF No. 180 Ex. 8.

advised PPG that it is dissatisfied with PPG's efforts to comply with the Administrative Order. (Id. ¶¶ 4, 6.)  At no time during any of the recent various discussions and related written communications between PPG and PADEP regarding treatability, engineering design and collection have any issues arisen regarding a violation of water quality standards or PPG's compliance with its obligations under the IAS.

Procedural History

On January 13, 2012, Plaintiffs gave notice of their intent to file suit to the Administrator of the EPA, the PADEP and Defendants as required by the CWA, CSL and RCRA.  33 U.S.C. § 1365(b)(1)(A); 35 P.S. § 691.601(e); 42 U.S.C. § 6972(b)(2)(A).  (CWA Compl. ¶ 4 & Ex. 1; RCRA Compl. ¶ 4 & Ex. 1.)  On March 20, 2012, Plaintiffs filed a complaint against PPG and Ford City under the CWA and the CSL (the "CWA Complaint").  The case was docketed at Civ. A. No. 12-342.  Count I alleges that that PPG has unlawfully discharged pollutants into navigable waters without an NPDES permit and continues to do so in violation of Sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342.  Count II alleges that PPG has violated and continues to violate sections 301(a) and 402(p)(2)(B), 33 U.S.C. §§ 1311(a), 1342(p)(2)(B), by discharging storm water associated with industrial activity without a permit authorizing such discharge.  Count III alleges that PPG has violated and continues to violate Sections 301 and 307 of the CSL, 35 P.S. §§ 691.301, 691.307, by discharging industrial waste into the Allegheny River, Glade Run, and groundwater associated with the Site without authorization or a permit obtained from PADEP, which constitutes a nuisance under Section 307(c).  Count IV alleges that PPG has violated and continues to violate Section 401 of the CSL, 35 P.S. § 691.401, by discharging pollutants and discharging waste containing high levels of pH, into the Allegheny River, Glade Run, and groundwater without a permit issued by PADEP authorizing such

discharges. Count V alleges that PPG has violated the CWA in that the Treatment Plan it submitted in June 2009 fails to provide a schedule for the application for NPDES permits and, based on the monthly progress reports submitted by PPG beginning on April 1, 2009, through at least January 5, 2012, PPG took no steps to apply for such permits and Plaintiffs allege, on information and belief, that PPG has failed to provide a schedule for the application of NPDES permits and has taken no steps to apply for such permits. Count VI alleges that PPG's acts as alleged in Count V also violate section 611 of the CSL, 35 P.S. § 691.611. Count VII alleges that PPG has discharged, and continues to discharge, untreated and ineffectively treated wastewater, in violation of the July 2 Addendum, and Count VIII alleges that these acts also violate section 611 of the CSL. Count IX alleges that PPG has violated the CWA by committing 162 discharge violations between February 2010 and December 2011, in violation of the 2009 Administrative Order, and Count X alleges that these acts also violate section 611 of the CSL. Count XI alleges that PPG has violated the CWA by committing 33 reporting violations between February 2010 and December 2011, in violation of the 2009 Administrative Order, and Count XII alleges that these acts also violate section 611of the CSL.

On April 20, 2012, Plaintiffs filed another complaint against PPG and Ford City under the RCRA (the "RCRA Complaint"). They allege that PPG is a generator and/or transporter of the solid or hazardous waste at the Site, as well as an owner and/or operator of the site, and has contributed to the past or present handling, storage, treatment, transportation, or disposal of the solid or hazardous waste at the Site, thereby presenting an imminent and substantial endangerment to health or the environment. This case was docketed at Civ. A. No. 12-527. On May 25, 2012, Plaintiffs filed a motion to consolidate the two cases (ECF No. 11). On May 29, 2012, an order was entered granting this motion and consolidating the cases at No. 12-342 (ECF

No. 12).

On September 25, 2013, Plaintiffs filed a second CWA/CSL complaint, including additional instances of alleged pollution and adding BPRI as a defendant. The case was docketed at No. 13-1395. On that same date, Plaintiffs filed a second RCRA complaint, also adding BPRI as a defendant, docketed at No. 13-1396. On September 30, 2013, an order was entered consolidating these cases at No. 12-342. Finally, on February 18, 2014, Plaintiffs filed a third CWA/CSL complaint against PPG, Ford City and BPRI, docketed at No. 14-229. On April 8, 2014, Plaintiffs filed a motion to consolidate the case and on April 9, 2014, an order was entered consolidating the case at No. 12-342.

