IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PENNENVIRONMENT and SIERRA CLUB,  )
                      Plaintiffs,  )
                             )
vs.  )      Civil Action No. 12-342
                             )      Member Cases: 12-527, 13-1395,
PPG INDUSTRIES, INC., BOROUGH OF FORD  )      13-1396, 14-229
CITY, and BUFFALO & PITTSBURGH  )
RAILROAD, INC.,  )
                 Defendants.  )

MEMORANDUM OPINION AND ORDER

      Plaintiffs, PennEnvironment and Sierra Club, bring these citizen suits pursuant to section

505 of the Federal Water Pollution Control Act, 33 U.S.C. § 1365(a)(1) (Clean Water Act or

CWA), section 7002(a)(1)(B) of the Resource Conservation and Recovery Act, 42 U.S.C.

§ 6972(a)(1)(B) (RCRA), and section 601(c) of the Pennsylvania Clean Streams Law, 35 P.S.

§ 691.601(c) (CSL), against Defendants, PPG Industries, Inc. (PPG), the Borough of Ford City

(Ford City), and Buffalo & Pittsburgh Railroad, Inc. (BPRI), to remedy the alleged imminent and

substantial endangerment to health and the environment presented by contamination of a site in

Armstrong County, Pennsylvania used and operated by PPG (the "Site"), contamination of

surface waters and sediments in the Allegheny River and Glade Run in the vicinity of the Site,

and contamination of groundwater associated with the Site.[1]

      Presently pending before the Court are cross-motions for partial summary judgment, filed

by Plaintiffs and PPG.  Plaintiffs contend that the evidence of record demonstrates that PPG

should be held liable for making discharges without a permit in violation of both the CWA

---

[1] As explained infra, Plaintiffs have indicated that they are not pursuing claims against or seeking
specific relief from Ford City or BPRI, but have joined these defendants as indispensable parties.

(Counts I, II, XIII and XV) and the CSL (Counts III, IV and XIV), for violating the 2009

Administrative Order issued by the Pennsylvania Department of Environmental Protection

(PADEP) (Counts IX, X, XVI, XVII, XX, XXI, XXII and XXIII), and for participating in

activities which may present an imminent and substantial endangerment to health or the

environment (as alleged in the RCRA Complaints).  PPG seeks judgment in its favor on the issue

of whether two areas of land (the Eljer landfill and the baseball fields) are included within the

definition of the Site.  For the reasons that follow, Plaintiffs' motion will be granted and PPG's

motion will be denied.

Facts

The Site is located in North Buffalo and Cadogan Townships in Armstrong County,

Pennsylvania.  It is bordered by Route 128 to the north, the Allegheny River to the south, Glade

Run, a tributary of the Allegheny River, to the west and a feature that PPG terms the "Drainage

Ditch" which flows southward and discharges into the Allegheny River to the east.  (Revised

Treatment Plan Report at 3.)[2]  From 1949 until 1970, PPG used parts of the property to dispose

of slurry waste and solid waste from its former glass manufacturing facility across the river in

Ford City, Pennsylvania.  (2009 Administrative Order at PADEP3.)[3]  The flat glass

manufacturing operation which generated the waste deposited at the Site has a Standard

Industrial Classification of 3211 (Flat Glass). See, e.g., Letter from Thomas J. Ebbert, PPG

Industries, Inc., to Scott Geiser, Fire Chief-Ford City Hose Company, enclosing 2012

---

[2] Pls.' App. (ECF No. 207) Ex. 1.  PPG denies that the Eljer landfill or the ballfields are part of
the Site.  This issue is discussed below.

[3] ECF No. 207 Ex. 3.  PPG denies this statement on the ground that Plaintiffs cannot rely upon
statements made in PADEP's Administrative Order because they are hearsay.  As explained
below, PPG's argument is unavailing because the agency decision is a public record pursuant to
Federal Rule of Evidence 803(8) and PPG has provided no basis for not accepting its
trustworthiness.

Pennsylvania Tier II Emergency and Hazardous Chemical Inventory (January 29, 2013) (PPG016160)[4]; see also United States Department of Labor, Occupational Safety & Health Administration, Division D: Manufacturing, Major Group 32: Stone, Clay, Glass, and Concrete Products, Industry Group 321: Flat Glass. Operations with such a classification are designated as industrial activities.  40 C.F.R. § 122.26(b)(14)(iii).

PPG created three slurry lagoons in an area formerly used as a sandstone quarry in which it deposited the slurry waste. (Revised Treatment Plan Report at 2.)  Collectively, the lagoons and surrounding area comprise an area of approximately 77 acres called the "slurry lagoon area" ("SLA") on the western part of the property.  PPG also disposed of solid waste in a landfill at the Site called the "solid waste disposal area" ("SWDA") beginning in the 1920s until 1967. (Administrative Order at PADEP3.)  The Allegheny River and a railroad line lie to the south of both the SLA and SWDA.  Glade Run, a tributary to the Allegheny River, lies to the west of the SLA.  (Revised Treatment Plan Report at 1.)

On its southern side, the SLA slopes steeply from the top of the slurry lagoon to the Buffalo and Pittsburgh Railroad tracks (formerly Pittsburgh and Shawmut) that run parallel to the Allegheny River.  (Baker Envt'l, Inc. Remedial Investigation Report ("Baker RIR") at 1-2 (PPG001818.)[5] This slope is interrupted by the South Bench, a wide flat area.  (Id. at 1-3 (PPG001819). On its western side, the SLA slopes to Glade Run.  (Revised Treatment Plan Report at 9 (PPG0050753).) This slope is referred to as the Western Slope. (Id. at 17 (PPG0050761).  A stream which PPG refers to as the Drainage Ditch runs between the SLA and SWDA. (Revised Treatment Plan Report at 3, 16 (PPG0050747, PPG0050760). See also Baker RIR at 2-4 (PPG001831).

---

[4] ECF No. 207 Ex. 4.
[5] ECF No. 207 Ex. 2.

Leachate is water contaminated as a result of its contact with the waste.  Leachate is formed when uncontaminated stormwater and groundwater pass through the waste and become contaminated with the contaminants in the waste. (Administrative Order at 2 (PADEP000004) ¶ 14.)  Fractures within the weakly cemented SLA waste provide a pathway for the leachate to travel.  (Revised Treatment Plan Report at 129 (PPG0050873). Some of the leachate emerges from the waste on the land surface at locations known as seeps. (Id. at 10 (PPG0050754). The leachate that emerges is referred to as leachate, seeps, seepage, seepage water, and seep water. Infiltrating stormwater is referred to as infiltration.  Id.

As PPG describes: "Precipitation infiltrating the former slurry lagoons and groundwater recharge within the subsurface provide the primary sources of water that contribute to the ongoing seepage from the SLA and also contribute significantly to the base flow of the Drainage Ditch."  (Revised Treatment Plan Report at 10 (PPG0050754). Leachate within the SLA "is expected to flow radially toward the east, south, and west, discharging into the Drainage Ditch on the east and onto the slopes on the southern and western sides of the former slurry lagoons." (Id.) Some of this leachate flows within the slurry material and discharges at ground surface through seeps. (Id.; see Administrative Order at 3 (PADEP000005) ¶ 15.)

PPG has described the nature of the SLA and its seeps as "[being] primarily associated with groundwater affected by contact with rouge, and occur along the outside of the southern and western flanks of the SLA Site." Request for Proposal, Professional Environmental and Engineering Design Services, Former Ford City Facility Slurry Impoundment (March 17, 2009) at 4 (PPG034173).[6] PPG further described that:

> The primary issue of interest is the seep discharge of groundwater exhibiting elevated pH along the steep slopes downgradient of the former impoundments.

---

[6] ECF No. 207 Ex. 7.

> Various metals have been detected in the seeps, including arsenic, chromium, and lead. These metals and the elevated pH are believed to arise as a result of contact of groundwater with the "rouge" located in the former slurry lagoons, and possibly within portions of the dikes.

Id.

The seep water contains metals, including aluminum, antimony, arsenic, chromium, iron, and lead. (December 2014 Monthly Progress Report,[7] Table 4 (PPG0053049-53064); see also Revised Treatment Plan Report at 54 (PPG0050798). The seep water also has regularly had a high pH.  PADEP describes the seep water or leachate as having "a very high pH." (Administrative Order at 2 (PADEP000004) ¶ 12.)

PPG notes that every value with a "U" in its monthly progress report means that a metal was not detected at the reporting limit.  (December 2014 Monthly Progress Report, Table 4 at 16 (PPG0050364). Plaintiffs reply that it is irrelevant that some of the metals in some instances were not detected above the reporting limit since they are not asserting that the data demonstrate violations of a numerical discharge limit, such as the numerical limit imposed on PPG's discharge for Total Suspended Solids (TSS).  Instead, they rely upon the data to demonstrate the presence of pollutants in the water being discharged.  Plaintiffs maintain that it is the discharge of "any pollutant" that triggers the requirement for a National Pollutant Discharge Elimination System (NPDES) permit, not the discharge of a certain amount of pollutants. Thus, they argue that PPG's response on this point is immaterial to the issue of its liability for discharging pollutants without an NPDES permit.

Some of the seep locations have been given designations.  For example, the Administrative Order identifies 18 seeps by name or designation.  (Administrative Order at 4, Performance Obligation A (PADEP000006). The named seeps are located on the South Bench,

---

[7] ECF No. 207 Ex. 8.

on the Western Slope, and in the Drainage Ditch.  (Id. Ex. B (PADEP000015). Other seeps lack a

specific name or designation.  Some of the unnamed seeps were discovered after the issuance of

the Administrative Order. (Shaw Rule 30(b)(6) Dep. at 52-55;[8] Revised Treatment Plan Report at

5 (PPG0050749).

      PPG responds that that unnamed seeps identified in the South Bench area after the

issuance of the Administrative Order have been "tied" into the Interim Abatement System for

collection and treatment and other unnamed seeps identified after the issuance of the Order are

being passively treated. (Shaw Rule 30(b)(6) Dep. 52-55, 59-60; Revised Treatment Plan Report

at 5 (PPG0050749).  PPG also notes that the Administrative Order does not require it to collect

and treat unnamed seeps discovered after its issuance as part of the interim abatement system;

rather, it only requires PPG to monitor for, collect and treat, any newly discovered seeps after the

required permitted, permanent collection and treatment system is in operation. (Administrative

Order at 5-6, Performance Obligations C, E (PADEP7 – PADEP8).

      Plaintiffs reply that PPG's assertion that all unnamed seeps identified after the issuance

of the Administrative Order have been incorporated into the interim abatement system for

collection and treatment is not supported by the record, which demonstrates that several seeps

remain uncollected and untreated.  See, e.g., CEC Checklist[9] at 15 ("Although many of the seeps

originating from the SLA are now being collected by the Interim Abatement System (IAS) along

the South Bench area, there are still seeps flowing down the steep slope at the southeastern

border of the site to the railroad grade at the base of the hill.").  They maintain that, contrary to

PPG's claim, only some, not all, of the unnamed seeps not collected for treatment in the interim

---

[8] ECF No. 207 Ex. 6.
[9] ECF No. 207 Ex. 27.

abatement system are passively treated.[10] There are unnamed seeps at the base of the SLA that are not passively treated.  Plaintiffs note that Dr. Kilburg explained on pages 62-63 of his testimony that neither Seep 5 nor the seeps at the railroad level are tied into the system or treated with mulch (passive treatment).  Cf. ECF No. 207 Ex. 1 at 17 (PPG0050761) (identifying the seeps which are being passively treated with mulch).

There are unnamed seeps at the base of the SLA that flow into the drainage channel that runs parallel to the railroad tracks. (Shaw Rule 30(b)(6) Dep. at 60.) The drainage channel is on the north side of the railroad tracks on the southern side of the Site. (PPG Rule 30(b)(6) Dep. at 76.)[11] These seeps are not collected and treated in the interim abatement system. (Shaw Rule 30(b)(6) Dep. at 60.)

PPG contends that the Administrative Order does not require it to collect and treat unnamed seeps discovered after its issuance as part of the interim abatement system; rather, it only requires PPG to monitor for, collect and treat, any newly discovered seeps after the required permitted, permanent collection and treatment system is in operation.  (Administrative Order at 5-6, Performance Obligations C, E (PADEP7 – PADEP8).)  Further, the limited number of seeps that are not collected in the Interim Abatement System are passively treated as per the PADEP approved Interim Abatement Plan.  (Revised Treatment Plan Report at 17, 28 (PPG0050761, PPG0050772).)

Plaintiffs reply that they are not seeking summary judgment for failure to collect and treat these seeps in the interim abatement system.  Instead, PPG has pollutant discharges other than the discharges associated with Outfall 001 and the interim abatement system for which Plaintiffs

---

[10] Passive treatment refers to the use of mulch beds.  (Revised Treatment Plan Report at 5 (PPG0050749).)
[11] ECF No. 207 Ex. 9.

seek summary judgment. The documents cited by PPG have no bearing on the existence,

location, or flow path of these unnamed seeps, and PPG's response admits that unnamed seeps

exist.

Two seeps have been identified on the north-facing slope of the SLA. (Revised Treatment

Plan Report at 16 (PPG0050760). These seeps discharge to a surface water channel adjacent to

State Route 128. (Id.)

Flow in the Drainage Ditch is fed, in part, by seep water from both the SLA and the

SWDA. (Baker RIR at 2-4 (PPG001831). Seep 105 discharges directly into the Drainage Ditch.

(Revised Treatment Plan Report at 17 (PPG0050761); Shaw Rule 30(b)(6) Dep. at 17, 82-83.

There are other, unnamed seeps that discharge into the Drainage Ditch. (Shaw Rule (30)(b)(6)

Dep. at 114.)

PPG contends that the documents to which Plaintiffs cite do not support the allegation

that unnamed seeps discharge into the Drainage Ditch. Seep 105 is the only identified seep that

discharges into the Drainage Ditch. (Revised Treatment Plan Report at 17 (PPG0050761); Shaw

Rule 30(b)(6) Dep. at 17.)

Plaintiffs reply that PPG is simply incorrect about the documents. First, the Baker RIR

states:

> Several seeps were observed along the southwestern toe of the SWDA. The seep
> water from the SWDA mixed with seep water from the lagoons in the stream
> which flowed down the slope to the railroad tracks. Culverts under the tracks
> directed the water to the Allegheny River.

(ECF No. 207 Ex. 2) at 2-4 (PPG001831.) Seep 105 is an identified or named seep in the

Drainage Ditch, as PPG admits. STRM2 is also an identified or named seep in the

Drainage Ditch. (Administrative Order, Performance Obligation A & Ex. B (PADEP 6-7,

15). The other seeps referred to in this report are logically unnamed seeps.  Second, Dr.

8

Kilburg testified that "there's a seep right at the end of the weir bypass structure" in the

Drainage Ditch.  (Shaw Rule (30)(b)(6) Dep. at 114; see also id. at 15[12] (noting that seep

in the drainage ditch is unidentified).  Plaintiffs note that Seep 105 is north or upstream of

the weir bypass structure (PPG Opp. App. Ex. J[13] at 5 (PPG011436)), so it is not the seep

identified by Dr. Kilburg in his testimony.  STRM2 is identified as being at the intake for

the weir bypass structure (ECF No. 207 Ex. 8, Table 2, notes on p. 14 (PPG 0053044)),

so it is not the seep identified by Dr. Kilburg in his testimony.

PADEP found that "[t]he Leachate discharges seep out of the Slurry Lagoon and the

Landfill at various locations at the Site and then flow or are conveyed into the waters of the

Commonwealth. These waters of the Commonwealth include the Allegheny River and Glade

Run in Cadogan and North Buffalo Townships, in Armstrong County, Pennsylvania."

(Administrative Order at 3 (PADEP000005) ¶ 15.)  The average flow from the seeps named in

the Administrative Order and Outfall 001 is 29 gallons per minute (gpm). (Revised Treatment

Plan Report at 28 (PPG050772).) The average discharge for seep water collecting in the drainage

channel adjacent to the railroad tracks along the SLA is eight gpm. Thus, the average seepage

rate discharge from the SLA is 37 gpm.  Consequently, the average seepage rate discharge from

the SLA on a daily basis is 53,280 gallons per day.

Although "seepage rates are dependent on precipitation[, * * *] the quantity of water

discharging from the seeps is more dependent on precipitation patterns rather than individual

precipitation events." (Revised Treatment Plan Report, App. Z (PPG0051940-51941).)

Administrative Enforcement History

On March 8, 1971, in response to a Notice of Violation issued by the PADEP, PPG and

---

[12] Pls.' Reply App. (ECF No. 222) Ex. 6.
[13] ECF No. 219.

PADEP entered into an Agreement and Stipulation concerning the Site.  In the Agreement and Stipulation, PADEP and PPG stipulated that "industrial wastes were being discharged from various points [on the Site] to the waters of the Commonwealth, to-wit, the Allegheny River," and that this discharge was "continuing." (Agreement and Stipulation at 1-2 (PADEP000011-12).[14] PPG committed to "immediately undertake a study of the problems created by virtue of the continuing discharge of industrial waste from various points at its industrial waste disposal site." PPG further committed to submitting a plan to PADEP by August 31, 1971, to either "eliminate said continuing discharge from said site or to permanently treat said continuing discharge from said site."  (Id. at PADEP000012.)

PPG submitted a proposal to PADEP in which it proposed a continued untreated discharge from the Site into the Allegheny River. (Administrative Order at 2 (PADEP000004), ¶ 8.) PADEP advised PPG that such a proposal was unacceptable.

By April 23, 1971, PPG proposed to the Borough of Ford City the transfer of the Site to the Borough for recreational use. (ECF No. 207 Ex. 16.)  In the resolution approving the transfer of the property, the Ford City Borough Council stated that the transfer was intended to aid Ford City's attempt "to update its recreational offerings for people of all ages." (ECF No. 207 Ex. 17.) On October 16, 1972, PPG sold the Site to the Borough of Ford City for one dollar. (ECF No. 207 Ex. 18.)

After the sale of the Site, on May 16, 1973, PPG withdrew its non-treatment proposal to PADEP (Administrative Order at 2 (PADEP000004) ¶ 11) and did not proceed with remediation of the Site pursuant to the 1971 Agreement and Stipulation (PPG Rule 30(b)(6) Dep. at 92-93.)[15]

On February 21, 1992, PADEP issued a Notice of Violation to PPG regarding the Site.

---

[14] ECF No. 207 Ex. 15.
[15] ECF No. 222 Ex. 3.

The Notice of Violation stated that "PPG has, through past disposal practices, disposed of waste materials onto the ground and into waters of the Commonwealth, contrary to the Rules and Regulations of the Department."  (ECF No. 207 Ex. 19.)

In response to that Notice of Violation, Baker Environmental conducted a remedial investigation of the Site on behalf of PPG. (Revised Treatment Plan Report at 6 (PPG0050750).) The final remedial investigation report was submitted to PADEP in October 1993. (ECF No. 207 Ex. 2.)  Between 1994 and 2009, PPG conducted various studies of the Site.  (Revised Treatment Plan Report at 6-8 (PPG0050750-50752). During this time PPG did not eliminate or treat its discharges from the Site.  During this time PPG did not apply for an NPDES permit for its discharges from the Site.  (PPG Rule 30(b)(6) Dep. at 93-94.)

PPG contends that the document and testimony to which Plaintiffs cite establish that PPG conducted studies of the Site prior to 1994 and that PPG did apply for an NPDES permit for stormwater discharges associated with construction activities.  (Revised Treatment Plan Report at 6-8 (PPG0050750 – PPG0050752); PPG Rule 30(b)(6) Dep. at 93-94.) PPG also notes that Plaintiffs have also not provided any record support for the assertion that between 1994 and 2009, PPG "did not eliminate or treat its discharges from the Site."

