IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PENNENVIRONMENT and SIERRA CLUB,    )
                        Plaintiffs,    )
                                       )
    vs.                                )     Civil Action No. 12-342
                                       )     Member Cases: 12-527, 13-1395,
PPG INDUSTRIES, INC., BOROUGH OF FORD  )     13-1396, 14-229
CITY, and BUFFALO & PITTSBURGH         )     Magistrate Judge Mitchell
RAILROAD, INC.,                        )
                        Defendants,    )
                                       )
PPG INDUSTRIES, INC.,                  )
                Third-Party Plaintiff, )
                                       )
    vs.                                )
                                       )
AS AMERICA, INC. d/b/a AMERICAN        )
STANDARD BRANDS a/s/i to ELJER, INC.,  )
ELJER PLUMBINGWARE, INC., ELJER        )
INDUSTRIES, INC. and ELJER HOLDING     )
CORP.,                                 )
                Third-Party Defendant. )

MEMORANDUM OPINION AND ORDER

Plaintiffs, PennEnvironment and Sierra Club, brought these citizen suits pursuant to

section 505 of the Federal Water Pollution Control Act, 33 U.S.C. § 1365(a)(1) (Clean Water

Act or CWA), section 7002(a)(1)(B) of the Resource Conservation and Recovery Act, 42 U.S.C.

§ 6972(a)(1)(B) (RCRA), and section 601(c) of the Pennsylvania Clean Streams Law, 35 P.S.

§ 691.601(c) (CSL), against Defendants, PPG Industries, Inc. (PPG), the Borough of Ford City

(Ford City), and Buffalo & Pittsburgh Railroad, Inc. (BPRI), to remedy the alleged imminent and

substantial endangerment to health and the environment presented by contamination of a site in

Armstrong County, Pennsylvania used and operated by PPG (the "Site"), contamination of

surface waters and sediments in the Allegheny River and Glade Run in the vicinity of the Site,

and contamination of groundwater associated with the Site.

PPG filed a Third-Party Complaint against AS America, Inc., d/b/a American Standard Brands a/s/i Eljer Inc., Eljer Industries, Inc. and Eljer Plumbingware, Inc. ("Eljer"),[1] seeking contribution and/or indemnity from Eljer under Pennsylvania law and specific provisions of the Hazardous Sites Cleanup Act, 35 P.S. §§ 6020.101 to 6020.1305 (HSCA), regarding any liability that PPG is responsible for relating to a portion of the Site called the Eljer Landfill. On June 9, 2016, the Court granted in part and denied in part a motion to dismiss filed by Eljer, dismissing Count II (HSCA cost recovery) and Count IV (common law indemnification) and leaving Count I (contribution under the Uniform Contribution Among Tort-feasors Act, 42 Pa. C.S. §§ 8321-27 (UCATA)) and Count III (contribution under HSCA).

Presently pending before the Court are two motions: a motion for summary judgment filed by Eljer to dismiss the remaining claims of the Third-Party Complaint (ECF No. 299) and a Fourth Motion for Partial Summary Judgment filed by Plaintiffs (ECF No. 303). For the reasons that follow, Eljer's motion will be granted and Plaintiffs' motion will be granted.

<u>Facts Relevant to Plaintiffs' Motion</u>

The Site is located in North Buffalo and Cadogan Townships in Armstrong County, Pennsylvania. It is bordered by Route 128 to the north, the Allegheny River to the south, Glade Run (a tributary of the Allegheny River) to the west and residential property to the east. (Revised Treatment Plan Report at 3; Baker Remedial Investigation Report (Baker RIR), Vol. 1,

---

[1] The Third-Party Defendant has denied that it is the successor-in-interest to Eljer Plumbingware, Inc. (now known as OEP, Inc.) or Eljer Industries (now known as OEI, Inc.), OEP's parent corporation. It has reserved for trial its defense that there is no successor liability relating to the Eljer Landfill. However, the parties use the term "Eljer" for convenience and the Court will do the same.

at 1-1 to 1-2.)[2]

The PPG Site includes an area known as the Slurry Lagoon Area (SLA) where PPG deposited slurry waste in three lagoons it created in an area it formerly used as a sandstone quarry. (Revised Treatment Plan Report at 4 (PPG0050748).) The SLA is bordered by Route 128 to the north, the Allegheny River and a railroad to the south, Glade Run to the west, and an area that PPG refers to the "solid waste disposal area" (SWDA) to the east. Baker RIR, p. 1-3 (PPG001819). A stream which PPG refers to as the Drainage Ditch runs between the SLA and SWDA. (Revised Treatment Plan Report at 16 (PPG0050760).)

From 1900 to 1927, PPG operated a sandstone quarry and sand plant in the area that later became the SWDA. (Baker RIR Vol. 1, p. 1-2 (PPG001818).) Beginning in the 1920s and continuing until 1967, PPG disposed of solid waste from its manufacturing operations in Ford City at the SWDA. (Administrative Order ¶¶ 3-4 (PADEP000003);[3] Baker RIR Vol. 1, pp. 1-3 to 1-5 (PPG001819-1821).)

PPG disposed of "off-spec" glass materials at the SWDA, as well as coal ash, metal debris, asbestos-coated material, batch materials, refractory material, cullet, bricks, construction debris, packing materials (paper, wood), municipal plant trash, and empty containers. (Dames & Moore Summary, p. 3 (SHAW 000158);[4] Baker RIR Vol. 1, p. 1-5 (PPG001821).[5])

---

[2] ECF No. 306 Ex. 1; ECF No. 306 Ex. 2.

[3] ECF No. 306 Ex. 3.

[4] ECF No. 306 Ex. 4.

[5] PPG objects to this statement, and many other statements in Plaintiffs' Concise Statement, "to the extent that it is incomplete or conflicts with the text of" a document cited. As Plaintiffs observe, this is not a proper response under LCvR 56C.1(b). PPG is required to identify how a particular statement is incomplete or in conflict with a cited document and support such a position with record evidence. Otherwise, Plaintiffs' statements remain undisputed.

There are no records indicating precisely where PPG disposed of solid waste on the Site, and thus there are no historic maps delineating the boundaries of the SWDA. In its August 31, 2015 opinion, this Court held that the boundaries of the SWDA "have not remained constant." (ECF No. 228 at 82.)  A map prepared by PPG in 1966 indicates that the acreage of the "PPG Dump," which covers the area known as the SWDA, is 39.97 acres, and this area is labeled as being owned by PPG. (ECF No. 228 at 76; ECF No. 306 Ex. 6) (PPG0038217).

In 1992, Dames & Moore, Inc. was retained by PPG to develop historic usage and ownership information for the Site as well as other PPG properties in Ford City. See ECF No. 228 at 77; Ford City Property History Report at 1 (CRC000380).[6] Dames & Moore stated that the "SWDA encompasses approximately 27 acres of property." See ECF No. 288 at 77; Ford City Property History Report at 15 (CRC000394).  An internal PPG memorandum in 1998 likewise described the SWDA as a "27 acre landfill." (ECF No. 288 at 77; ECF No. 306 Ex. 8 at 2 (PPG007889).)

In 1993, Baker Environmental, Inc. ("Baker"), a PPG consultant, produced a Remedial Investigation Report on behalf of PPG in which it "calculated the SWDA to be approximately 14 acres in size." (ECF No. 288 at 77; Baker RIR Vol. 1, p. 1-5 (PPG001821).)

The SWDA was not lined and was not covered after PPG stopped using the area for waste disposal. (ECF No. 306 Ex. 5 at 2 (PPG008835).)

Identification of High-pH Seeps at the SWDA

Plaintiffs note that, in its earlier decision, this Court held that PPG had violated "the Clean Water Act, 33 U.S.C. § 1365(a)(1), and the Pennsylvania Clean Streams Law, 35 P.S.

———————————————

[6] ECF No. 306 Ex. 7.

§ 691.601(c), and implementing regulations for failure to address the Solid Waste Disposal Area in the Treatment Plan, as required by the Administrative Order * * *." (ECF No. 288 at 85.)

On September 22, 2015, representatives of PADEP and PPG conducted a site visit. (ECF No. 306 Ex. 10). Following that site visit, PADEP informed PPG that it intended "to evaluate any potential discharges from the SWDA into the drainage ditch." (ECF No. 306 Ex. 12).

On November 4, 2015, PADEP conducted a follow up inspection "to check on seep conditions from the [SWDA] * * *." (ECF No. 306 Ex. 13). PADEP observed seeps along the border with the SLA and along the slope of the SWDA facing towards the railroad track which run[s] parallel to the Allegheny River. PPG agreed to create a sampling plan to evaluate the environmental impact of these seeps along the SWDA.

Following the approval of a December 18, 2015, sampling plan, PPG conducted sampling and analysis of seepage areas and monitoring wells identified near the SWDA. (ECF No. 306 Ex. 16). Samples were taken on December 22, 2015, and December 29, 2015. (Id. at Table 1 (PPG054769).) Three of those seepage areas – SA1, SA2, and SA3, are on the western edge of the SWDA and discharge into the drainage ditch that forms the border between the SWDA and SLA. (Id. at Figure 1 (PPG0054770).) The reported pH values for SA1 were 11.48 and 11.54. (Id. at Table 1 (PPG054769).) The reported pH values for SA2 were 11.45 and 11.49. The reported pH values for SA3 were 11.42 and 11.4.

PPG states that the three seepage areas referenced in this paragraph, SA1, SA2, and SA3, are influenced by the SLA and not the SWDA. (O'Hara Aff. ¶ 7.)[7] The SWDA does not cause elevated pH in seeps. (O'Hara Aff. ¶ 11.) Plaintiffs reply that PPG's response is not material

_____

[7] ECF No. 317 Ex. A.

because the question presented by their motion is whether the high-pH seeps located at the SWDA may present an imminent and substantial endangerment to health or the environment. Plaintiffs contend that it is not material whether those seeps are mainly impacted by the SLA or mainly impacted by the SWDA because such questions relate to relief, not liability.

PPG states that the base flow from seepage areas SWDA SA-1, SWDA SA-2, SWDA SA-3 has been collected and treated by the installed SLA Interim Abatement System since 2010. (O'Hara Aff. ¶ 8; ECF No. 306-16). Plaintiffs respond that it is undisputed that SWDA Seeps SA-1, SA-2, and SA-3 discharge into the Drainage Ditch. As part of the interim abatement system, PPG installed a weir bypass structure in the Drainage Ditch, designed to collect the base flow and direct it to the treatment system. (Revised Treatment Plan Report, p. 3 (PPG0050747).)[8] The bypass structure is designed to intercept and pass the base flow to the treatment plant at all times, while "allow[ing] flows greater than the base flow to remain in the" Drainage Ditch and discharge to the Allegheny River without treatment. (May 26, 2009, Addendum to Interim Abatement Plan, p. 1 (PADEP002909).[9] The system was designed to accommodate a base flow of 12 gallons per minute (gpm). (ECF No. 323 Ex. 26.) When the Drainage Ditch flow is greater than 12 gpm, the excess flow, including leachate from the Site, discharges to the Allegheny River without treatment. (ECF No. 323 Ex. 27 at 2) ("Currently there is a diversion structure that allows dry weather flow to go to the treatment plant and wet weather flow to go over a weir and discharge untreated"). PPG's consultant and expert, Dr. James Kilburg, testified that samples taken in the Drainage Ditch below the weir bypass structure "[a]bsolutely" include[] water from

---

[8] ECF No. 323 Ex. 24.
[9] ECF No. 323 Ex. 25.