On February 28, 2013, PPG filed a motion to dismiss on various grounds, including lack of standing (ECF No. 24). Ford City filed a motion indicating it was joining in PPG's motion to dismiss (ECF No. 29). On August 8, 2013, a Memorandum Opinion and Order was entered, denying the motions (ECF No. 66).

On December 19, 2013, Plaintiffs filed a motion for partial summary judgment on the issue of standing (ECF No. 116). On February 28, 2014, PPG filed its cross-motion for summary judgment on the issue of standing (ECF No. 137). On May 28, 2014, a Memorandum Opinion and Order was entered, denying PPG's motion and granting Plaintiffs' motion (ECF No. 162).

On October 1, 2014, Plaintiffs filed a motion for preliminary injunction (ECF No. 173). PPG filed its brief in opposition on October 31, 2014 (ECF No. 178) and on November 7, 2014, Plaintiffs filed a reply brief (ECF No. 180). On November 13, 2014, a hearing was held, at which five witnesses testified and arguments were presented. The motion is now ripe for disposition.

NPDES Permits Under the CWA

As the Supreme Court recently stated:

> Congress passed the Clean Water Act in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 86 Stat. 816, 33 U.S.C. § 1251(a). A central provision of the Act is its requirement that individuals, corporations, and governments secure National Pollutant Discharge Elimination System (NPDES) permits before discharging pollution from any point source into the navigable waters of the United States.  See §§ 1311(a), 1362(12); EPA v. California ex rel. State Water Resources Control Bd., 426 U.S. 200, 205, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976).

Decker v. Northwest Envtl. Def. Ctr., 133 S.Ct. 1326, 1331 (2013).

To that end, Section 301(a) of the CWA provides that in the absence of a permit, except under specified circumstances, "the discharge of any pollutant by any person shall be unlawful." 33 U.S.C. § 1311(a).  The "discharge of a pollutant" is defined by the CWA as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12)(A). The term "point source" means:

> any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged. This term does not include agricultural stormwater discharges and return flows from irrigated agriculture.

33 U.S.C. § 1362(14).  Finally, the term "pollutant" means "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water."  33 U.S.C. § 1362(6). Section 1365(a) "authorizes private enforcement of the provisions of the Clean Water Act and its implementing regulations."  Decker, 133 S.Ct. at 1334 (citation omitted).

PPG's reference to a "priority pollutant" finds no basis in the CWA, which as cited, requires an NPDES permit before a party may discharge any "pollutant," a term which is broadly defined to include rock and sand.  The CWA does define the term "toxic pollutant," 33 U.S.C.

§ 1362(13) and Plaintiffs note that many of the metals present in PPG's discharges (antimony, lead and zinc) are classified as "toxic pollutants," 40 C.F.R. § 401.15(5, 44, 65).

Standard of Review

The Court of Appeals has held that:

> A party seeking a preliminary injunction must show: (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief. Allegheny Energy, Inc. v. DQE, Inc., 171 F.3d 153, 158 (3d Cir. 1999). Preliminary injunctive relief is "an extraordinary remedy" and "should be granted only in limited circumstances."

Kos Pharmaceuticals, Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir. 2004) (quoting American Tel. & Tel. Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1427 (3d Cir. 1994). The Supreme Court has clarified that parties seeking a preliminary injunction are required to demonstrate that "irreparable injury is likely in the absence of an injunction." Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 22 (2008). Preliminary injunctions are usually brought to preserve the status quo pending the outcome of a trial and are thus prohibitory in nature. Kos, 369 F.3d at 708. However, Plaintiffs contend that, in the context of ongoing environmental violations, courts have employed mandatory injunctions that require a party to take action. United States v. Price, 688 F.2d 204, 212 (3d Cir. 1982).[12] In Price, the United States brought suit under the RCRA against owners and operators of a former commercial landfill that was leaking contaminants into a water supply used by Atlantic City, New Jersey. The Court of Appeals observed that:

> The unequivocal statutory language and this legislative history make it clear that Congress, by enacting section 7003, intended to confer upon the courts

---

[12] Plaintiffs further note that the Pennsylvania legislature has recognized that mandatory preliminary injunctions may issue under the CSL "where the circumstances require it or the public health is endangered." 35 Pa. C.S. § 691.601(b).

the authority to grant affirmative equitable relief to the extent necessary to eliminate any risks posed by toxic wastes. Under section 7003, a court could not order the cleanup of a waste disposal site which posed no threat to health or the environment. There is no doubt, however, that it authorizes the cleanup of a site, even a dormant one, if that action is necessary to abate a present threat to the public health or the environment. It is also clear that if a threat to human health can be averted only by providing individuals with an alternate water supply, that remedy, in an appropriate case, may be granted under the authority of section 7003.

Id. at 713-14 (legislative citations omitted). Nevertheless, the court did not order the injunctive relief sought because the application predated an amendment of the complaint that added 35 additional defendants and it was both impractical and unfair to grant an injunction binding only a small minority of defendants. In addition, during the pendency of the appeal, New Jersey made available to affected homeowners uncontaminated water and the EPA funded an initial study of the toxic hazard posed by the contaminants.

Plaintiffs cite three additional cases in support of their motion and PPG responds that they are distinguishable. United States v. Malibu Beach, Inc., 711 F. Supp. 1301 (D.N.J. 1989), involved an action to clean up wetlands and the court ordered the defendant to remove fill material that it had dumped in the wetlands. However, the court did not order the defendant to apply for a permit. Plaintiffs contend that the court's order to remove fill material obviated the need for a permit, but that a permit is needed here because PPG's violation of the CWA cannot be fully remedied by removal of the unlawfully discharged pollutants or cessation of the discharge as was possible in Malibu Beach. PPG argues that, in this case, it is already under an order from PADEP to remediate the Site and to treat the discharges under the IAS until an NPDES permit application can be submitted and approved.

In Romero-Barcelo v. Brown, 478 F. Supp. 646, 663-64 (D.P.R. 1979), rev'd in part on other grounds, 643 F.2d 835 (1st Cir. 1981), rev'd sub nom. Weinberger v. Romero-Barcelo, 456

U.S. 305 (1982), the district court found that the Navy had violated the CWA by discharging ordnance into the Atlantic Ocean during training operations without obtaining an NPDES permit. The court ordered the Navy to apply for an NPDES permit (although it did not order the Navy to cease its operations for national security reasons). The Navy took an appeal from the district court's decision, but it did not appeal the order requiring it to obtain an NPDES sewage discharge permit. 643 F.2d at 840 n.6. The Navy argued that it did not have to apply for a permit at all because its vessels operated outside the three-mile geographical limit of the CWA and the Secretary of Defense exempted the vessels from marine sanitations requirements under the authority of the CWA, but the court found that enough activity occurred within the "territorial seas" to fall within the CWA.

The Supreme Court reversed the decision of the Court of Appeals for the First Circuit, which had erroneously concluded that the CWA withdrew federal courts' equitable discretion to order any relief other than an immediate prohibitory injunction. The Court noted that the integrity of the nation's waters is the purpose of the CWA, not the permitting process.

> This purpose is to be achieved by compliance with the Act, including compliance with the permit requirements. Here, however, the discharge of ordnance had not polluted the waters, and, although the District Court declined to enjoin the discharges, it neither ignored the statutory violation nor undercut the purpose and function of the permit system. The court ordered the Navy to apply for a permit. It temporarily, not permanently, allowed the Navy to continue its activities without a permit.

456 U.S. at 315 (footnotes omitted). In other words, although the Supreme Court held that a federal court has discretion regarding the issue of whether to issue an injunction upon finding a violation of the CWA ordering the violator to immediately cease its polluting activity, it also observed that requiring the violator to apply for an NPDES permit is one of the appropriate actions that a court may legitimately take in the interim.