Plaintiffs reply that PPG's response rests on an overly literal reading of the cited documents.  The cited testimony from PPG's Rule 30(b)(6) deponent clearly establishes that, although PPG applied for an NPDES permit for stormwater discharges associated with construction activities, it did not apply for an NPDES permit for its discharges from the Site. They argue that it is disingenuous for PPG to deny that it failed to eliminate or treat its discharges from the Site prior to 2009.  The Revised Treatment Plan Report describes remedial investigations and other reports prepared on behalf of PPG prior to 2009, but does not describe

11

any actions taken to eliminate or treat PPG's discharges from the Site.  (Revised Treatment Plan Report at 6-8 (PPG0050750 – PPG0050752).) PPG's March 17, 2009, Request for Proposal, Professional Environmental and Engineering Design Services, states that, "[m]itigating the elevated pH levels occurring on and emanating from the Ford City property in surface seepage is the principal objective," indicating that, as of that date, PPG had not addressed the seeps from the Site. (ECF No. 207 Ex. 7 (PPG0034173). The installation of the interim abatement system in the fall of 2009 is the first documented activity undertaken by PPG to treat its discharges. (Revised Treatment Plan Report at 8 (PPG0050752).) Further, PPG's pending NPDES permit application for discharges from the Site, as ordered by this Court (ECF No. 192), demonstrates that it did not and has not eliminated its discharges.

2009 Administrative Order

On March 9, 2009, PADEP, "recognizing that PPG continued to discharge pollutants from the Site into state and federal waters without being authorized by an NPDES permit" (Harper Aff. ¶ 3)[16] issued an Administrative Order to PPG regarding the Site containing factual findings and imposing performance obligations. In the letter accompanying the Administrative Order, PADEP stated that: "The Department believes that the discharges coming from the site and entering into the Allegheny River and Glade Run pose a significant threat to public health and the environment." (Letter from Samuel C. Harper, PADEP, to Mark E. Terril, PPG Industries, Inc. (March 9, 2009)[17] (PADEP000001).)

The PADEP official who issued the Administrative Order, Samuel C. Harper, has stated

---

[16] ECF No. 207 Ex. 20.  Plaintiffs note that Mr. Harper adopted his affidavit as his direct testimony during the November 13, 2014 hearing before this Court on Plaintiffs' Motion for a Preliminary Injunction. (PI H'rg Tr. (ECF No. 222 Ex. 4) at 53), that PPG had the opportunity to, and did, cross-examine Mr. Harper on his testimony at that hearing and that Mr. Harper is now deceased.
[17] ECF No. 207 Ex. 10.

that the "Administrative Order was issued to address PPG's discharges to the waters of the

Commonwealth of Pennsylvania, particularly the Allegheny River and adjacent wetlands, by

requiring PPG to obtain and abide by the required NPDES permit(s) for the Site." (Harper Aff.

¶ 4.) Mr. Harper further stated that PPG should have filed for an NPDES permit for the Site as

early as 1972. (PI H'rg Tr. at 46, 55, 62.)[18]

The PPG Site that is the subject of the Administrative Order includes both the SLA and

the SWDA. The Administrative Order stated that:

> Part of the Property located in Cadogan and North Buffalo Townships ("Site")
> was used by PPG to dispose of waste products from its former facility in Ford
> City, Pennsylvania. PPG disposed of glass polishing waste slurry in lagoons
> ("Slurry Lagoons") at the Site from 1949 until 1970 ("Slurry Lagoons") [sic]. The
> Slurry Lagoons are now covered. PPG also disposed of solid wastes in a landfill
> at the Site from the 1920s until 1967.

(Administrative Order at 1 (PADEP000003) ¶ 4.)

The Administrative Order stated that the industrial waste discharges from the Site, as

noted in the 1971 Agreement and Stipulation, "which are pollutional and have a very high pH

and contain metals and other toxic chemicals, continue unabated as of the date of this

Administrative Order." (Administrative Order at 2 (PADEP000004) ¶ 12.) The Administrative

Order further concluded that the leachate is contaminated with hazardous substances:

"Precipitation which infiltrates the Slurry Lagoons and the Landfill at the Site becomes

contaminated with hazardous substances, as defined under the Hazardous Sites Cleanup Act

(HSCA), [* * *] and then is discharged into the waters of the Commonwealth. This contaminated

precipitation is known as 'Leachate.'" (Administrative Order at 2 (PADEP000004) ¶ 14.) The

Administrative Order further concluded that PPG was in violation of Section 611 of the CSL, 35

P.S. § 691.611. (Id. at 4 (PADEP000006) ¶ 27.)

---

[18] ECF No. 207 Ex. 24.

The Administrative Order found that the "Leachate discharges seep out of the Slurry Lagoons and the Landfill at various locations at the Site and then flow or are conveyed into the waters of the Commonwealth. These waters of the Commonwealth include the Allegheny River and Glade Run * * *." (Administrative Order at 3 (PADEP000005) ¶ 15.) These discharges "constitute industrial waste pursuant to Section 1 of the Clean Streams Law, 35 P.S. § 691.1, and pollutants as defined in 25 Pa. Code § 91.1. The discharges result in or may result in pollution of waters of the Commonwealth, in violation of Sections 401 and/or 402 of The Clean Streams Law, 35 P.S. §§ 691.401, 691.402." (Id. at 3 (PADEP000005) ¶16.) The Order further found that "PPG is allowing contaminated Leachate and other liquids to be discharged from the Site into waters of the Commonwealth, resulting in pollution of those waters of the Commonwealth." (Id. at 3 ¶ 21.)

The Administrative Order was specifically issued pursuant to PADEP's authority under the CSL.  (Administrative Order at 4 (PADEP000006) (citing 35 P.S. §§ 691.5, 691.316, 691.402, 691.601, 691.610). The Administrative Order imposed a number of Performance Obligations on PPG, including, but not limited to, the following:

> a. PPG shall conduct weekly monitoring and reporting of seeps, for flow, total suspended solids, oil and grease, iron, aluminum, lead, chromium, antimony, arsenic, and pH (Performance Obligation A);
> b. "Until such time as the industrial waste discharges, Leachate, and seeps are collected and conveyed to an industrial waste treatment facility and the discharge from that facility is authorized by an NPDES permit, PPG shall implement interim abatement measures" (Performance Obligation C);
> c. Within 90 days of the date of the Administrative Order, PPG "shall submit to the Department for review and approval, a treatment plan and schedule ('Treatment Plan') to collect and treat all industrial waste discharges, Leachate and seeps from the Site into the waters of the Commonwealth. [* * *] PPG shall identify * * * the necessary NPDES permit(s) for the authorization of the discharges associated with the collection and treatment system. PPG shall provide a schedule for applying for the necessary permits." All such schedules must be approved by PADEP and "shall be incorporated herein as obligations of this Order." (Performance Obligations D, G).

(Id. at 4-6 (PADEP000006-8).)

On April 8, 2009, PPG submitted an interim abatement plan to PADEP. (Letter from Thomas J. Ebbert, PPG Industries, Inc., to PADEP enclosing Interim Abatement Plan (April 8, 2009).[19] The interim abatement plan proposed to adjust the pH of the seep discharges through the addition of sulfuric acid to the contaminated water flowing across the Site, including using an in-stream mixing approach in the Drainage Ditch. (Id. (PPG0017031-17032).

PPG responds that it submitted an initial Interim Abatement Plan to PADEP on April 8, 2009, which proposed, among other things, to neutralize high pH waters in the Drainage Ditch utilizing an in-stream mixing approach with a pH adjustment system. The initial Interim Abatement Plan also proposed to both passively and actively treat the seeps in the South Bench area through a pH adjustment system. (Id. at 3-2 to 3-3 (PPG0017032 – PPG0017033). These pH adjustment systems proposed to use sulfuric acid in a carefully controlled mineral acid feed system at discrete locations, as the means of adjusting the pH. (Id. at 3-1 to 3-2 (PPG0017031 – PPG0017032). Finally, the Interim Abatement Plan proposed to provide pH mitigation through a series of passive and semi-passive approaches in the Western Slope area. (Id. at 3-3.) (PPG0017033). The Interim Abatement Plan also provided for infrastructure improvements in order to operate the pH adjustment system, installation of equipment in order to conduct the interim monitoring required by the 2009 Administrative Order, and an implementation schedule for all of the elements of the plan. (Id. at 4-1, 5-1, 6-1 (PPG0017034 – PPG0017036).

On April 9, 2009, PADEP rejected PPG's proposed Interim Abatement Plan, stating that it did not fulfill the requirements of the Administrative Order that PPG collect and treat the seepage or collect and haul the contaminated seep water from the site. (Letter from Samuel C.

---

[19] ECF No. 207 Ex. 11.

Harper, PADEP, to Thomas J. Ebbert, PPG Industries, Inc. (April 9, 2009).[20] In the letter,

PADEP stated that the submitted plan "in fact utilizes waters of the Commonwealth as a

treatment option" and that "[n]one of the options presented are acceptable to the Department."

(Id.) PPG responds that the only portion of the April 8, 2009 initial Interim Abatement Plan that

PADEP disapproved was the proposal for the in-stream mixing approach in the Drainage Ditch.

Id.  See ECF No. 207 Ex. 13 at  1 (PADEP 2906).

On May 26, 2009, PPG submitted an addendum to its Interim Abatement Plan, which

purported to address PADEP's refusal to allow the use of the "waters of Commonwealth" to treat

the leachate.  (ECF No. 207 Ex. 13.) PPG's revised plan proposed to remove the base flow from

the Drainage Ditch and treat it on-site. (Id. (PADEP002909-2910).

On July 2, 2009, PADEP approved "the revised Interim Abatement Plan, in which PPG

identifies that it will collect wastewater from the Site and treat that wastewater in a treatment

system that will be designed to address any accumulated sludge that may result from treatment

and neutralization," and issued an Addendum to the Administrative Order. (July 2 Addendum at

1 (PADEP000016).[21] The letter granting approval specified that PPG "shall install, operate, and

maintain the collection and treatment system in accordance with the requirements of Attachment

A" and that "PPG shall design the collection system using pipes, therefore, avoiding the

collection and treatment of uncontaminated storm water runoff." Id.  As of July 2, 2009, the

revised Interim Abatement Plan was incorporated into the Administrative Order as a

performance obligation. (Administrative Order at 5, Performance Obligation C

(PADEP000007).)

Attachment A to the July 2, 2009, Addendum required PPG to "monitor the discharges

---

[20] ECF No. 207 Ex. 12.
[21] ECF No. 207 Ex. 14.

from any temporary system and * * * comply with the effluent limitations" set forth therein. (July 2 Addendum (PADEP000018).) Specifically, Attachment A required that PPG monitor and report the levels of aluminum, arsenic, iron, lead, chromium, and antimony in the discharge, and established effluent limitations for TSS, oil and grease, and pH.  Id. For the TSS parameter, the Attachment established an instantaneous maximum limit of 60 mg/l and an average monthly maximum of 30 mg/l.  The Attachment also established that pH must be "[w]ithin the range of 6.0 to 9.0 of standard units." Id. The Attachment further provided that the interim abatement system should be operated such that "[n]o untreated or ineffectively treated wastewaters shall be discharged into the waters of the Commonwealth" and instructed that "Storm water * * * shall not be conveyed to the Systems for which this authorization is issued, without the approval of the Department" (id. (PADEP000018-19)). PADEP stated that the "discharge of untreated or improperly treated industrial wastes to the waters of the Commonwealth is contrary to the requirements of the Department." Id. (PADEP000019.)

Although PADEP approved the Interim Abatement Plan generally, it required PPG to "submit a final design [for the interim abatement system] before construction commences. This will allow the Department to review the final plan." (July 2 Addendum (PADEP000016). PPG submitted a final design of the interim abatement system to PADEP on September 11, 2009, but PADEP never issued final approval of the design. (PPG Rule 30(b)(6) Dep. at 52; Shaw Rule 30(b)(6) Dep. at 23.)

PPG's interim abatement system was operational by February 2010. (Revised Treatment Plan Report at 5 (PPG0050749). The collection system collects and combines seep discharges and stormwater runoff, directing the combined flow to the treatment system. The flow is then directed to a treatment box, where sulfuric acid is added to reduce the pH to between 6.0 and 9.0.

17

Operating Plan for the South Bench & Drainage Ditch Neutralization System for PPG Former

Ford City Slurry Lagoon.[22] The interim abatement system is fully automated. (Id.

(PPG0027367). This form of treatment is called neutralization.  (Revised Treatment Plan Report

at 74 (PPG0050818).

PPG denies the second and third sentences as stated. The document to which Plaintiffs

cite makes no mention of collecting stormwater runoff in the treatment system.  Plaintiffs reply

that the cited document describes the collection of base flow in the Drainage Ditch and seepage

in a "riprap-lined channel" on the South Bench, both of which, by implication, are open to

precipitation and thus convey stormwater runoff, along with seepage, to the treatment

system. (Operating Plan (PPG0027367). As admitted by PPG, the interim abatement system

includes open conveyances, the Drainage Ditch receives stormwater from the SLA and the

SWDA and the collected flow in the Drainage Ditch includes stormwater.  (See also Shaw Rule

30(b)(6) Dep. at 19, 21.) The cited document specifically describes the addition of sulfuric acid

to the flow to achieve a pH of between 6.0 and 9.0. (Operating Plan (PPG0027368).)

As part of the interim abatement system, PPG installed a weir bypass structure in the

Drainage Ditch, designed to collect the base flow and direct it to the treatment system. (Revised

Treatment Plan Report at 3 (PPG0050747). The bypass structure is designed to intercept and

pass the base flow to the treatment plant at all times, while "allow[ing] flows greater than the

base flow to remain in the" Drainage Ditch and discharge to the Allegheny River without

treatment.  (May 26, 2009, Addendum to Interim Abatement Plan at 1 (PADEP002909). The

system was designed to accommodate a base flow of 12 gallons per minute. (E-mail from Al

---

[22] ECF No. 207 Ex. 22.

Briggs, Key Environmental, Inc., to David Roote, PADEP (December 1, 2009).[23] When the Drainage Ditch flow is greater than 12 gallons per minute, the excess flow, including leachate from the Site, discharges to the Allegheny River without treatment. (PADEP May 13, 2014 Comments at  2 (PPG0052122)[24] ("Currently there is a diversion structure that allows dry weather flow to go to the treatment plant and wet weather flow to go over a weir and discharge untreated"); cf. Shaw Rule 30(b)(6) Dep. at 83 (sample taken in the Drainage Ditch below the weir bypass structure "[a]bsolutely" included water from Seep 105). The Drainage Ditch ultimately discharges to the Allegheny River and wetlands via the culverts under the railroad tracks. (PI H'rg Tr. at 96.)

PPG responds that the documents and testimony to which Plaintiffs cite do not contain any assertion that "leachate" is discharged to the Allegheny River without treatment during the rare storm events that exceed the base flow design of 12 gpm in the Interim Abatement System. Plaintiffs have also mischaracterized Mr. O'Hara's testimony as he makes no mention or reference to the "Drainage Ditch" on the cited page.  In further response, storm events that cause the 12 gpm base flow design for the Interim Abatement System are rare and there is no data that bypassed flows are impacted. See ECF No. 219 Ex. B at 39-40 (PPG0050783 - PPG0050784).

Plaintiffs reply that PPG is simply incorrect that none of the cited documents demonstrate that leachate is discharged without treatment to the Allegheny River when the base flow of 12 gpm is exceeded.  PADEP's comments to PPG regarding the Treatment Plan Report (ECF No. 207 Ex. 26 at 2 (PPG0052122) state exactly that.  Because the base flow of the Drainage Ditch includes contaminated leachate, the excess flow that is discharged untreated necessarily includes leachate.  Dr. Kilburg's testimony also supports this fact.  He testified that "the purpose of the

---

[23] ECF No. 207 Ex. 23.
[24] ECF No. 207 Ex. 26.

weir bypass structure was to collect only the baseflow[25] and to bypass the rest of the water."

(Shaw Rule 30(b)(6) Dep. at 18.)  Plaintiffs also indicate that PPG's objection that they have

mischaracterized the testimony of Mr. O'Hara is simply incorrect.  On the cited page, Mr.

O'Hara specifically agrees that "storm water on the site goes through the drainage ditch feature

that separates the slurry lagoon area from the solid waste disposal area" and, further, that such

stormwater "goes through a culvert on Railroad property and then, eventually goes to the

Allegheny River, yes." (PI H'rg Tr. at 96.)

Plaintiffs contend that, contrary to PPG's assertion, flow greater than the base flow of 12

gpm is not rare or limited to rare storm events. Weekly flow data reported to PADEP pursuant to

the reporting obligations established in Attachment A of the July 2 Addendum reflect an average

flow in the Drainage Ditch of 14.1 gpm, with approximately 49% of the weekly measurements

exceeding 12 gpm. See Treatment Plan Report, Appendix H (GRAD021656-21772);[26] Revised

Treatment Plan Report, Appendix H (PPG0051362-51395).[27]

PPG and its consultant, Shaw Environmental, Inc., designed the collection system of the

interim abatement system using trenches and ditches that are open to precipitation. (Shaw Rule

30(b)(6) Dep. at 16 (affirming that the Interim abatement system is "a combination of open and

closed conveyance"); id. at 17 ("Seep 105 discharges into the drainage ditch" where it "flow[s]

openly before it reaches the weir structure"); id. at 20-21 (describing "an open channel * * * on

the western part of the south bench to collect overland flow from the seepage"); PPG Rule

30(b)(6) Dep. at 48 ("So the design of the system is we don't have a pipe drilled at one seep, we

have a collection trench that allows for collection * * *"); see also Rogers Aff. ¶¶ 2-3,

---

[25] Dr. Kilburg explained that the baseflow is the groundwater contribution. (Shaw Rule 30(b)(6) Dep. at 16.)
[26] ECF No. 222 Ex. 8.
[27] ECF No. 222 Ex. 7.

Attachment A.[28]

The interim abatement system discharges to the slope below the South Bench through a pipe, known as Outfall 001. (Shaw 30(b)(6) Dep. at 61.) The effluent flows down the slope into the drainage channel north of the railroad tracks. (PPG Rule 30(b)(6) Dep. at 76; Revised Treatment Plan Report, App. M, n.1 (PPG0051582) (stating that "Outfall 001 flow is a primary contributor to the culvert flows * * *"); see also Bell Aff. ¶¶ 6-7, Photographs 4-5.[29]

The interim abatement system does not treat or remove metals from the collected flow or remove suspended solids. (Shaw Rule 30(b)(6) Dep. at 22, 24.)  When it is discharged, the effluent at Outfall 001 contains metals, including at least arsenic, aluminum, antimony, chromium, and lead.  (Revised Treatment Plan Report at 67-68 (PPG0050811-50812); December 2014 Monthly Progress Report, Table 4 (PPG0053049-53064).

PPG contends that the documents to which Plaintiffs cite do not support the proposition that the effluent at Outfall 001 contains metals as the Revised Treatment Plan Report only reports theoretical modeling results and the December 2014 Monthly Progress Report, Table 4 does not list the metals monitoring results for Outfall 001.  Rather, the metals monitoring results for Outfall 001 are included in the monthly discharge monitoring reports (DMRs) and metals, such as chromium, are often not detected above the reporting limit as indicated by a "<" sign. See e.g., ECF No. 207 Ex. 41; ECF No. 219 Ex. D.  In further response, PADEP's Approval of the May 26, 2009 Addendum to the Interim Abatement Plan only requires monitoring for certain metals at Outfall 001 and does not set effluent limitations on the Outfall 001 discharge for metals nor require metals to be treated in this discharge. (ECF No. 207 Ex. 14.)