Seep 105. (Shaw Rule 30(b)(6) Dep. 83.)[10] Seep 105, as well as SWDA Seeps SA-1, SA-2 and

SA-3, are all upstream of the Drainage Ditch's weir bypass structure. Compare Revised

Treatment Plan Report, Figure 2 (PPG 0050912)[11] with ECF No. 306-16, Figure 1. See also

(ECF No. 306-13, p. PPG0053525 (describing SWDA Seep SA-1 as being "approximately 20 ft

uphill from previously listed Seep 105").

Further deposition testimony by Dr. Kilburg, also supports this fact. Dr. Kilburg testified

that "the purpose of the weir bypass structure was to collect only the baseflow and to bypass the

rest of the water." (Shaw Rule 30(b)(6) Dep. 18.)

Flow greater than the base flow of 12 gpm is common. And, as shown above, flow in

excess of 12 gpm goes untreated to the Allegheny River. PPG's weekly flow data reported to

PADEP reflect an average flow in the Drainage Ditch of 14.1 gpm, with approximately 49% of

the weekly measurements exceeding 12 gpm. (Treatment Plan Report, App. H (GRAD021656-

21772)[12]; Revised Treatment Plan Report, App. H (PPG0051362-51395).)[13]

After the November 4, 2015 inspection, Plaintiffs alerted PADEP to additional seeps

located further to the east than those PADEP observed. (ECF No. 306 Ex. 18 at 2.)  PADEP

required PPG to verify whether the six seeps identified as a result of its sampling plan "are the

only seeps associated with the SWDA" and to conduct "a delineation of the extent of the SWDA,

including any waste material that has migrated from its original location." (ECF No. 306 Ex. 19

at 1) (PPG0054726).)

---

[10] ECF No. 323 Ex. 28.
[11] ECF No. 323 Ex. 24.
[12] ECF No. 323 Ex. 29.
[13] ECF No. 323 Ex. 24.

In addition to providing further seep sampling, PPG produced a figure showing that the geographical extent of the visually observable waste extends beyond the fenced portion of the SWDA to the north towards the Ballfield and Eljer Landfill Areas, to the south toward the railroad tracks and Allegheny River, and to the east to the eastern property boundary of the PPG Site. (ECF No. 306 Ex. 20) (PPG0054543).

Procedural History

On January 13, 2012, Plaintiffs gave notice of their intent to file suit to the Administrator of the Environmental Protection Agency (EPA), PADEP and Defendants as required by the CWA, CSL and RCRA. 33 U.S.C. § 1365(b)(1)(A); 35 P.S. § 691.601(e); 42 U.S.C. § 6972(b)(2)(A). (CWA Compl. ¶ 4 & Ex. 1; RCRA Compl. ¶ 4 & Ex. 1.) On March 20, 2012, Plaintiffs filed a complaint against PPG and Ford City under the CWA and the CSL (the "CWA Complaint"). The case was docketed at Civ. A. No. 12-342. Count I alleged that that PPG has unlawfully discharged pollutants into navigable waters without an NPDES permit and continues to do so in violation of Sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342. Count II alleged that PPG has violated and continues to violate sections 301(a) and 402(p)(2)(B), 33 U.S.C. §§ 1311(a), 1342(p)(2)(B), by discharging storm water associated with industrial activity without a permit authorizing such discharge. Count III alleged that PPG has violated and continues to violate Sections 301 and 307 of the CSL, 35 P.S. §§ 691.301, 691.307, by discharging industrial waste into the Allegheny River, Glade Run, and groundwater associated with the Site without authorization or a permit obtained from PADEP, which constitutes a nuisance under Section 307(c). Count IV alleged that PPG has violated and continues to violate Section 401 of the CSL, 35 P.S. § 691.401, by discharging pollutants and discharging waste containing high levels of pH, into the Allegheny River, Glade Run, and groundwater without a

permit issued by PADEP authorizing such discharges. Count V alleged that PPG has violated the CWA in that the Treatment Plan it submitted in June 2009 fails to provide a schedule for the application for NPDES permits and, based on the monthly progress reports submitted by PPG beginning on April 1, 2009, through at least January 5, 2012, PPG took no steps to apply for such permits and Plaintiffs allege, on information and belief, that PPG has failed to provide a schedule for the application of NPDES permits and has taken no steps to apply for such permits. Count VI alleged that PPG's acts as alleged in Count V also violate section 611 of the CSL, 35 P.S. § 691.611. Count VII alleged that PPG has discharged, and continues to discharge, untreated and ineffectively treated wastewater, in violation of the July 2 Addendum, and Count VIII alleged that these acts also violate section 611 of the CSL. Count IX alleged that PPG has violated the CWA by committing 162 discharge violations between February 2010 and December 2011, in violation of the 2009 Administrative Order, and Count X alleged that these acts also violate section 611 of the CSL. Count XI alleged that PPG has violated the CWA by committing 33 reporting violations between February 2010 and December 2011, in violation of the 2009 Administrative Order, and Count XII alleged that these acts also violate section 611 of the CSL.

On April 20, 2012, Plaintiffs filed another complaint against PPG and Ford City under the RCRA (the "RCRA Complaint"). They alleged that PPG is a generator and/or transporter of the solid or hazardous waste at the Site, as well as an owner and/or operator of the site, and has contributed to the past or present handling, storage, treatment, transportation, or disposal of the solid or hazardous waste at the Site, thereby presenting an imminent and substantial endangerment to health or the environment. This case was docketed at Civ. A. No. 12-527. On May 25, 2012, Plaintiffs filed a motion to consolidate the two cases (ECF No. 11). On May 29,

2012, an order was entered granting this motion and consolidating the cases at No. 12-342 (ECF No. 12).

On September 25, 2013, Plaintiffs filed a second CWA/CSL complaint (the Second CWA Complaint), including additional instances of alleged pollution and adding BPRI as a defendant. The case was docketed at No. 13-1395. Count XIII alleged that PPG violated the CWA by discharging pollutants (including arsenic, chromium, lead, manganese, copper, zinc, mercury, antimony, barium, beryllium, iron, vanadium, aluminum, total dissolved solids or salts and semi-volatile organic compounds, as well as waste with high or low levels of pH) into the wetlands without a permit, and Count XIV alleged that these acts violated the CSL. Count XV alleged that PPG violated the CWA by discharging storm water without a permit. Count XVI alleged that PPG violated the Administrative Order by failing to include the SWDA in its Treatment Plan, and Count XVII alleged that these acts violated the CSL. Count XVIII alleged that PPG violated the CWA by submitting a Treatment Plan that failed to provide a schedule for the application for NPDES permits for discharges from the SWDA, and Count XIX alleged that this failure violated the CSL. Count XX alleged that PPG violated the CWA by designing an interim collection system that fails to use piping throughout and therefore collects uncontaminated storm water and Count XXI alleged that these acts violated the CSL. Count XXII alleged that PPG violated the CWA and the Administrative Order by designing a system that collects uncontaminated storm water, and Count XXIII alleged that these acts violated the CSL. Count XXIV alleged that PPG violated the CWA by failing to properly monitor charges in that the system is diluted with uncontaminated storm water, and Count XXV alleged that this failure violates the CSL. Count XXVI alleged that PPG violated the CWA by allowing the discharge of uncontaminated storm water which enters the Drainage Ditch and mixes with contaminated

leachate and/or seep water which is not monitored, and Count XXVII alleged that these acts

violate the CSL.

On September 25, 2013, Plaintiffs also filed a second RCRA complaint ("Second RCRA

Complaint"), which added BPRI as a defendant, and was docketed at No. 13-1396. On

September 30, 2013, an order was entered consolidating the Second CWA Complaint and the

Second RCRA Complaint at No. 12-342. Finally, on February 18, 2014, Plaintiffs filed a third

CWA/CSL complaint against PPG, Ford City and BPRI, docketed at No. 14-229 ("Third CWA

Complaint"). Count XXVIII alleged that PPG has violated the CWA and the Administrative

Order by discharging water with a pH value exceeding the range set therein, and Count XXIX

alleged that this act violated the CSL. Count XXX alleged that PPG is violating the CWA and

the Administrative Order by discharging water from the culverts with high pH values, and Count

XXXI alleged that this act violates the CSL. Count XXXII alleged that PPG is violating the

CWA by failing to report the final pH values prior to discharge to the Allegheny River but

instead using values from PPG's neutralization tank and Count XXXIII alleged that this act

violates the CSL. On April 8, 2014, Plaintiffs filed a motion to consolidate the case and on April

9, 2014, an order was entered consolidating the case at No. 12-342.[14]

On February 28, 2013, PPG filed a motion to dismiss on various grounds, including lack

of standing (ECF No. 24). Ford City filed a motion indicating it was joining in PPG's motion to

dismiss (ECF No. 29). On August 8, 2013, a Memorandum Opinion and Order was entered,

---

[14] The complaints state that Plaintiffs are not pursuing claims or specific relief against
Ford City or BPRI, but that they are joined as indispensable parties under Rule 19(a). (CWA
Compl. ¶ 13 & at 23-24; RCRA Compl. ¶ 15 & at 11; Second CWA Compl. ¶¶ 5-6, 17-18 &
nn.1-2 & at 30; Second RCRA Compl. ¶¶ 5-6, 19-20 & nn.1-2 & at 15; Third CWA Compl.
¶¶ 19-20 & at 19.)

denying the motions (ECF No. 66).

On December 19, 2013, Plaintiffs filed a motion for partial summary judgment on the issue of standing (ECF No. 116). On February 28, 2014, PPG filed its cross-motion for summary judgment on the issue of Plaintiffs' standing (ECF No. 137). On May 28, 2014, a Memorandum Opinion and Order was entered which denied PPG's motion and granted Plaintiffs' motion (ECF No. 162).

On October 1, 2014, Plaintiffs filed a motion for a preliminary injunction to compel PPG to apply for an NPDES permit (ECF No. 173). After receiving briefing on the issue and holding a hearing on November 13, 2014, the Court entered a Memorandum Opinion and Order on December 10, 2014 which granted the motion insofar as PPG was directed to file an application for an NPDES permit by March 31, 2015 (ECF No. 192). On April 7, 2015, PPG submitted a notice that it had timely filed its application and that PADEP had accepted it (ECF No. 212).