Finally, in <u>American Canoe Ass'n, Inc. v. Murphy Farms, Inc.</u>, 1998 U.S. Dist. LEXIS 21402 (E.D.N.C. Dec. 22, 1998), <u>appeal dismissed in part, remanded in part</u>, 2000 U.S. App. LEXIS 13033 (4th Cir. Mar. 29, 2000), the court ordered the defendant swine facility to apply for and obtain an NPDES permit because it was making unauthorized discharges of waste into navigable waters. The defendant argued that it did not have to apply for a permit because it was not a concentrated animal feeding operation, but the court agreed with the plaintiffs that it was

PPG argues that, in <u>American Canoe</u>, the state agency (NCDENR) was a participant in the court proceedings so that the court was not ordering relief that would affect absent administrative agencies (but PADEP is not a party to these proceedings); that NCDENR was not involved in any administrative enforcement action (unlike PADEP in the instant matter); and that both the defendant and NCDENR took the position that the defendant did not have to apply for an NPDES permit (whereas PPG admits that it is required to do so, at the appropriate time).

Plaintiffs respond that NCDENR was not a party to the proceedings (it merely filed an amicus brief) and in fact the court denied the defendants' motion to join NCDENR in the case (Pravlik Aff. ¶ 23; ECF No. 180 Ex. 11); the fact that a state agency will eventually be involved in the permit process does not require the court to exercise jurisdiction over that agency—PADEP's authority derives from state and federal law, not the order Plaintiffs request from this Court; PPG's acknowledgment of its legal obligation does not mean that it has complied with the law, as it has never sought an NPDES permit in the 40 years since its discharges were first noted; NCDENR had in fact taken administrative enforcement action including imposing civil penalties and threatening revocation of the defendants' non-discharge permit (the state's alternative to an NPDES permit) in the event of further discharge (Pravlik Aff. ¶ 24; ECF No. 180 Ex. 16).

Plaintiffs argue that: 1) they are likely to prevail on the merits of their claims, given that

the Court has determined that they have standing to bring these claims, PPG admits that it is discharging pollutants into the Allegheny River without an NPDES permit and that it intends to seek such a permit from PADEP and it is discharging water into the River with pH values in excess of those set by the Administrative Order and is thus in violation of that order; 2) irreparable harm is being done to the environment and Plaintiffs are harmed by PPG's delay in seeking a permit; 3) the requested injunction will not harm PPG; 4) the granting of the injunction furthers the public interest; and 5) the Court should issue the injunction now to prevent the ongoing and irreparable harm caused by PPG's discharges.

PPG responds that: 1) the requested injunction is unnecessary and unhelpful in that the permit application cannot currently be completed and PPG will file the application at the appropriate time as indicted by PADEP; 2) Plaintiffs have failed to meet their heavy burden for the issuance of a mandatory injunction in that filing for an NPDES permit is a procedural requirement under the CWA and injunctive relief is inappropriate to address procedural violation; 3) the irreparable harm contention cannot be sustained given that the lead case has been pending for over two years; 4) PPG will be harmed by having to go through the meaningless gesture of filing an incomplete permit application; and 5) Plaintiffs have not explained why the public interest is not served by allowing the duly authorized agency to complete its work on the schedule it has defined.

In a reply brief, Plaintiffs argue that: 1) PADEP's oversight of the 2009 Administrative Order is not a basis for denying the request for injunctive relief and the Court has already rejected PPG's arguments when made in the context of a motion to dismiss based on primary jurisdiction; 2) PADEP does not have to approve the TPR as a prerequisite for an NPDES permit and the filing of an application would trigger a policy requiring PADEP to respond within 188

business days; 3) the requested relief is appropriate and consistent with established case law: PPG is not liable for the "mere procedural violation" of failing to file for an NPDES permit, but for its discharge of pollutants without a permit, PPG cites a case in which a preliminary injunction was denied because the plaintiff failed to show that the discharges were likely to recur and PPG falsely claims that an injunction would fundamentally constitute a finding on the ultimate merits of some of Plaintiffs' claims; and 4) contrary to PPG's argument, the four factors for the issuance of a preliminary injunction have been met.