Plaintiffs reply that, by way of clarification, the December 2014 Monthly Progress Report

---

[28] ECF No. 207 Ex. 61.
[29] ECF No. 207 Ex. 60.

(PPG0053049-53064) demonstrates the presence of metals, including aluminum, arsenic, antimony, chromium, and lead, in the seeps, which constitute a portion of the influent to the treatment system which discharges at Outfall 001. PPG admits in its response that the interim abatement system does not treat or remove the metals in the effluent.  PPG further admits that the effluent at Outfall 001 contains these metals.  The monthly discharge monitoring report for July 2013 reflects the presence of these metals in the effluent discharged at Outfall 001. (ECF No. 219 Ex. D; see also Revised Treatment Plan Report at 28 (PPG0050772) (describing measurements taken to determine "the average concentrations of the six metals that are being monitored in the Outfall 001 discharge water * * * includ[ing] aluminum, antimony, arsenic, chromium, iron, and lead * * *").

Plaintiffs contend that it is not relevant or material to their claims that PADEP's Approval of the May 26, 2009, Addendum to the Interim Abatement Plan does not set effluent limitations on these metals or that the metals are on some occasions not detected above the reporting limit.  Plaintiffs are not asserting that the data demonstrate violations of a numerical discharge limit, such as the numerical limits imposed on PPG's discharge for TSS.  Instead, Plaintiffs rely upon these data to demonstrate the presence of pollutants in the water being discharged.  It is the discharge of "any pollutant" that triggers the requirement for an NPDES permit, not the discharge of a certain amount of pollutants.

The interim abatement system runs continuously. (Shaw Rule 30(b)(6) Dep. at 29.)  The interim abatement system does not collect all seeps at the Site. (Shaw Rule 30(b)(6) Dep. at 59-60; CEC Ecological Assessment at 15) (CEC001063).[30]  For example, Seep 5, which lies on the slope beneath the South Bench, is not collected or treated.  (Shaw Rule 30(b)(6) Dep. at 62.)

---

[30]  ECF No. 207 Ex. 27.

Although Seep 5 was one of the named seeps identified in the Administrative Order (p. 4, Performance Obligation A (PADEP000006)), it was not collected for the interim abatement system.  Because of Seep 5's location on the slope beneath the South Bench, it was not considered "expedient to collect it for the initial part of the installation of the interim abatement system," due to the fact that "[PPG] would have had to install electrical service to collect and pump that water." (Shaw Rule 30(b)(6) Dep. at 38; see generally id. at 36-38.)  Seep 5 discharges down the slope to the drainage channel along the railroad tracks.  (Id. at 38.)

PPG responds that, in August 2012, the Seep 5 base flow of 5 gpm was directed to the Interim Abatement System for pH adjustment.  (Revised Treatment Plan Report at 17, 28 (PPG0050761, PPG0050772). Other seeps identified after implementation of the Interim Abatement Plan have been collected for treatment in the Interim Abatement System. (Id.) Certain seeps, including those on the Western Slope area of the SLA are passively treated as per the approved Revised Interim Abatement Plan.  (ECF No. 207 Ex. 11, Figure 3.)

Plaintiffs reply that PPG's denial ignores the distinction between the flow that is collected with respect to the pool adjacent to Seep 5 and the actual flow from the seep. In August 2012, PPG began collecting flow from a pool that lies upslope of Seep 5, with the hope of drying up Seep 5.  (Shaw Rule 30(b)(6) Dep. at 39, 59; see also id. at 58.[31]) PPG's monitoring data from 2014 show that there is still flow from Seep 5.  E.g., December 2014 Monthly Progress Report, Table 2 (PPG0053031-53043).  Plaintiffs also indicate that, to the extent that PPG's response suggests that all unnamed seeps are either collected for treatment in the interim abatement system or passively treated, several seeps remain uncollected, as described above.

PPG responds that the measured Seep 5 overflow is non-existent in certain months and

---

[31] ECF No. 222 Ex. 6.

negligible at less than 1 gpm in other months. (ECF No. 207 Ex. 8, Table 2.)

Plaintiffs reply that PPG's response admits that flow from Seep 5 remains uncollected. The December 2014 Monthly Progress report demonstrates that flow from Seep 5 was recorded in 22 of the recorded weekly measurements, with a peak flow of 21.4 gpm on August 12, 2014. This seep monitoring also shows that the Seep 5 flow has a pH as high as 10.32. (Id. Table 4 at 4 (PPG0053052).

Leachate from seeps not collected in the interim abatement system, such as Seep 5, flows down the slope into the drainage channel north of the railroad tracks. CEC Ecological Assessment at 15 (CEC001063) ("Although many of the seeps originating from the SLA are now being collected by the Interim Abatement System (IAS) along the South Bench area, there are still seeps flowing down the steep slope at the southeastern border of the site to the railroad grade at the base of the hill"); Baker RIR at 2-4 (PPG001831) (on the southern side of the SLA "seep water flows south and ponds in several low areas that parallel the railroad tracks"); see also Bell Aff. ¶¶ 6-7, Photographs 4-5; Rogers Aff. ¶¶ 4-5, Attach. B.)

PPG responds that the base flow of Seep 5 is collected and treated in the Interim Abatement System. The limited number of seeps that are not collected as part of the approved Revised Interim Abatement Plan are passively treated.  (Revised Treatment Plan Report at 17, 28.)  It contends that Plaintiffs cannot rely on the Baker RUR as record support because it is dated almost 10 years prior to the implementation of the approved Revised Interim Abatement Plan.

Plaintiffs reply that the Revised Treatment Plan Report indicates that some seeps are currently unaddressed. (Id. at 28 (PPG00050772) ("Collection of other seeps downslope of the IAS treatment system is also being considered."). Although the Baker RIR predates the

24

implementation of the revised Interim Abatement Plan, the cited page documents the flow path of uncollected seep water on the southern side of the SLA. Plaintiffs contend that PPG has not pointed to any evidence suggesting that the flow path for uncollected seepage has been altered since the issuance of the report.  Further, PPG has not addressed the additional evidence from Dr. Bell, which describes his observations in September 2013 regarding the flow path of seepage to the drainage channel adjacent to the railroad tracks.  As noted above, seeps that are not collected and treated in the interim abatement system discharge directly into the drainage channel adjacent to the railroad tracks.

The water in the drainage channel adjacent to the railroad tracks discharges through culverts beneath the tracks. (Revised Treatment Plan Report at 58 (PPG0050802); PPG Rule 30(b)(6) Dep. at 76; Shaw 30(b)(6) Dep. at 68-69; CEC Ecological Assessment at 15 (CEC001063) ("This seepage is flowing through a culvert pipe beneath the railroad track and is entering the Allegheny River at the shoreline * * *"); Baker RIR at 2-4 (PPG001831). For the culverts that lie directly south of the SLA, PPG has characterized this water as "discharging from the SLA." (Revised Treatment Plan Report at 58 (PPG0050802).

In October 1993, PPG submitted to PADEP a Remedial Investigation Report prepared by Baker Environmental, Inc. on PPG's behalf.   The 1993 Baker RIR identified 15 wetlands at the Site.  (Baker RIR at 5-21 (PPG001884); id. Figure 5-1 (PPG002048) (showing location of identified wetlands). Wetland #15 lies between the railroad tracks and the Allegheny River and stretches along the length of the Site.  The wetland is described as being "in the flood plain of the Allegheny River, adjacent to the watercourse." (Id. 5-33 (PPG001896).)

Plaintiffs' expert, Ralph E. Huddleston, confirmed this area as a wetland in November

25

2013. (Huddleston Expert Report at 8-9.)[32] Mr. Huddleston observed that:

> Seeps or surface water flowed down from the steep slope to the ditch north of the railroad tracks. Surface water flowed from the ditch into and through the northern end of culverts REH-W-2, 1, A, B, and C. Surface water flowed from the southern end of the culverts to a defined channel along the hillslope and into the floodplain wetlands.  The surface water then flowed via a defined channel to the Allegheny River.

Id. at 8.

Data collected by PPG show that the seeps discharging from the Site contain at least aluminum, antimony, arsenic, chromium, iron, and lead. (December 2014 Monthly Progress Report, Table 4 (PPG0053049-53064); see also Revised Treatment Plan Report at 54 (PPG0050798).  Data collected or reported by PPG and PADEP since 1972 have regularly indicated that the pH of the leachate discharging from the SLA ranges between 10 and 11.6. See, e.g., Industrial Waste Permit Application, PPG Ford City Works No. 5, Inactive Sludge Lagoons (July 1972) at 4-2 (PPG009423)[33]; Letter from James Elliott to Carl Bender (July 15, 1973) (PADEP003896)[34]; Letter from Barbara Grabowski to Jerry Miklos (June 29, 1994) (PADEP000535)[35]; Baker Environmental, Inc., Surface Water Monitoring Report (October 9, 1997) at 1-3 & Attach. D (PPG006840-6842; PPG006872-6891)[36]; Cummings/Riter Consultants, Inc., Report – Water Balance and Sampling (August 11, 2000) Table 3 (CRC000244)[37]; Memorandum from Annette T. Paluh to Dave Beal (January 22, 2007) (PADEP001874).[38]

Data collected by PPG between July 2012 and June 2013 show that the pH of the water at the culverts is regularly above 9. See ECF No. 105 at 36-39 (table summarizing pH data

---

[32] ECF No. 207 Ex. 29.
[33] ECF No. 207 Ex. 30.
[34] ECF No. 207 Ex. 31.
[35] ECF No. 207 Ex. 32.
[36] ECF No. 207 Ex. 33.
[37] ECF No. 207 Ex. 34.
[38] ECF No. 207 Ex. 35.

collected by PPG). The highest of these readings was 11.48. (Id.)

PADEP requires that the pH of water discharged by PPG's interim abatement system be within the range of 6 to 9 standard units. (July 2 Addendum (PADEP000018).) Plaintiffs note that, because pH values are logarithmic, a pH of 11.48 is more than two orders of magnitude or approximately 300 times more basic than a pH of 9.0.

PPG disputes the characterization that the summary table shows that all culverts, especially culvert #7, "regularly" have water with a pH above 9.  Further, PADEP's July 2, 2009 approval of the Interim Abatement Plan only requires water discharged from Outfall 001 to have a pH range within 6 to 9 standard units. (ECF No. 207 Exs. 13 and 14.) There has been no allegation or record proof provided that PPG has not continuously met this pH limitation at Outfall 001 and in fact, the opposite is true.  See O'Hara Aff. ¶ 6.[39]

Plaintiffs reply that, although the pH at culvert #7 was recorded to be above 9.0 on only one occasion, collectively the pH at the all of culverts was recorded to be above 9.0 on 197 occasions between July 24, 2012 and June 25, 2013. (ECF No. 105 at 36-39.)

Plaintiffs further note that PPG's assertion that PADEP's July 2, 2009, approval of the interim abatement plan only imposes a limitation on the pH at the point of discharge from Outfall 001 is irrelevant because Plaintiffs are not claiming that PPG has violated the pH limit set in the Administrative Order at Outfall 001.  PPG's assertion that the culverts are not subject to the Administrative Order is irrelevant for the same reason.  Plaintiffs do not seek summary judgment for PPG's violation of the pH limitation at the culverts.

Data collected by PPG in March 2014 show pH readings of up to 11.835 in the Drainage Ditch just above the drainage channel adjacent to the railroad tracks. (Revised Treatment Plan

---

[39] ECF No. 219 Ex. C.

Report, App. Q (PPG0051646). PPG has stated that these "pH levels in the southern portion of the Drainage Ditch * * * [are] similar to levels monitored from named seep location Seep 105 in the ditch." (Revised Treatment Plan Report at 43 (PPG0050787). The pH levels in the portion of the Drainage Ditch upstream of the SLA are below 9.0 standard units.

PPG contends that the pH values referred to in this paragraph are pH values in the Drainage Ditch prior to collection and treatment in the Interim Abatement System.  Plaintiffs reply that, accepting PPG's claim that the referenced pH data point is upstream of the weir bypass structure that collects water in the Drainage Ditch for treatment in the interim abatement system, this does not mean that the pH of the water that bypasses this system is not similar to the pH of the water that is directed to the system. The water in the culverts at the base of the Drainage Ditch has a high pH. The Drainage Ditch discharges to the culverts and then to the Allegheny River.

Weekly pH data collected by PPG throughout 2014 and reported to PADEP in its Monthly Progress Reports indicate that the seeps frequently had pH levels exceeding 10 and 11, ranging as high as 12.36. (December 2014 Monthly Progress Report, Table 4 (PPG053049-53064).  PPG responds that all the seeps that are monitored are being either actively or passively treated. (Revised Treatment Plan Report at 16-17 (PPG0050760 - PPG0050761).  Plaintiffs reply that some of this high pH seep water is discharged directly without pH adjustment in the interim abatement system, thus supporting their claims of unlawful discharge of pollutants without an NPDES permit.  Some of this high pH seep water contaminates stormwater, thus supporting their claims of unlawful discharge of stormwater associated with an industrial activity.  Some of this high pH seep water is present in open channels or ditches on the Site, which are accessible to humans and ecological receptors, thus supporting their RCRA claims that the high pH seep water

28

on the SLA may present an imminent and substantial endangerment to health or the environment. Other high pH seep water that is discharged without treatment contaminates stormwater or is present in open, accessible channels and ditches on the SLA, is not presented in these particular pH data.  On the other hand, it is irrelevant and not material to their claims that some of the monitored seeps are actively or passively treated since untreated, high pH seep water is discharged, contaminates stormwater, and is accessible to humans and ecological receptors.

### Stormwater Runoff

Stormwater runoff from the Site is exposed to contamination that originates with the waste. (Revised Treatment Plan Report at 93, 100 (PPG0050837, PPG0050844) (discussing plans to prevent the mixing of unimpacted stormwater with leachate).  PPG has stated that "it is PPG's understanding that a National Pollutant Discharge Elimination System (NPDES) permit for storm water discharges associated with industrial activity would potentially be required if storm water runoff was discharged from the SLA via a conveyance that is used for collecting and conveying storm water." (Id. App. Z (PPG0051938).

PPG responds that the first sentence of this paragraph is a gross mischaracterization of the cited exhibit. The cited exhibit only states that unimpacted storm water that infiltrates the surface will be segregated as part of the enhanced collection and treatment system in order to prevent mixing with the leachate.  There is no evidence that storm water that runs off the surface of the SLA in the form of sheet flow is exposed to any contamination or is in anyway impacted.

Plaintiffs reply that PPG's objection that their statement is a "gross mischaracterization" of the cited statement in the Revised Treatment Plan Report rests on an overly limited reading of the exhibit.  PPG also misrepresents the cited text. The Revised Treatment Plan Report describes a proposed plan to "collect[] leachate internal to the SLA * * * [which] will prevent mixing of

the leachate with storm water." (Revised Treatment Plan Report at 100 (PPG00050844). This statement necessarily implies that, in the absence of the collection of internal leachate, otherwise unimpacted stormwater mixes with that leachate.  Responding to PADEP's comments on the Treatment Plan Report, PPG noted that its revised proposal was intended to "mitigate the formation of high pH seeps and to eliminate the need for active treatment of storm water." (Id. at PPG0051937). That the storm water runoff from the SLA takes the form of "sheet flow runoff" indicates the manner in which it flows over the surface, but has no bearing on whether it is impacted by mixing with high pH seeps. PPG's response to PADEP's comments admits as much. (Id. at PPG0051937- PPG0051938.) PPG elsewhere admitted that stormwater is contaminated by leachate at the Site, stating that its proposed "remedy will include not only segregation and permitting of stormwater currently mixing with affected waters, but collection and treatment of the affected waters including stormwater runoff * * *."  PPG Opp'n Pls.' Motion for Preliminary Injunction (ECF No. 178) at 7.  According to PPG, the Allegheny River, Glade Run, and the Drainage Ditch are receiving streams for stormwater discharge from the Site. (Revised Treatment Plan Report at 52 (PPG0050796).)

In addition to seep water, the Drainage Ditch receives stormwater runoff from the SLA. (Revised Treatment Plan Report at 4; PI H'rg Tr. at 96.) The Drainage Ditch also receives stormwater runoff from the SWDA. (Letter from Chris Girouard, PPG Industries, Inc., to Jessie Donahue, PADEP (March 25, 1994) (PADEP000424) ("With respect to the stream [Drainage Ditch], it is more appropriate to characterize this as a drainage channel as it primarily receives runoff water and seep water from the two areas of the site").[40]

Some of the flow in the Drainage Ditch is collected in the interim abatement system and

---

[40] ECF No. 207 Ex. 28.

conveyed to the treatment plant for pH neutralization and discharge. This collected flow includes stormwater that was uncontaminated before it commingled with the leachate or seep water. (Shaw Rule 30(b)(6) Dep. at 18 (the interim abatement system collects stormwater when "we're flowing above baseflow"); id. at 19 (answering "Yes" to the question of whether stormwater enters the interim abatement system from the inlet in the drainage ditch); id. at 20-21 (the "open channel * * * on the western part of the south bench * * * can collect stormwater if the conditions are right"); PADEP May 13, 2014 Comments at 2 (PPG0052122) ("PPG indicates that efforts would be taken to remove uncontaminated storm water that is now currently collected and conveyed by the eastern drainage ditch for treatment").

The Drainage Ditch flow that is not directed to the IAS is discharged untreated to the Allegheny River via the culverts. See CEC Photographs 20 and 21.[41] Stormwater runoff from the Site also enters the drainage channel adjacent to the railroad tracks and flows through the culverts to the wetlands and the Allegheny River.  (PI H'rg Tr. at 96.)  Stormwater runoff on the western side of the SLA flows into Glade Run.  (Revised Treatment Plan Report at 52 (PPG0050796).)

In its May 13, 2014, Comments on the Treatment Plan Report, PADEP stated that "[a]ll discharges of storm water runoff (contaminated or uncontaminated) from the site will need to be included in the NPDES permit." (PADEP May 13, 2014 Comments at 2 (PPG0052122).

In March 2010, PPG, through its consultant, Cummings Riter, Inc., began submitting discharge monitoring data to PADEP, pursuant to the monitoring requirements of the July 2009 Addendum. February 2010 Discharge Monitoring Report ("DMR") (CRC0000943-944).[42] PPG continues to submit such data on a monthly basis.

---

[41] ECF No. 207 Ex. 28.
[42] ECF No. 207 Ex. 21.

Total Suspended Solids Violations

For July 2010, PPG reported an instantaneous TSS value of 136 mg/l, exceeding the instantaneous maximum of 60 mg/l in the Administrative Order. (July 2010 DMR (PPG0017653).[43] PPG also reported a monthly average of 43.50 mg/l, exceeding the monthly average limit of 30 mg/l in the Administrative Order.

PPG responds that the cover letter to the July 2010 DMR notes that one of the sampling events occurred during a very intense storm, with a resulting atypical result for TSS. (Id. (PPG0017652.)

Plaintiffs reply that it is irrelevant that the cover letter characterizes one of the TSS sampling results as "atypical." Violations of effluent limitations are based on strict liability and PPG's submission of the data to PADEP constitutes an admission of liability.

For August 2010, PPG reported an instantaneous TSS value of 3200 mg/l, exceeding the instantaneous maximum of 60 mg/l in the Administrative Order. (August 2010 DMR (PPG0017623).[44] PPG also reported a monthly average of 652.50 mg/l, exceeding the monthly average limit of 30 mg/l in the Administrative Order. Id.

PPG responds that the cover letter to the August 2010 DMR notes that one TSS sampling event was anomalously high likely due to temporary system maintenance issues and that system maintenance procedures are being updated.

Plaintiffs reply that it is irrelevant that the cover letter characterizes one of the TSS sampling results as "anomalously high." Violations of effluent limitations are based on strict liability and PPG's submission of the data to PADEP constitutes an admission of liability. Thus, PPG's submission of the data to PADEP constitutes an admission of liability.