On March 31, 2015, Plaintiffs filed their Third Motion for Partial Summary Judgment (ECF No. 204)[15] and PPG also filed a motion for partial summary judgment (ECF No. 208). On August 31, 2015, a Memorandum Opinion and Order was entered (ECF No. 228), which granted Plaintiffs' motion for partial summary judgment and denied PPG's motion for partial summary judgment.

On August 15, 2017, Plaintiffs filed their Fourth Motion for Partial Summary Judgment (ECF No. 303). On October 16, 2017, PPG filed a brief in opposition (ECF No. 315). On

---

[15] The motion was titled "Third Motion" because on December 20, 2013, Plaintiffs filed their second motion for partial summary judgment on certain violations of the 2009 Administrative Order (ECF No. 120). The Court dismissed this motion without prejudice on January 8, 2014 to be refiled at the summary judgment stage after the conclusion of expert discovery.

November 3, 2017, Plaintiffs filed a reply brief (ECF No. 321).

Standard of Review

The Federal Rules of Civil Procedure provide that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court of Appeals has held that "where the movant bears the burden of proof at trial and the motion does not establish the absence of a genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented." National State Bank v. Federal Reserve Bank, 979 F.2d 1579, 1582 (3d Cir. 1992).

In following this directive, a court must take the facts in the light most favorable to the non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's favor. Hugh v. Butler County Family YMCA, 418 F.3d 265, 266 (3d Cir. 2005); Doe v. County of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001).

<u>Plaintiffs' Motion for Partial Summary Judgment</u>

In their motion, Plaintiffs argue that: 1) PPG is liable under RCRA because it generated, transported and disposed of solid waste at the Site; and 2) the disposal may present an imminent and substantial endangerment to health and the environment, including high pH seeps at the SWDA and metals contamination and even PPG's expert identified the risks.

In response, PPG argues that: 1) Plaintiffs' motion is untimely in that the schedule provided for a motion for summary judgment by Eljer, not a fourth motion by Plaintiffs; 2) this Court has held that high pH seeps in the SLA presented an imminent and substantial endangerment but in the SWDA it is a disputed issue of fact (PPG maintains that the waste has been collected and treated by the Interim Abatement System since 2010); 3) its expert said there was no endangerment to the environment and Plaintiffs take snippets from his report and rely on the 25-year old Baker Report (which cannot describe "imminent" endangerment); and 4) the determination cannot be based solely on a number.

In their reply brief, Plaintiffs argue that: 1) their motion is not untimely—nothing in the scheduling order limited motions to Eljer, and the recent data about very high pH seeps at the SWDA could not have been raised earlier; 2) PADEP found seeps discharging from the SWDA and PPG's own sampling showed three high pH level seeps, yet it is now contending that the facts are disputed; 3) PPG's expert concluded that the chemical concentrations in soils at the SWDA indicated the potential for unacceptable risks to small invertebrates and Plaintiffs did not take snippets from the report, his new affidavit introduces terms not used in the report and opines on the ultimate legal issue which is not his responsibility; and 4) Plaintiffs are not required to prove that PPG's disposal actually caused an imminent and substantial endangerment, only that it

"may" cause one, and PPG ignores its expert's ultimate qualitative statement and tries to ignore the Baker Report.

Timeliness of Motion

PPG argues that Plaintiffs' motion is untimely. However, nothing in any scheduling order precluded Plaintiffs from filing the present motion. Moreover, Plaintiffs represent that recent data about high pH seeps at the SWDA could not have been raised earlier because the data did not become available until February 22, 2016 (ECF No. 306 Ex. 16), and PPG has not responded to this argument. In addition, the parties have fully addressed Plaintiffs' motion on the merits and there would be no point in dismissing it based on a highly technical procedural point, even if it were firmly established. Therefore, this argument is rejected.

Are High pH Levels in Seeps Disputed?

PPG argues that the pH levels in the seeps are a disputed issue. Plaintiffs deny this argument and contend that all the evidence, from PADEP's investigation and PPG's own sampling, shows that there are high pH levels in some of the seeps.

Plaintiffs note that PADEP recognized three high-pH seeps as SWDA seeps and directed PPG to revise its permit application to include them (ECF No. 306 Exs. 13, 16). In addition, PPG represented in its April 15, 2016 update to its NPDES permit application that the discharges from the three SWDA seeps had high pH values (ECF No. 306 Ex. 16; O'Hara Aff. ¶ 6; ECF No. 323 Ex. 21).

PPG's primary argument is that the high pH values measured at the SWDA seeps "result[] solely from impacts from the SLA." PPG relies upon the affidavit of Patrick O'Hara as support for this statement. However, Plaintiffs note that what O'Hara actually stated was that

"the results for seepage areas SWDA SA-1, SWDA SA-2 and SWDA SA-3 show that these seeps are mainly influenced by the SLA and not the [SWDA]." (O'Hara Aff. ¶ 7.)

In any event, Plaintiffs contend that whether the high pH discharges from the SWDA seeps are mainly influenced by the SLA is relevant only to the issue of relief, not liability. PPG has not responded to this argument.

Plaintiffs also point to the statements in the Baker Report. PPG argues that the Baker Report is hearsay because it is 25 years old. However, as Plaintiffs observe, a document that is over 20 years old and the authenticity of which is established is explicitly excluded from the definition of hearsay. Fed.R.Evid. 803(16). In addition, a statement that was made by an opposing party's agent and which is on a matter within the scope of that relationship and while it existed is also excluded from the definition of hearsay. Fed.R.Evid. 810(d)(2)(D). Thus, Plaintiffs do not have to produce an individual with "first-hand" knowledge of the Baker Report in order to rely on it and the fact that Baker is not currently a consultant for PPG is irrelevant.

PPG also contends that, because the Baker Report is so old, it cannot constitute evidence of an "imminent" threat to the environment, because "imminent" means "threatens to occur immediately." Interfaith Cmty. Org. v. Honeywell Int'l, Inc., 399 F.3d 248, 258 (3d Cir. 2005). PPG also cites Maine People's Alliance and Natural Resources Defense Council v. Mallinckrodt, Inc., 471 F.3d 277, 296 (1st Cir. 2006), for the proposition that "an imminent and substantial endangerment requires a reasonable prospect of a near-term threat of serious potential harm." However, the case went on to conclude that "the court below made supportable findings that suffice to bring this case within the compass of that standard" without discussing the age of the evidence relied upon. In other words, PPG does not actually cite authority to support its argument: no case has held that data should be excluded from the analysis of "imminent and

16

substantial endangerment" because it is not the most recent data available.  See also Meghrig v.

KFC Western, Inc., 516 U.S. 479, 486 (1996) (stating that RCRA's language "implies that there

must be a threat which is present *now*, although the impact of the threat may not be felt until

later" and therefore concluding that RCRA does not provide a remedy for past cleanup costs).

To establish liability under the RCRA, Plaintiffs must prove:

> (1) that the defendant is a person, including, but not limited to, one who
> was or is a generator or transporter of solid or hazardous waste or one who was or
> is an owner or operator of a solid or hazardous waste treatment, storage, or
> disposal facility; (2) that the defendant has contributed to or is contributing to the
> handling, storage, treatment, transportation, or disposal of solid or hazardous
> waste; and (3) that the solid or hazardous waste may present an imminent and
> substantial endangerment to health or the environment.

Interfaith Cmty. Org., 399 F.3d at 258 (quoting Parker v. Scrap Metal Processors, Inc., 386 F.3d

993, 1014-15 (11th Cir. 2004)).

"Solid waste" is defined by the RCRA as:

> any garbage, refuse, sludge from a waste treatment plant, water supply
> treatment plant, or air pollution control facility and other discarded material,
> including solid, liquid, semisolid, or contained gaseous material resulting from
> industrial, commercial, mining, and agricultural operations, and from community
> activities, but does not include solid or dissolved material in domestic sewage, or
> solid or dissolved materials in irrigation return flows or industrial discharges
> which are point sources subject to permits under section 1342 of Title 33, or
> source, special nuclear, or byproduct material as defined by the Atomic Energy
> Act of 1954, as amended (68 Stat. 923) [42 U.S.C.A. § 2011 et seq.].

42 U.S.C. § 6903(27).

Plaintiffs note that PPG operated a glass manufacturing plant in Ford City, that it

generated a number of wastes ("off spec" glass materials, coal ash, metal debris, asbestos-coated

material, batch materials, refractory material, cullet, bricks, construction debris, packing

materials, municipal plant trash and empty containers) at this plant and disposed of them in the

SWDA from the 1920s until 1967.  In addition, the SWDA was not lined or covered after PPG

stopped depositing waste, so the waste was further allowed to enter the environment.  Thus, they

contend that PPG was a generator and transporter and that the waste met the definition of solid

waste under RCRA.

The Court of Appeals has explained that, with respect to the issue of whether a discharge

may present an imminent and substantial endangerment to health or the environment:

> The operative word ... [is] "may"....
>
> [P]laintiffs need only demonstrate that the waste ... "may present" an
> imminent and substantial threat.... Similarly, the term "endangerment" means a
> threatened or potential harm, and does not require proof of actual harm.... The
> endangerment must also be "imminent" [meaning] threatens to occur
> immediately.... Because the operative word is "may," however, the plaintiffs must
> [only] show that there is a potential for an imminent threat of serious harm ... [as]
> an endangerment is substantial if it is "serious" ... to the environment or health.

Interfaith Cmty. Org., 399 F.3d at 258 (quoting Parker, 386 F.3d at 1015).  The court held that

quantification of the endangerment is not required and rejected the district court's conclusion

that the contaminant must be present at levels above that considered acceptable by the state.  Id.

at 259.  See also id. at 261 ("Proof of contamination in excess of state standards may support a

finding of liability, and may alone suffice for liability in some cases, but its required use is

without justification in the statute.")  The court further observed that:

> When Congress enacted RCRA in 1976, it sought to close "the last
> remaining loophole in environmental law, that of unregulated land disposal of
> discarded materials and hazardous wastes." H.R. Rep. No. 1491, 94th Cong., 2d
> Sess. 4, reprinted in 1976 U.S.C.C.A.N. 6238, 6241. As we have noted, there is
> no definition or explanation of the meaning of "substantial," but a discussion of
> RCRA's amendments observes that § 6972(a)(1)(B) is "'intended to confer upon
> the courts the authority to eliminate any risks posed by toxic wastes,'" S. Rep. No.
> 98-284, 98th Cong., 1st Sess. at 59 (1983) (quoting [United States v.] Price, 688
> F.2d [204,] 213-14 [(3d Cir. 1982)]), and further that courts should "recogniz[e]
> that risk may be assessed from suspected, but not completely substantiated,
> relationships between imperfect data, or from probative preliminary data not yet
> certifiable as fact." Id. (internal quotations and citations omitted). This supports

neither District Court's particular quantitative requirement nor the even higher and more narrow quantitative standards that Honeywell would have us impose.