Likelihood of Success on the Merits

Plaintiffs contend that they have demonstrated a likelihood of success on the merits, given that they have established their standing to bring the cases, PPG has admitted that it is discharging pollutants without an NPDES permit and PPG has indicated that it intends to apply for a permit at some point. PPG responds that filing for an NPDES permit is a mere procedural requirement under the CWA and injunctive relief is inappropriate to address procedural violations. PPG's argument is not availing—filing for an NPDES permit is not a mere procedural technicality, but the means by which the CWA is enforced. See International Union, United Auto. Aerospace & Agricultural Implement Workers of America, AFL-CIO v. Amerace Corp., 740 F. Supp. 1072, 1086 (D.N.J. 1990). Therefore, this factor weighs in favor of granting injunctive relief.

Irreparable Harm

Plaintiffs contend that harm to the environment has been held to be irreparable by its very nature. Natural Resources Defense Council v. Texaco Ref. & Mktg., Inc., 906 F.2d 934, 941 (3d Cir. 1990). "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. If such injury is

sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." Amoco Production Co. v Village of Gambell, Alaska, 480 U.S. 531, 545 (1987).

PPG does not dispute this argument, but argues that Plaintiffs cannot demonstrate that the harm is "immediate" because they did not file for a preliminary injunction for two years after instituting this action. Plaintiffs explain the delay by indicating that the parties had been involved in settlement negotiations and subsequently various other motions were pending before the Court that had to be resolved first. (Pravlik Aff. ¶¶ 4-20.) The Court of Appeals has held that "[d]elay in seeking enforcement of [a plaintiff's] rights tends to indicate at least a reduced need for such drastic, speedy action" but that "delay may be excused where the party seeking a preliminary injunction delays only in the reasonable belief that negotiations may resolve the dispute." Lanin v. Borough of Tenafly, 515 F. App'x 114, 118 (3d Cir. 2013). PPG contends that Plaintiffs could have filed the preliminary injunction motion despite the pending motions to dismiss and for summary judgment.

The Court finds this discussion irrelevant to the instant proceedings. As noted above, harm to the environment has been classified as irreparable. That harm did not become reparable (or "less immediate") because of Plaintiffs' delay in filing for a preliminary injunction, whatever the reason. PPG's citations to other cases, not involving environmental issues, are not on point: Lanin involved residents challenging an ordinance that turned the road in front of their house into a one-way street; and Patel v. St Vincent Health Ctr., Civ. A. No. 1:12-298 (W.D. Pa. Aug. 28, 2013), involved a student who was terminated from a 4-year medical residency program. Finally, although Defenders of Conewango Creek v. Echo Developers, LLC, Civ. A. No. 1:06-242 (W.D. Pa. Oct. 11, 2007), was an environmental case, the court's finding of lack of

irreparable harm was based upon its conclusion that the plaintiff had failed to demonstrate that <u>any</u> harm was likely to befall the riffleshell mussel that the plaintiff was purporting to protect. Thus, the court's conclusion was primarily based on the plaintiff's failure to show likelihood of success on the merits.

Plaintiffs have demonstrated that PPG's continuing discharge of pollutants into the Allegheny River constitutes irreparable harm to the environment. Therefore, this factor weighs in favor of granting injunctive relief. As Plaintiffs note, Rule 65 sets no time limit on filing for a preliminary injunction.

### Harm to PPG

Plaintiffs contend that PPG will suffer no harm from submitting an NPDES permit application. PPG argues that ordering it to submit an application for an NPDES permit now will delay or somehow interfere with its ongoing collaborative efforts with PADEP. It cites no authority in support of the contention that such delay or interference, even if it occurred, constitutes "harm." The Court finds that this factor favors granting Plaintiffs' request for an injunction.

### Public Interest

Plaintiffs argue that the public interest will be served by requiring PPG to comply with the application process and end its pollution of the Allegheny River. PPG has not specifically responded to this argument. The Court finds that this factor favors granting Plaintiffs' request for an injunction.

### Other Issues

PPG devotes the majority of its brief and argued at the hearing that being required to file for an NPDES permit at this time would be "a futile act," for several reasons: 1) PADEP has not

ordered it to do so and has not cited it for failing to do so; 2) the mere filing an application would not change the status quo, as it would simply place the issue before PADEP, where it already is; 3) in fact, PPG would be unable to complete the form, because it lacks all of the data necessary to indicate water volume and chemical components; 4) as a result, PADEP would likely reject the application as incomplete; and 5) PPG is working with PADEP and the plan is for the submission of an NPDES permit application at the appropriate time, namely following its filing of a revised TPR and a pre-application meeting with PADEP.