---

[43] ECF No. 207 Ex. 37.
[44] ECF No. 207 Ex. 38.

For September 2010, PPG reported an instantaneous TSS value of 1980 mg/l, exceeding the instantaneous maximum of 60 mg/l in the Administrative Order and another incident in which the TSS value exceeded the instantaneous maximum by some unspecified amount. (September 2010 DMR (PPG0017698).)[45] PPG also reported a monthly average of 554.6 mg/l, exceeding the monthly average limit of 30 mg/l in the Administrative Order. Id.

PPG responds that the cover letter to the September 2010 DMR notes that two TSS sampling event was anomalously high likely due to temporary system maintenance issues and that such issues have been likely resolved based on the four sampling results obtained since September 28.

Plaintiffs reply that it is irrelevant that the cover letter characterizes two of the TSS sampling results as "anomalously high" because violations of effluent limitations are based on strict liability and PPG's submission of the data to PADEP constitutes an admission of liability.

For October 2010, PPG reported an instantaneous TSS value of 1370 mg/l, exceeding the instantaneous maximum of 60 mg/l in the Administrative Order. (October 2010 DMR (PPG0017689).[46] PPG also reported a monthly average of 351.90 mg/l, exceeding the monthly average limit of 30 mg/l in the Administrative Order. Id.

For November 2010, PPG reported that the TSS levels for all four of the sampling events that month were "anomalously high." (November 2010 DMR (PPG0017679).)[47] PPG reported an instantaneous TSS value of 4300 mg/l, exceeding the instantaneous maximum of 60 mg/l in the Administrative Order, as well as three additional instances in which the TSS value exceeded the instantaneous maximum by some unspecified amount. Id. (PPG0017680). PPG also reported a

---

[45] ECF No. 207 Ex. 39.
[46] ECF No. 207 Ex. 40.
[47] ECF No. 207 Ex. 41.

monthly average of 2927 mg/l, exceeding the monthly average limit of 30 mg/l in the Administrative Order. Id. The minimum value recorded that month was 2630 mg/l. Id.

PPG responds that the cover letter to the November 2010 DMR notes that anomalously high TSS measurements are no longer occurring due to a modification in the operational procedures in the Interim Abatement System.  Plaintiffs reply that PPG mischaracterizes the statement in the cover letter, which states that efforts to address the performance of the interim system were "continuing" and that three subsequent sampling events "indicate that the system has responded well to a modification in operational procedures and that TSS has now returned to normal levels in effluent monitoring samples." (November 2010 DMR.) However, the assertions in the cover letter that the results have "returned to normal" are irrelevant because violations of effluent limitations are based on strict liability.

For May 2012, PPG reported an instantaneous TSS value of 2830 mg/l, exceeding the instantaneous maximum of 60 mg/l in the Administrative Order. (May 2012 DMR (PPG003250).)[48] PPG also reported a monthly average of 580.2 mg/l, exceeding the monthly average limit of 30 mg/l in the Administrative Order. Id.  For June 2012, PPG reported an instantaneous TSS value of 3320 mg/l, exceeding the instantaneous maximum of 60 mg/l in the Administrative Order. (June 2012 DMR (PPG0017662).)[49] PPG also reported a monthly average of 834.9 mg/l, exceeding the monthly average limit of 30 mg/l in the Administrative Order. Id. For September 2012, PPG reported an instantaneous TSS value of 55.3 mg/l. This value was derived from the "average of duplicate sample results (48 mg/L and 62.5 mg/L)" taken on September 18, 2012. (September 2012 DMR (PPG0017704).)[50] One of the samples registered a

---

[48] ECF No. 207 Ex. 42.
[49] ECF No. 207 Ex. 43.
[50] ECF No. 207 Ex. 45.

TSS value of 62.5 mg/l, exceeding the instantaneous maximum of 60 mg/l in the Administrative Order. Id.

PPG responds that the average result of the duplicate samples is reflective of lab variability rather than temporal variability as the results are from a split sample collected at the same time (11:35 am) on the same day (September 18, 2012). (ECF No. 219 Exs. E, F.) Further, the individual and average results were fully disclosed to PADEP in the cover letter to the September 2012 DMR.

Plaintiffs reply that the cover letter enclosing the data describes the sample as a "duplicate sample," rather than a split sample. (PPG0017703). However, it is irrelevant whether the results were generated by duplicate samples or a split sample, or that the results were obtained at different laboratories. PPG has not pointed to any evidence calling into question the reliability of either result. PPG is required to comply with the instantaneous maximum limit based on measurements taken by grab samples and the averaging of multiple samples is not permitted. Moreover, violations of effluent limitations are based on strict liability. Thus, PPG's submission of the data to PADEP constitutes an admission of liability.

For November 2013, PPG reported an instantaneous TSS value of 78.2 mg/l, exceeding the instantaneous maximum of 60 mg/l in the Administrative Order, as well as an additional instance in which the TSS value exceeded the instantaneous maximum by some unspecified amount. (November 2013 DMR (PPG0052453).)[51]

PPG responds that it was only one unconfirmed split sample that was reported to exceed the TSS limit as reflected on the November 2013 DMR, and the other split sample was below the limit. In the monthly Progress Report, it was reported to PADEP that the "inconsistent

---

[51] ECF No. 207 Ex. 46.

laboratory results relate to precipitation of silicates that occasionally occurs in the sample jar after discharge sample collection, but before the laboratory analyzes the sample. The TSS appears to be a silica gel based on visual inspection of replicate discharge samples that are provided to the KEY project manager for inspection on a weekly basis." (ECF No. 219 Ex. G at 2 (PPG0052648).)

Plaintiffs reply that it is irrelevant that these violations are each from one sample of the split samples. There are a number of reasons that split samples could yield different results, including a poor division of the sample. PPG has not pointed to any evidence calling into question the reliability of either result. However, the suspected cause of the inconsistent results as reported to PADEP in the December 2013 monthly progress report is irrelevant.  PPG's claim that the sample was "unconfirmed" is also irrelevant.  PPG is required to comply with the instantaneous maximum limit based on measurements taken by grab samples.  Further, PPG suggests that somehow the presence of silica gel makes this sample result unreliable. The presence of silica gel in PPG's discharge is both normal and irrelevant. See Revised Treatment Plan Report at 84 (PPG0050828).[52]

Treatment Plan

On June 5, 2009, PPG submitted a Treatment Plan to PADEP, which described potential discharge, leachate, and seep mitigation options for the SLA, and additional data to be collected for the SLA. Letter from Thomas J. Ebbert, PPG Industries, Inc., to Samuel C. Harper, PADEP, enclosing Treatment Plan (June 5, 2009);[53] Treatment Plan, Former Ford City Facility Slurry Lagoon Area, North Buffalo and Cadogan Township Armstrong County, Pennsylvania, prepared

---

[52] ECF No. 222 Ex. 7.
[53] ECF No. 207 Ex. 47.

by Shaw Environmental, Inc. (June 2009) ("Treatment Plan").[54]

The Treatment Plan does not include the SWDA. (Treatment Plan at 3 (PPG001572.)

PPG has not undertaken any remedial measures related to the SWDA pursuant to the

Administrative Order. (PPG Rule 30(b)(6) Dep. at 39-40. )

PPG responds that the Administrative Order does not contain any Performance

Obligations that specifically refer to the SWDA. (Administrative Order, Performance

Obligations ¶¶ A - I, (PADEP6 – PADEP8). Moreover, PADEP has not stated that PPG is out of

compliance with the Administrative Order for not including the SWDA as part of the interim

abatement measures.

Plaintiffs reply that these facts are material because they establish that PPG has failed to

comply with requirements of the Administrative Order. The Administrative Order includes

Performance Obligations that require PPG to address conditions at the "Site."  Performance

Obligations B, D, and E all refer to actions required at "the Site." (Administrative Order at 6-7

(PADEP 000007-8). The Administrative Order defines "the Site" to include the SWDA.

Plaintiffs also contend that PADEP's failure to enforce the Administrative Order is only a

condition precedent to a citizen suit. It is not a material fact on the issue of PPG's liability for its

violations of the Administrative Order.  PPG admits that it has not taken any action related to the

SWDA pursuant to the Administrative Order. (PPG Rule 30(b)(6) Dep. at 26 (stating that the

Treatment Plan Report "is specific to the slurry lagoon area"); id. at 39 ("PPG has [not]

undertaken [any specific action] related to the solid waste disposal area under that

Administrative] Order").

On November 9, 2011, PADEP informed PPG that it had reviewed the Treatment Plan

---

[54] ECF No. 207 Ex. 48.

and that "PPG may proceed to implement the investigative items identified in the treatability plan as submitted."  (ECF No. 219 Ex. H at 1.)  PPG initially submitted the Treatment Plan Report (TPR) to PADEP in December 2012.  (ECF No. 219 Ex. B at 13 (PPG0050757).) PADEP issued comments to the TPR in May 2014.  (ECF No. 207 Ex. 26.)  The comments did not indicate that the TPR was required to include the SWDA.

PPG submitted a revised Treatment Plan Report to PADEP for its review and approval on January 30, 2015.  (ECF No. 219 Ex. B.)  PPG indicates that this document formalized PADEP and PPG's work, communications and agreements in principal regarding outstanding issues and comments from the initial December 2012 TPR.  (ECF No. 219 Ex. O.)

PPG further contends that the approved remedy in the TPR consists of a comprehensive collection and treatment system that is designed and intended to collect, treat, and prevent exposure to all leachate-impacted seeps and also segregate and prevent unimpacted stormwater from mixing with leachate and leachate-impacted seeps.  (ECF No. 219 Ex. B at 96-106, 122-23; ECF No. 219 Ex. P.)  Plaintiffs respond that they dispute many aspects of this statement, but that there is no need to discuss them now because they concern matters of relief, not liability.

PPG notes that, by letter dated March 5, 2015, PADEP approved the revised TPR and instructed PPG to begin implementation of the selected remedy.  (ECF No. 219 Ex. Q.) Plaintiffs respond that PADEP told PPG that the level of treatment that will be required cannot be determined until the NPDES permit is issued.  By e-mail dated March 16, 2015, PPG confirmed that prior discussions with PADEP had addressed PADEP's comments that accompanied that March 5, 2015 approval of the revised Treatment Plan Report and confirmed PPG's intent to move forward with the design and implementation of the various components of the selected remedy while simultaneously working through the NPDES permitting process. (ECF

38

No. 219 Ex. P.)  PPG states that, on March 30, 2015, it timely submitted the NPDES Permit

Application to PADEP based upon, and expressly incorporating by reference, the selected

remedy in the revised TPR approved by PADEP. (ECF No. 213.)

According to PPG, "[t]he SLA currently has a well-developed vegetative cover and

appears to be a significant wildlife habitat based on the casual sightings of large and small game,

a variety of birds, and other animals." (Revised Treatment Plan Report at 113 (PPG050857).

During a 2013 site visit of the SLA and SWDA conducted by Civil & Environmental

Consultants, Inc., whitetail deer, cardinals, junco (a type of bird), and grey squirrels were

observed. (CEC Ecological Assessment at 10 (CEC001058).)  Beaver cuttings and coyote scat

were also observed at the site. (Id.) A PPG consultant conducting sampling of the seeps at the

SLA reported that "[a]n animal removed the bucket from Seep 105 – teeth marks evident in

bucket!" (E-mail from Mark Anthony, Field & Technical Services, to Bert Hubbard, Key

Environmental, Inc., and Melissa Gabriel (October 13, 2010).[55]

In his November 30, 2014, expert report, Plaintiffs' ecological risk expert, Dr. William J.

Rogers, stated that "[h]igh pH levels * * * have the potential to affect both mammals and birds at

levels found on the site." (Rogers Expert Report at 22.)[56] In addition to potential eye damage,

caustic material, such as the SLA seeps, "can also impact the mucous membranes of the mouth,

throat, and air passages." (Id.) High pH liquids are often referred to as being alkaline or caustic.

See Verslycke Expert Report at 21 ("Alkaline (or caustic) pH liquids may result in dermal

irritation or damage to the gastrointestinal tract").[57]

PPG responds that the information contained in this paragraph is speculative potential

---

[55]  ECF No. 207 Ex. 49.
[56]  ECF No. 207 Ex. 50.
[57]  ECF No. 207 Ex. 51.

impacts, and therefore cannot be considered "fact" for purposes of summary judgment. It also

notes that Dr. Verslycke found the high pH seeps will not imminently or substantially endanger

wildlife or ecological receptors at the Site.  Plaintiffs reply that, despite its phrasing, PPG's

response does not constitute a denial.  The legal standard under RCRA includes consideration of

whether the waste "may present" an imminent and substantial endangerment (emphasis added).

42 U.S.C. 6972(a)(1)(B). This "does not require proof of actual harm." Interfaith Community

Org. v.Honeywell Int'l, Inc., 399 F.3d 248, 258 (3d Cir. 2005).  Instead, plaintiffs must "show

that there is a potential for an imminent threat of serious harm…." Id.

In his January 31, 2014, expert report, PPG's ecological risk expert, Dr. Tim Verslycke,

opined about wildlife exposure to the SLA seeps:

> Wildlife exposure to seep water may occur though either direct contact or
> ingestion of water by ecological receptors. Alkaline (or caustic) pH liquids may
> result in dermal irritation or damage to the gastrointestinal tract. However, tissue
> injury from alkaline substances is not determined solely by pH. Other important
> factors include: duration of contact; the amount and state (liquid, solid) of the
> substance involved; and the substance's physical properties (e.g. viscosity,
> concentration, and ability to penetrate tissue). Current pH levels associated
> with seep waters are elevated (generally ranging between 9 and 12) and could
> pose unacceptable risks (e.g., skin irritation or gastrointestinal effects) if
> prolonged exposure occurs. No evidence of such effects were observed during my
> visits to the Site. In addition, ongoing and anticipated enhanced collection and
> treatment of seeps at the Site, will further address seep water quality and the
> potential for seep water exposures.

(Verslycke Expert Report at 21) (internal citations omitted).

In his January 30, 2015, supplemental expert report, Dr. Verslycke stated that he

"concluded that avian and mammalian wildlife are appropriate ecological receptors to evaluate

with respect to seep water exposures and concluded that exposure of wildlife to seep water with

elevated pH has the potential for unacceptable risk." (Verslycke Supp. Expert Report at 7.)[58] He

---

[58] ECF No. 207 Ex. 52.

also stated that he "considered the Drainage Ditch and other seeps as areas of potential exposure for wildlife and concluded that elevated seep pH may pose unacceptable risks to wildlife." (Id. at 8.) Dr. Verslycke also said that "[e]xposure of wildlife to seeps with elevated pH levels has the potential for unacceptable risks (e.g., skin and eye irritation or gastrointestinal effects)." (Id. at 22.)

PPG responds that Dr. Verslycke opined that "to a reasonable degree of scientific certainty, that current conditions at the Site do not present an imminent and substantial endangerment to the environment." (Verslycke Expert Report at 3.)

In 2008, students and staff of the University of Pittsburgh conducted sampling at the site as part of the Allegheny River Stewardship Project. (Andrew Ryan Michanowicz, Community-Driven Research: Effluent Characterization of Legacy Contamination Containing Trace Metals in an Alkaline Outfall Entering the Allegheny River Near Cadogan Pennsylvania (2009) at 1, 19 (ARM000101, ARM000119).[59] Samples were taken in the Allegheny River and at seep locations along the southern bank of the SLA. (Id. at 21 (ARM000121). Samples were also taken directly adjacent to SLA cliff face seeps. (Id. at 21-22 (ARM000121-122).

During a March 12, 2009, meeting between PPG and PADEP, the Department expressed concerns over the "possibility of children coming into contact with water of elevated pH." See Letter from Thomas J. Ebbert to Samuel C. Harper (April 21, 2009).[60]

The Administrative Order required PPG to "provide security calculated to exclude unauthorized persons from the Site and to ensure that no unauthorized person comes into contact with the Leachate and seeps." (Performance Obligation B at 5 (PADEP000007).  In response to the Administrative Order, PPG repaired and improved the Site security fencing and installed

---

[59] ECF No. 207 Ex. 53.
[60] ECF No. 207 Ex. 54.

warning signs in May 2009. (Cummings Riter Consultants, Inc., Monthly Progress Report No. 3 (June 1, 2009) at 1 (PPG006652).[61]

An October 14, 2010, e-mail sent by Tom Ebbert of PPG stated that "[h]unters have been observed on the Ford City site, so it may be a good idea to wear something orange." E-mail from Thomas J. Ebbert, PPG Industries, Inc., to John Richter and Mark Terril (October 14, 2010).[62]

The fencing at the SLA is only around the perimeter of the plateau or terrace level of the SLA and does not encompass the seeps at the South Bench or the water collecting in the drainage ditch adjacent to the railroad tracks. See Shaw Environmental, Inc., Site Plan, Interim Abatement System (Sheet No. C-1) (June 30, 2009) (PPG011436).[63] There is a human-size hole in this fencing on the western side of the SLA. (Nairn Dep. at 59.)[64] The gate into the SLA from Route 128 prevents vehicle access without a key, but it does not prevent pedestrian access. (PPG Rule 30(b)(6) Dep. at 34-36.) There is no fencing or other security measure that prevents access to the South Bench of the SLA from the river side. See Nairn Dep. at 94 (confirming that there was no fencing on the river side of the discharge from the interim abatement system); Shaw Rule 30(b)(6) Dep. at 91 (confirming that there is no fencing preventing animals from coming into contact with mulch beds installed by PPG on the South Bench). Consequently, the flowing seep water on the South Bench, on the slope below the South Bench, in the Drainage Ditch, and in the drainage channel adjacent to the railroad tracks is accessible to humans.

A subsidiary of Key Environmental, Inc. has been responsible for collecting pH data on the seeps as part of the weekly monitoring that PPG is responsible for under the Administrative Order. (Shaw Rule 30(b)(6) Dep. at 27-29, 63-64.)

---

[61] ECF No. 207 Ex. 55.
[62] ECF No. 207 Ex. 56.
[63] ECF No. 207 Ex. 57.
[64] ECF No. 207 Ex. 58.

Key Environmental, Inc.'s Site Specific Health and Safety Plan for High pH Seep Area

Activities, PPG Ford City Former Slurry Lagoon and Solid Waste Disposal Areas encompasses

work performed for "weekly sampling and analysis of seep locations." (April 22, 2009; revised

October 8, 2009), at 3-1) (KEY0014827).[65] The plan advises:

> A greater potential concern when performing work at the Site is high pH water
> from the seeps and in soils. High pH water and soils can be irritating and
> corrosive to the skin, mucous membranes and eyes. Workers must wear rubber or
> nitrile gloves and safety glasses while working near the seeps and while sampling
> seeps, groundwater and soils. High pH material can do permanent damage to eyes
> and cause blindness. A portable eyewash station or bottles must be immediately
> available at the seep areas and any other areas where high pH water or soils may
> be encountered. [emphasis in original]

(Id. at 3-3 (KEY0014829).)

Procedural History

On January 13, 2012, Plaintiffs gave notice of their intent to file suit to the Administrator

of the Environmental Protection Agency (EPA), PADEP and Defendants as required by the

CWA, CSL and RCRA.  33 U.S.C. § 1365(b)(1)(A); 35 P.S. § 691.601(e); 42 U.S.C.