Id. at 260.[16]

Plaintiffs note that PPG's sampling in response to PADEP's November 4, 2015, inspection of the SWDA demonstrate that there are three high-pH seeps—SA1, SA2, and SA3—that are on the western edge of the SWDA and discharge into the Drainage Ditch that forms the boundary between the SWDA and SLA. The reported pH values for SA1 were 11.48 and 11.54. The reported pH values for SA2 were 11.45 and 11.49. The reported pH values for SA3 were 11.42 and 11.4. (ECF No. 306 Ex. 16 at Table 1, PPG054769-70.)

Plaintiffs observe that the Court previously found PPG liable under RCRA for high-pH leachate or seep water associated with the SLA that may present an imminent and substantial endangerment to health and the environment with pH levels that exceeded 10 and 11, which are directly comparable to the pH levels at the SWDA seeps SA1, SA2, and SA3. The Court based its decision on several factors. First, the experts agreed that those pH levels presented the potential for unacceptable risk to wildlife. Second, PADEP had expressed concern about the risk to public health and children specifically from the high-pH SLA seeps, and PPG consultants required workers to take safety precautions because of the high-pH levels. Third, the lack of security measures preventing people from accessing the Drainage Ditch from the river side of the Site.

Plaintiffs argue that the SWDA and SLA seeps are comparable in terms of both pH levels

_____

[16] Although the district court erred in requiring the plaintiffs to meet this higher burden, the Court of Appeals found the error harmless because they actually met it, and the court found that New Jersey's standards were "relevant and useful in determining the existence of an imminent and substantial endangerment." Id. at 261 & n.6.

and potential access, and therefore share the same risks to human health and environmental receptors. Accordingly, they contend that the Court should find that the high-pH SWDA seeps may present an imminent and substantial endangerment to health and the environment and award them summary judgment on this aspect of their RCRA claim.

Dr. Verslycke's Report

PPG's ecological risk expert, Tim Verslycke, Ph.D., has concluded that chemical concentrations in surface soils at the SWDA "indicate the potential for unacceptable risks to small wildlife-consuming soil invertebrates." (ECF No. 306 Ex. 15 at 19, 22.) Plaintiffs argue that this conclusion, based on the risk analysis summarized below, is more than sufficient to support a holding that the SWDA soils may present an imminent and substantial endangerment to the environment. They also contend that Dr. Verslycke's risk results are consistent with those identified by PPG consultant Baker Environmental, Inc. in 1993.

Dr. Verslycke visited the Site on May 24 and August 8, 2013. (ECF No. 306 Ex. 14 at 7.) He observed that, "[a]lthough access for some terrestrial organisms may be limited by the fencing along the SLA and SWDA, mammals and birds may use or traverse the site," including the SWDA. (Id. at 8.) He also noted that "migratory songbirds and waterfowl are known to be present along the Allegheny River corridor." Id.

On July 17, 2013, Dr. Verslycke and his colleague, Dr. Barbara Beck (PPG's human health risk expert), provided PPG with a Data Collection Proposal. (ECF No. 306 Ex. 14, Attach. B, Data Collection Proposal, p. 1.) The Data Collection Proposal noted that:

> Preliminary foodweb modeling for wildlife (i.e., birds, mammals) suggest potential risks based on metal concentrations in surface soils. However, foodweb models are known to generally be overly conservative as they do not consider site conditions and assume 100% contaminant bioavailability (US EPA, 2003).

> Therefore, preliminary wildlife risk estimates are considered likely to be overestimates and could be refined on the basis of additional data collection.

The Data Collection Proposal proposed collecting additional surface and subsurface soils on the Site, including the SWDA. It also proposed collecting "soil invertebrate samples to evaluate metal bioaccumulation risks to ecological receptors." (<u>Id.</u> at 2.)

Surface soil, subsurface soil, and earthworm tissue samples were collected in 2013. (<u>Id.</u> at 7, 9-10.) The 2013 soil samples were collected using a grid sampling approach. (<u>Id.</u> at 9.) The grids for the SWDA soil samples are identified as SW-01 through SW-10. (<u>Id.</u>, Figure 4.). While the metal concentrations identified in the 2013 soil samples were "consistent" with those taken by other PPG consultants in historic investigations, such as Baker, Dr. Verslycke used only the 2013 soil samples in his quantitative risk analysis. (<u>Id.</u> at 9.)

Dr. Verslycke has submitted initial and supplemental expert reports evaluating the risks posed by soils at the SWDA to ecological receptors. (ECF No. 306 Exs. 14, 15.) Dr. Verslycke's ecological risk assessment included both an initial screening phase and a subsequent baseline risk assessment. (ECF No. 306 Ex. 14 at 12.) The screening phase of an ecological risk assessment is done to determine if there are no significant ecological risks present. Dr. Verslycke screened maximum soil concentrations for certain SWDA soil samples collected in 2013 against the screening levels established by the EPA. (<u>Id.</u> at 14 & Table 7.) Dr. Verslycke also chose to develop a background upper tolerance level (UTL) because some of the EPA screening levels are below natural background metal concentrations. (<u>Id.</u>) Dr. Verslycke identified a substance or contaminant as a chemical of potential concern (COPC) if it exceeded both the relevant EPA screening level and this background UTL. (<u>Id.</u>) Dr. Verslycke identified the following metals as COPCs in the SWDA soils: antimony, arsenic, cadmium, chromium,

cobalt, copper, lead, manganese, mercury, nickel, selenium, and zinc. (Id. at 15 & Table 7.) The maximum lead concentration detected in the SWDA soils was 254 times greater than the EPA screening level and 73 times greater than Dr. Verslycke's background UTL.

For his baseline risk assessment, Dr. Verslycke used a food-web model, which "provides an estimated total dietary exposure for chemicals resulting from consumption of food and incidental ingestion of soil * * *." (Id. at 13, 15.) Dr. Verslycke selected four receptors for his analysis, which represent various feeding preferences and which serve as surrogates for wildlife species with similar feeding preferences and habitat distributions. (Id. at 16.) The receptors evaluated by Dr. Verslycke were the American robin (invertivore), short-tailed shrew (invertivore), raccoon (omnivore), and meadow vole (herbivore).

Dr. Verslycke compared exposure doses calculated from his food-web model to toxicity reference values (TRVs) at both the no observed adverse effect level (NOAEL) and the lowest observed adverse effect level (LOAEL)[17] to develop hazard quotients (HQ) for each contaminant for each receptor. (Id. at 16-17.) An HQ "provides information on the potential magnitude of ecological effects expected based on the concentrations of COPCs present within environmental media at the Site." Id. Dr. Verslycke developed both NOAEL and LOAEL based HQs "to

_____

[17] A NOAEL "represents a body weight normalized daily intake of rate of a chemical that did not elicit any adverse responses in the test organism." (ECF No. 306 Ex. 14 at 17.) Exceedance of a NOAEL "does not necessarily imply that adverse effects would occur," while a value lower than the NOAEL indicates that "adverse ecological effects are unlikely to occur." A LOAEL "is the minimum dose reported to elicit a statistically significant adverse effect in the test species in a pertinent laboratory study." (Id.) Exposure in excess of the LOAEL "indicates some potential for adverse effects to an exposed individual receptor," though the population-level effects are uncertain.

bracket the risk estimates and reflect the range of uncertainty that exists regarding the potential for adverse effects."

As noted by Dr. Verslycke, an HQ of less than 1 "indicates that the chemical is unlikely to cause adverse ecological effects." (Id. at 17.) HQs of greater than 1 indicate "some potential for adverse ecological effects but do not necessarily signify unacceptable risk." Dr. Verslycke evaluated risks using both the NOAEL and LOAEL toxicity reference values. (Id. at 16-17.) Using the NOAEL, the HQs for lead for each receptor are above 1.0. (Id., Tables 17-20.) For example, the NOAEL-based HQ for the American robin is 22.59. Using the LOAEL, the HQs for lead are above 1.0 for both the American robin and short-tailed shrew. For example, the LOAEL-based HQ for the American robin is 11.30. Dr. Verslycke concluded that the lead concentrations in SWDA soils "may pose a risk to the most sensitive receptors examined (i.e., the American robin and shrew) from ingesting surface soils or biota associated with surface soils." (Id. at 17.)

In his supplemental expert report, Dr. Verslycke revised his calculations to account for his use of wet weight concentrations for the earthworm tissue samples rather than dry weight concentrations. (ECF No. 306 Ex. 15 at 17, 19.) This revision resulted in higher HQs for small wildlife that consumes terrestrial invertebrates (such as earthworms), which includes three of the receptors he used in his analysis, the American robin, short-tailed shew, and raccoon. (Id. Tables 17-22.)

Under Dr. Verslycke's adjusted values, the following metals have HQs over 1.0 for both the LOAEL and NOAEL for the American robin: arsenic, cadmium, chromium, lead, nickel, and zinc. (Table 17 (revised.)) Copper and selenium also have HQs over 1.0 when compared to the NOAEL. Dr. Verslycke also calculated a Hazard Index (HI) for each receptor. (ECF No. 306 Ex.

14 at 17.) The HI is the sum of the HQs for all COPCs for a given receptor in a given area, such as the SWDA, and "is reflective of potential cumulative risks." Id. The HI for the American robin is 126.1 when using the NOAEL. (ECF No. 306 Ex. 15, Table 17 (revised.) The HI for the American robin is 65.1 when using the LOAEL.

Under Dr. Verslycke's adjusted values, the following metals have HQs over 1.0 for both the LOAEL and NOAEL for the short-tailed shrew: antimony, arsenic, chromium, copper, lead, nickel, selenium, and zinc. (Id. Table 18 (revised.) Cadmium and manganese also have HQ's over 1.0 when compared to the NOAEL. The total HI for the short-tailed shrew is 174.6 when using the NOAEL. The HI for the short-tailed shrew is 53.0 when using the LOAEL.

Under Dr. Verslycke's adjusted values, for the raccoon, antimony and lead have HQs over 1.0 for the NOAEL, while lead has an HQ over 1.0 for the LOAEL. (Id. Table 19 (revised.)

Dr. Verslycke summarized his opinion with respect to the risk posed to ecological receptors at the SWDA as follows: "chemical concentrations in surface soils at the SWDA indicate the potential for unacceptable risks to small wildlife-consuming soil invertebrates * * *." (ECF No. 306 Ex. 15 at 19, 22.)