These arguments are unavailing. First, "futility" is not a factor for a court to consider when presented with a motion for a preliminary injunction. Therefore, all of PPG's sub-arguments are irrelevant. Moreover, even if they are taken into consideration, Plaintiffs do not have the burden of demonstrating that an injunction would not be futile.

With respect to the specific arguments presented, Plaintiffs have responded to show that PPG is obfuscating the issues in this case. PPG's requirement to file for an NPDES permit is not based on an order from PADEP, nor is its failure to file for such a permit excused by the lack of an order from PADEP. Rather, this responsibility is the fundamental requirement of the CWA. See 33 U.S.C. § 1311(a) ("except [under specified circumstances, including an NPDES permit] the discharge of any pollutant by any person shall be unlawful.")

Plaintiffs contend that filing an application would change the status quo, in that it would require PADEP to respond to the application within 188 business days, unlike PPG's voluntary remediation efforts, which (although recently more active) appear to have no timing requirements. Pursuant to Pennsylvania Executive Order 2012-11 (July 24, 2012),[13] PADEP was required to establish, among other things, predictable process times for permit applications that

---

[13] ECF No. 180 Ex. 13.

would be covered by a "permit decision guarantee." The resulting Policy for Implementing the Department of Environmental Protection (Department) Permit Review Process and Permit Decision Guarantee (November 2, 2012)[14] sets forth guarantee time frames for the processing of applications. Those time frames are the "length of processing time that a permit decision will be guaranteed by the Department, provided an applicant submits complete, technically adequate applications that address all applicable regulatory and statutory requirements in the first submission." (Id. at 1.) The permit decision guarantee time frame for NPDES applications relating to industrial wastewater facilities is 188 business days. (Id. at 24.)[15] Thus, rather than causing a delay, Plaintiffs contend that requiring PPG to apply for the NPDES permit would trigger PADEP's permit decision guarantee time frame and result in issuance of an NPDES permit with effluent limitations sooner rather than at some indefinite time in the future as the matter continues to linger as it has for decades.

Plaintiffs note that PPG has not explained why it cannot fill out the application using its existing IAS and modify it as appropriate (Bell Aff. II ¶ 15). Moreover, even if it could not proceed in this fashion, PPG has not made a credible argument that, 42 years after first being notified of its violations and five years after the Administrative Order issued, it still lacks sufficient information to complete an NPDES permit application. Finally, there is no basis for concluding that PADEP would reject the application as incomplete. PPG is counseled not to attempt to submit an incomplete application to induce PADEP to reject it.

With respect to PPG's final argument, although PPG's recent voluntary remediation

---

[14] ECF No. 180 Ex. 17.
[15] Plaintiffs note that PPG acknowledged this Policy in its reply brief in support of its motion to dismiss (ECF No. 45 at 25 & Ex. B), in which it argued that PADEP was working within its published guidelines in reviewing PPG's change to an already approved leachate collection system within 186 business days of its submission.

efforts and cooperation with PADEP is commendable, such actions do not supplant PPG's responsibility under the CWA. As one district court held, when presented with this argument:

> Defendants suggest that there is no need to order a preliminary injunction because they are taking adequate steps to remedy the harm. Together with the DEQ and the City of Warrenton, defendants have developed a public-private partnership that intends to reroute defendants' discharge to the Columbia River by March 2006.
>
> This court finds no credible assurance that defendants will be able to discharge to the Columbia River by next spring. In September 2004, defendants argued that they would be discharging to the Columbia River by March 2005. They failed to do so. Moreover, even if defendants were able to reroute their discharges by next spring, that does not affect the current irreparability analysis. See Piney Run Pres. Ass'n v. County Comm'rs of Carroll County, Md., 82 F. Supp. 2d 464, 473 (D. Md. 2000) (finding that, despite the sewage treatment plant's efforts to mitigate environmental damages, injunctive relief was appropriate because the plant continued to violate the CWA), vacated on other grounds, 268 F.3d 255 (4th Cir. 2001). Obviously, the possibility that defendants may cease their unlawful discharges by next spring does not bear on whether the harm they are inflicting now is irreparable.