§ 6972(b)(2)(A).  (CWA Compl. ¶ 4 & Ex. 1; RCRA Compl. ¶ 4 & Ex. 1.)  On March 20, 2012,

Plaintiffs filed a complaint against PPG and Ford City under the CWA and the CSL (the "CWA

Complaint").  The case was docketed at Civ. A. No. 12-342.  Count I alleges that that PPG has

unlawfully discharged pollutants into navigable waters without an NPDES permit and continues

to do so in violation of Sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342.  Count

II alleges that PPG has violated and continues to violate sections 301(a) and 402(p)(2)(B), 33

U.S.C. §§ 1311(a), 1342(p)(2)(B), by discharging storm water associated with industrial activity

without a permit authorizing such discharge.  Count III alleges that PPG has violated and

continues to violate Sections 301 and 307 of the CSL, 35 P.S. §§ 691.301, 691.307, by

---

[65] ECF No. 207 Ex. 59.

43

discharging industrial waste into the Allegheny River, Glade Run, and groundwater associated with the Site without authorization or a permit obtained from PADEP, which constitutes a nuisance under Section 307(c). Count IV alleges that PPG has violated and continues to violate Section 401 of the CSL, 35 P.S. § 691.401, by discharging pollutants and discharging waste containing high levels of pH, into the Allegheny River, Glade Run, and groundwater without a permit issued by PADEP authorizing such discharges. Count V alleges that PPG has violated the CWA in that the Treatment Plan it submitted in June 2009 fails to provide a schedule for the application for NPDES permits and, based on the monthly progress reports submitted by PPG beginning on April 1, 2009, through at least January 5, 2012, PPG took no steps to apply for such permits and Plaintiffs allege, on information and belief, that PPG has failed to provide a schedule for the application of NPDES permits and has taken no steps to apply for such permits. Count VI alleges that PPG's acts as alleged in Count V also violate section 611 of the CSL, 35 P.S. § 691.611. Count VII alleges that PPG has discharged, and continues to discharge, untreated and ineffectively treated wastewater, in violation of the July 2 Addendum, and Count VIII alleges that these acts also violate section 611 of the CSL. Count IX alleges that PPG has violated the CWA by committing 162 discharge violations between February 2010 and December 2011, in violation of the 2009 Administrative Order, and Count X alleges that these acts also violate section 611 of the CSL. Count XI alleges that PPG has violated the CWA by committing 33 reporting violations between February 2010 and December 2011, in violation of the 2009 Administrative Order, and Count XII alleges that these acts also violate section 611of the CSL.

On April 20, 2012, Plaintiffs filed another complaint against PPG and Ford City under the RCRA (the "RCRA Complaint"). They allege that PPG is a generator and/or transporter of the solid or hazardous waste at the Site, as well as an owner and/or operator of the site, and has

contributed to the past or present handling, storage, treatment, transportation, or disposal of the

solid or hazardous waste at the Site, thereby presenting an imminent and substantial

endangerment to health or the environment.  This case was docketed at Civ. A. No. 12-527.  On

May 25, 2012, Plaintiffs filed a motion to consolidate the two cases (ECF No. 11).  On May 29,

2012, an order was entered granting this motion and consolidating the cases at No. 12-342 (ECF

No. 12).

On September 25, 2013, Plaintiffs filed a second CWA/CSL complaint (the Second CWA

Complaint), including additional instances of alleged pollution and adding BPRI as a defendant.

The case was docketed at No. 13-1395.  Count XIII alleges that PPG violated the CWA by

discharging pollutants (including arsenic, chromium, lead, manganese, copper, zinc, mercury,

antimony, barium, beryllium, iron, vanadium, aluminum, total dissolved solids or salts and semi-

volatile organic compounds, as well as waste with high or low levels of pH) into the wetlands

without a permit, and Count XIV alleges that these acts violated the CSL.  Count XV alleges that

PPG violated the CWA by discharging storm water without a permit.  Count XVI alleges that

PPG violated the Administrative Order by failing to include the SWDA in its Treatment Plan,

and Count XVII alleges that these acts violated the CSL.  Count XVIII alleges that PPG violated

the CWA by submitting a Treatment Plan that failed to provide a schedule for the application for

NPDES permits for discharges from the SWDA, and Count XIX alleges that this failure violated

the CSL.  Count XX alleges that PPG violated the CWA by designing an interim collection

system that fails to use piping throughout and therefore collects uncontaminated storm water and

Count XXI alleges that these acts violated the CSL.  Count XXII alleges that PPG violated the

CWA and the Administrative Order by designing a system that collects uncontaminated storm

water, and Count XXIII alleges that these acts violated the CSL.  Count XXIV alleges that PPG

violated the CWA by failing to properly monitor charges in that the system is diluted with uncontaminated storm water, and Count XXV alleges that this failure violates the CSL.  Count XXVI alleges that PPG violated the CWA by allowing the discharge of uncontaminated storm water which enters the Drainage Ditch and mixes with contaminated leachate and/or seep water which is not monitored, and Count XXVII alleges that these acts violate the CSL.

On September 25, 2013, Plaintiffs also filed a second RCRA complaint ("Second RCRA Complaint"), which added BPRI as a defendant, and was docketed at No. 13-1396.  On September 30, 2013, an order was entered consolidating the Second CWA Complaint and the Second RCRA Complaint at No. 12-342.  Finally, on February 18, 2014, Plaintiffs filed a third CWA/CSL complaint against PPG, Ford City and BPRI, docketed at No. 14-229 ("Third CWA Complaint").  Count XXVIII alleges that PPG has violated the CWA and the Administrative Order by discharging water with a pH value exceeding the range set therein, and Count XXIX alleges that this act violated the CSL.  Count XXX alleges that PPG is violating the CWA and the Administrative Order by discharging water from the culverts with high pH values, and Count XXXI alleges that this act violates the CSL.  Count XXXII alleges that PPG is violating the CWA by failing to report the final pH values prior to discharge to the Allegheny River but instead using values from PPG's neutralization tank and Count XXXIII alleges that this act violates the CSL.  On April 8, 2014, Plaintiffs filed a motion to consolidate the case and on April 9, 2014, an order was entered consolidating the case at No. 12-342.[66]

On February 28, 2013, PPG filed a motion to dismiss on various grounds, including lack of standing (ECF No. 24).  Ford City filed a motion indicating it was joining in PPG's motion to

---

[66] The complaints state that Plaintiffs are not pursuing claims or specific relief against Ford City or BPRI, but that they are joined as indispensable parties under Rule 19(a).  (CWA Compl. ¶ 13 & at 23-24; RCRA Compl. ¶ 15 & at 11; Second CWA Compl. ¶¶ 5-6, 17-18 & nn.1-2 & at 30; Second RCRA Compl. ¶¶ 5-6, 19-20 & nn.1-2 & at 15; Third CWA Compl. ¶¶ 19-20 & at 19.)

dismiss (ECF No. 29).  On August 8, 2013, a Memorandum Opinion and Order was entered, denying the motions (ECF No. 66).

On December 19, 2013, Plaintiffs filed a motion for partial summary judgment on the issue of standing (ECF No. 116).  On February 28, 2014, PPG filed its cross-motion for summary judgment on the issue of Plaintiffs' standing (ECF No. 137).  On May 28, 2014, a Memorandum Opinion and Order was entered which denied PPG's motion and granted Plaintiffs' motion (ECF No. 162).

On October 1, 2014, Plaintiffs filed a motion for a preliminary injunction to compel PPG to apply for an NPDES permit (ECF No. 173).  After receiving briefing on the issue and holding a hearing on November 13, 2014, the Court entered a Memorandum Opinion and Order on December 10, 2014 which granted the motion insofar as PPG was directed to file an application for an NPDES permit by March 31, 2015 (ECF No. 192).  On April 7, 2015, PPG submitted a notice that it had timely filed its application and that PADEP had accepted it (ECF No. 212).

On March 31, 2015, Plaintiffs filed their Third Motion for Partial Summary Judgment (ECF No. 204)[67] and PPG also filed a motion for partial summary judgment (ECF No. 208).  The parties submitted responses (ECF Nos. 214, 217) on April 30, 2015 and reply briefs (ECF Nos. 220, 223) on May 15, 2015.

Standard of Review

As amended effective December 1, 2010, the Federal Rules of Civil Procedure provide that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

---

[67] The motion is titled "Third Motion" because on December 20, 2013, Plaintiffs filed their second motion for partial summary judgment on certain violations of the 2009 Administrative Order (ECF No. 120).  The Court dismissed this motion without prejudice on January 8, 2014 to be refiled at the summary judgment stage after the conclusion of expert discovery.

Fed.R.Civ.P. 56(a).  Summary judgment may be granted against a party who fails to adduce facts

sufficient to establish the existence of any element essential to that party's case, and for which

that party will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322

(1986).  The moving party bears the initial burden of identifying evidence which demonstrates

the absence of a genuine issue of material fact.  Once that burden has been met, the non moving

party must set forth "specific facts showing that there is a genuine issue for trial" or the factual

record will be taken as presented by the moving party and judgment will be entered as a matter

of law.  Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  An

issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In following this directive, a court must take the facts in the light most favorable to the

non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's

favor.  Hugh v. Butler County Family YMCA, 418 F.3d 265, 266 (3d Cir. 2005); Doe v. County

of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001).

Plaintiffs' Motion

Plaintiffs move for summary judgment in the following respects: 1) PPG is liable for

discharging waste without an NPDES permit in violation of the CWA (Counts I, II, XIII and

XV); 2) PPG is liable for discharging waste without an NPDES permit in violation of the CSL

(Counts II, IV and XIV); 3) PPG is liable for failing to comply with the Administrative Order in

violation of both the CWA and CSL in its release of total suspended solids (Counts XVI, XVII)

and using an interim abatement system that collects and treats uncontaminated storm water

because it uses open trenches instead of pipes (Counts XX, XXI, XXII, XXIII); and 4) PPG has

created an imminent and substantial danger to the public health and the environment in violation

of the RCRA.

PPG responds that: 1) & 2) it complied with PADEP and filed for an NPDES permit so the claims about discharging without a permit are no longer "redressable," the culverts are not covered by the Administrative Order and an NPDES permit was not required in 1973 because historical discharges were not point source discharges; 3) this Court has already held that whether it is violating the Administrative Order is best left to the PADEP, the SWDA is not part of the Administrative Order and PADEP has never held otherwise, past TSS violations are not actionable when the last one occurred in 2013, and citizen suits are for the purpose of addressing discharge limits, not IAS designs or alleged requirement to include the SWDA; and 4) high pH values do not constitute "imminent" danger, the issue is hotly debated by the parties' experts and PADEP will address this issue.

In a reply brief, Plaintiffs indicate that: 1) the issues are not moot because PPG is still discharging without a permit and civil penalties and a declaratory judgment are still available remedies; 2) they are not seeking summary judgment on pH values at the culverts; 3) the discharge from Outfall 001 follows the same course as other discharges from the Site which means they are all point source discharges for which an NPDES permit is required; 4) the Court's order regarding allowing PADEP to evaluate compliance with the Administrative Order concerned the issue of whether high pH values violated it; 5) the Court has already held that scope of SWDA and design of IAS can be actionable which makes it the law of the case and "wholly past" refers to pre-Complaint; and 6) high pH values do present a threat of imminent and substantial endangerment.

<u>Hearsay Objections</u>

PPG first argues that Plaintiffs cannot cite the PADEP Administrative Order and other

reports from the agency because they represent hearsay.  Plaintiffs respond that the public

records exception applies to these documents.

The Federal Rules of Evidence contain the following exception to the hearsay rule:

**(8) Public Records.** A record or statement of a public office if:
**(A)** it sets out:
**(i)** the office's activities;
**(ii)** a matter observed while under a legal duty to report, but not including, in a
criminal case, a matter observed by law-enforcement personnel; or
**(iii)** in a civil case … factual findings from a legally authorized investigation; and
**(B)** the opponent does not show that the source of information or other
circumstances indicate a lack of trustworthiness.

Fed. R. Evid. 803(8).  As this Court has previously observed regarding reports from the EPA and

PADEP:

these reports all appear to be public records and reports generated by public
agencies setting forth their activities and/or factual findings as the result of an
investigation made pursuant to their authority granted by law and, thus, are
admissible under Fed.R.Evid. 803(8)(A) & (C) as exceptions to the hearsay rule.
See Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 161–62, 170, 109 S.Ct. 439,
102 L.Ed.2d 445 (1988); Coates v. AC and S, Inc., 844 F. Supp. 1126, 1132-33
(E.D. La. 1994); United States v. Davis, 826 F. Supp. 617, 621-22 (D.R.I. 1993);
Conde v. Velsicol Chemical Corp., 804 F. Supp. 972, 993 (S.D. Ohio 1992),
aff'd, 24 F.3d 809 (6th Cir. 1994). See also 33 U.S.C. § 1311(b)(2)(A).

Moreover, the authors of these reports need not be qualified as experts in
order for the reports to be admissible under Rule 803(8) as it is presumed that
government officials will perform their duties properly and that their reports are
accurate and reliable. Coleman v. Home Depot, Inc., 306 F.3d 1333, 1341 (3d Cir.
2002); Complaint of Munyan, 143 F.R.D. 560, 563 (D.N.J. 1992). Hence, any
challenge to the trustworthiness of these reports must be accompanied by
evidence that would impugn their reliability. Clark v. Clabaugh, 20 F.3d 1290,
1294-95 (3d Cir. 1994), quoting Melville v. American Home Assur. Co., 584 F.2d
1306, 1316 (3d Cir. 1978) ("We have held that [b]efore [an objection to the
opinion testifier's expert qualifications] may be recognized ... the party
challenging the validity of an official report admitted under 803(8)(C) must come
forward with some evidence which would impugn its trustworthiness"). Further,
as found by the Court of Appeals for the Third Circuit, this reading of Rule 803(8)
also applies to Rule 702, which provides a means of testing an expert's reliability.
Melville v. American Home Assur. Co., 584 F.2d at 1316. Specifically, the Court
has found that "[t]o allow objections to be sustained under Rule[ ] 702... without a
showing of untrustworthiness would have the practical effect of nullifying the

exception to the hearsay rule provided by Rule 803(8)(C)." Id.  Thus, GenOn's
objections to the admissibility of the agency reports submitted by Plaintiffs are
only sustainable if accompanied by evidence that would call the trustworthiness
of these reports into question. GenOn has not presented any such evidence and,
thus, the reports are properly considered.

PennEnvironment v. GenOn Northeast Mgmt. Co., 2011 WL 1085885, at *10 (W.D. Pa. Mar.

21, 2011) (Mitchell, M.J).  See also Interfaith Community Org. v. Honeywell Int'l, Inc., 399 F.3d

248, 262-63 (3d Cir. 2005) (affirming conclusion of district court that site conditions presented

an imminent and substantial endangerment based, in part, on findings of NJDEP, 263 F. Supp. 2d

796, 814 (D.N.J. 2003)); Goodman v. Pennsylvania Turnpike Comm'n, 293 F.3d 655, 669 n.10

(3d Cir. 2002) (Commission provided no reason to doubt trustworthiness of a report from a

public agency, so it was admitted).

        As in the cited cases, PPG has provided no reason to doubt the trustworthiness of PADEP

reports and indeed, it has cited them throughout this litigation.  Therefore, they are admitted as

reports of a public agency pursuant to Rule 803(8).

        PPG also challenges certain other documents as hearsay, specifically: 1) an October 13,

2010 email from Mark Anthony of Field & Technical Services to Bert Hubbard of Key

Environmental, Inc. and Melissa Gabriel which noted that an animal was found in a bucket in

Seep 105 (ECF No. 207 Ex. 49); 2) a report from Andrew Ryan Michanowicz, a student at the

University of Pittsburgh, that he and other students and staff of the University conducted

sampling at the Site along the southern bank of the SLA and directly adjacent to SLA cliff face

seeps as part of the Allegheny River Stewardship Project (ECF No. 207 Ex. 53 at 1, 19, 21-22);

3) a letter dated April 21, 2009 from Thomas J. Ebbert (described as "Manager, Remediation"

for PPG) to Samuel C. Harper of PADEP in which it was noted that PADEP had expressed

concerns at a March 12, 2009 meeting over "the possibility of children coming into contact with

water of elevated pH" (ECF No. 207 Ex. 54); 4) an October 14, 2010 email from Ebbert to John
Richter and Mark Terril in which Ebbert stated that hunters "have been observed on the Ford
City site, so it may be a good idea to wear something orange" (ECF No. 207 Ex. 56); and 5) Key
Environmental, Inc.'s Site Specific Health and Safety Plan for High pH Seep Area Activities,
PPG Ford City Former Slurry Lagoon and Solid Waste Disposal Areas (April 22, 2009, revised
October 8, 2009), which advised precautions to take around high pH water, including wearing
rubber or nitrile gloves and safety glasses while working near the seeps and while sampling
seeps, groundwater and soils, and noted that, because high pH material can do permanent
damage to eyes and cause blindness, a "portable eyewash station or bottles must be immediately
available at the seep areas and any other areas where high pH water or soils may be encountered"
(ECF No. 207 Ex. 59 at 3-3).

　　　　Plaintiffs respond that several of these documents are admissible pursuant to Federal Rule
of Evidence 801(d)(2)(D) as a statement offered against a party opponent that "was made by the
party's agent or employee on a matter within the scope of that relationship and while it existed."
Field & Technical Services, a subsidiary of Key Environmental, Inc., was responsible for
collecting pH data on the seeps at the Site as part of the weekly monitoring that PPG has been
responsible for under the Administrative Order.  Similarly, the April 21, 2009 letter by Thomas
Ebbert "was made by the party in an individual or representative capacity" or "by the party's
agent or employee on a matter within the scope of that relationship and while it existed" pursuant
to Rules 801(d)(2)(A) and (d)(2)(D).  In addition, Plaintiffs note that PPG "manifested that it
adopted or believed to be true" such evidence, pursuant to Rule 801(d)(2)(B), when it developed
an Interim Abatement Plan designed to enable rapid mitigation of high pH conditions and to
reduce exposure potential to waters with elevated pH.  Plaintiffs apply the same reasoning to Mr.

Ebbert's October 14, 2010 email about hunters being seen on the Site: the statement was made by a party's agent within the scope of his relationship and he manifested that he believed it to be true by advocating wearing orange clothing.  Finally, Plaintiffs argue that the Site Specific Health and Safety Plan is a statement of an agent or employee of PPG within the scope of that relationship while it existed and is not hearsay.

The statement made by Mark Anthony was that of an FTS employee within the scope of FTS's relationship with PPG while that relationship existed.  With respect to the student's report, Plaintiffs contend that it is admissible pursuant to Rule 801(c)(2) because it is submitted to demonstrate that these individuals were able to gain access from the Allegheny River to the southern bank of the SLA, that is, other than for the truth of the matters asserted in the report.[68]

The Court concludes that PPG's hearsay objections do not withstand scrutiny for the reasons Plaintiffs cite.  Therefore, these documents are admitted.

<u>Mootness or Lack of Redressability</u>

PPG argues that some of Plaintiffs' claims are moot, or no longer redressable, because it has applied for an NPDES permit.  It relies on <u>Ohio Valley Environmental Coalition, Inc. v. Hobet Mining, LLC</u>, 2008 WL 5377799 (S.D.W. Va. Dec. 18, 2008), and on <u>Public Interest Research Group of N.J., Inc. v. Hercules, Inc.</u>, 2003 WL 23519620 (D.N.J. Oct. 27, 2003).  In <u>Ohio Valley</u>, the court found that a citizen suit was rendered partially moot by the West Virginia Department of Environmental Protection's prosecution.  As another court (in another case against PPG) has observed about these cases, however:

In <u>Ohio Valley</u>, the plaintiffs brought suit against the defendant, Hobet Mining,

---

[68] Plaintiffs concede that the use of the statements to identify the specific locations where the sampling was conducted, the statements concerning irritations of the skin and mucous membranes suffered by the researchers and their observations, would constitute inadmissible hearsay (ECF No. 221 ¶ 87).  Thus, these additional statements are not cited herein.

for its violations of effluent permits under the Clean Water Act. Id. at *3. After
plaintiffs filed the complaint, Hobet Mining entered into a mandatory consent
decree with WVDEP to cease violations of its permits. Id. at *3-4. The court
concluded that plaintiffs' action was moot because there was no "realistic
prospect that violations alleged in [plaintiffs'] complaint will continue
notwithstanding the consent decree." Id. at *7.