Even under the least protective assumptions that Dr. Verslycke used to test further his risk assessment with respect to lead contamination, the HQs for the American robin are above 1.0 in every sampling grid within the SWDA, ranging from 2.0 to 36.5. (ECF No. 306 Ex. 14 Tables 21-22 (revised).) Similarly, the HQs calculated for the short-tailed shrew are above 1.0 in every sampling grid within the SWDA, ranging from 2.8 to 52.4. (Id.; see also Verslycke Dep. 141-44.[18]) Dr. Verslycke observes that his adjusted calculations do not change his opinion that

_____

[18] ECF No. 306 Ex. 11.

"[c]hemical concentrations (especially Pb [lead]) in surface soils at the SWDA indicate the potential for unacceptable risks to small wildlife-consuming soil invertebrates."

At his deposition, Dr. Verslycke explained that, as a risk assessor, his role is not to make remedy recommendations. (Verslycke Dep. 17.) Instead, it is the role of a risk manager to evaluate the risk information presented by a risk assessor to determine how remedial options would address risks. Dr. Verslycke explained that the phrase "potential for unacceptable risk" means that further risk management is required.

Dr. Verslycke noted in his supplemental report that:

> COPCs that remain at the end of the baseline [ecological risk assessment] may be carried forward to the next phase of site investigation, following a scientific/management decision. It is during this next phase (i.e., corrective measures study or feasibility study) that preliminary remedial goals are developed, which may ultimately result in the development of site cleanup goals. A review of sites that have ecological risks due to Pb [lead] in soil as the primary risk and remediation driver indicates typical soil cleanup goals of around 400-650 mg/kg * * *.

(ECF No. 306 Ex. 15 at 21) (citations omitted).

Figure 1 of Dr. Verslycke's Supplemental Expert Report identifies the percentage of samples for areas of interest of the Site, including the SWDA, that exceed these typical soil lead cleanup goals. His Figure 1 indicates that almost 50% of the SWDA soil samples exceed the lower end of the typical lead cleanup goal range he identified (i.e., 400 mg/kg). It also indicates that more than 30% of the SWDA soil samples exceed the higher end of the typical lead cleanup goal range identified by Dr. Verslycke (i.e., 650 mg/kg). PPG sampling of the SWDA shows lead values as high as 14,500 mg/kg in historic samples and 2,800 mg/kg in the sampling overseen by Dr. Verslycke.

PPG states that the planned new SLA leachate collection system is being designed to

intercept the impacted SLA seepage currently effecting the eastern diversion ditch, including effects of the SLA seepage areas, SWDA SA-1, SWDA SA-2, and SWDA SA-3. (O'Hara Aff. ¶ 9; ECF No. 306-16). Plaintiffs respond that PPG fails to define "eastern diversion ditch" and it is not a geographical term used in materials produced in discovery and that, in any event, PPG's plans for the Site do not address the question of whether the high-pH seeps at SWDA SA-1, SWDA SA-2, and SWDA SA-3 currently may present an imminent and substantial endangerment to health or the environment.

PPG states that the high pH of seeps SWDA SA-1, SWDA SA-2, and SWDA SA-3 results solely from impacts from the SLA, not the SWDA. (O'Hara Aff. ¶¶ 7, 10, 11.) Plaintiffs respond that the affidavit of Mr. O'Hara states that seeps SWDA SA-1, SWDA SA-2, and SWDA SA-3 are "mainly" impacted by the SLA, not "solely."

PPG states that seepage areas SWDA SA-4, SWDA SA-5, and SWDA SA-6 are reflective of seeps that emanate from the SWDA. (O'Hara Aff. ¶ 10.) PPGs states that SWDA SA-4, SWDA SA-5, and SWDA SA-6 do not have an elevated pH, which means that they do not have a pH above 9.0 S.U. (O'Hara Aff. ¶ 10.)

PPG states that the SWDA does not cause elevated pH in seeps. (O'Hara Aff. ¶ 11.) Plaintiffs admit that O'Hara makes this assertion in his affidavit, but they contend that he has provided no information regarding the basis for this conclusion, however, for them to respond further. In addition, they contend that this statement is not material.

PPG states that Dr. Verslycke evaluated the effect of potential metals contaminants in the SWDA soil when he completed his Expert Report (ECF No. 306-14 at 21; ECF No. 306-15 at 2-3).

PPG states that Dr. Verslycke concluded that conditions in the SWDA do not present an

imminent and substantial endangerment to the environment. (ECF No. 306-14 at 3; Ex. 306-15 at

2-3; Verslycke Aff. ¶¶ 11-12, 18, 24.[19]) Plaintiffs respond that this statement is not a material

fact, but a legal conclusion.

Relying upon Dr. Verslycke's affidavit, PPG states that:

1) an imminent and substantial environmental hazard is a condition where there is
a near-term threat to environmental receptors of potentially serious harm and
requires an immediate response action in order to mitigate the potentially serious
harm; 2) risk assessors like Dr. Verslycke use the term "unacceptable risk" to
characterize and communicate site risks and assist risk managers with determining
whether risk management actions may be warranted; 3) a finding of
"unacceptable" ecological risk under such an assessment does not automatically
mean that adverse effects are occurring, that there is a near-term threat of
potentially serious harm, or that an imminent and substantial endangerment exists
to the environment; 4) whether or not a near-term threat of potentially serious
harm exists to the environment involves evaluation of more than just the
numerical calculations in an ecological risk assessment; 5) in reaching his
conclusion that conditions in the SWDA do not present an imminent and
substantial endangerment, i.e. a near-term threat of potentially serious harm, Dr.
Verslycke evaluated all of the quantitative, qualitative, and semi-qualitative
evidence; 6) Dr. Verslycke calculated HQs for chemicals of concern for several
representative wildlife species potentially exposed in different areas of the Site,
including the SWDA a calculated HQ above 1.0 indicates the potential for
adverse ecological effects and requires further risk evaluation or potential risk
management, HQ above 1.0 is not a statistical probability of environmental harm
occurring and a calculation of a HQ above 1.0 does not mean that any harm will
ever occur; and 7) Dr. Verslycke calculated HQs above 1.0 for representative
wildlife receptors at the SWDA, and relied on those HQs as one line of evidence
to conclude that chemical concentrations in surface soils at the SWDA indicate
the potential for unacceptable risks for small wildlife that primarily feed on soil
invertebrates, by which he meant that there is a "potential" for ecological risk that
is identified and that warrants further risk evaluation or potential risk management
and he concluded that there was not an imminent and substantial endangerment in
the SWDA because there was not near-term threat to environmental receptors of
potentially serious harm in the SWDA

(Verslycke Aff. ¶¶ 14-25.)

_____

[19] ECF No. 317 Ex. C.

Plaintiffs respond that these statements are not material because Dr. Verslycke's opinion as to what constitutes an imminent and substantial endangerment is irrelevant just as his conclusion as to whether the current conditions at the SWDA present an imminent and substantial endangerment are irrelevant. They also note that Dr. Verslycke does not purport to be speaking on behalf of all risk assessors, that Dr. Verslycke's Expert Report, Supplemental Expert Report, and Reply Report do not use the term "near-term threat of potentially serious harm" at any point in the analyses of the risks posed by the Site. They argue that Dr. Verslycke cannot opine on the ultimate legal issue in this case, namely whether the conditions at the SWDA may present an imminent and substantial endangerment to health and/or the environment.

The Baker Report

Dr. Verslycke noted that his risk results were consistent with those identified by Baker. In 1993, Baker conducted a remedial investigation of the PPG Site, including the SWDA, on behalf of PPG. (Baker RIR Vol. 1, at. i (PPG001807).) As part of that remedial investigation, Baker conducted an ecological risk assessment.[20] In its ecological risk assessment for the SWDA, Baker analyzed twenty surface soil samples that it collected during its investigation. Baker RIR Vol. 1, p. 5-12 (PPG001875). Baker also analyzed six surface soils samples from the SWDA that were previously collected by Ecology & Environment, Inc., an EPA consultant, and Dames & Moore, another PPG consultant.

Baker considered soil exposure pathways through ingestion and dermal contact, as well as the impact to terrestrial species that may ingest organisms, such as insects or plants, that have bioconcentrated constituents from the soils. (Baker RIR Vol. 1, p. 6-96 (PPG001993).)

_____

[20] PPG objects to the Baker Report as hearsay. However, as explained above, the Baker Report is not hearsay.

Baker initially compared surface soil samples against both United States Geological Survey (USGS) Background Levels for Metals in Soils, as well as what it stated were site-specific background levels. (Baker RIR Vol 1., p. 5-8 (PPG001871, PPG001875.). In comparing the SWDA soil samples against the USGS levels, Baker stated that lead was "detected at particularly high levels" in four of the samples. In addition, twenty-four of the twenty-six SWDA surface soil samples exceeded the maximum site-specific background concentration for lead. (Baker RIR Vol. 1, p. 5-12 (PPG001875); Baker RIR Vol. 2, Table G-3A (PPG002269).)

Plaintiffs note that Site visits by different groups have noted the presence of wildlife at the SWDA. Based on the Site-specific and regional ecology, Baker found that "many" ecological receptors were at risk. (Baker RIR Vol. 1, p. 6-81 (PPG001978).) Baker concluded that arsenic and lead may be impacting ecological integrity and were the "most significant [constituents of concern] that were detected in concentrations that potentially may decrease the viability of plants and earthworms." (Baker RIR Vol. 1, p. 6-8 (PPG001905), (Baker RIR Vol. 1, pp. 6-117-6-118 (PPG002014-002015); see also id. at 7-3 (PPG002020), Baker RIR Vol. 1 at 6-119 (PPG002016). Based on soil toxicity data for plants and terrestrial invertebrates, Baker concluded that arsenic and lead at the SWDA were the "most significant site-related [constituents of concern] that were detected in concentrations that potentially may decrease the viability of plants and earthworms." (Baker RIR Vol. 1, pp. 6-117-6-118 (PPG002014-002015); see also id. at 7-3 (PPG002020) ("Current lead levels [in SWDA surface soils] pose a potential risk to terrestrial organisms (in particular, earthworms)").

While Baker also concluded that terrestrial organisms, such as rabbits, birds, and deer, would be exposed to Site constituents in the different media through ingestion and/or dermal contact, it did not quantify the risks through the calculation of HQs. (Baker RIR Vol. 1 at 6-110

(PPG002007), 6-118 (PPG002015). Baker stated that it made this decision based on both a lack of media-specific screening values on which to evaluate the constituent levels, and the lack of a database of bioassay toxicity information. (Id. at 6-118 (PPG002015).)

In its review of the regional ecology, Baker stated that the Allegheny River corridor includes wildlife such as waterfowl, migratory bird species, small mammals, and songbirds. (Baker RIR Vol. 1, pp. 6-90-6-91 (PPG001987-001988).)