Oregon State Public Interest Research Group v. Pacific Coast Seafoods Co., 374 F. Supp. 2d 902, 906 (D. Or. 2005) (internal citations omitted). In this case, PPG has been working with PADEP since 2001 and until recently, there has been little progress toward a permanent remediation. In addition, PPG has not even provided a date by which it intends to file for an NPDES permit or otherwise cease violating the CWA (it merely provides a date by which its final TPR is due to PADEP, which it indicates will be followed at some point by a "pre-application meeting"). At the hearing, even PPG's engineer, Mr. O'Hara, admitted that the TPR contains no public notice or comment period but that filing an NPDES permit application would trigger these procedural elements.

Plaintiffs have demonstrated that a likelihood of success on the merits, irreparable harm, lack of harm to PPG and the public interest all favor the granting of its motion for a preliminary injunction to compel PPG to apply for an NPDES permit. PPG's arguments to the contrary are

not supported and are mostly irrelevant.  Therefore, in this respect, its motion will be granted.

Based upon PPG's representation that it will submit its final treatment plan report to PADEP on or before January 31, 2015 and because this matter must move forward, PPG will be permitted until March 31, 2015 to file its application for an NPDES permit with PADEP.  This date shall not be extended, however, even if PADEP extends the time in which PPG is to file its final treatment plan report.

On the other hand, Plaintiffs have not demonstrated that PPG has violated the 2009 Administrative Order by discharging wastewater with pH values exceeding the permissible range of 6 to 9 standard units.  Plaintiffs appear to be focusing on the discharge levels at the culverts, which are not included within the Administrative Order.  The parties dispute when PADEP became aware of the pH values from the monitoring at the culverts, but even by Plaintiffs' reckoning, "PADEP … became aware of these pH violations as a result of plaintiffs' November 2013 notice of intent to sue regarding the violations."  (ECF No. 180 at 21 n.17 (citing Pravlik Aff. ¶ 26)).  Yet Plaintiffs do not dispute that PADEP has taken no action to assert that PPG is in violation of the Administrative Order.

Unlike the question of whether PPG is violating the CWA, the issue of whether PPG is violating the Administrative Order should be decided by the agency that issued the order, namely PADEP.  If PADEP has been aware of pH violations for nearly a year and has not concluded that PPG is violating its Administrative Order, it would be anomalous for this Court to intervene in that process and conclude otherwise.  Therefore, Plaintiffs' request for an injunction requiring PPG to comply with the Administrative Order will be denied.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PENNENVIRONMENT and SIERRA CLUB,      )
                  Plaintiffs,                    )
                                         )
    vs.                                                    )          Civil Action No. 12-342
                                         )
PPG INDUSTRIES, INC., BOROUGH OF FORD   )
CITY, and BUFFALO & PITTSBURGH          )
RAILROAD, INC.,                        )
                  Defendants.                   )

ORDER

AND NOW, this 10th day of December, 2014, for the reasons provided in the

Memorandum Opinion,

IT IS HEREBY ORDERED that the Motion for Preliminary Injunction filed by Plaintiffs,

PennEnvironment and Sierra Club (ECF No. 173), is granted in part and denied in part, as

follows:

The motion for a preliminary injunction regarding an application for an NPDES permit is

GRANTED and by March 31, 2015, PPG shall file an application for an NPDES permit with

PADEP.  As a result of the issuance of this mandatory injunction requiring PPG to file an

application for an NPDES permit with PADEP, an action it has committed to perform although

the timing is uncertain, PPG will suffer no injury if it is determined that this injunction was

improvidently granted, and a result no security will be required to be posted by Plaintiffs

pursuant to Federal Rule of Civil Procedure 65(c).

The motion for a preliminary injunction to compel PPG to comply with the 2009

Administrative Order issued by PADEP is DENIED.

                                       s/Robert C. Mitchell
                                       ROBERT C. MITCHELL
                                       United States Magistrate Judge