Ohio Valley is easily distinguished. In Ohio Valley, the defendant had already
agreed to do what, substantively, the plaintiffs' sought to require it to do: cease
permit violations.[7] The consent decree provided the full remedy that the plaintiffs
sought.

> [7]Defendant also cites to Pub. Interest Research Group of N.J., Inc. v.
> Hercules, Inc., Nos. 89-2291, 93-2381, 2003
> WL 23519620 (D.N.J. Oct. 27, 2003). The Hercules court found mootness
> because it was "absolutely clear" that no more violations would occur, and
> that all effects of past violations had been "completely and irrevocably
> eradicated." Id. at *11.

Here, PPG has not agreed to provide all the remedies which Plaintiffs seek.
Furthermore, in contrast with permitting cases, PPG's liability cannot be
established simply by establishing "compliance" or "non-compliance" with
preexisting state standards and regulations. Rather, the extent of Defendant's
liability, if any, must be determined by a court. Therefore, PPG, unlike Hobet
Mining, may be liable under the RCRA even if it complies with the state
standards incorporated in the Consent Judgment. See Honeywell, 399 F.3d at 259-
60 (holding a court may grant relief "as necessary" to abate endangerment,
regardless of state standards).

Interfaith Cmty. Org. Inc. v. PPG Indus., Inc., 702 F. Supp. 2d 295, 302 (D.N.J. 2010) (other

footnote omitted).

Plaintiffs point out that, although PPG has applied for an NPDES permit, the permit has

not been issued and thus PPG is still currently discharging without a permit.  See Carr v. Alta

Verde, Indus., Inc., 931 F.2d 1055, 1063 (5th Cir. 1991) (discharger who violates the CWA by

discharging without a permit remains in continuing state of violation until it obtains a permit);

Weber v. Trinity Meadows Raceway, Inc., 1996 WL 477049, at *11 (N.D. Tex. 1996) (violation

continues if permit applied for but not yet issued).  They note that PPG's cases involve a

cessation of violation (which did not occur here) or the settlement of a pre-existing state court suit for the same violations which would not continue.  Neither situation applies here.

PPG argues that this Court has already observed that PADEP has never taken any action with respect to the assertion that PPG is in violation of the Administrative Order with regard to alleged high pH values at the culverts and that the issue should be determined by PADEP. Plaintiffs respond that this ruling was necessarily limited to whether the high pH values at the culverts constituted a violation of the Administrative Order, not that any violation of the Administrative Order can only be handled by PADEP.  Plaintiffs note that the CWA explicitly provides for citizen suits to enforce violations of orders issued by states with respect to effluent standards or limitations.  33 U.S.C. § 1365(a)(1).

Plaintiffs are correct that violations of state orders, such as the Administrative Order in this case, can provide the basis for a citizen suit.  To the extent that this Court's previous statement appeared to say otherwise, it was in the context of a specific disputed issue on a motion for a preliminary injunction.  (ECF No. 192 at 31.)  In addition, while PADEP has apparently never initiated an enforcement action or issued a Notice of Violation to PPG for allegedly violating the Administrative Order (PI Hr'g at 59-61, 91),[69] Plaintiffs note that PADEP's failure to enforce the Administrative Order is a condition precedent to a citizen suit, but is not a material fact on the issue of PPG's liability.

PPG states that there are no identified impacted seeps at the SWDA listed in the Administrative Order. (ECF No. 207 Ex. 3.) Plaintiffs respond that it is not clear from the Administrative Order what the origin of the seep identified as STRM2 is. See Performance Obligation A and Exhibit B (PADEP 6-7, 15). Prior to issuance of the Administrative Order,

---

[69] ECF No. 219 Ex. M.

PPG had informed PADEP that there were seeps or leachate emerging from the SWDA. (Baker RIR (ECF No. 207 Ex. 2 at 2-4 (PPG001831) ("Several seeps were observed along the southwestern toe of the SWDA. The seep water from the SWDA mixed with seep water from the [SLA flowing towards] the railroad tracks"); See ECF No. 207 Ex. 36 (PADEP000424) ("With respect to the stream [Drainage Ditch], it is more appropriate to characterize this as a drainage channel as it primarily receives runoff water and seep water from the two areas of the site").

PPG indicates that Dr. Verslycke evaluated the effect of potential contact with high pH seeps in his ecological risk assessment expert report. (ECF No. 219 Ex. N at 21; Ex. R at 2-3; Ex. S at 76-81.) Plaintiffs respond that Dr. Verslycke conducted a qualitative evaluation of the risk that the high pH seeps pose to ecological receptors. Dr. Verslycke opined that "[c]urrent pH levels associated with seep waters are elevated (generally ranging between 9 and 12) and could pose unacceptable risks (e.g., skin irritation or gastrointestinal effects) if prolonged exposure occurs." (ECF No. 219 Ex. N at 21; see also Ex. R at 3 ("I opined that exposure of wildlife to seeps with elevated pH levels has the potential for unacceptable risks"); Ex. S at 76 ("with respect to pH, I conclude that wildlife may come into contact with seep waters and that that contact could pose unacceptable risk"); id. at 77 ("I took a conservative approach and determined that you can't exclude that they could come into contact with it and, given the pH range, that those exposures may pose a risk").

Dr. Verslycke opined to a reasonable degree of scientific certainty that the Site does not currently pose an imminent and substantial endangerment. (ECF No. 219 Ex. N at 3; Ex. R at 2-3.)  PPG notes that Dr. Barbara Beck[70] evaluated the effect of potential contact with high pH seeps in her human health risk assessment expert report. (ECF No. 219 Ex. T at 23-34; Ex. U at

---

[70] Dr. Beck is PPG's human health risk expert and a principal at Gradient.  See Beck Report (ECF No. 216 Ex. 8) at 1-2.

61-66.)  Further, Dr. Beck opined to a reasonable degree of scientific certainty that the Site did

not currently pose an imminent and substantial endangerment. (Ex. T at 3.)  Plaintiffs observe

that Dr. Beck's opinion concerning whether the Site poses an imminent and substantial

endangerment addresses only the chemicals at the Site, not the high pH of the seeps:

> Overall, it is my opinion, to a reasonable degree of scientific certainty, that
> concentrations of the subject chemicals at the PPG Site do not present an
> imminent and substantial endangerment to human health, as the concentrations of
> the subject chemicals do not present risks that exceed permissible regulatory
> limits or are well below concentrations associated with adverse health effects.

(ECF No. 219 Ex. T at 3.)  In addition, Plaintiffs argue that the question of whether the

risks presented by the high pH seeps at the SLA "may present an imminent and

substantial endangerment to health and the environment" under RCRA is an issue for the

Court to decide after applying the law to the undisputed, material facts.

PPG contends that Plaintiffs have not alleged nor provided record evidence of actual and

identifiable harm to humans or ecological receptors resulting from high pH exposure for the 40+

years in which the Site is alleged to have high pH impacted seeps.  Plaintiffs respond that, under

the RCRA, they do not need to identify an "actual or identifiable harm" (terms not defined by

PPG) to human or ecological receptors to establish whether conditions "may present an

imminent and substantial endangerment to health or the environment" under RCRA. See ICO v.

Honeywell Int'l, Inc., 399 F.3d at 258 ("the term 'endangerment' means a threatened or potential

harm, and does not require proof of actual harm").

PPG argues that its liability is limited to Outfall 001 discharges as point source

discharges and that they date back to 2010, when this structure was created.  Plaintiffs respond

that other discharges follow the same course as that from Outfall 001 and that the Administrative

Order did not create the need for an NPDES permit.  Rather, it was PPG's discharges without an

NPDES permit that led PADEP to issue the Administrative Order.  Plaintiffs are correct and

PPG's liability is not limited to Outfall 001 discharges.

CWA Claims re Discharges Without an NPDES Permit

As the Supreme Court has stated:

> Congress passed the Clean Water Act in 1972 to "restore and maintain the
> chemical, physical, and biological integrity of the Nation's waters." 86 Stat. 816,
> 33 U.S.C. § 1251(a). A central provision of the Act is its requirement that
> individuals, corporations, and governments secure National Pollutant Discharge
> Elimination System (NPDES) permits before discharging pollution from any
> point source into the navigable waters of the United States.  See §§ 1311(a),
> 1362(12); EPA v. California ex rel. State Water Resources Control Bd., 426 U.S.
> 200, 205, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976).

Decker v. Northwest Envtl. Def. Ctr., 133 S.Ct. 1326, 1331 (2013).

To that end, Section 301(a) of the CWA provides that in the absence of a permit, except

under specified circumstances, "the discharge of any pollutant by any person shall be unlawful."

33 U.S.C. § 1311(a).  The "discharge of a pollutant" is defined by the CWA as "any addition of

any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12)(A). The term

"point source" means:

> any discernible, confined and discrete conveyance, including but not limited to
> any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling
> stock, concentrated animal feeding operation, or vessel or other floating craft,
> from which pollutants are or may be discharged. This term does not include
> agricultural stormwater discharges and return flows from irrigated agriculture.

33 U.S.C. § 1362(14).  The term "pollutant" means "dredged spoil, solid waste, incinerator

residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials,

radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial,

municipal, and agricultural waste discharged into water."  33 U.S.C. § 1362(6).  Plaintiffs note

that pH is a pollutant regulated by the CWA.  40 C.F.R. § 401.16.  Finally, the term "navigable

waters" means "the waters of the United States."  33 U.S.C. § 1362(7).  The Allegheny River, its

adjacent wetlands, and Glade Run are navigable waters within the meaning of the CWA.  See

United States v. Donovan, 661 F.3d 174, 179 & n.4 (3d Cir. 2011).  Section 1365(a) "authorizes

private enforcement of the provisions of the Clean Water Act and its implementing regulations."

Decker, 133 S.Ct. at 1334 (citation omitted).

   The CWA also prohibits the discharge of storm water "associated with industrial

activity."  33 U.S.C. § 1342(p).  According to EPA regulations "storm water" "means storm

water runoff, snow melt runoff, and surface runoff and drainage."  40 C.F.R. § 122.26(b)(13).

The phrase "storm water discharge associated with industrial activity" means:

> the discharge from any conveyance that is used for collecting and conveying
> storm water and that is directly related to manufacturing, processing or raw
> materials storage areas at an industrial plant. The term does not include discharges
> from facilities or activities excluded from the NPDES program under this part
> 122. For the categories of industries identified in this section, the term includes,
> but is not limited to, storm water discharges from industrial plant yards;
> immediate access roads and rail lines used or traveled by carriers of raw materials,
> manufactured products, waste material, or by-products used or created by the
> facility; material handling sites; refuse sites; sites used for the application or
> disposal of process waste waters (as defined at part 401 of this chapter); sites used
> for the storage and maintenance of material handling equipment; sites used for
> residual treatment, storage, or disposal; shipping and receiving areas;
> manufacturing buildings; storage areas (including tank farms) for raw materials,
> and intermediate and final products; and areas where industrial activity has taken
> place in the past and significant materials remain and are exposed to storm water.
> For the purposes of this paragraph, material handling activities include storage,
> loading and unloading, transportation, or conveyance of any raw material,
> intermediate product, final product, by-product or waste product. The term
> excludes areas located on plant lands separate from the plant's industrial activities,
> such as office buildings and accompanying parking lots as long as the drainage
> from the excluded areas is not mixed with storm water drained from the above
> described areas.

40 C.F.R. § 122.26(b)(14).  The regulation then goes on to list eleven "categories of

facilities" that are considered to be engaging in "industrial activity."  Plaintiffs contend

that PPG's glass manufacturing operation from which the waste at the Site originated was

an industrial activity and PPG has not disputed this point.

The Supreme Court has held that CWA citizen suits may be brought only to abate ongoing, as opposed to wholly past, violations.  Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc., 484 U.S. 49 (1987) ("Gwaltney I").  "Consistent with this requirement, the Court held that jurisdiction will not lie where a plaintiff alleges claims for 'wholly past' violations."  Natural Resources Defense Council v. Texaco Ref. & Mktg., Inc., 2 F.3d 493, 497 (3d Cir. 1993) ("NRDC") (citing Gwaltney I, 484 U.S. at 57-58); see also Chesapeake Bay Foundation, Inc. v. Gwaltney of Smithfield, Ltd., 844 F.2d 170 (4th Cir. 1988) ("Gwaltney II"). As stated by the Supreme Court, in order for a court to have jurisdiction, citizen-plaintiffs must "allege a state of either continuous or intermittent violation – that is, a reasonable likelihood that a past polluter will continue to pollute in the future."  Gwaltney I, 484 U.S. at 57.  In order to satisfy federal subject matter jurisdiction, a plaintiff's allegations of continuing violation must be made in "good faith."  Id. at 64.  In Gwaltney II, the Fourth Circuit elaborated on what a plaintiff must show to demonstrate a continuing violation:

> Citizen-plaintiffs may accomplish this [proof of an ongoing violation] either (1) by proving violations continue on or after the date the complaint is filed, or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of recurrence in intermittent or sporadic violations. Intermittent or sporadic violations do not cease to be ongoing until the date when there is no real likelihood of repetition.

844 F.2d at 171-72.  The Court of Appeals for the Third Circuit has adopted the Fourth Circuit's standard in Gwaltney II.  See NRDC, 2 F.3d at 501.

Plaintiffs contend that, because PPG's violations were ongoing as of the date the Complaint was filed, they are not "wholly past" and not actionable.  They argue that PPG's ongoing violations are redressable by civil penalties and declaratory judgment in addition to the injunctive relief which has already been ordered.  PPG has not pointed to any authority holding to the contrary.  Therefore, Plaintiffs' claims will not be dismissed as moot or not redressable.

60

CSL Claims

The CSL provides that:

> No person or municipality shall place or permit to be placed, or discharged or permit to flow, or continue to discharge or permit to flow, into any of the waters of the Commonwealth any industrial wastes, except as hereinafter provided in this act.

35 P.S. § 691.301.  Further, the CSL provides that no person "shall discharge or permit the discharge of industrial wastes in any manner, directly or indirectly, into any waters of the Commonwealth unless such discharge is authorized by the rules and regulations of the [PADEP] or such person … has first obtained a permit from the department."  35 P.S. § 691.307(a).  The CSL defines an "industrial waste" as "any liquid, gaseous, radioactive, solid or other substance, not sewage, resulting from any manufacturing or industry, or from any establishment, as herein defined…."  35 P.S. § 691.1.

The CSL provides that:

> It shall be unlawful for any person or municipality to put or place into any of the waters of the Commonwealth, or allow or permit to be discharged from property owned or occupied by such person or municipality into any of the waters of the Commonwealth, any substance of any kind or character resulting in pollution as herein defined.

35 P.S. § 691.401.  The implementing regulation states that a "person may not discharge pollutants from a point source into surface waters except as authorized under an NPDES permit."  25 Pa. Code § 92a.1(b).

Plaintiffs contend that, since PADEP has found that PPG is allowing contaminated seep water to be discharged from the Site into the waters of the Commonwealth, and PPG has admitted it, summary judgment should be entered in their favor on Counts III and IV of the First CWA Complaint.  PPG has not presented arguments that would alter this conclusion.

Violation of Administrative Order

61

Plaintiffs seek summary judgment for PPG's past and continuing violations of the Administrative Order, with respect to TSS (Counts IX and X), failure to address contamination in the SWDA (Counts XVI and XVII) and creating an interim abatement system that collects and treats uncontaminated storm water using open trenches rather than pipes (Counts XX-XXIII). PPG argues that: this Court has already held that the issue of whether it is complying with the Administrative Order should be left to PADEP, the agency that issued it; the SWDA is not part of the Administrative Order, past TSS violations are not actionable since the most recent one allegedly occurred in 2013; and citizen suits are only intended to address discharge limits, not interim system designs or an alleged requirement to include the SWDA. Plaintiffs reply that the TSS violations are actionable because they occurred post filing of the Complaint; the order regarding allowing PADEP to determine compliance with the Administrative Order was limited to whether high pH values at the culverts constitute a violation; the Court has already held that the scope of the SWDA and the design of the IAS can be actionable; and the discharge from Outfall 001 follows the same path as other discharges from the Site.

The Administrative Order establishes instantaneous maximum and average monthly effluent limitations for TSS discharges from PPG's IAS of 60 mg/l and 30 mg/l, respectively. (ECF No. 207 Ex. 14 (PADEP18.) The Order requires that PPG sample its discharges at least weekly and submit the results of such monitoring on a monthly basis to PADEP. (Administrative Order at 4 (PADEP6).)

Plaintiffs argue that violations of effluent limitations are based on strict liability.  See United States v. Allegheny Ludlum Corp., 366 F.3d 164, 175 (3d Cir. 2004). A violation of monthly discharge limit constitutes a violation for each day of the month that the facility was in operation.  Id. at 189.  PPG's IAS operates continuously. (Shaw Rule 30(b)(6) Dep. at 29.)  The

monthly effluent monitoring data reports submitted by PPG to PADEP demonstrate that PPG violated the effluent limitations for TSS on 264 days between July 2010 and November 2013. (ECF No. 207 Exs. 37-46) (listing violations).  Of these 264 days of violation, 127 were at least 1,000% of the effluent limit established by PADEP. (Id.) Plaintiffs argue that, because PPG's own discharge data show PPG's violations of the TSS effluent limitations, there can be no dispute of fact as to PPG's liability for those violations.  See Allegheny Ludlum, 366 F.3d at 174.

"[P]roof of one or more post-complaint violations is itself conclusive" of the ongoing nature of the pre-complaint violations. NRDC v. Texaco Refining & Marketing, Inc., 2 F.3d at 502.  By its own admission, PPG has committed post-complaint violations of the TSS effluent limitations, and has thus established that the violations are ongoing.  Plaintiffs argue that PPG's discharge monitoring data demonstrate that it has continued to exceed the TSS limitations since the filing of the First CWA Complaint in March 2012, including TSS violations in May, June, July, and September of 2012, and November 2013.

Submissions to a state agency constitute admissions of liability. See, e.g., United States v. Ward, 448 U.S. 242 (1980) (defendants' report of an oil spill into navigable waters sufficient to establish defendant's liability for civil penalties); L.E.A.D. Group of Berks v. Exide Corp., 1999 WL 124473, at *32 (E.D. Pa. Feb. 19, 1999); Public Interest Research Group of New Jersey, Inc. v. Rice, 774 F. Supp. 317, 324-325 (D.N.J. 1991) (defendant's discharge monitoring reports, laboratory reports, and operating logs demonstrated violation of terms of its NPDES permit).

In September 2012, PPG reported a maximum TSS measurement of 55.3 mg/l. (ECF No. 207 Ex. 45.)  In a footnote, PPG declared that this measurement was an "average of duplicate sample results (48 mg/L and 62.5 mg/L)" taken on September 18, 2012. (Id.) The Administrative

Order requires PPG to comply with an "Instantaneous Maximum" of 60 mg/l. State regulations define an "instantaneous maximum effluent limitation" as the "highest allowable discharge of a concentration or mass of a substance at any one time as measured by a grab sample." 25 Pa. Code § 92a.2.  This definition does not allow averaging of multiple samples. Id. (defining "daily discharge" as the "average measurement of the pollutant over the day").

Plaintiffs indicate that they are not seeking summary judgment for pH violations at the culverts.  Rather, they are citing the high pH values to show that PPG is discharging pollutants from a point source to waters of the United States and the Commonwealth, independent of the Administrative Order.  They argue that any discharge with a pH outside the acceptable range is a discharge of pollutants without a permit and is therefore unlawful under the CWA and the CSL.