A PPG consultant conducting sampling of a seep in the Drainage Ditch reported that "[a]n animal removed the bucket from Seep 105 – teeth marks evident in bucket!" (ECF No. 306 Ex. 17) (KEY0040809). During a 2013 site visit of the SLA and SWDA, Civil & Environmental Consultants, Inc., ("CEC"), observed whitetail deer, cardinals, junco (a type of bird), and grey squirrels. (ECF No. 306 Ex. 21 at 10 (CEC001058).) CEC also observed beaver cuttings and coyote scat at the site. Dr. Verslycke also noted that "migratory songbirds and waterfowl are known to be present along the Allegheny River corridor." (ECF No. 306 Ex. 14 at 8.)

PPG argues that the determination of whether an imminent and substantial endangerment is present at the Site cannot be made solely pursuant to a numerical bright-line, quantitative test. Plaintiffs respond that this argument misreads both their contentions and the Honeywell case.

In Honeywell, the trial court held, among other things, that plaintiffs needed to establish that "the contaminant is present at levels above that considered acceptable by the state." 399 F.3d at 259. However, the Court of Appeals did not agree and held that RCRA's language did not support the "District Court's particular quantitative requirement nor the even higher and more narrow quantitative standards that Honeywell would have us impose." Id. at 260. Accordingly, the court held that "[p]roof of contamination in excess of state standards may support a finding of liability, and may alone suffice for liability in some cases, but its required use is without

justification in the statute" Id. at 261. In other words, the court held that a court cannot require a particular quantitative showing, not that a quantitative showing alone is never sufficient.

PPG's argument inverts Honeywell as if it held that quantitative evidence alone cannot support a finding of liability, when the court actually held that the law does not "require a particular quantitative showing as the *sine qua non* for liability." Id. at 260 (citations omitted). In addition, Plaintiffs do not merely rely upon "one numerical showing" but upon Dr. Verslycke's entire risk analysis and ultimate qualitative statement from his baseline risk assessment that "chemical concentrations in surface soils at the SWDA indicate the potential for unacceptable risks to small wildlife-consuming soil invertebrates." (ECF No. 306 Ex. 15 at 19, 22.) Thus, PPG's argument is unsupported and is rejected.

Plaintiffs have demonstrated that the conditions at the SWDA may pose an imminent and substantial endangerment to health and the environment, including high pH seeps at the SWDA and metals contamination. As they observe, even PPG's own expert, Dr. Verslycke, has identified these risks, although he attempts to dispute the ultimate legal conclusion resulting therefrom, which is not his purview to address. As Plaintiffs observe, PPG took this same tack with respect to the high pH seeps at the SLA—it pointed to Dr. Verslycke's opinion that such high pH seeps did not present an imminent and substantial endangerment to the environment (ECF No. 288 at 40-41)—but the Court nevertheless found that the conditions may present an imminent and substantial endangerment, thereby implicitly rejecting the attempt to allow Dr. Verslycke to determine the ultimate legal issue in the case. And PPG's argument that RCRA precludes a finding of liability based upon quantitative evidence alone is an improper reading of Honeywell. Therefore, Plaintiff's fourth motion for partial summary judgment will be granted, as detailed below.

Eljer Motion for Summary Judgment

On May 5,1988, Eljer obtained approval from the Pennsylvania Department of Environmental Resources ("PADER," now PADEP), as part of a beneficial use authorization, to dispose and/or deposit unfired clay moldings, ball clay and slip tailings, fired off-spec ware, and spent kiln refractories into the Eljer Landfill. (ECF No. 314 Ex. B.) The approval states: "The following residual wastes are approved as fill material: composite wastes consisting of unfired clay moldings; ball clay and slip tailings; fired off-spec ware; and spent kiln refractories." (ECF No. 299-2 at Tab 9; ECF No. 314 Ex. B.)

PPG contends that the approval does not specifically list any metals that are approved for disposal. Eljer responds that, while the approval did not specifically list any metals that are approved for disposal, the letter granted approval "as described in your [Eljer's] submittals of October 16, 1987, February 4,1988, and March 15, 1988, as prepared by Duncan, Lagnese and Associates, Inc. (DLA Project No. 2E027)." (ECF No. 299-2 at Tab 9; ECF No. 314 Ex. B.) The October 16, 1987 submittal expressly referenced in the approval letter included required leaching tests that measured the potential for the Eljer wastes to leach certain metals. (ECF No. 299-2, Tab 8). These leaching tests were the same tests reviewed by PPG's expert, Dr. Eric Butler, in reaching his opinion that the Eljer waste "had the potential" to leach certain metals at levels that are "a small fraction of the regulatory levels of concern." (Butler Aff. ¶ 15.)[21]

On March 28, 1991, Eljer obtained approval from PADER, as part of a beneficial use authorization, to dispose and/or deposit filter cake into the Eljer Landfill. (ECF No. 314 Ex. C.) The approval states "This approval is only for the use of filter cake generated from Eljer

_____

[21] ECF No. 314 Ex. A.

Industries, Inc., Ford City, Armstrong County." (ECF No. 314 Ex. C.) PPG contends that the approval does not specifically list any metals that are approved for disposal and that, by allowing Eljer to complete this beneficial reuse project, PADEP did not specifically authorize Eljer to release arsenic, barium, cadmium, chromium, lead, selenium, silver, or mercury into the Eljer Landfill.

From 1989 to 1998, Eljer estimated that it sent approximately 46,731.5 tons of the waste approved under the beneficial use authorizations to the Eljer Landfill. (ECF No. 314 Ex. D.)

There is evidence that Eljer did dispose and/or deposit filter cake at the Eljer Landfill (aka "Ford City Park") after obtaining beneficial use approval from PADEP. (ECF No. 314 Ex. F, at 19; Ex. G at p. OEP000570.) A 1997 Phase I Environmental Site Assessment of the Eljer Plumbingware facility in Ford City stated that "[t]he filter cake generated at the facility's wastewater treatment plant has been disposed of at various landfills and as fill at the Ford City Park." (ECF No. 314 Ex. F at 19.)

Eljer notes that the excerpted page from the Toxic Chemical Release Inventory Reporting Form R, Reporting Year 1995 for Eljer Plumbingware, Ford City, PA (ECF No. 314 Ex. G at OEP000570), makes no mention of the source of the barium compounds reported on the form. The analysis included in the October 16, 1987 submittal demonstrates that the ball clay and slip tailings, off spec ware and spent kiln refractory were sources of barium approved for disposal at the Eljer Landfill. (ECF No. 299-2, Tab 8 at PADEP 3726, PADEP 3738, PADEP 3760). As part of its applications for the beneficial reuse authorizations, Eljer subjected the waste it sought approval for (the unfired clay moldings, ball clay and slip tailings, fired off-spec ware, and spent kiln refractories, and filter cake) to testing designed to simulate the leaching that a waste would

undergo if disposed of in a sanitary landfill. (Butler Aff. Attach. 1, at 3[22]; ECF No. 299-2, Tab 8; ECF No. 314 Ex. E.)

In 1998, Eljer notified PADEP[23] that it would no longer deposit waste in the Eljer Landfill Area and that it planned to close the beneficial reuse area in accordance with the plan approved by DEP. (ECF No. 211, Ex. C; Tab 10).

On July 25, 2000, PADEP approved the Closure Report, submitted on behalf of Eljer, for the Eljer Landfill. (ECF No. 299-2, Tab 10). The approval stated: "The Department's acceptance of your Closure Report does not constitute a waiver or release of liability for any past, present or future contamination at the site. The Department reserves the right to require additional investigation and remediation of any contamination at the site which is covered subsequent to the closure activities." (ECF No. 299-2, Tab 10).

PPG notes that Plaintiffs have produced no evidence to prove that PPG owned, accessed or exercised control over the Eljer Landfill or that any disposal activity undertaken by PPG in the SLA or SWDA has ever contaminated either of these two areas. (See ECF No. 25-3 at 1-5; ECF No. 28-5.)

Cullet is the only PPG waste that has been observed and that Plaintiffs have specifically alleged has migrated and/or exists beyond the fenced area of the SWDA. (Amster Dep. 14:13-14; Ebbert Dep. 65:13-66:11.)[24]  At the request of PADEP, PPG delineated the areas of cullet placement at the Ford City site. (Ebbert Dep. 22:20-25; 23:1-24; 39:12-25; 40:1-8; 49:4-12;

---

[22] ECF No. 314 Ex. A.
[23] On June 28, 1995, PADER was renamed PADEP.  71 P.S. § 1340.501.
[24] ECF No. 314 Exs. H, I.

Ebbert Dep. Ex. 2.[25]) Thomas Ebbert, PPG Manager for Remediation, testified that he is unaware of any information regarding migration of Eljer waste, any information about the impact of Eljer waste on soils outside the Eljer Landfill area, any information about the impact of Eljer waste on surface water, or groundwater, or soil samples. (Ebbert Dep. 30:9-31:22.)[26] Similarly, Marian Broz, PPG's project manager for the Site for the period 2001-2009, had no knowledge of the impact of Eljer waste at the Site. (Broz Dep. 28:1-21.)[27]

Cullet was visually observed near the Eljer Landfill area. (Butler Aff. ¶ 8; Butler Aff. Attach.1, p. 4; ECF No. 314 Ex. J. at PPG00054092.)

Dr. Eric L. Butler was retained on behalf of PPG to test and evaluate the waste characteristics of cullet with respect to its leachability of metals and compare the results of that test to the historical results metal leachability testing results of various Eljer waste materials that were disposed of in the Eljer landfill. (Butler Aff. ¶¶ 8, 14-15).

The testing of the leachability of metals from the cullet and the Eljer waste was conducted using U.S. EPA test methods designed to simulate leaching through a landfill. (Butler Aff. ¶ 11.) In plain terms, this testing measures the concentrations of metals that "leak" out of the waste over time into the environment.

The U.S. EPA test methods for metals leachability are used to determine whether or not a waste is classified as a hazardous waste. (Butler Aff. ¶ 12). A waste is not classified as a hazardous waste if the leachability results are below certain levels specified by U.S. EPA.

The cullet does not qualify as hazardous waste under applicable U.S. EPA regulatory

---

[25] ECF No. 314 Ex. J.
[26] ECF No. 299 Ex. 6.
[27] ECF No. 299 Ex. 5.

limits using U.S. EPA's leachability test method. (Butler Aff. ¶ 13; Butler Aff. Attach. 1, at 1-2, 4-5). Accordingly, the cullet is a nonhazardous material according to U.S. EPA guidelines.

The Eljer waste materials that received beneficial use approval from PADEP in 1988 and 1991 did not qualify as hazardous waste under applicable U.S. EPA regulatory limits using U.S. EPA's leachability test method. (Butler Aff. ¶ 15; Butler Aff. Attach. 1, at 1-3). Accordingly, the Eljer waste materials that received beneficial use approval from PADEP in 1988 and 1991 are nonhazardous materials according to U.S. EPA guidelines.