PPG argues that it can only be held liable for not obtaining an NPDES permit for point source discharges and that Outfall 001 is its only point source discharge.  Thus, it contends that its liability extends back to 2010, when Outfall 001 was installed, not 1973 as Plaintiffs claim. PPG also claims that these are not point source discharges because they discharge through culverts which PPG did not create and are on property owned and controlled by the railroad. Plaintiffs respond that the discharge from Outfall 001 follows the same path as other discharges from the Site to such waters.  Thus, if the discharge from Outfall 001 is a point source discharge, so are all the other discharges through the same culverts whether they pre-date discharges from Outfall 001 or are contemporaneous with such discharges.  Plaintiffs also respond that ownership of the property is irrelevant.  Dague v. City of Burlington, 935 F.2d 1343, 1355 (2d Cir. 1991), rev'd in part on other grounds, 505 U.S. 557 (1992).

Plaintiffs are correct: nothing in the Administrative Order alters the fact that PPG is responsible for discharges it creates, whether they are captured by the interim abatement system

or not; the ownership of the point source is irrelevant (thus, PPG cannot shift responsibility for the discharges that flow through the culverts to the railroad); and PPG's citation to support its argument that seeps are nonpoint source discharges is to a section of a Memorandum in which the Court was summarizing PPG's position on the subject.

PPG argues that the CWA allows citizen suits for discharge limits, not for the design of interim abatement systems or the issue of whether the SWDA was included.  Plaintiffs respond that this Court has already held that citizen suits can be brought to enforce orders of state agencies, including the requirements of the Administrative Order concerning the design of an interim abatement system and the scope of coverage.  Plaintiffs are correct.  See ECF No. 66 at 52 (both the CWA and CSL allow for a citizen suit arising out of a defendant's failure to submit a treatment plan, as ordered by a state, with certain performance obligations.)

RCRA Claims

Plaintiffs contend that the high pH leachate or seep water that is formed when water comes into contact with the waste PPG disposes of in the SLA may present an imminent and substantial threat of endangerment to health or the environment in violation of the RCRA.  PPG responds that high pH seeps do not establish "imminent endangerment," that this issue is heavily disputed by the parties' experts and that PADEP will address this issue in any event.  Plaintiffs reply that the experts do not disagree that high pH has an adverse impact on ecological and human receptors and that the question is one of law for the Court to decide.

To establish liability under the RCRA, Plaintiffs must prove:

(1) that the defendant is a person, including, but not limited to, one who was or is a generator or transporter of solid or hazardous waste or one who was or is an owner or operator of a solid or hazardous waste treatment, storage, or disposal facility; (2) that the defendant has contributed to or is contributing to the handling, storage, treatment, transportation, or disposal of solid or hazardous waste; and (3) that the solid or hazardous waste may present an imminent and substantial

65

endangerment to health or the environment.

Interfaith Community Org., 399 F.3d at 258 (quoting Parker v. Scrap Metal Processors, Inc., 386

F.3d 993, 1014-15 (11th Cir. 2004)).

"Solid waste" is defined by the RCRA as:

> any garbage, refuse, sludge from a waste treatment plant, water supply treatment
> plant, or air pollution control facility and other discarded material, including solid,
> liquid, semisolid, or contained gaseous material resulting from industrial,
> commercial, mining, and agricultural operations, and from community activities,
> but does not include solid or dissolved material in domestic sewage, or solid or
> dissolved materials in irrigation return flows or industrial discharges which are
> point sources subject to permits under section 1342 of Title 33, or source, special
> nuclear, or byproduct material as defined by the Atomic Energy Act of 1954, as
> amended (68 Stat. 923) [42 U.S.C.A. § 2011 et seq.].

42 U.S.C. § 6903(27).  Plaintiffs note that the comment to the regulations indicates that the

exclusion "applies only to the actual point source discharges.  It does not exclude industrial

wastewaters while they are being collected, stored or treated before discharge, nor does it

exclude sludges that are generated by industrial wastewater treatment."  40 C.F.R. § 261.4(a)(2)

cmt.  Thus, they contend that the conditions which they identify are above PPG's actual point

source discharges and are included by the definition.  Cf. Interfaith Community Org., 399 F.3d at

263 (waste from a dump site which made its way to a river fell within the definition of solid

waste and not the exclusion).

Plaintiffs note that PPG operated a glass manufacturing plant in Ford City, that it

generated grinding and polishing slurry waste at this plant and disposed of it in the SLA from

1949 to 1970.  Thus, they contend that PPG was a generator and transporter and that the slurry

waste met the definition of solid waste under RCRA.

The term "disposal" means:

> the discharge, deposit, injection, dumping, spilling, leaking, or placing of any
> solid waste or hazardous waste into or on any land or water so that such solid

waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

42 U.S.C. § 6903(3).  Plaintiffs note that PPG piped the slurry waste from its manufacturing plant across the Allegheny River in Ford City to former sandstone quarries at what is now the SLA.  Thus, they contend that it "deposited," "dumped" and "placed" solid waste within the definition of disposal.

The Court of Appeals has explained that, with respect to the issue of whether a discharge may present an imminent and substantial endangerment to health or the environment:

> The operative word ... [is] "may"....
>
> [P]laintiffs need only demonstrate that the waste ... "may present" an imminent and substantial threat.... Similarly, the term "endangerment" means a threatened or potential harm, and does not require proof of actual harm.... The endangerment must also be "imminent" [meaning] threatens to occur immediately.... Because the operative word is "may," however, the plaintiffs must [only] show that there is a potential for an imminent threat of serious harm ... [as] an endangerment is substantial if it is "serious" ... to the environment or health.

Interfaith Community Org., 399 F.3d at 258 (quoting Parker, 386 F.3d at 1015).  The court held that quantification of the endangerment is not required and rejected the district court's conclusion that the contaminant must be present at levels above that considered acceptable by the state.  Id. at 259.  See also id. at 261 ("Proof of contamination in excess of state standards may support a finding of liability, and may alone suffice for liability in some cases, but its required use is without justification in the statute.")  The court further observed that:

> When Congress enacted RCRA in 1976, it sought to close "the last remaining loophole in environmental law, that of unregulated land disposal of discarded materials and hazardous wastes." H.R. Rep. No. 1491, 94th Cong., 2d Sess. 4, reprinted in 1976 U.S.C.C.A.N. 6238, 6241. As we have noted, there is no definition or explanation of the meaning of "substantial," but a discussion of RCRA's amendments observes that § 6972(a)(1)(B) is "'intended to confer upon the courts the authority to eliminate any risks posed by toxic wastes,'" S. Rep. No. 98-284, 98th Cong., 1st Sess. at 59 (1983) (quoting [United States v.] Price, 688 F.2d [204,] 213-14 [(3d Cir. 1982)]), and further that courts should "recogniz[e]

that risk may be assessed from suspected, but not completely substantiated, relationships between imperfect data, or from probative preliminary data not yet certifiable as fact." Id. (internal quotations and citations omitted).

Id. at 260.[71]

Plaintiffs note that, for over 40 years, the leachate that discharges from the SLA through seeps has regularly had a pH range of 10 to 11.6.[72] (ECF No. 207 Exs. 30-35.) The pH from SLA seeps has been reported, at times, to exceed 12. (December 2014 Monthly Progress Report, Table 4 (PPG053049-53064).) Data collected by PPG between July 2012 and June 2013 shows that the pH of the water at the culverts is above 9, with the highest reported reading being 11.48. (ECF No. 105 at 36-39.) These culvert readings are indicative of the pH of the water in the drainage channel beside the railroad tracks which flows into the culverts. In 2014, PPG reported that the pH levels of the SLA seeps frequently exceeded 10 and 11, and ranged as high as 12.36.

PPG has reported that the average flow rate for the seeps that it is monitoring pursuant to the Administrative Order is approximately 29 gpm and that the average discharge for water collecting adjacent to the railroad tracks is 8 gpm. (Revised Treatment Plan Report at 28 (PPG050772).) Thus, the average seepage rate discharge from the SLA is 37 gpm, which amounts to over 53,000 gallons of seepage per day. Id.

_____

[71] Although the district court erred in requiring the plaintiffs to meet this higher burden, the Court of Appeals found the error harmless because they actually met it, and the court found that New Jersey's standards were "relevant and useful in determining the existence of an imminent and substantial endangerment." Id. at 261 & n.6.

[72] Plaintiffs note that pH is an expression of the hydrogen ion concentration in a substance. EPA, CADDIS Volume 2: Sources, Stressors & Responses (available at http://www.epa.gov/caddis/ssr_ph_int.html) (last visited March 30, 2015). A pH of 7 is neutral, while values above 7 are basic. Id. pH is a logarithmic function, so that one unit change (e.g., 6 to 7) indicates a 10x change in hydrogen ion concentration. Id. PADEP requires that the pH of water discharged by PPG's interim abatement system be within the range of 6 to 9 standard units. (July 2 Addendum, Attachment A (PADEP18).).

In the Administrative Order, PADEP informed PPG that the "discharges coming from the site and entering into the Allegheny River and Glade Run pose a significant threat to public health and the environment." (ECF No. 207 Ex. 10.) See Interfaith Community Org., 399 F.3d at 262-263 (upholding district court determination that the site presented an imminent and substantial endangerment based, in part, on state agency determination that "the Site posed a risk of human exposure to chromium waste constituting a 'substantial risk of imminent damage to public health and safety and imminent and severe damage to the environment'").

Both PPG and its consultants have reported wildlife on the SLA, including "large and small game," deer, birds, and squirrels. (Revised Treatment Plan Report at 113 (PPG050857); CEC Ecological Assessment at 10 (CEC001058).) Evidence of beavers and coyote has also been reported. There is evidence of an unspecified animal having removed the sample bucket at the Seep 105 sample location. (ECF No. 207 Ex. 49.) Both sides' ecological risk experts concluded that the exposure of avians and mammals to the elevated pH levels in the seep water at the SLA presents the potential for unacceptable risk, such as skin and eye irritation or gastrointestinal effects. (Rogers Expert Report at 22; Verslycke Expert Report at 21; Verslycke Supp. Expert Report at 7, 8, 22.) Plaintiffs argue that the potential risks to wildlife present at the SLA, as recognized by PADEP, PPG, and Plaintiffs, satisfy the "potential for an imminent threat of serious harm" to the environment required under RCRA.

The high pH levels also present the "potential for an imminent threat of serious harm" to health under RCRA. In addition to PADEP's finding in the Administrative Order that the discharges from the site "pose a significant threat to public health" (ECF No. 207 Ex. 10), PADEP informed PPG in March 2009 that it was concerned about the "possibility of children coming into contact with water of elevated pH." (Id. Ex. 54.)

A 2008 investigation of the SLA and SWDA by students and staff from the University of Pittsburgh under the Allegheny River Stewardship Project ("Project") was able to gain access from the Allegheny River to the southern bank of the SLA and take seep samples there and adjacent to SLA cliff face seeps. (ECF No. 207 Ex. 53 at 1, 19, 21.)  The Project also reported observing hikers in the vicinity of the SLA and SWDA.

After PPG repaired or improved security fencing and installed warning signs in response to the Administrative Order (Administrative Order, Performance Obligation B; ECF No. 207 Ex. 55 at 1), hunters were still observed on the Site (ECF No. 207 Ex. 56).

The SLA fence surrounds the perimeter of the plateau/terrace level, but there is a hole in this fencing on the western side of the SLA. (Nairn Dep. at 59.) The gate on the north side of the SLA prevents vehicle access, but not pedestrian access. There is no fencing or security measure that prevents people from accessing the SLA from the river side of the site. People can therefore access the areas with seep water on the South Bench, the slope below the South Bench, in the Drainage Ditch, and in the drainage channel adjacent to the railroad tracks.  (Shaw Rule 30(b)(6) Dep. at 91.)

A subsidiary of Key Environmental, Inc. has been responsible for weekly seep monitoring that PPG has been conducting in response to the Administrative Order. (Shaw Rule 30(b)(6) Dep. at 27-29, 63-64.)  The Site Specific Health and Safety Plan for High pH Seep Area Activities prepared by Key Environmental advises that high pH water "can be irritating and corrosive to the skin, mucous membranes and eyes" and that "[h]igh pH material can do permanent damage to eyes and cause blindness" (ECF No. 207 Ex. 59 at 3-3.)  The plan requires that workers "wear rubber or nitrile gloves and safety glasses while working near the seeps and while sampling seeps, groundwater and soils" and that "[a] portable eyewash station or bottles

70

must be immediately available at the seep areas and any other areas where high pH water or soils may be encountered" Id.

Finally, PPG argues that Plaintiff's motion should be denied because the implementation of "PADEP's approved remedy" will eliminate potential exposure to high pH seeps, thereby making Plaintiffs' claims futile.  However, as Plaintiffs observe, PPG offers no support for this argument.  In addition, PPG's citation to Trinity Industries, Inc. v. Chicago Bridge & Iron Co., 735 F.3d 131, 138-40 (3d Cir. 2013), is not on point, as that case concerned the availability of relief for the plaintiff; whereas in this case Plaintiffs are only moving for partial summary judgment on the issue of RCRA liability.

PPG Motion

PPG argues that Plaintiffs have failed to offer any evidence that the Site includes the ballfields or the Eljer landfill.  Plaintiffs contend that they have not brought separate RCRA claims with respect to each area of the Site but that their claims extend to the full property described in the complaints.  Moreover, they contend that the evidence in the record (much of which comes from PPG's own documents) demonstrates that PPG owned the Eljer landfill and that there are at least triable issues of fact as to whether contamination from PPG's waste has migrated to the Eljer landfill and the ballfields.  PPG replies that Plaintiffs continue to refer to their Complaints and use terms such as "may" and "possible," but offer no evidence that it deposited waste on the ballfields or the Eljer landfill or that the waste deposited elsewhere has actually migrated to these areas.

PPG asserts that the Site does not include the ballfields or the Eljer landfill.  Plaintiffs note that a 1992 Work Plan submitted to PADEP on behalf of PPG by Dames & Moore described the Site as follows:

> The site totals approximately 150 acres. The site consists of two former disposal areas, one active disposal area and a relatively undisturbed recreational area containing four baseball fields. The two former PPG disposal areas consist of a slurry lagoon and solid waste disposal area (SWDA). The active disposal area is operated by Eljer Plumbingware, Inc. (Eljer).

Pls.' App. Resp. (ECF No. 216) Ex. 1 at 3 (PPG009678.)

PPG describes the Eljer landfill as "exclusively owned and operated by Eljer, Inc."  (ECF No. 210 ¶ 2.)  Plaintiffs respond that the land is in fact owned by Ford City. See ECF No. 216 Ex. 2 at 2 (PPG009226) (Eljer "is seeking permission from Ford City to deposit this material upon Borough property. * ** [Eljer] would assume operational responsibility for the facility while Ford City would maintain ownership of the property"); Ex. 3 at 1 (PADEP003691) ("* * * the beneficial reuse project is proposed to be performed on property owned by the Ford City Borough * * *").  Plaintiffs also note that this area was previously owned by PPG and was transferred to Ford City in 1972. See ECF No. 216 Ex. 4 at 2 (PPG010066) (describing the "various components of the [PPG] disposal area" as "Sludge lagoons," "Solid waste area (including an area allegedly receiving waste from Eljer Company)," and "Ballfields"); Ex. 1 at 3 (PPG009678) (including the Eljer landfill area in the description of the site "PPG sold * * * to the [borough of Ford City] on October 16, 1972"); compare PPG – Property North Buffalo Township Map (September 15, 1966) ("1966 PPG Property Map")[73] (PPG0038217) (showing property owned by PPG) and PPG Properties (August 19, 1992) ("1992 PPG Property Map") (PPG011429)[74]  (showing same) with Remedial Investigation for the PPG Ford City Site, Final Report, volume 1 of 2, prepared by Baker Environmental, Inc.

---

[73] ECF No. 216 Ex. 5.
[74] ECF No. 216 Ex. 6.

(October 1993)[75]  ("Baker RIR"), Figure 1-2 (PPG002034) (showing location of Eljer landfill area).

PPG submits a map depicting an overhead shot of the SLA, the SWDA, the Eljer landfill and the ballfield area that was produced during the course of expert discovery. See PPG App. (ECF No. 211) Ex. A, Gradient's 12/20/2013 Site Overview Figures 1 and 2.) Plaintiffs dispute the accuracy of the overlay added by Gradient that purports to show the boundaries of the different areas of the Site.  They note that PPG does not provide any support for the boundaries set out in the exhibits.  Both figures cite only the following sources: US Census, 2012; USDA, 2012; ESRI, 2013.  Based on the references cited in the expert report of Dr. Barbara D. Beck, these citations appear to be to the following: United States Census Bureau (2012), TIGER/Line Shapefile for Pennsylvania; United States Department of Agriculture (2012), National Hydrography Dataset; Environmental Systems Research Institute (2013), Aerial imagery web mapping service.  (Beck Report at 31, 34.)

Plaintiffs contend that none of these sources indicated the boundaries of the different areas of the Site or indeed attempted to differentiate areas of the Site in any manner.  Rather, the boundary lines drawn on the exhibits appear to have been added by PPG's expert witnesses in order to represent the manner in which they divided the Site for analysis during the production of their expert reports. See Beck Report at 4.  Plaintiffs contend that the historical boundary of the SWDA is not well defined, but evidence indicates that it extends beyond the lines indicated on the Gradient-produced exhibit. Plaintiffs also note that PPG's exhibits do not attempt to provide boundary lines for the

---

[75] ECF No. 216 Ex. 7.

Eljer landfill area.  Based on documents produced by PPG, however, Plaintiffs assert that the location shown on the exhibits is misleading.  The exhibits show the Eljer landfill area to be entirely to the east of the ballfield area and the SWDA.  However, maps or figures prepared by PPG prior to this litigation show that the fence around the Eljer landfill area lies further to the west than is depicted on the Gradient-produced exhibits, enclosing an area directly south of the ballfield area and abutting the SWDA fence. See ECF No. 216 Ex. 9 at 2 (PPG009186); Ex. 10 Figure 8 (SHAW000174).

Plaintiffs further dispute the overall "Site Boundary" that Gradient has added to the exhibits. The Gradient exhibits indicate that the Eljer landfill area lies entirely outside of the Site.  On maps and figures prepared by PPG prior to this litigation, the eastern boundary of the Site extends significantly further east than is depicted on the Gradient exhibits and includes the Eljer landfill area. (1966 PPG Property Map; 1992 PPG Property Map.)

PPG contends that it has never owned, accessed or exercised control over the Eljer landfill, and that the ballfield area has never been used as a landfill or disposal area. See ECF No. 211 Ex. B at 1-5; Ex. C.  PPG argues that the Plaintiffs have produced no evidence to prove that PPG owned, accessed or exercised control over the Eljer landfill, that the ballfield area was ever used as a disposal site, or that any activity undertaken by PPG in the SLA or SWDA has ever impacted either of these two areas.

Plaintiffs respond PPG owned the land that constitutes the Eljer landfill area, whatever its boundaries, until 1972.  Second, there is evidence that PPG either disposed of waste in the area or that the waste has migrated to the Eljer landfill area. Third, there is evidence that PPG either disposed of waste in the ballfield area or that contamination

originating from PPG's waste has migrated to the ballfield area.

Plaintiffs note that from 1949 to 1970, PPG used parts of the Site to dispose of slurry waste from its manufacturing plant in Ford City and that it disposed of solid waste in the SWDA from the 1920s until 1967.