Dr. Butler compared the results of his cullet sample testing with the results of the historical leachability testing performed on the Eljer waste that received beneficial reuse authorization from PADEP. (Butler Aff. ¶¶ 16-18; Butler Aff. Attach. 1 at 1-2, 6-7, Figure 4.1, Figure 4.2, Figure 4.3). Specifically, Dr. Butler compared the number of detections of metals and the concentrations of detected metals from the leachability testing between the cullet and the Eljer wastes. (Butler Aff. ¶¶ 16-18).

Dr. Butler concluded that the Eljer Waste, as a whole, "yielded more detections of metals and higher concentrations of metals" than the cullet samples. (Butler Aff. ¶¶ 16-18; Butler Aff. Attach. 1 at 2.)

Dr. Butler opined to a reasonable degree of scientific certainty that, "in comparing the cullet samples to the Eljer samples, the cullet samples exhibited much lower detection frequencies of metals and overall lower concentrations of leachable metals, all of which were far below US EPA regulatory limits for those metals." (Butler Aff. ¶ 18; Butler Aff. Attach. 1 at 7.)

Because the Eljer wastes that authorized for beneficial reuse had more frequent detections of metals and higher concentrations of metals than the cullet, the Eljer waste has a higher potential for leaching metals into the environment than the cullet. (Butler Aff. ¶ 17). However,

the detected metals from the U.S. EPA leaching procedures for both the cullet and the Eljer waste are a small fraction of regulatory levels of concern.

Dr. Butler concluded that the comparison of the waste characteristics of the Eljer Waste to the cullet samples showed that the cullet samples were "more benign than the Eljer Waste with regard to the potential for leaching metals into the environment." (Butler Aff. ¶ 17; Butler Aff. Attach. 1 at 2).

In this case, Plaintiffs allege that contaminants, including arsenic, barium, chromium, lead, and mercury, are impacting the soil at the Site and present and/or may present an imminent and substantial endangerment to health or the environment. (See ECF No. 91 ¶ 35; Civ. A. No. 13-1396, ECF No. 1 ¶¶ 49, 51).

Procedural History of Eljer Involvement

On October 14, 2015, PPG filed a motion to join Eljer as a necessary party under Rule 19 or to implead it as a third-party defendant under Rule 14(a) (ECF No. 230). On November 19, 2015, an order was entered (ECF No. 236), granting PPG's motion insofar as it sought leave to implead Eljer as a third-party defendant. PPG filed its Third-Party Complaint against Eljer on December 3, 2015 (ECF No. 240).

Count I sought contribution under UCATA. Count II alleged a cost recovery claim under sections 701 and 702 of the HSCA. Count III alleged a claim of contribution under section 705 of the HSCA. Count IV sought indemnification under Pennsylvania law.

Eljer filed a motion to dismiss on March 10, 2016 (ECF No. 259). On June 9, 2016 a Memorandum Opinion and Order was entered (ECF No. 264) which granted the motion with respect to Counts II and IV and denied it with respect to Counts I and III.

On August 15, 2017, Eljer filed a motion for summary judgment (ECF No. 299). On October 16, 2017, PPG filed a brief in opposition (ECF No. 312). On November 3, 2017, Eljer filed a reply brief (ECF No. 320).

In its motion, Eljer argues that: 1) Count I of the Third-Party Complaint should be dismissed because PPG has failed to introduce evidence that Eljer's deposits contaminated the Site and two employees did not say that its waste contributed to the imminent and substantial endangerment of the environment; and 2) Count III should be dismissed because Eljer's disposal was authorized by a PADEP beneficial use permit and PPG has pointed to no evidence of migration from the landfill.

In response, PPG argues that: 1) although it agrees with Eljer that Plaintiffs will not be able to show that waste conditions at the Site present and imminent and substantial endangerment to the environment, all PPG has to do with respect to Count I is present evidence to show that Eljer is a joint tortfeasor that contributed to the loss (not prove the underlying claim) and Dr. Butler said that Eljer's waste was more likely a cause of metals leaching into the environment than PPG's waste; and 2) with respect to Count III, PPG is not required to show that Eljer's disposal activities caused or contributed to imminent and substantial endangerment, only that Eljer meets one of the three definitions of "responsible party" under the HSCA, the Butler Report demonstrates that Eljer waste constituted an actual or threatened release of hazardous substances, and Eljer's "permit shield" argument was already rejected when Eljer presented it in a motion to dismiss, because the permit never said that Eljer could dispose of arsenic, barium, cadmium, chromium, lead, mercury, selenium or silver, under CERCLA the scope is limited to the four corners of the permit and under HSCA liability is even broader.

In its reply brief, Eljer argues that: 1) the harm or loss alleged by Plaintiffs is that of RCRA liability, Dr. Butler only said that Eljer waste "had the potential" to leach metals at levels that a small fraction of regulatory levels of concern; 2) there has been no evidence of a release or threatened release or conditions at the Eljer Landfill for which PPG will incur costs; and 3) the permit shield argument can be renewed on a motion for summary judgment and the PADEP was aware of the content of the waste when it issued a permit.

Count I: Contribution

In Count I, PPG asserts a claim of contribution under Pennsylvania law. Eljer contends that PPG has failed to introduce sufficient evidence that Eljer's deposits contaminated the Site. PPG responds that it has presented evidence that Eljer is a joint tortfeasor.

The UCATA provides that:

> (a) General rule.--The right of contribution exists among joint tort-feasors.

> (b) Payment required.-- A joint tort-feasor is not entitled to a money judgment for contribution until he has by payment discharged the common liability or has paid more than his pro rata share thereof.

> (c) Effect of settlement.--A joint tort-feasor who enters into a settlement with the injured person is not entitled to recover contribution from another joint tort-feasor whose liability to the injured person is not extinguished by the settlement.

42 Pa. C.S. § 8324. The UCATA contains the following definition:

> As used in this subchapter "joint tort-feasors" means two or more persons jointly or severally liable in tort for the same injury to persons or property, whether or not judgment has been recovered against all or some of them.

42 Pa. C.S. § 8322.

Contribution "is not a recovery for the tort, but rather it is the enforcement of an equitable duty to share liability for the wrong done by both." Swartz v. Sunderland, 169 A.2d 289, 290

(Pa. 1961). The burden of proving the joint causal negligence falls upon the contribution claimant. Wade v. S.J. Groves & Sons Co., 424 A.2d 902, 907 n.7 (Pa. Super. 1981); Restatement (Second) of Torts § 433B. Thus, PPG must demonstrate that it and Eljer are joint tortfeasors both liable to Plaintiffs. "In order to be joint tortfeasors, the parties must either act together in committing the wrong, or their acts, if independent of each other, must unite in causing a single injury." Agere Sys., Inc. v. Advanced Envt'l Tech. Corp., 552 F. Supp. 2d 515, 520 (E.D. Pa. 2008) (when one defendant pleaded that another defendant was liable to it for breaching contractual obligations or duties, this did not provide a basis for contribution).

In this case, PPG and Eljer did not act together, so the contribution claim must be based on the theory that Eljer's acts united with PPG's acts to cause a single injury. However, Eljer argues that PPG cannot succeed on this theory because its evidence demonstrates only that Eljer's waste had more of a potential for leaching regulated metals into the environment than PPG's materials, not that they actually did leach beyond the Eljer Landfill.

As Eljer observes, Plaintiffs have not alleged that Eljer is responsible for any harm to the environment and PPG has no evidence of harm either. Therefore, PPG cannot maintain an action against Eljer as a joint tortfeasor and with respect to Count I, Eljer's motion will be granted.

Count III: HSCA Liability

In Count III of the Third-Party Complaint, PPG seeks to recover from Eljer under the HSCA for contribution. Eljer argues that this claim is precluded because it deposited waste pursuant to a valid permit and because PPG has presented no evidence of migration. PPG responds that Eljer cannot rely on the permit shield defense and that it is only required to demonstrate that Eljer meets one definition of "responsible party" under the HSCA.

Section 705 of the HSCA provides as follows:

(a) General rule.—A person may seek contribution from a responsible person under section 701, during or following a civil action under section 507 or 1101. Claims for contribution shall be brought in accordance with this section and the Pennsylvania Rules of Civil Procedure. Nothing in this section shall diminish the right of a person to bring an action for contribution in the absence of a civil action under section 507 or 1101.

(b) Allocation.—In a civil action in which a liable party seeks a contribution claim, the court, or the board in an action brought under section 507 or 1101, shall enter judgment allocating liability among the liable parties. Allocation shall not affect the parties' liability to the department. The burden is on each party to show how liability should be allocated. In determining allocation under this section, the court or the board may use such equitable factors as it deems appropriate.

35 P.S. § 6020.705(a) (footnotes omitted). Section 701 provides that:

(a) General rule.--Except for releases of hazardous substances expressly and specifically approved under a valid Federal or State permit, a person shall be responsible for a release or threatened release of a hazardous substance from a site when any of the following apply:

(1) The person owns or operates the site:

(i) when a hazardous substance is placed or comes to be located in or on a site;

(ii) when a hazardous substance is located in or on the site, but before it is released; or

(iii) during the time of the release or threatened release.

(2) The person generates, owns or possesses a hazardous substance and arranges by contract, agreement or otherwise for the disposal, treatment or transport for disposal or treatment of the hazardous substance.

(3) The person accepts hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person from which there is a release or a threatened release of a hazardous substance which causes the incurrence of response costs.

35 P.S. § 6020.701(a).

The Court of Appeals has held that:

to make a prima facie case of liability under HSCA, plaintiffs must establish that: (1) defendants are responsible parties; (2) there has been an actual or threatened "release" of a hazardous substance from a site; (3) "response costs" were or will be incurred; and (4) the response costs were "reasonable and necessary or appropriate."

In re Joshua Hill, Inc., 294 F.3d 482, 485 (3d Cir. 2002) (citation omitted).[28]

Eljer argues that it cannot be a "responsible party" under section 701 (because it operated under a valid permit from PADEP), and therefore PPG may not seek contribution from it under section 705. PPG argues that parties may be held liable under the HSCA even if they are not directly responsible for disposal of hazardous substances, citing Joshua Hill, 294 F.3d at 488 (noting that "it is sufficient that a release significantly contributes" and that, "to the extent that persons other than defendants may share responsibility for the contamination of the Property, the Act affords Defendants a right to seek contribution from responsible parties.") However, in that case, the disposal was without approval of PADER. Id. at 484-85. Thus, Whitemarsh was a "responsible party" under the HSCA and other responsible parties could seek contribution from it. The permit shield defense was not at issue in that case.