Plaintiffs note that, to the north and east of the SWDA fence is another fenced area used by Eljer Plumbingware pursuant to a beneficial reuse permit issued by PADEP. (Baker RIR at 1-5 (PPG001821).) Between 1988 and 1998, Eljer deposited residual waste from its Ford City manufacturing plant on a portion of the Site. (ECF No. 216 Ex. 12) (PADEP3810). The intent of the project was to use the waste as fill material to level and stabilize a portion of the Site so that it could be used for the expansion of the ballfield area and community park. (ECF No. 216 Ex. 13) (PADEP003706); Ex. 14 at 1 (PADEP003693).

Plaintiffs state that, according to PPG's consultants, the ballfield area has been used as such since at least the 1950s, well after PPG began dumping waste on the Site. (Baker RIR at 1-5 (PPG001821).) Although PPG has generally assumed that the ballfield area was historically used for agricultural purposes rather than waste disposal (Baker RIR at 1-5 (PPG001821)), that assumption is not confirmed.  In 2002, PPG sent a letter to Ford City in which it made note of "the lack of definitive historical knowledge regarding former uses of the existing softball field area on the Property * * *." (ECF No. 216 Ex. 15). As a result of this lack of knowledge, PPG recommended that the use of the ballfield area be restricted.

PPG responds that Plaintiffs do not provide record support for their assertions and rely on outdated historical materials that do not reflect current conditions in the ballfields area.  Current conditions in the ballfields area based on recent testing show that this area was not used for waste disposal, that there is no evidence of contaminant migration to this area, and that there is

no risk to human health or the environment in this area.  See Beck Expert Report at

BECK000008-10, BECK000018, BECK000026-27, BECK000074, BECK000077,

BECK000080, BECK000083, BECK000097;[76] Beck Dep. at 38-39;[77] Verslycke Expert Report

at VERSLYCKE0000016, VERSLYCKE000081;[78] Supp. Verslycke Expert Report at 10.[79])

PPG's experts, Drs. Beck and Verslycke, concluded that there is no potential for an imminent

and substantial endangerment to human health or the environment in ballfields area.  PPG argues

that Plaintiffs' experts did not respond to or challenge Dr. Beck's and Dr. Verslycke's testing,

analysis, findings, or conclusions in the ballfields area.  Further, Plaintiffs' experts did not

conduct any of their own testing or analysis of the current conditions in the ballfields area.

PPG's Disposal of Waste at the Site

PPG installed a fence in 1994 around at least the perimeter of the SWDA. (ECF No. 216

Ex. 16 at 1-5 (PPG012525). The Eljer landfill area lies to the east and north of this fence. (ECF

No. 216 Ex. 10, Figure 8 (SHAW000174).

Plaintiffs note that a map prepared by PPG in 1966 indicates that the acreage of the "PPG

Dump," which covers the area now known as the SWDA, is 39.97 acres. (1966 PPG Property

Map.) This area is labeled as being owned by PPG. The map shows that the area now comprising

the Eljer landfill area was once owned by PPG and considered to be part of the PPG Dump.

Compare with Baker RIR, Figure 1-2 (PPG002034); see also 1992 PPG Property Map.

PPG denies that the documents support these assertions.

In 1992 Dames & Moore, Inc. was retained by PPG to develop historical usage and

ownership information for the Site as well as other PPG properties in Ford City. (ECF No. 216

---

[76] PPG Reply App. (ECF No. 225) Ex. D.
[77] ECF No. 225 Ex. E.
[78] ECF No. 225 Ex. F.
[79] ECF No. 225 Ex. G.

Ex. 17 at 1 (CRC000380).  Dames & Moore stated that the "SWDA encompasses approximately 27 acres of property." (Id. at 15 (CRC000394). An internal PPG memorandum in 1998 likewise described the SWDA as a "27 acre landfill." (ECF No. 216 Ex. 18 at 2 (PPG007889).)

In 1993, Baker Environmental, Inc. produced a Remedial Investigation Report on behalf of PPG in which it "calculated the SWDA to be approximately 14 acres in size." (Baker RIR at 1-5 (PPG001821).)  In describing the SWDA, Baker stated that "[f]ugitive debris was observed east of the Eljer landfill, obscuring the eastern boundary." (Id. at 1-3 (PPG001819).) The Eljer landfill lies to the north and east of the area that PPG has fenced as the SWDA. (ECF No. 216 Ex. 9 at 2 (PPG009186); see also Schneider Review at 4 (PPG009228) (inspection of the Site carried out in 1988 on behalf of Ford City revealed that"[w]aste glass was observed in nearly all areas, and polishing rouge was observed at various locations on the surface and in some slope areas").

During his September 19, 2013, visit to the Site, Plaintiffs' expert, Steven Amter, observed large quantities of waste glass outside the SWDA fence. See Amter Expert Report (ECF No. 216 Ex. 20 at 6.)  PPG notes that at his deposition, Amter stated that he believed that any glass cullet observed outside the fence had been purposefully placed there for slope stability purposes. (Amter Dep. (ECF No. 219 Ex. A) at 14-15.)

Plaintiffs state that, during his September 19, 2013, visit to the Site, their expert, William J. Rogers, Ph.D., "observed significant amounts of waste glass at the railroad track level and on the slope adjacent to the portion of the SWDA that is fenced." Ecological Health Evaluation and Tier III Ecological Risk Assessment, PPG Industries Inc. and Borough of Ford City, Slurry Lagoon Area and Solid Waste Disposal Area, William J. Rogers, Ph.D. (November 30, 2013) (ECF No. 216 Ex. 21 at 5). Dr. Rogers further stated that "[b]ased on my experience, like the

waste glass, contaminated soils have migrated well beyond the fenced portions of the SWDA."

PPG responds that Dr. Rogers did not conduct any testing to support his assertion regarding migration of contaminated soils. In further response, PPG's experts, Dr. Beck and Dr. Verslycke, conducted and relied upon comprehensive testing to determine that the nature and extent of any contamination in SWDA had fully been characterized and found no evidence that "contaminated soils have migrated" from the SWDA. (Beck Expert Report at BECK000014; Beck Dep. at 96-99; Verslycke Expert Report at VERSLYCKE0000017, VERSLYCKE000030-31, VERSLYCKE000081; Verslyke Supp. Expert Report at 3-5; Verslycke Dep. at 31, 40-41, 69.[80])

Plaintiffs state that, during his September 19, 2013, visit to the Site, their expert, Atul M. Salhotra, Ph.D., observed that "[t]he [SWDA] fence does not encompass the entire area strewn with waste-glass. I observed significant quantities of glass outside the fence and along the railroad tracks." (Human Health Risk Assessment, Solid Waste Disposal Area, Former PPG Industries, Inc. Ford City Site, Ford City, Pennsylvania, Atul M. Salhotra, Ph.D. (November 29, 2013) (ECF No. 216 Ex. 22 at 3.)

They note that PPG's ecological risk expert, Tim Verslycke, Ph.D., observed waste glass from the SWDA outside of the fence during his 2013 visit to the Site. (Verslycke Dep. (ECF No. 216 Ex. 23) at 32 ("during the site visit [we] observed some cullet [waste glass], you know, on both sides of the [SWDA] fence * * *"). However, PPG replies that Dr. Verslycke further testified that "I can't speak to whether that translates to chemicals [sic] concentrations on either side of the fence. So I can't, you know, conclusively answer whether there is anything beyond the fence." Id.

---

[80] ECF No. 225 Ex. H.

In 1991, Ecology and Environment, Inc. conducted a screening site inspection of the Site on behalf of the United States Environmental Protection Agency. Ecology and Environment, Inc., Screening Site Inspection Report for PPG Glass Dump, Armstrong County, Pennsylvania (October 24, 1991) ("E&E Report") (ECF No. 216 Ex. 24) at 1-1 (PADEP005507). A soil sample taken near the ballfield area:

> revealed the presence of TAL [Target Analyte List] analytes in the * * * sample at levels above or comparable to those detected in other on-site soil/sediment samples. The presence of TAL analytes in soil sample S11 indicates that wastes may have been deposited in or migrated to the baseball field area.

(id. at 5-2 to 5-3) (PADEP005535-5536).  PPG responds that this is historic information and does not reflect current conditions.

In response to the E&E Report, a PPG consultant stated that it:

> believe[d] that TAL concentrations in soil sample S-11 may be within the natural range for soils of North America (USEPA Office of Solid Waste and Emergency Response, "Hazardous Waste Land Treatment, SW-874," [April 1983], page 273, Table 6.46). Therefore these levels may represent soil quality background, as intended by the sample collection.

(ECF No. 216 Ex. 25 at 4 (PPG007665).)

In 1993, PADEP provided comments to PPG on the Remedial Investigation Report produced by Baker.  (Letter from Jessie G. Donahue, PADEP, to Christie L. Girouard, PPG Industries, Inc. (November 29, 1993) (ECF No. 216 Ex. 26). In those comments, PADEP stated that background "should be the background soil samples collected and analyzed from the vicinity of the site rather than the USGS published values." (Id. at 2, cmt. 6) (PADEP000367).

In its comments on the 1993 Remedial Investigation Report, PADEP further queried:

> Could waste disposal have occurred near the ball fields? On photos from 1938, some activity is evident under what would now be the second ball field. On the 1949 photo, a small disturbed area appears just south of the first ball field, at

79

about the location of surface soil sample S11, which shows slightly elevated
[arsenic] and [lead]. Is there any documentation in PPG records that confirms
disposal only occurred south of the access road?

(id. at 3, cmt. 9 (PADEP000368).)  PPG responded that:

There is no documentation that supports the suggestion that the ballfield area was
used at any time for disposal of waste materials. The area in question in the 1938
aerial photograph appears to be consistent with tilled agricultural fields in the
vicinity of the site.

(ECF No. 216 Ex. 27 at 4, cmt. 9 (PADEP000373).) PPG did not attempt to provide an alternate

interpretation of the 1949 photograph that did not involve waste disposal in the ballfield area.

Plaintiffs note that PPG has admitted that it does not possess "definitive historical knowledge

regarding former uses of the existing softball field area on the Property."

In 1971, a PPG consultant performed a study of the Site. Report, Subsurface Investigation

and Study of Solid Waste Disposal Lagoon Leakage, PPG Industries, Ford City, Pennsylvania,

prepared by E. D'Appolonia Consulting Engineers, Inc. (August 1971) (ECF No. 216 Ex. 28) at

1 (PPG003647). This report noted that "it is possible that the phosphate [found in a well in the

ballfield area] represents a very minor contamination of the well by the lagoon." (Id. at 2

(PPG003665).) Twenty years later, PPG sent a letter to the Mayor of Ford City informing him of

the EPA-led investigation occurring at the Site.  In that letter, PPG stated that:

[A] review of previous records reveals the presence of a water well at the
ballfield-park area. PPG is not aware of any degradation of water from that well.
However, in light of our current understanding of site conditions, PPG would
advise the discontinued use of that water well. PPG will supply bottled water
upon your request for use at the ballfield-park area, without admitting liability.

(Letter from Charles G. Evans, PPG Industries, Inc., to Hon. Gregory Dinko, Ford City

(March 25, 1991) (ECF No. 216 Ex. 29) (PPG008910).)

Migration of Contamination

The fence around the SWDA does not prevent the migration of waste and/or

contaminants originating from that waste. (Letter from Annette T. Paluh, PADEP, to Christie L. Girouard, PPG Industries, Inc. (April 16, 1996) (ECF No. 216 Ex. 30) at 4 (PADEP000760) (PADEP rejecting PPG's proposal to close the SWDA by fencing, deed restrictions, and monitoring, because "PPG's proposed limited action with monitoring does not address surface soil direct contact risk to both human and ecological receptors and will not decrease, eliminate or control possible migration of waste constituents"); Ebbert Dep. (ECF No. 216 Ex. 31) at 71 ("Does the fence serve the purpose of * * * preventing migration of the waste? I believe the intention of the fence was to prevent people from coming into contact with the waste in the [SWDA] but it's not constructed as a barrier to the waste itself"). In 2002, PPG noted that samples taken in the "ballfield area exceed arsenic direct contact and soil to groundwater non-residential [Medium Specific Concentrations]" and that those "[e]xceedances were near [the] SWDA boundary." (ECF No. 216 Ex. 32), Attachment 1 (PPG008681).) In general, a fence cannot prevent the migration of contamination such as that found on the Site. Cf. Beck Report at 11 (suggesting that samples taken along the railroad tracks are "potentially influenced by the Eljer landfill").

PPG responds that the nature of the solid waste historically deposited in the SWDA tends not to migrate due to its inherent nature and size and comprehensive testing has confirmed this assertion because the nature and extent of the contamination in the SWDA has been fully characterized and PPG's experts found no evidence that "contaminated soils have migrated" from the SWDA. In further response, current data shows that there is no evidence of historic waste disposal or contaminant migration in the ballfields and that this area presents no risk to human health or the environment.

PADEP has found that contaminants in the PPG waste material are spreading or

migrating from the areas in which they were originally deposited. (Administrative Order at 2-4, ¶¶ 13-15, 21, 23-24, 26, 29 (PADEP000004-6).

Plaintiffs' expert, Bruce A. Bell, Ph.D., has opined that "[a]t present, for purposes of selecting a remedy for the contamination at the SWDA, there is insufficient data regarding the full extent of the contamination.  A full investigation to delineate the horizontal and vertical extent of contamination at the SWDA must be performed in order to select a remedy to protect human health and the environment from the SWDA contamination." (Bell Expert Report (ECF No. 216 Ex. 33) at 23.)

PPG responds that its expert found that the nature and extent of any contamination in SWDA is fully characterized. See Verslycke Expert Report at VERSLYCKE000030-31; Verslycke Supp. Expert Report at 3-5; Verslycke Dep. at 40-41.)

Discussion

PPG argues that the Site does not include the ballfields or the Eljer landfill.  Plaintiffs argue that the Court already rejected this argument.  This is not accurate—in the Memorandum Opinion and Order issued on August 8, 2013, the Court concluded only that the Complaints alleged pollution in the ballfields and the Eljer landfill and that PPG's attempt to contradict these allegations by citing to materials outside the Complaints was premature at that time.  (ECF No. 66 at 68.)

Nevertheless, the evidence is not as one-sided as PPG asserts.  Plaintiffs have pointed to parts of the record to support the conclusions that: 1) the boundaries of the SWDA (and therefore of the ballfields and the Eljer landfill that adjoin it) have not remained constant, and thus PPG's disposal of waste in the past at what was then the SWDA may well have constituted disposal of waste in what is now designated the ballfields and/or the Eljer landfill; 2) although PPG's

experts state that there is no evidence of contaminant migration to the ballfields, Plaintiffs'

experts state that the record is not complete for purposes of making this determination.

      In addition, PPG has not cited any authority to support the proposition that Plaintiffs were

required to file separate RCRA actions with respect to different parts of a disposal site or that

partial summary judgment for a defendant is appropriate in the event that the record fails to

document the exact locations where waste was deposited or the extent of migration.  As Plaintiffs

observe, if no remediation of the Eljer landfill or the ballfields is required, PPG will not have to

take any action with respect to that part of the Site.

      Therefore, Plaintiffs' motion for partial summary judgment will be granted and PPG's

motion for partial summary judgment will be denied.

      An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PENNENVIRONMENT and SIERRA CLUB, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 12-342 |
| | ) | Member Cases: 12-527, 13-1395, |
| PPG INDUSTRIES, INC., BOROUGH OF FORD | ) | 13-1396, 14-229 |
| CITY, and BUFFALO & PITTSBURGH | ) | |
| RAILROAD, INC., | ) | |
| Defendants. | ) | |

ORDER

AND NOW, this 31st day of August, 2015, for the reasons provided in the Memorandum Opinion,

IT IS HEREBY ORDERED that Plaintiffs' Third Motion for Partial Summary Judgment (ECF No. 204) is granted, as follows:

Defendant PPG Industries, Inc., is liable for the following:

1. Violations of the Clean Water Act, 33 U.S.C. 1365(a)(1), the Pennsylvania Clean Streams Law, 35 P.S. § 691.601(c), and implementing regulations, for discharging pollutants from its waste site into the waters of the United States and of the Commonwealth of Pennsylvania since April 16, 1973, without a National Pollutant Discharge Elimination System (NPDES) permit authorizing such discharges, as set forth in Plaintiffs' First CWA Complaint (as amended, ECF No. 90) and Second CWA Complaint (Civ. No. 2:13-cv-01395; ECF No. 1), Claims I, III, XIII, and XIV;

2. Violations of the Clean Water Act, 33 U.S.C. § 1365(a)(1), the Pennsylvania Clean Streams Law, 35 P.S. § 691.601(c), and implementing regulations for discharging stormwater associated with an industrial activity from its waste site into the waters of the United States and of the

Commonwealth of Pennsylvania without a National Pollutant Discharge Elimination System (NPDES) permit authorizing such discharges, as set forth in Plaintiffs' First CWA Complaint (as amended, ECF No. 90) and Second CWA Complaint (Civ. No. 2:13-cv-01395; ECF No. 1), Claims II, IV, and XV;

3. Violations of the Clean Water Act, 33 U.S.C. § 1365(a)(1), the Pennsylvania Clean Streams Law, 35 P.S. § 691.601(c), and implementing regulations for violating the instantaneous maximum total suspended solids effluent limitation in the Administrative Order on 19 days, as set forth in Plaintiffs' First CWA Complaint (as amended, ECF No. 90), Claims IX and X;

4. Violations of the Clean Water Act, 33 U.S.C. § 1365(a)(1), the Pennsylvania Clean Streams Law, 35 P.S. § 691.601(c), and implementing regulations for violating the monthly average total suspended solids effluent limitation in the Administrative Order on 245 days, as set forth in Plaintiffs' First CWA Complaint (as amended, ECF No. 90), Claims IX and X;

5. Violations of the Clean Water Act, 33 U.S.C. § 1365(a)(1), the Pennsylvania Clean Streams Law, 35 P.S. § 691.601(c), and implementing regulations for failure to address the Solid Waste Disposal Area in the Treatment Plan, as required by the Administrative Order, as set forth in Plaintiffs' Second CWA Complaint (Civ. No. 2:13-cv-01395; ECF No. 1), Claims XVI and XVII;

6. Violations of the Clean Water Act, 33 U.S.C. § 1365(a)(1), the Pennsylvania Clean Streams Law, 35 P.S. § 691.601(c), and implementing regulations because it designed and operates an interim abatement system that collects and treats uncontaminated storm water in violation of the Administrative Order, as set forth in Plaintiffs' Second CWA Complaint (Civ. No. 2:13-cv-01395; ECF No. 1), Claims XX-XXIII; and it is further

ORDERED that defendant PPG Industries, Inc., is liable under the Resource

Conservation and Recovery Act (RCRA), 42 U.S.C. § 6972(a)(1)(B), because it contributed to the past disposal of solid waste at the Slurry Lagoon Area (SLA) which may present an imminent and substantial endangerment to health or the environment, as set forth in the Claim in Plaintiffs' First RCRA Complaint (as amended, ECF No. 91) and the Claim in Plaintiffs' Second RCRA Complaint (Civ. No. 2:13-cv-01396; ECF No. 1); and it is further

ORDERED that judgment is entered against defendant PPG Industries, Inc., on plaintiffs' RCRA claim as it relates to the high pH leachate or seep water that is formed when water comes into contact with the waste PPG disposed of in the SLA, as set forth in the claim in Plaintiffs' First RCRA Complaint (as amended, ECF No. 91) and the claim in Plaintiffs' Second RCRA Complaint (Civ. No. 2:13-cv-01396; ECF No. 1); and it is further

ORDERED that relief issues related to defendant PPG Industries, Inc.'s liability for these claims shall be addressed in further proceedings in these consolidated cases.

IT IS FURTHER ORDERED that the Motion for Partial Summary Judgment filed by Defendant PPG Industries, Inc. (ECF No. 208) is denied.

s/Robert C. Mitchell_____
ROBERT C. MITCHELL
United States Magistrate Judge