Permit Shield

Eljer argues that, because the statute explicitly exempts "releases of hazardous substances expressly and specifically approved under a valid Federal or State permit," PPG must demonstrate that Eljer lacked such a permit, but Eljer has stated (and PPG has acknowledged) that Eljer deposited off-spec plumbing waste pursuant to a valid permit issued by PADEP. PPG responds that the permit approved only the following: composite waste consisting of unfired clay

---

[28] Under the HSCA, a "hazardous substance" includes "any element, compound or material which is … defined or designated as a hazardous substance pursuant to [CERCLA]." 35 P.S. § 6020.103. Arsenic, barium, cadmium, chromium, lead, selenium, silver and mercury are all hazardous substances under CERCLA. 42 U.S.C. § 9601(14); 40 C.F.R. § 302.4

moldings; ball clay and slip tailings; fired off-spec ware; and spent kiln refractories. (ECF No. 234 Ex. 2.) It argues that Eljer did not receive approval to deposit arsenic, barium and other elements. Eljer replies that PADEP did approve of the disposal of these items, which were identified in the analysis submitted with its application, dated October 16, 1987. (ECF No. 235 Ex. 1.)

The Court of Appeals has found that "cost recovery" available under § 6020.702(a)(3) of the HSCA to be "virtually identical" to that available under § 9607(a)(4)(B) of CERCLA. <u>Agere Systems, Inc. v. Advanced Envt'l Tech. Corp.</u>, 602 F.3d 204, 236 (3d Cir. 2010). PPG argues that the Court can look to CERCLA cases and that, under CERCLA, the Court can look only to the "four corners" of the permit to see if "hazardous substances" were allowed to be released. <u>United States v. United Nuclear Corp.</u>, 814 F. Supp. 1552, 1565 (D.N.M. 1992) (license did not anticipate or authorize seepage from the tailings pits).

Nevertheless, there are also material differences between the two statutes. <u>Andritz Sprout-Bauer, Inc. v. Beazer East, Inc.</u>, 12 F. Supp. 2d 391, 407 (M.D. Pa. 1998). The treatment of permits is not handled in the same manner. According to the HSCA, as quoted above, a party that releases hazardous substances expressly and specifically approved under a valid Federal or State permit is not a "responsible party." CERCLA, by contrast, contains the following provision:

> Recovery by any person (including the United States or any State or Indian tribe) for response costs or damages resulting from a federally permitted release shall be pursuant to existing law in lieu of this section. Nothing in this paragraph shall affect or modify in any way the obligations or liability of any person under any other provision of State or Federal law, including common law, for damages, injury, or loss resulting from a release of any hazardous substance or for removal or remedial action or the costs of removal or remedial action of such hazardous substance. In addition, costs of response incurred by the Federal Government in connection with a discharge specified in section 9601(10)(B) or

(C) of this title shall be recoverable in an action brought under section 1319(b) of Title 33.

42 U.S.C. § 9607(j). Not only does the wording differ from that of the HSCA, but subsection (j) does not even appear to be a defense: it states that recovery shall be pursuant to existing law in lieu of this section. In addition, the liability provision in subsection (a) states that it is "subject only to the defenses set forth in subjection (b)," which clearly does not include subsection (j). Thus, case law under CERCLA cannot be used to address the permit shield under the HSCA.

Under the HSCA, parties who release hazardous substances expressly and specifically approved under a valid Federal or State permit are not responsible parties, 35 P.S. § 6020.701(a), and pursuant to 25 Pa. Code § 287.102(e), beneficial use of residual waste which the PADEP has approved in writing "shall be deemed to have a residual waste processing or disposal permit if the person … uses the residual waste in accordance with the terms and conditions of the written approval and the Department has not revoked the approval." Taken together, these provisions indicate that Eljer's beneficial use of residual waste, as approved in writing by PADEP, would constitute a residual waste disposal permit exempting Eljer from liability.

It is true that PADEP informed Eljer that its application for beneficial use was "not a permit application" (ECF No. 28-5 at 15). Eljer argues that the fact that PADEP stated on November 25, 1987 that Eljer's application was "not a permit application" "is explained by the fact that the DEP's residual waste permit-by-rule regulation was not promulgated until July 4, 1992 … The regulation was adopted after the letter, but expressly applies to earlier approvals." (ECF No. 320 at 9 n.4.)

PPG contends that the permit itself referred only to "composite wastes consisting of unfired clay moldings; ball clay and slip tailings; fired off-spec ware; and spent kiln

refractories." (ECF No. 234 Ex. 2 at 1.) The permit further stated that it could be rescinded if

"[t]he disposal of waste is creating or may create, along or in conjunction with other wastes, a

nuisance, environmental harm, or hazard to the public's health." (ECF No. 234 Ex. 2 at 2.)

Moreover, when Eljer submitted its closure report, PADEP stated on July 25, 2000 that it:

> does not warrant the accuracy or veracity of any closure report. The Department's acceptance of your Closure Report does not constitute a waiver or release of liability for any past, present or future contamination at the site. The Department reserves the right to require additional investigation and remediation of any contamination at this site which is covered subsequent to the closure activities. The Department also reserves the right to take any appropriate enforcement action to ensure compliance with any applicable statute or regulations.

(ECF No. 234 Ex. 1.) Thus, PADEP itself did not absolve Eljer of all responsibility for potential

environmental problems at the Eljer Landfill. However, there is no evidence that PADEP has

ever pursued any enforcement action against Eljer relating to the Site.

The regulation provides that a person who receives prior written approval from the

PADEP for the beneficial use of residual waste shall be deemed to have a residual waste

processing or disposal permit:

> The beneficial use of residual waste which the Department has approved, in writing, prior to July 4, 1992, shall be deemed to have a residual waste processing or disposal permit if the person or municipality uses the residual waste in accordance with the terms and conditions of the written approval and the Department has not revoked the approval. The expiration date for permits issued pursuant to this subsection is July 4, 2002, unless a specific permit term is written as a condition of the prior written approval.

25 Pa. Code § 287.102(e).

Moreover, the permit also stated that:

> The Department grants approval for the beneficial use of certain residual wastes generated at Eljer Plumbingware's Ford City facility as described in your submittals of October 16, 1987, February 4, 1988, and March 15, 1988, as prepared by Duncan, Lagnese and Associates, Inc. as fill material for future

45

> development of recreational areas of the Ford City Park Site, North Buffalo
> Township, Armstrong County.

(ECF No. 234 Ex. 2 at 1.) Reference to those three submittals shows that they listed arsenic,

barium and other elements as constituents of the waste and the fact that any leaching of metals

from landfill would be at concentrations below regulatory limits. (ECF No. 234 Ex. 2, Tab 9.)

Eljer has produced evidence that it operated pursuant to a valid permit, that the permit

application materials revealed the existence of the metals PPG contends Eljer did not have

permission to deposit, and that PADEP approved the permit nonetheless. PPG has not responded

to this argument. Considering all of this evidence, Eljer has successfully demonstrated that it

deposited material in the Eljer Landfill pursuant to a valid beneficial use permit and thus it

cannot be a responsible party under section 701(a) of the HSCA, nor can PPG seek contribution

from Eljer under section 705 of the statute.

PPG also contends that, even if Eljer is allowed to rely on the permit shield defense, it

still may be held liable under the HSCA because of the statute's broad definition of "responsible

party," that is, any person who owned or operated a site that has hazardous substances regardless

of when they were released or if that person is the entity that released the hazardous substances.

See Bethlehem Iron Works, Inc. v. Lewis Indus., Inc., 1996 WL 557592, at *64 (E.D. Pa. Oct. 1,

1996) ("It is enough under HSCA that the Lewis Defendants owned or operated the property

when a hazardous substance was either placed or came to be located in or on the site.") This

argument, however, is untenable because it reads the phrase "Except for releases of hazardous

substances expressly and specifically approved under a valid Federal or State permit" out of the

statute. Such an interpretation would run afoul of the cardinal principle that "courts must give

effect, if possible, to every clause and word of a statute." Loughrin v. United States, 134 S.Ct.

46

2384, 2390 (2014) (citation omitted).  Therefore, with respect to Count III of the Third-Party

Complaint, the motion for summary judgment will be granted.

In summary, Eljer's motion for summary judgment will be granted and Plaintiffs' Fourth

Motion for Partial Summary Judgment will be granted.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PENNENVIRONMENT and SIERRA CLUB, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 12-342 |
| | ) | Member Cases: 12-527, 13-1395, |
| PPG INDUSTRIES, INC., BOROUGH OF FORD | ) | 13-1396, 14-229 |
| CITY, and BUFFALO & PITTSBURGH | ) | Magistrate Judge Mitchell |
| RAILROAD, INC., | ) | |
| Defendants, | ) | |
| | ) | |
| PPG INDUSTRIES, INC., | ) | |
| Third-Party Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| AS AMERICA, INC. d/b/a AMERICAN | ) | |
| STANDARD BRANDS a/s/i to ELJER, INC., | ) | |
| ELJER PLUMBINGWARE, INC., ELJER | ) | |
| INDUSTRIES, INC. and ELJER HOLDING | ) | |
| CORP., | ) | |
| Third-Party Defendant. | ) | |

<u>ORDER</u>

AND NOW, this 13th day of April, 2018, for the reasons provided in the

Memorandum Opinion,

IT IS HEREBY ORDERED that the Motion for Summary Judgment filed by

Third Party Defendant AS America, Inc., d/b/a American Standard Brands a/s/i Eljer Inc., Eljer

Industries, Inc. and Eljer Plumbingware, Inc. (Eljer) (ECF No. 299) is granted.

IT IS FURTHER ORDERED that Plaintiffs' Fourth Motion for Partial Summary

Judgment (ECF No. 303) is granted and it is further:

ORDERED that defendant PPG Industries, Inc., is liable under the Resource

Conservation and Recovery Act (RCRA), 42 U.S.C. § 6972(a)(1)(B), because it contributed to

the past disposal of waste at the Solid Waste Disposal Area (SWDA) which may present an imminent and substantial endangerment to health or the environment, as set forth in the Claim in Plaintiffs' First RCRA Complaint (as amended, ECF No. 91) and the Claim in Plaintiffs' Second RCRA Complaint (Civ. No. 2:13-cv-01396; ECF No. 1); and it is further

ORDERED that judgment is entered against defendant PPG Industries, Inc., on plaintiffs' RCRA claim as it relates to the soils of the SWDA, which may present an imminent and substantial endangerment to the environment, and high-pH waters emanating from the SWDA seeps, which may present an imminent and substantial endangerment to health or the environment, as set forth in the claim in Plaintiffs' First RCRA Complaint (as amended, ECF No. 91) and the claim in Plaintiffs' Second RCRA Complaint (Civ. No. 2:13-cv-01396; ECF No. 1); and it is further

ORDERED that relief issues related to defendant PPG Industries, Inc.'s liability for these claims shall be addressed in further proceedings in these consolidated cases.


s/Robert C. Mitchell_____
ROBERT C. MITCHELL
United States Magistrate Judge