IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PENNENVIRONMENT and SIERRA CLUB,    )
                      Plaintiffs,    )
                                         )
    vs.    )             Civil Action No. 12-342
                                         )             Member Cases: 12-527, 13-1395,
PPG INDUSTRIES, INC., BOROUGH OF FORD    )             13-1396, 14-229
CITY, and BUFFALO & PITTSBURGH    )             Magistrate Judge Mitchell
RAILROAD, INC.,    )
                       Defendants.    )
                                         )

## MEMORANDUM OPINION AND ORDER

Plaintiffs, PennEnvironment and Sierra Club, bring these citizen suits pursuant to section 505 of the Federal Water Pollution Control Act, 33 U.S.C. § 1365(a)(1) (Clean Water Act or CWA), section 7002(a)(1)(B) of the Resource Conservation and Recovery Act, 42 U.S.C. § 6972(a)(1)(B) (RCRA), and section 601(c) of the Pennsylvania Clean Streams Law, 35 P.S. § 691.601(c) (CSL), against Defendants, PPG Industries, Inc. (PPG), the Borough of Ford City (Ford City), and Buffalo & Pittsburgh Railroad, Inc. (BPRR), to remedy the alleged imminent and substantial endangerment to health and the environment presented by contamination of a site in Armstrong County, Pennsylvania used and operated by PPG (the "Site"), contamination of surface waters and sediments in the Allegheny River and Glade Run in the vicinity of the Site, and contamination of groundwater associated with the Site.[1]

Presently pending before the Court is Defendant PPG Industries, Inc.'s Motion for a Determination that Injunctive Relief Under RCRA is Futile as a Matter of Law (ECF No. 391). For the reasons that follow, the motion will be denied without prejudice.

---

[1] Plaintiffs have indicated that they are not pursuing claims against or seeking specific relief from Ford City or BPRR, but have joined these defendants as indispensable parties.

<u>Facts</u>

The Site is located in North Buffalo and Cadogan Townships in Armstrong County, Pennsylvania. It is bordered by Route 128 to the north, the Allegheny River to the south, Glade Run (a tributary of the Allegheny River) to the west and residential property to the east. (Revised Treatment Plan Report at 3; Baker Remedial Investigation Report (Baker RIR), Vol. 1, at 1-1 to 1-2.)[2]

The PPG Site includes an area known as the Slurry Lagoon Area (SLA) where PPG deposited slurry waste in three lagoons it created in an area it formerly used as a sandstone quarry. (Revised Treatment Plan Report at 4 (PPG0050748).) The SLA is bordered by Route 128 to the north, the Allegheny River and a railroad to the south, Glade Run to the west, and an area that PPG refers to the "solid waste disposal area" (SWDA) to the east. (Baker RIR, p. 1-3 (PPG001819).)[3] A stream which PPG refers to as the Drainage Ditch runs between the SLA and SWDA. (Revised Treatment Plan Report at 16 (PPG0050760).)

<u>Brief History of Site Investigation and Treatment</u>

From 1900 to 1927, PPG operated a sandstone quarry and sand plant in the area that later became the SWDA. (Baker RIR Vol. 1, p. 1-2 (PPG001818).) Beginning in the 1920s and continuing until 1967, PPG disposed of solid waste from its manufacturing operations in Ford City at the SWDA. (2009 Administrative Order ¶¶ 3-4 (PADEP000003);[4] Baker RIR Vol. 1, pp. 1-3 to 1-5 (PPG001819-1821).)

---

[2] ECF No. 306 Ex. 1; ECF No. 306 Ex. 2.
[3] Previously, PPG referred only to the SWDA, but in the Consent Order and Agreement, at the hearing and in its post-hearing brief, PPG began referring to both the SWDA and the "SWDA Annex," which is defined below.
[4] ECF No. 306 Ex. 3.

PPG disposed of "off-spec" glass materials at the SWDA, as well as coal ash, metal debris, asbestos-coated material, batch materials, refractory material, cullet, bricks, construction debris, packing materials (paper, wood), municipal plant trash, and empty containers. (Dames & Moore Summary, p. 3 (SHAW 000158);[5] Baker RIR Vol. 1, p. 1-5 (PPG001821).)

In 1971, the Pennsylvania Department of Environmental Resources – now known as the Pennsylvania Department of Environmental Protection ("PADEP") – issued a Notice of Violation to PPG concerning discharges of industrial waste from the Site into the Allegheny River. On March 8, 1971, PPG and PADEP entered into an Agreement and Stipulation which required PPG to submit a remediation plan that would either eliminate the continuing discharges or treat the discharges in perpetuity. (CWA Compl. ¶ 19; RCRA Compl. ¶ 21.)

On August 1, 1972, PPG submitted a remediation plan that proposed continuing untreated discharge into the Allegheny River. (CWA Compl. ¶ 20; RCRA Compl. ¶ 22.) On October 16, 1972, PPG sold the Site to Ford City for one dollar. (CWA Compl. ¶ 21; RCRA Compl. ¶ 23.) On or about March 16, 1973, PADEP informed PPG that its plan was unacceptable and requested that PPG revise the plan to provide for treatment of the discharge. On or about May 16, 1973, PPG withdrew its plan. (CWA Compl. ¶ 22; RCRA Compl. ¶ 24.)

PADEP informed PPG at least as early as February 21, 1992 that it was required to obtain a permit under the CSL. (CWA Compl. ¶ 24; PPG Ex. 11.) PPG indicates that, in response to the notice, it prepared a Remedial Investigation Work Plan which the Department approved in November 1992.

_____

[5] ECF No. 306 Ex. 4.

3

PPG entered the Site into Pennsylvania's Land Recycling Program (commonly known as "Act 2") in 2001. Pennsylvania's Act 2 program allows owners and operators to "voluntarily" (i.e., without the issuance of a PADEP Order) remediate properties under the supervision of PADEP. The study and remediation of a property under Act 2 can take place either before or after an owner/operator has formally submitted the property to the Act 2 process. Nonetheless, PADEP must approve all work plans and remediation plans and has the ability to require changes and revisions in order to assure compliance with Act 2 remediation standards. PPG submitted the Site to the Act 2 process by filing a Notice of Intent to Remediate ("NIR") in 2001, pursuant to which PPG committed to ensure that the Site, including the leachate from the slurry lagoon area at issue in Plaintiffs' Complaints, met the Act 2 statutory site-specific remediation standards. As part of the Act 2 process, PPG submitted a Remedial Investigation Report for the slurry lagoon area on July 31, 2001 and an Addendum on October 15, 2001. PADEP approved these reports on October 19, 2001. (ECF No. 27 Ex. 21.)

PPG developed and submitted to PADEP a National Pollutant Discharge Elimination System ("NPDES") Permit Application for Discharges Associated with Construction Activities that contained an Erosion and Sedimentation (E&S) Control Plan to address the leachate seeps during the construction phase. (ECF No. 27 Ex. 22.) However, PADEP did not approve this E&S Plan, but instead issued PPG an interim discharge permit on November 19, 2002 that required the collection and treatment of seeps resulting from the leachate from the slurry lagoon area during construction. (ECF No. 27 Ex. 23.)

On March 9, 2009, PADEP issued an Administrative Order ("2009Administrative Order"), in which it stated that "[t]he Department believes that the discharges coming from the site and entering into the Allegheny River and Glade Run pose a significant threat to public

health and the environment." (CWA Compl. ¶ 26; RCRA Compl. ¶ 27; ECF No. 25 Ex. 1 at PADEP 1.)

Procedural History

On January 13, 2012, Plaintiffs gave notice of their intent to file suit to the Administrator of the Environmental Protection Agency (EPA), PADEP and Defendants as required by the CWA, CSL and RCRA.  33 U.S.C. § 1365(b)(1)(A); 35 P.S. § 691.601(e); 42 U.S.C. § 6972(b)(2)(A).  (CWA Compl. ¶ 4 & Ex. 1; RCRA Compl. ¶ 4 & Ex. 1.)  On March 20, 2012, Plaintiffs filed a complaint against PPG and Ford City under the CWA and the CSL (the "CWA Complaint").  The case was docketed at Civ. A. No. 12-342.

On April 20, 2012, Plaintiffs filed another complaint against PPG and Ford City under the RCRA (the "RCRA Complaint").  They alleged that PPG is a generator and/or transporter of the solid or hazardous waste at the Site, as well as an owner and/or operator of the site, and has contributed to the past or present handling, storage, treatment, transportation, or disposal of the solid or hazardous waste at the Site, thereby presenting an imminent and substantial endangerment to health or the environment.  This case was docketed at Civ. A. No. 12-527.  On May 25, 2012, Plaintiffs filed a motion to consolidate the two cases (ECF No. 11).  On May 29, 2012, an order was entered granting this motion and consolidating the cases at No. 12-342 (ECF No. 12).

On September 25, 2013, Plaintiffs filed a second CWA/CSL complaint ("Second CWA Complaint"), including additional instances of alleged pollution and adding BPRR as a defendant.  The case was docketed at No. 13-1395.

On September 25, 2013, Plaintiffs also filed a second RCRA complaint ("Second RCRA Complaint"), which added BPRR as a defendant, and was docketed at No. 13-1396.  On

September 30, 2013, an order was entered consolidating the Second CWA Complaint and the

Second RCRA Complaint at No. 12-342.  Finally, on February 18, 2014, Plaintiffs filed a third

CWA/CSL complaint against PPG, Ford City and BPRR, docketed at No. 14-229 ("Third CWA

Complaint").  On April 8, 2014, Plaintiffs filed a motion to consolidate the case and on April 9,

2014, an order was entered consolidating the case at No. 12-342.

On December 10, 2014, the Court granted Plaintiffs' motion for a preliminary injunction

insofar as it requested that PPG be ordered to file an application for a NPDES permit, and PPG

was ordered to apply for a permit by March 31, 2015 (ECF No. 192.)  On April 7, 2015, PPG

notified the Court that it had submitted its NPDES application and that PADEP had accepted it

(ECF No. 212).

On August 31, 2015, the Court granted Plaintiffs' Third Partial Motion for Summary

Judgment, finding that the high-pH seeps in the SLA may present an imminent and substantial

endangerment to human health or the environment under RCRA (ECF No. 228). On April 13,

2018, the Court granted Plaintiffs' Fourth Partial Motion for Summary Judgment, finding that

PPG's waste may present an imminent and substantial endangerment to human health or the

environment under RCRA due to its contamination of the soils and high pH seeps in the SWDA

(ECF No. 331).  In both of these orders, the Court indicated that "relief issues related to PPG

Industries, Inc.'s liability for these claims shall be addressed in further proceedings."

History of Recent PPG Activity Related to the Site

On January 30, 2015, PPG submitted to PADEP the Revised Treatment Plan Report,

proposing the High pH Remedy. (ECF No. 392 Ex. A.) The submitted High pH Remedy consists

of an enhanced collection, conveyance, and treatment system that is designed to: segregate

unimpacted stormwater from high pH seeps; collect and treat the high pH seeps; and then

discharge the treated water to the Allegheny River pursuant to the PADEP-issued NPDES permit. Additional reduction of precipitation infiltrating into the SLA also was proposed as part of the remedy, and PPG further committed to evaluate slope stability. PPG asserts that the High pH Remedy was based upon years of extensive investigative and sampling activities and technical evaluations, including: years of weekly seep-and-stream monitoring, sampling and analysis of the Allegheny River and Glade Run; treatability studies; geotechnical and slope stability evaluations; hydrologic modeling; and a water quality assessment through PADEP-developed PENTOXSD modeling.

On March 5, 2015, PADEP approved the Revised Treatment Plan Report's proposed High pH Remedy. (ECF No. 392 Ex. B.) PADEP's approval included four comments, all of which PPG accepted on March 16, 2015. (Id.; Ex. E.) PADEP summarized its approval of PPG's High pH Remedy in its May 19, 2016 draft NPDES Permit Fact Sheet, which states that:

> The selected long-term remedial alternative is Enhanced Collection and Treatment. The process to transition from operation of the IAS[6] to operation of the Enhanced Collection and Treatment System (ECTS) will be as follows:
>
> • Continued operation of the IAS (Outfall 001) during the design, permitting, construction and start-up of the ECTS.
>
> • Update the technical evaluation of slope stability under loadings associated with the Enhanced Collection and Treatment alternative.[7]
>
> • Installation of a leachate collection system (vertical cut-off wall with collection) along the interior of the SLA located as shown on Figure 3.[8] This system will be designed to intercept leachate associated with impacted seepage and to convey the collected water to a new treatment facility.

_____

[6] The "IAS" refers to the Interim Abatement System that PPG continues to operate at the Site that collects and treats the high pH seeps named in the 2009 Administrative Order.

[7] PPG notes that, on January 15, 2016, it submitted this updated slope stability evaluation to PADEP. (ECF No. 392 Ex. F.)

[8] "Figure 3" is located on page 6 of the draft 2016 NPDES Permit Fact Sheet. (Ex. G.)

• Installation of a dedicated system to collect remote seeps along the western perimeter of the SLA. This will include angled recovery wells and/or seep collection sumps as well as the electrical, control, and conveyance systems to enable conveyance of leachate/seepage to the new treatment facility.

• Installation of a new treatment facility designed to treat influent from the new collection systems. The treatment processes will, at a minimum, include mixing and neutralization. The possible need for any other process steps will be identified based on the NPDES permit.

• Installation of a new discharge line from the new treatment facility to the Allegheny River (Outfall 002).

• Installation of surface and drainage improvements to reduce leachate generation. These will include upgraded maintenance of drainage culverts and ditches associated with Route 128, a network of shallow drains on areas of the SLA to promote increased runoff, and further localized improvements to the vegetative cover to further improve evapotranspiration.[9]

• Upon demonstration of operational efficacy for the ECTS, the IAS will be decommissioned.

(ECF No. 392 Ex. G at 3.)

PPG states that, in order for it to begin construction of the "installations" referenced in PADEP's summary of the approved High pH Remedy, it is required to initially obtain wetlands and waterways permits via a Joint Permit Application ("JPA") to PADEP and the U.S. Army Corps of Engineers, as detailed in PPG's prior status reports. On November 14, 2017, PPG submitted the JPA to PADEP.

Pursuant to Act 2, on June 11, 2018, PPG submitted to PADEP revised reports, including the Remedial Investigation Report, the Human Health Risk Assessment, the Ecological Risk Assessment, and the Cleanup Plan (collectively, the "June 2018 Revised Act 2 Submission") for

---

[9] On October 9, 2015, PADEP approved PPG's revised infiltration reduction plan, the referenced surface and drainage improvements, and improvements to vegetative cover (Ex. H).

PADEP's review and approval. (ECF No. 392 Ex. C.) The Cleanup Plan incorporated PADEP's approved High pH Remedy and PADEP's approved investigation of the soils at the SLA, which documented that no remediation of the soils in the SLA area was required because the results were below the uniform Act 2 cleanup standards. The Cleanup Plan also proposed a remedy for the balance of the Site (the "Act 2 Remedy"), which set forth a remedy for soil at the SWDA and sitewide groundwater. Under the Cleanup Plan, the proposed site-wide groundwater remedy consists of a deed restriction preventing the use of the groundwater at the Site and ongoing sampling to confirm that the groundwater from the Site does not impact downstream locations near the railroad and the Allegheny River.

PPG will remedy the soil at the SWDA through: (1) engineering and institutional controls, consisting of upgraded fencing and warning signs, and an upgraded restrictive covenant pursuant to the Uniform Environmental Covenants Act ("UECA"), prohibiting residential or commercial development on the Site; and (2) a soil cover to be placed over all portions of the SWDA and "SWDA Annex"[10] identified as presenting unacceptable potential risk to ecological receptor populations (no risk to human health was found to exist from exposure to soils at the SWDA).

Finally, PPG will collect and monitor any seeps from the SWDA under the final NPDES permit issued by PADEP in compliance with the Court's August 31, 2015 Memorandum Opinion and Order. (ECF No. 392 Ex. G, at 1; Ex. I at 1-2 (noting that PADEP added four outfalls for seeps from the SWDA).)

_____

[10] PPG states that the SWDA Annex refers to areas outside the currently fenced area at the SWDA where the limits of cullet disposal were visually delineated, as requested by PADEP.

On October 10, 2018, PADEP approved PPG's June 2018 Revised Act 2 Submission and created the Comprehensive Site-Wide Remedy, incorporating both the previously-approved High pH Remedy and the Act 2 Remedy for the balance of the Site. (ECF No. 392 Ex. D.) PPG is required to submit to PADEP a Final Report under Act 2 after it completes the activities required by the Comprehensive Site-Wide Remedy. In connection with the Comprehensive Site-Wide Remedy, PPG has extensively studied, sampled, and delineated the nature and extent of contamination at the Site at PADEP's direction. PPG states that it also carefully evaluated multiple remedial approaches, including some approaches advocated by Plaintiffs, and fully responded to technical comments and questions presented by PADEP in its evaluation of the data and selection of remedial approaches. PPG asserts that ultimately, under the Comprehensive Site-Wide Remedy, PADEP is enforcing, and will continue to enforce, the same remediation standards applied across thousands of contaminated sites within the Commonwealth.

PPG has undertaken implementation of the approved Comprehensive Site-Wide Remedy by seeking the appropriate permits to begin construction for the High pH Remedy and by initiating substantial procurement activities. PPG states that it has already selected and contracted with a consultant to implement the Act 2 Remedy, and the consultant has begun to conduct the required groundwater monitoring. Additionally, PPG has completed the final design drawings for the Enhanced Collection and Treatment System under the High pH Remedy and has begun discussions with bidders to construct the system as it awaits receipt of the necessary permits. PPG indicates that the entire remediation of the Site will be subject to PADEP's full oversight and extensive authority, and PADEP will actively ensure that PPG addresses and remediates all potential contamination at the Site resulting from its past disposal activities. PPG states that PADEP is and will be utilizing its decades of expertise and experience in conducting,

10

supervising, and overseeing successful cleanups of contaminated sites, and PPG is dedicating all of the resources, whether financial, technical, or otherwise, needed to successfully complete the remediation.

PPG's Pending Motion

On October 31, 2018, PPG filed the motion under consideration (ECF No. 391). On December 7, 2018, Plaintiffs filed a brief in opposition (ECF No. 395) and on December 14, 2018, PPG filed a reply brief (ECF No. 396).

PPG argues that: 1) RCRA allows plaintiffs to request injunctive relief where "necessary," but in this case such relief would be futile given PADEP's extensive remedial scheme in place, namely the Comprehensive Site-Wide Remedy, and this is not a situation in which there was "a substantial breakdown in the agency process," such that there was "strong doubt as to whether there is a [state-ordered] process to override" Interfaith Cmty. Org. v. Honeywell Int'l Inc., 399 F.3d 248, 265, 267 (3d Cir. 2005); and 2) Plaintiffs' requested relief either conflicts with or is encompassed by the Comprehensive Site-Wide Remedy, or their requests have already been considered and rejected by PADEP.

Plaintiffs respond that: 1) under RCRA, a plaintiff may seek either a mandatory injunction requiring a responsible party to clean up its waste or a prohibitory injunction to restrain a responsible party from further violating the statute and courts have "expansive" authority not weighted by typical injunction rules because Congress favors remediation; 2) the case upon which PPG relies involved apportioning financial responsibility for remediation efforts, not enjoining and remediating an environmental danger; 3) the mere existence of a remedial scheme does not preclude injunctive relief, nor do Plaintiffs have to demonstrate a "breakdown" in the agency process to obtain a mandatory injunction, and in this case PADEP's

11

plan is ineffective and took 50 years to advance; 4) the other cases cited by PPG similarly are distinguishable because the plaintiffs did not challenge the plans as deficient and did not identity some action for the defendants to take other than what the state agencies had ordered, but here Plaintiffs have made these challenges and a trial is necessary to resolve the issue; 5) a trial is also necessary because Plaintiffs request injunctive relief that is more extensive than the state-approved remedial scheme; 6) despite claiming that injunctive relief is futile as a matter of law, PPG raises factual issues that are disputed and thus should be addressed at trial through expert witnesses and documents; 7) PPG relies on "diligent prosecution" cases but they require a prior case that is being diligently prosecuted by the state or federal government, which did not occur here; 8) PPG's state-approved remedial scheme does not foreclose a trial on Plaintiffs' RCRA liability claims yet to be considered by the Court and PPG's statement that they are "in conflict" with PADEP's remedy is unsupported; and 9) even if PPG were correct, the appropriate response would be to deny Plaintiffs their request for injunctive relief, not to dismiss such claims.

In a reply brief, PPG argues that: 1) the cases it cites have held that mandatory injunctions should be "sparingly exercised" and that plaintiffs seeking such injunctions must satisfy an extraordinarily high burden; 2) courts have not held, as Plaintiffs contend, that a trial is warranted whenever plaintiffs object to a remedial scheme and PPG cannot "walk away" from this process because it is going to sign a Consent Order and Agreement which will be enforceable; 3) PADEP is not in the same position as the state agency in the case Plaintiffs cite (in which there was a substantial breakdown in the agency process); and 4) Plaintiffs have already presented their arguments to PADEP, which has evaluated and rejected them.

On January 18, 2019, an order was entered (ECF No. 397), scheduling a hearing on the motion and directing the parties to present expert testimony regarding PPG's proposed remedy.

The order further directed PPG to file the Consent Order and Agreement (COA) it reached with PADEP and PPG filed the COA on April 2, 2019 (ECF No. 409-1).

A hearing was held on April 9 and 10, 2019. PPG called Kevin Halloran of PADEP, as well as Patrick O'Hara, Barbara Beck and Tim Verslycke in support of its motion. Plaintiffs called Bruce Bell, Steven Amter, George C. Flowers and William James Rogers in opposition to PPG's motion and it also submitted an expert report prepared by Michael Kavanaugh on the issue of damages prior to his death.

On May 8, 2019, Plaintiffs (ECF No. 418) and PPG (ECF No. 419) submitted post-hearing briefs. In their brief, Plaintiffs argue that: 1) at the hearing, PPG merely demonstrated that its remedy has been approved by PADEP, but we demonstrated that it is both ineffective and inefficient; 2) prior to examining PPG's remedy, the Court must first independently assess the full extent of PPG's RCRA liability; 3) PPG's remedy is not entitled to deference under RCRA—in cases brought by private attorneys general, the standard is "concern for the general public interest" and if liability is found denial of injunctive relief should be rare, and Halloran was in error when he stated that RCRA authority is delegated to Pennsylvania; 4) PPG's remedy for the SLA (collecting and treating groundwater) is both deficient and ineffective—groundwater contamination is itself a violation, PPG does not address contamination in sediments and wetlands (where the concentration of nickel exceeds EPA standards and threatens the endangered rayed bean mussel) and PPG has not delineated the full extent of the contamination, the interceptor trenches will not eliminate all seepage from the southern and eastern portions and new seeps will form for centuries, the collection system for the western slope will not capture all of the seepage (PPG has not even determined how much groundwater is entering the SLA) and new seeps have appeared even during this litigation; 5) the remedy is insufficient because it does

not address imminent and substantial endangerment to vegetation presented by the contamination of the groundwater; 6) PPG's remedy for the SWDA (installing a soil cover) is deficient and ineffective because it fails to address the full scope of the endangerment to the soil (the SWDA is 40 acres but PPG proposes to cover only 5 acres), the full extent of the contamination has not been delineated, high lead levels are not addressed and six inches of topsoil will fail when burrowing earthworms and plants bring the metals back to the surface; and 7) the remedy is ineffective because it does not require PPG to maintain the remedy over centuries, instead the only consequence is to void the release of liability (if PADEP notices PPG's failure), the Consent Order terminates six months after the remedy is implemented, imposes no additional obligations not already required by law and gives PPG a discount on statutory civil penalties, with no assurance that PPG will pay (such as an evergreen standby letter of credit or a fully funded trust) and PPG may have even transferred its environmental liability to another company.

In its brief, PPG argues that: 1) Plaintiffs have misrepresented that PPG limited the remedy to three seeps—in fact it has to monitor the Site and update the NPDES permit for any new seeps that are found, the COA requires PPG to comply, imposes penalties if it does not and obligates PPG to conduct inspections and revise the remedy as needed, and the EPA has delegated to the PADEP the authority to supervise RCRA cleanups in Pennsylvania; 2) mandatory injunctive relief is not available where an enforceable remedial scheme is underway because the Third Circuit focuses on the remedial scheme rather than the remedy itself, and here there was no breakdown in the administrative process; 3) even if the Plaintiffs' criticisms were relevant, they were already presented to and rejected by the PADEP (for example, the cap they propose would destroy the ecosystem for no legitimate environmental benefit, and installing a barrier north of the state road would require placing collection systems in residents' front yards

and they would then have to receive new water supplies), PADEP concluded that PPG has fully delineated the Site, nickel was not associated with PPG's activities or detected in any material concentrations on the Site (which is why U.S. Fish and Wildlife Service (USFWS) withdrew its concern), robins are not at risk from individual spots with high lead levels because they do not eat from the same place continually and risk assessment looks at the entire Site, financial assurances are available if PADEP wants them and it reasonably determined that it did not because the remedy would impose only modest costs on PPG; and 4) Plaintiffs had numerous opportunities—when the Revised Treatment Plan Report was issued, when PADEP approved of the remedy, when the COA was signed, and in the future when a NPDES permit is issued—to appeal to state administrative bodies and courts, but they have never done so.

Injunctions in RCRA Cases

RCRA provides that:

> any person may commence a civil action on his own behalf ... against any person ... including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

42 U.S.C. § 6972(a)(1)(B). The district court has jurisdiction "to restrain any person who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste referred to in paragraph (1)(B), to order such person to take such other action as may be necessary, or both…." § 6972(a).

In Trinity Industries, Inc. v. Chicago Bridge & Iron Co., 735 F.3d 131 (3d Cir. 2013), the owner of an industrial site (Trinity) brought suit against the former owner of the site ("CB&I"), seeking injunctive and monetary relief for the remediation that it was undertaking pursuant to a

court order, asserting claims under CERCLA, RCRA and other environmental laws and common law.  The district court granted CB&I's motion for summary judgment on the CERCLA and RCRA claims and dismissed the state law claims, declining to exercise supplemental jurisdiction over them.  With respect to the RCRA claim, the court concluded that, although there were disputed issues of material fact regarding the existence of an imminent and substantial endangerment at the site, there was no "meaningful relief available under RCRA in light of the Consent Order" that Trinity had entered into with PADEP to fund and conduct "response actions" according to a schedule approved by PADEP.

The Court of Appeals began by stating that:

> to prevail under RCRA § 7002(a)(1)(B), a plaintiff must prove: (1) that the defendant is or was a "generator or transporter of solid or hazardous waste or one who was or is an owner or operator of a solid or hazardous waste treatment, storage, or disposal facility"; (2) that the defendant contributed to the "handling, storage, treatment, transportation, or disposal of solid or hazardous waste"; and (3) that the waste "may present an imminent and substantial endangerment to health or the environment." Interfaith Cmty. Org. v. Honeywell Int'l Inc., 399 F.3d 248, 258 (3d Cir. 2005). The District Court found that all three requirements of the Interfaith test were met. Trinity naturally does not challenge the District Court's findings, and CB & I does not either.

Id. at 138-39.

The court then noted that two types of injunctions are available under RCRA § 7002(a)(1)(B): 1) a mandatory injunction that requires a responsible party to participate in cleanup and the proper disposal of waste; and 2) a prohibitory injunction restraining the party from further action violating RCRA.  Id. at 139 (citing Meghrig v. KFC W., Inc., 516 U.S. 479, 484 (1996)).  The court observed that no prohibitory injunction could issue because CB&I was no longer involved at the site and thus could not be prohibited from "further action."  With respect to the other type, the court stated that:

a mandatory injunction is an extraordinary remedy that is only granted sparingly by the courts. Communist Party of Ind. v. Whitcomb, 409 U.S. 1235, 1235, 93 S.Ct. 16, 34 L.Ed.2d 64 (1972) (noting that a mandatory injunction is an "extraordinary remedy [to] be employed only in the most unusual case."); United States v. Spectro Foods Corp., 544 F.2d 1175, 1181 (3d Cir. 1976) ("The power to issue a preliminary injunction, especially a mandatory one, should be sparingly exercised."). We have noted that when mandatory injunctive relief is sought, "the burden on the moving party is particularly heavy." Punnett v. Carter, 621 F.2d 578, 582 (3d Cir.1980). Indeed, the moving party's "right to relief must be indisputably clear." Communist Party, 409 U.S. at 1235, 93 S.Ct. 16.

Id. The court noted that the district court had concluded, relying primarily on 87th Street Owners Corp. v. Carnegie Hill-87th Street Corp., 251 F. Supp. 2d 1215 (S.D.N.Y. 2002), that imposing a mandatory injunction would require a court to exercise a broader power than RCRA § 7002(a)(1)(B) authorizes.

The court stated that:

Section 7002(a)(1)(B) permits a district court "to order [a person who may have contributed to endangerment] to take such action as may be necessary." The District Court reasoned that it would be impossible to deem a mandatory injunction "necessary" for § 7002(a)(1)(B) purposes in a case like this one, in which a remedial scheme is already underway. See Belitskus v. Pizzingrilli, 343 F.3d 632, 650 (3d Cir. 2003) (striking part of injunction that "was not necessary"). We have not yet considered this issue in the RCRA context, although Trinity urges us to apply the ultimate holding of Interfaith, wherein we affirmed the grant of a RCRA injunction after the New Jersey Department of Environmental Protection ("NJDEP") had previously taken steps to order remediation of a contaminated site. However, as CB & I points out, we held in Interfaith that "a fair reading of the record casts strong doubt as to whether there is a [state-agency ordered] process to override," Interfaith, 399 F.3d at 267, since the district court had found that the defendant's "dilatory tactics and NJDEP's inability to deal effectively with those tactics" thwarted the remediation process and therefore did make an injunction "necessary" under the RCRA, id. at 267-68.

The Court of Appeals for the Fifth Circuit has cited the holding of 87th Street favorably, holding that where remedial "efforts have been ongoing, and absent a clear reason ... to find them deficient, we see no error in the district court's conclusion that it could grant no further relief to the plaintiff beyond what is already being done." Ctr. for Biological Diversity, Inc. v. BP Am. Prod. Co., 704 F.3d 413, 431 (5th Cir. 2013). In Center for Biological Diversity, the court held that a plaintiff was not entitled to injunctive relief against a defendant where

17

the Executive Branch was "charged with the responsibility to oversee the cleanup," and where there was no reason to make a determination that that cleanup scheme was deficient or ineffective. Id. In Interfaith, by contrast, just such a determination was made, as we considered the "substantial breakdown in the agency process" to be significant in our decision to affirm the district court's order of injunctive relief. Interfaith, 399 F.3d at 265. In this case, Trinity has not contended that the remediation scheme put in place by the Consent Order is deficient or ineffective.

The Supreme Court has distinguished the remedial scheme created by RCRA from the CERCLA scheme in the following manner: "RCRA is not principally designed to effectuate the cleanup of toxic waste sites or to compensate those who have attended to the remediation of environmental hazards." Meghrig, 516 U.S. at 483, 116 S.Ct. 1251. "RCRA's primary purpose, rather, is to reduce the generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste" to "minimize the present and future threat to human health and the environment." Id. (quotation marks omitted). Trinity has not shown that future participation by CB & I in the remediation effort will aid in the minimization of such threats. That is, Trinity has not shown that CB & I's participation is "necessary" as RCRA § 7002(a)(1)(B) requires, now that the conditions of the Consent Order are in place and appear to be effective. Accordingly, we will affirm the District Court's grant of summary judgment to CB & I as to Trinity's request for an injunction under RCRA.

Id. at 139-40.

Plaintiffs contend that Trinity essentially holds that, when a plaintiff does not contend that a remediation is deficient or ineffective (or that there has been a "substantial breakdown" in the agency process as occurred in the Interfaith case), a court will not grant a mandatory injunction.  Here, however, Plaintiffs have alleged that the remediation planned by PADEP is deficient and ineffective and therefore a mandatory injunction may issue.  They also argue that the Trinity case concerned apportioning financial responsibility for remediation efforts (which is not at issue in this case) and that the court erred in relying upon the Communist Party case for its conclusion that mandatory injunctions must meet a higher standard, because that case dealt with the granting of injunctive relief under applications for stays and writs to the Supreme Court.  PPG responds that Trinity does not stand for the proposition that a trial is warranted whenever a

plaintiff objects to a remedial scheme and that numerous courts have held, both in RCRA and other types of cases, that mandatory injunctions require meeting a higher standard. PPG also argues that <u>Trinity</u> limited the mandatory injunction of the kind granted in <u>Interfaith</u> to a situation in which there is a "breakdown" in the agency process.

With respect to the standard for granting mandatory injunctions, this Court would be bound by the Third Circuit's ruling in <u>Trinity</u> even if Plaintiffs convincingly demonstrated that the Court of Appeals misinterpreted the Supreme Court's holding in <u>Communist Party</u>. Moreover, as PPG notes, <u>Communist Party</u> itself did not involve a request for mandatory injunctive relief under RCRA or any other statute but various courts have nonetheless cited it for the proposition that mandatory injunctions are "an extraordinary remedy to be employed only in the most unusual case" where the movant's right to relief is "indisputably clear." <u>See</u> <u>United States v. Spectro Foods Corp.</u>, 544 F.2d 1175, 1181 (3d Cir. 1976) (case under the Federal Food, Drug and Cosmetic Act); <u>Punnett v. Carter</u>, 621 F.2d 578, 582 (3d Cir. 1980) (involving dangers due to the testing of nuclear weapons); <u>Jacobson & Co. v. Armstrong Cork Co.</u>, 548 F.2d 438, 441 (2d Cir. 1997) (antitrust case); <u>URL Pharma, Inc. v. Reckitt Benckiser, Inc.</u>, 2016 WL 1592695, at *3 (E.D. Pa. Apr. 20, 2016) (breach of contract case); <u>Lane v. Tavares</u>, 2015 WL 435003, at *8 (M.D. Pa. Feb. 3, 2015) (deprivation of constitutional rights).

In two RCRA cases since <u>Trinity</u>, district courts have agreed that movants seeking mandatory injunctive relief must meet an extraordinarily high burden. <u>See</u> <u>LAJIM, LLC v. General Elec. Co.</u>, 2017 WL 3922139, at *3 (N.D. Ill. Sep. 7, 2017), <u>aff'd</u>, 917 F.3d 933 (7th Cir. 2019);[11] <u>Phoenix Bevs., Inc. v. Exxon Mobil Corp.</u>, 2015 WL 588826, at *4 (E.D.N.Y. Feb.

---

[11] On appeal (discussed in detail below), the Seventh Circuit did not address the district court's

11, 2015).

Faced with this considerable authority, Plaintiffs would have this Court revisit the Third Circuit's citation of Communist Party in Trinity for the conclusion that mandatory injunctions must meet a higher standard and conclude that the Court of Appeals was in error. This the Court will not do.

The second issue is more nuanced than the parties suggest. In Trinity, the Court of Appeals observed that: 1) there was a remedial scheme put in place by a consent order; 2) Trinity did not challenge the remedial scheme; and 3) the "the conditions of the Consent Order are in place and appear to be effective." 735 F.3d at 140.[12] In this case, PPG relies upon the first statement (the existence of the remedial scheme) and Plaintiffs rely upon the second statement (whether the plaintiff objects to the remedial scheme). Neither of these extreme positions is supported in the law. On the one hand, the mere existence of a state agency remedial scheme is not sufficient to render futile a plaintiff's request for injunctive relief, as the Court of Appeals explicitly held in Interfaith:

> "[C]itizens need not exhaust or rely upon other resources or remedies before seeking relief under these amendments. As with Section 7003, these amendments are to be an alternative and supplement to other remedies." Courts should consider the availability of other alternatives, as the District Court did here, but there is no requirement to defer to them, notwithstanding Honeywell's protestations otherwise.

---

conclusion that a mandatory injunction requires a more demanding standard.

[12] This third statement does not mean that the court concluded that the remedy was effective because the court noted that Trinity had undertaken "preliminary investigative work in anticipation of cleanup," but "has yet to perform shovel-in-the-ground remediation." 735 F.3d at 133. In its post-hearing brief, PPG contends that the court was addressing only the "remedial scheme" and not the actual remedy itself. However, as quoted in the text, the court stated that the conditions of the Consent Order appeared to be effective, not the remedial scheme. In addition, PPG has not explained how a determination can be made that a remedial scheme is effective.

399 F.3d at 267 (quoting S. Rep. No. 98–284, 98th Cong., 1st Sess. at 57 (1983)).  See also

Adkins v. VIM Recycling, Inc., 644 F.3d 483, 506 (7th Cir. 2011) ("congressional policy choices

reflected in the RCRA citizen-suit provisions remove the abstention doctrines from the district

court's toolbox.")  Nor is it necessary for a plaintiff to demonstrate that there was a "breakdown"

in the state agency process for a court to grant a mandatory injunction in a RCRA case.

PPG argues that this case is further along than Trinity because, in that case, the plaintiff

had signed a COA only obligating it to remediate the site but without a specific plan; whereas in

this case PADEP has approved PPG's Comprehensive Site-Wide Remedy.[13]  However, this case

has unfolded in a completely different manner.  Moreover, at the time it filed its motion, PPG

was not yet obligated to comply with the Comprehensive Site-Wide Remedy, including a

schedule of dates and penalties for failure to comply.  PPG cites authority that "[a]ttainment of

Act 2 remediation also satisfies [RCRA and other federal statutes]." EQT Prod. Co. v.

Department of Envt'l Protection of Commw. of Pa., 153 A.3d 424, 433 n.19 (Pa. Commw.

2017), aff'd in part, rev'd in part, 181 A.3d 1128 (Pa. 2018).  But PPG has not yet "attained" Act

2 remediation in this case; it has only proposed a plan to do so.

PPG stated that it and PADEP "will execute a consent order and agreement that binds

PPG to a schedule of implementation for the [Cleanup Plan]; an NPDES permit for any

discharge to the Allegheny River; and payment of a civil penalty."  (ECF No. 396 Ex. A at 1,

PADEP Summary of PPG's Act 2 Cleanup Plan.)  At a hearing on November 15, 2018, PADEP

---

[13] In fact, although Trinity had signed only the COA at the time the case was filed, its expert had
submitted and PADEP had approved a specific remediation plan prior to the time the cross-
motions for summary judgment were filed.  However, the courts referred only to the COA.

indicated that it anticipated that the COA would be ready for signing in about six months. As noted above, the COA was signed and filed on April 2, 2019. Thus, this case is procedurally in a posture similar to that in Trinity.

On the other hand, the mere fact that a plaintiff expresses generalized dissatisfaction with a remedial scheme or a proposed remedy without identifying deficiencies or proposing viable alternatives cannot be enough to conclude that further injunctive relief is "necessary" under RCRA.[14] Numerous courts have rejected such arguments. See, e.g., Center for Biological Diversity, 704 F.3d at 431 (plaintiff admitted that cleanup efforts were ongoing and identified no deficiency in them); 87th Street Owners, 251 F. Supp. 2d at 1219 (the plaintiff was "unable to describe a single action that defendant could be ordered to take to reduce or eliminate any risk its past actions may have caused, that is not already being undertaken by [the state agency]" and the court observed that, if at some future time the plaintiff could identify specific additional measures that could be undertaken, it could bring suit at that time, id. at 1221). Accord Liebhart v. SPX Corp., 2018 WL 1583296, at *6-7 (W.D. Wis. Mar. 30, 2018), vacated and remanded on other grounds, 917 F.3d 952 (7th Cir. 2019); 3000 E. Imperial, LLC v. Robertshaw Controls Co., 2010 WL 5464296, at *13 (C.D. Cal. Dec. 29, 2010).

---

[14] PPG cites Group Against Smog & Pollution v. Shenango Inc., 810 F.3d 116 (3d Cir. 2016), and other cases to support its argument that Plaintiffs' dissatisfaction with the Comprehensive Site-Wide Remedy alone does not entitle it to injunctive relief. However, GASP was addressing the diligent prosecution bar under the Clean Air Act, which is identical to the bar codified in RCRA at 42 U.S.C. § 6972(b)(1)(B) and which bars citizen suits if the federal or state government has instituted and is diligently prosecuting a case. PPG admits that it is not invoking the bar in this case, which it could not because neither the EPA nor the PADEP has commenced a civil action against PPG, but it cites the case law as "equally applicable and instructive with respect to whether injunctive relief is futile." (ECF No. 392 at 21 n.20.) As Plaintiffs note, the doctrine either applies or it does not, and it does not here.

Nor is the Trinity case inapposite because it concerned "apportioning financial responsibility for remediation efforts, not enjoining and remediating an environmental danger." Trinity Indus., Inc. v. Chicago Bridge & Iron Co., 867 F. Supp. 2d 754, 764 (W.D. Pa. 2012). Although the district court made this observation, the Court of Appeals still described the issue as being whether further injunctive relief was "necessary" under RCRA when a remedial scheme was in place, to which Trinity did not object.

Rather, the true path lies in between. When a remedial scheme is in place and a plaintiff presents expert evidence calling into question whether the remedial scheme is sufficient to address any danger to health and the environment under RCRA, the court must evaluate this evidence and decide the issue. See, e.g., LAJIM, 2017 WL 3922139, at *4 (the court held an evidentiary hearing to hear from the parties' respective experts and concluded that General Electric's expert witness provided reasonable, rational and credible bases explaining why certain actions were taken and others were not and plaintiffs did not demonstrate that these conclusions should be second-guessed); Kara Holding Corp. v. Getty Petroleum Mktg., Inc., 2004 WL 1811427, at *11 (S.D.N.Y. Aug. 12, 2004) (Kara proposed a remediation plan, but its experts acknowledged at a hearing on motions for summary judgment that there were various acceptable ways of handling the remediation and there was no evidence that the plan in place and approved by NYSDEC was not sufficient to address any danger to health or the environment);[15] Christie-Spencer Corp. v. Hausman Realty Co., 118 F. Supp. 2d 408, 420 (S.D.N.Y. 2000) (following a hearing on plaintiff's motion for injunctive relief, court concluded that plaintiff failed to

[15] PPG cites the LAJIM and Kara cases, but fails to acknowledge that in both, a hearing was held and testimony was taken. The court did not simply reject imposing further injunctive relief on the ground that the agency found the remediation sufficient.

23

demonstrate that its proposals proved that defendant's remediation, as approved by DEC, would be insufficient).

In this case, PPG was not obligated to perform the Comprehensive Site-Wide Remedy at the time it filed its motion and Plaintiffs have not merely expressed dissatisfaction with it in some general sense. They have stated explicitly in what ways their experts have concluded that the proposed scheme is insufficient and ineffective. PPG responds that their proposals are either duplicative of measures already included in the remedial scheme, or are contradicted by it, or have been made to and rejected by PADEP. Plaintiffs dispute these assertions. Upon a reviewing of the briefing, the Court determined that it could not decide this issue on the submitted record, and scheduled an evidentiary hearing.

<u>Deference to PADEP Approval</u>

PPG contends that substantial deference is owed to PADEP's approval of the Comprehensive Site-Wide Remedy. Plaintiffs argue that PADEP has no authority over RCRA imminent and substantial endangerment claims in Pennsylvania and thus no deference to its approval is due.

At the hearing, Kevin Halloran first acknowledged that the Memorandum of Agreement (MOA), Pls.' Hr'g Ex. 38, cited as authority in the COA (PPG Hr'g Ex. 3 at 2 ¶ A) applies only to RCRA sections 3004(u) and 3008(h), neither of which is applicable to the Site, and therefore it would be "inappropriate for the Department to tell this Court that it has RCRA authority with regard to the PPG waste site." (Apr. 9 Halloran Test. 53:10-13.)[16] On redirect examination by

---

[16] ECF No. 416.

PPG, he stated that "The RCRA corrective action program is actually delegated to the State. So we have the authority under the full corrective action program, not just what is under that MOA." (Id. at 55:22-25.)  However, as Plaintiffs observe, according to the EPA itself: "In EPA Region 3, Delaware, Virginia and West Virginia are authorized to implement their own Corrective Action Programs, while EPA Region 3 implements the Corrective Action Programs for Maryland, Pennsylvania and the District of Columbia." EPA, Corrective Action Programs Around the Nation.[17] As noted above, the case law holds that this Court need not defer to a state administrative process.  Honeywell, 399 F.3d at 267.

PPG cites a Federal Register section indicating that "Pennsylvania received final authorization to implement its hazardous waste management program effective January 30, 1986" and that "States that have received final authorization from EPA under RCRA section 3006(b), 42 U.S.C. 6926(b), must maintain a hazardous waste program that is equivalent to, consistent with, and no less stringent that the Federal program."  74 Fed. Reg. 19453, 19454 (Apr. 29, 2009).  Thus, PPG contends that its Comprehensive Site-Wide Remedy, which was achieved via Pennsylvania's Act 2, had to meet the standards required under RCRA.  However, the case law it cites does not support this position.  See Delaware Riverkeeper Network v. Secretary of PADEP, 870 F.3d 171, 181 (3d Cir. 2017) (concluding that PADEP's interpretation of the meaning of the ambiguous phrase "water dependent" was entitled to deference, not a remedial scheme); GASP, 810 F.3d at 130 (a diligent prosecution case). If the Court of Appeals

_____

[17] Available at https://www.epa.gov.hwcorrectiveactionsites/corrective-action-programs-around-nation#3 (last visited May 16, 2019). The Court can take judicial notice of a government agency's information on its public website.  Vanderklok v. United States, 868 F.3d 189, 204 n.16 (3d Cir. 2017).

wanted to conclude that courts should give substantial deference to state agency-approved remediations, it could easily have said so, but it did not. Therefore, PPG's argument is rejected.

Challenges in State Administrative Forums

PPG suggests that Plaintiffs can challenge decisions made by PADEP in the Pennsylvania Environmental Hearing Board (EHB), with appeal therefrom to the Pennsylvania Commonwealth Court. In fact, it argues that at various points in this litigation, Plaintiffs could have taken an appeal to the EHB: when PADEP approved the Revised Treatment Plan Report on March 5, 2015; when PADEP approved the Comprehensive Site-Wide Remedy on October 10, 2018; when the COA was signed on April 2, 2019; and in the future when PPG obtains a new NPDES permit. However, PPG does not actually argue that Plaintiffs are limited to this recourse and the case law cited herein demonstrates that they are not precluded from proceeding with this lawsuit, irrespective of the actions they could take in the state agency proceedings.

Recent Case Law on Injunctions in RCRA Cases

On March 4, 2019,[18] the Court of Appeals for the Seventh Circuit issued a published opinion affirming the district court's decision in LAJIM, LAJIM, LLC v. General Electric Co., 927 F.3d 933 (7th Cir. 2019). In that case, plaintiffs brought suit under RCRA seeking a mandatory injunction ordering the defendant manufacturer (GE) to investigate and remediate groundwater contamination that originated from GE's plant. GE had been under orders from the Illinois Environmental Protection Agency ("IEPA") to conduct investigations and remediations since 1987 and a consent order was entered in 2010. The plaintiffs filed suit in 2013 and

_____

[18] That is, after briefs were filed on the pending motion and before the hearing was held on April 9, 2019.

following discovery the parties filed cross-motions for partial summary judgment. The court ordered an evidentiary hearing and invited IEPA and the Illinois Attorney General to provide their views on the progress under the consent order and whether the court should order injunctive relief under RCRA. Following a two-day hearing, the court issued an opinion in which it found that GE's expert had "provided reasonable, rational and credible bases explaining why certain actions were taken and others were not," but the plaintiffs' expert merely "testified that additional investigation and testing was necessary to opine on the proper scope of remediation for the site." When asked what specific cleanup was recommended, the plaintiffs' expert declined to make a recommendation. The court held that the plaintiffs had not met their burden of showing harm not already addressed by the IEPA proceeding.

On appeal, the court first noted that "the denial of injunctive relief after a district court has found a risk of imminent and substantial danger to public health or to the environment should be rare. Here, however, plaintiffs failed to provide the district court with any evidence that injunctive relief, in addition to what the IEPA had already ordered in the state action, would improve the environment and not cause additional harm." Id. at 942. The court rejected the plaintiffs' argument that RCRA requires a court that has found liability to order injunctive relief. Id. at 943. Then the court rejected the plaintiffs' position that traditional equitable factors do not apply in a citizen suit, although in such a case, plaintiffs need only show a "risk of harm," not "the traditional requirement of threatened irreparable harm." Id. at 944-45. The court explicitly rejected the argument that Plaintiffs herein posit, namely that in a citizen suit alleging an environmental violation, they act as private attorneys general and thus are not required to meet the traditional balancing of equitable factors. Id. at 944 (citing eBay, Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006)).

The court stated that:

Turning to plaintiffs' argument regarding the irreparable harm finding, we note that it is somewhat indirect. Rather than directly challenging the district court's factual findings, plaintiffs repeat their general assertion: There is contamination, therefore there is harm. And because there is harm, there must be an injunction. In oversimplifying the argument, plaintiffs fail to grapple with the thoughtful and nuanced decisions the district court made that led it to deny injunctive relief. In their request for an injunction, plaintiffs claimed action under the RCRA was necessary because the Consent Order and actions in the state proceeding were insufficient to remedy their injury. For that reason, the district court informed the parties *repeatedly* that it was looking for evidence of harm not already being addressed through the state proceeding and for what exactly plaintiffs wanted the court to order GE to do to address that harm.

At the evidentiary hearing, plaintiffs argued that the extent of the contamination had not been determined and that the IEPA's analysis based on a limited investigation was flawed; as such, their expert testified that additional investigation was necessary before he could opine on the proper remediation. Plaintiffs requested GE perform the following additional investigation: additional and deeper monitoring wells, soil borings penetrating the bedrock, and vapor-intrusion monitoring to the extent necessary to (1) determine if a dense non-aqueous phase liquid ("DNAPL") is present and, relatedly, determine the vertical and horizontal extent of the groundwater contamination; (2) determine whether Rock Creek is a groundwater divide, and if so, explain the presence of contamination in the well across the creek; and (3) determine the source of and monitor the vapors present in the Conway home. Noting that many of these issues are interrelated, the district court considered the competing expert testimony presented on each avenue of investigation.

Although plaintiffs do not directly challenge the district court's factual findings, we review those findings briefly to highlight the court's thoroughness in evaluating the evidence (or lack thereof) supporting plaintiffs' request for injunctive relief. A district court's finding of an expert witness's credibility is one of fact that we review for clear error. Madden v. U.S. Dep't of Veterans Affairs, 873 F.3d 971, 973 (7th Cir. 2017). Clear error is a deferential standard of review that only merits reversal if "after reviewing the entire record, we are left with the firm and definite conviction that a mistake has been made." United States v. Ranjel, 872 F.3d 815, 818 (7th Cir. 2017) (quoting United States v. Marty, 450 F.3d 687, 689-90 (7th Cir. 2006)). "[I]n a case of dueling experts, as this one was, it is left to the trier of fact, not the reviewing court, to decide how to weigh the competing expert testimony." Madden, 873 F.3d at 973-74 (alteration in original) (quoting Wipf v. Kowalski, 519 F.3d 380, 385 (7th Cir. 2008)).

Id. at 946.

The court found that, as to each of the three identified issues, plaintiffs failed to support their argument. With respect to DNAPL, they failed to perform their own groundwater testing, despite the fact that it was not expensive and contrary to GE's expert's testimony that contamination in the samples had decreased over time. As to Rock Creek being a groundwater divide, GE's expert testified that it was and plaintiff's expert offered no additional testing that would have seriously challenged this finding. And with respect to vapor intrusion, the plaintiffs no longer owned the home and the new owners could not be forced to consent to testing, so there was no basis to conclude that GE's expert's testimony that the groundwater and sub-slab under and around the home showed no evidence of contamination.

The court concluded as follows:

> While an injunction does not follow automatically from a finding of a risk of imminent and substantial endangerment—as this case demonstrates—such a finding usually goes a long way towards justifying an injunction. Here however, despite the district court's admonition that it was looking for evidence of harm requiring relief in addition to the IEPA action, at no point did plaintiffs ever conduct their own investigation to contradict GE's test results. Rather, they continue to insist that irreparable harm is "self-evident" where there is contamination and criticize GE's investigation, which had been conducted subject to the IEPA's oversight and direction. As demonstrated by the two years it spent grappling with the injunctive relief questions, the district court understood it had to "walk a fine line" between supplementing and supplanting the Consent Order. The court focused on the facts before it, commenting repeatedly that "facts matter," and it provided plaintiffs with numerous opportunities to present evidence that the state proceedings were not adequately protecting the public and the environment. See Trinity Indus., Inc. v. Chicago Bridge & Iron Co., 735 F.3d 131, 140 (3d Cir. 2013) (explaining that ongoing remediation in independent proceedings may justify the denial of injunctive relief in the RCRA action); Adkins, 644 F.3d 501-02 ("When this case finally addresses the merits, and if the [state environmental] actions have been resolved by then, the federal court will be entitled to insist that plaintiffs show how the resolution of those cases was not sufficient."). In the end, plaintiffs could not present contradictory facts because they did not conduct any of their own investigation. As the district court held, plaintiffs "have not provided the evidence necessary for this Court to second guess [GE]'s Remedial Action Plan" and order relief in addition to what the IEPA has already required.

Nevertheless, plaintiffs insist they are entitled to relief because they did not get what they wanted; they want more than the IEPA found adequate and will be satisfied with nothing less than a mandatory injunction ordering GE to remove any contamination on their property. We sympathize with plaintiffs' position— TCE is a dangerous contaminant and the current plan leaves the contamination in place (though contained and restricted from access). But, despite plaintiffs' characterization, the RCRA is not a "cleanup" statute. See Meghrig, 516 U.S. at 483, 116 S.Ct. 1251 ("[The] RCRA is not principally designed to effectuate the cleanup of toxic waste sites ...."). Under the RCRA, the district court may "restrain" the handling of hazardous waste that "may present an imminent and substantial endangerment to health or the environment," or order actions that may be "necessary" to eliminate that danger. 42 U.S.C. § 6972(a).

Here, the district court considered both parties' expert presentations and concluded that plaintiffs had not established any additional actions were "necessary" to eliminate the danger. In spite of the district court's multiple inquiries to plaintiffs' expert as to what remedy he proposed the court order, he did not make a recommendation, leaving the court without guidance. Conversely, the court found GE's explanations for the actions it had taken to investigate and develop its remediation plans "reasonable, rational and credible." The RCRA does not require a court-ordered cleanup where the court has not found such action necessary to prevent harm to the public or the environment, especially where, as here, an expert the court found credible testified that additional cleanup could cause further harm.

The district court did not abuse its discretion in concluding plaintiffs had not carried their burden to establish mandatory injunctive relief was necessary under the RCRA.

Id. at 948-49. See also Liebhart v. SPX Corp., 917 F.3d 952 (7th Cir. 2019) (the district court

determined that SPX's existing remedial plan was sufficient and that the Liebharts had not

identified any way in which the plan was deficient or violated federal law, and on appeal the

court saw no evidence to contradicted this factual finding, but because the court was remanding

the case as a result of the district court's error in requiring actual harm as opposed to harm that

"may be imminent," it directed the district court to reconsider its decision on injunctive relief).

Plaintiffs contend that Liebhart and LAJIM stand for the proposition that courts must

hold a trial on the merits of RCRA liability prior to addressing the issue of injunctive relief, but

this is not a fair reading of the cases. In Liebhart, the district court assumed that the defendants were in violation of RCRA but nevertheless granted their motion for summary judgment on the issue of injunctive relief. And in LAJIM, an evidentiary hearing, not a trial, was held, to determine whether an injunction should issue. Thus, Plaintiffs' contention that PPG's motion should be denied as premature on the ground that the full extent of PPG's RCRA liability has not yet been determined is rejected.

On the other hand, the hearing in this case—unlike the hearings in LAJIM and Liebhart—presented the Court with dueling narratives from equally-credible experts as to the issue of whether PPG's remedy will fulfill RCRA's requirement of doing all that is "necessary" to prevent a risk of imminent and substantial endangerment to human health and the environment at the PPG Site. Moreover, unlike in LAJIM, Plaintiffs' experts testified specifically as to how PPG's remedy and PADEP's proceedings were not adequately protecting the public and the environment and what relief the Court should order.

Requested Relief that is Duplicative

PPG argues that the majority of Plaintiffs' requested mandatory injunctive relief is duplicative of actions already undertaken and/or included as part of the Comprehensive Site-Wide Remedy. For example, Plaintiffs demand a full delineation of the SWDA waste and an evaluation of the stability of the SWDA. (Pls.' Am. Pretrial Statement at 11, Item Nos. 3 and 4.)[19] PPG states that it has already completed a full delineation of the SWDA and investigated its slope stability. (ECF No. 392, Ex. J, email from P. O'Hara to K. Halloran.) PADEP accepted

---

[19] ECF No. 338.

PPG's delineation and investigation through its approval of the Comprehensive Site-Wide Remedy. Plaintiffs respond that the full horizontal and vertical extent of the SWDA has not been delineated as required under RCRA and their experts will explain that there are areas with visually observed waste where no delineation sampling has been conducted. They contend that visual delineation is insufficient and does not even encompass all areas where SWDA waste can be visually observed. PPG replies that PADEP has indicated that it "believes PPG has fully delineated the vertical and horizontal extent of Site waste." (ECF No. 396 Ex. A at 1.) The Court could not resolve this issue based upon the briefs submitted by the parties and email messages and attachments thereto. Moreover, as detailed below, at the hearing, competing expert testimony was presented as to whether PPG has completely delineated the Site.

PPG states that the Comprehensive Site-Wide Remedy already includes certain other future relief requested by Plaintiffs (see ECF No. 338 at 12-13) and thus, such requested relief is duplicative of the approved remedy and is neither necessary nor meaningful. Specifically, as part of PADEP's approval of the Revised Treatment Plan Report/High pH Remedy, PPG is already committed to monitoring along the railroad to ensure that the collection system captures all impacted/high pH seeps. (ECF No. 392 Exs. B, E.) PPG indicates that its express commitment includes taking additional action, such as utilizing additional collection wells, if monitoring reveals that the high pH leachate impacts to the seeps have not been eliminated. (Id. Ex. E.) Additionally, under the NPDES Permit that will be issued to PPG, PADEP will require PPG to regularly monitor the railroad seepage area, the western slope seepage area, the seep 5 area, and seepage from the SWDA for pH and other constituents. (Id. Ex. G at 47-50 (Outfalls 004, 005, 006, 007, 008, 009, and 010); Ex. I at 17-18 (Outfalls 013, 014, 015, 016, and 017).

Further, the Comprehensive Site-Wide Remedy already requires that institutional controls

be established, as Plaintiffs have requested, through a UECA-compliant restrictive covenant that was provided to PADEP as Appendix B to the Cleanup Plan included in the June 2018 Revised Act 2 Submissions. (Id. Ex. C.)  PPG notes that, under Act 2, PADEP requires that a UECA-compliant covenant be recorded on the title to the land that provides for specific protections and maintenance of the institutional and engineering controls that PADEP has approved as part of a remedy for the Site.  Thus, PPG contends that Plaintiffs' demand that institutional controls be established is superfluous because this relief is already standard and required at all Act 2 sites across the Commonwealth where PADEP approves the use of institutional controls as part of an approved remedy. The PADEP-approved UECA Covenant includes land-use restrictions prohibiting residential or commercial development and prohibiting use of groundwater for purposes other than monitoring and includes protections for the installed remediation systems (for both the High pH Remedy and Act 2 Remedy) and fencing and warning signs, soil management procedures, and future health and safety requirements. Once recorded, the UECA covenant requires that PPG submit annual reports to PADEP to certify that the land-use limitations in the covenant are being met. Finally, Plaintiffs have requested that the relief include best management practices related to stormwater management and the requirement to obtain all necessary permits, both of which are already a fundamental requirement of the Comprehensive Site-Wide Remedy.  PPG therefore argues that Plaintiffs' requested relief is duplicative and wholly unnecessary.

Obtaining injunctive relief that is already provided for in a state agency-approved remedy cannot be characterized as "necessary" for purposes of RCRA.  However, unlike in Trinity, Plaintiffs have specifically disputed many of the factual assertions made by PPG.

Remediation for the SLA

With respect to the SLA, the Comprehensive Site-Wide Remedy proposes to collect the groundwater after it has become contaminated and treat it before releasing it to the Allegheny River. Plaintiffs contend that: 1) this remedy is deficient because allowing water to contact the waste in the SLA produces contaminated groundwater which must then be treated, as opposed to using a cap and upgradient groundwater diversion to prevent the water from contacting the SLA contamination in the first instance; 2) the remedy does not address the contamination in sediments and wetlands; 3) PPG has not fully delineated the extent of the contamination; 4) interceptor trenches will not eliminate all seepages from the southern and eastern portions of the SLA and in fact new seeps will form for centuries; and 5) the collection system for the western slope will not capture all of the seepages.

The Court of Appeals has held that RCRA "imposes liability for endangerments to the environment, including water in and of itself." Honeywell, 399 F.3d at 263. Thus, "actual groundwater contamination essentially constitutes a per se endangerment to the environment under RCRA." United States v. Apex Oil Co., 2008 WL 2945402, at *80 (S.D. Ill. July 28, 2008) (citing Honeywell, 399 F.3d at 261-63), aff'd, 579 F.3d 734 (7th Cir. 2009). There is no dispute that PPG's waste is contaminating the groundwater at the Site. (Apr. 9 Bell Test. 90:24-91:2; Apr. 9 Amter Test. 129:13-16; Apr. 9 Halloran Test. 38:4-16.) Plaintiffs submitted testimony that contaminated groundwater impairs the ability to support plant life at the Site. (Apr. 10 Rogers Test. 73:21-74:10; Apr. 9 Amter Test. 129:17-20, 134:20-23.) Because PPG's remedy treats the water only after it is contaminated, the SLA will serve for centuries as a "chemical reactor" that converts uncontaminated infiltration and uncontaminated upgradient groundwater into contaminated groundwater until all of the SLA waste has been transferred into the Allegheny River and Glade Run. (Apr. 9 Bell Test. 90:14-91:18; Apr. 10 Flowers Test. 25:10-

28:3; Apr. 9 Halloran Test. 38:13-16 (the PPG remedy will allow the groundwater to be contaminated "in perpetuity").)

Plaintiffs propose using a cap and upgradient groundwater diversion to prevent water from contacting the SLA waste and submitted testimony that these methods are commonly used in remediations under RCRA. (Apr. 9 Bell Test. 92:3-9, 93:4-12, 97:4-6; Apr. 9 Amter Test. 137:23-139:16; Apr. 10 Amter Test. 111:9-12[20]; Apr. 10 Bell Test. 115:3-15.) Halloran testified that such a remedy would destroy the vegetation at the SLA (Apr. 9 Halloran Test. 27:20-23), but as Plaintiffs note, the SLA vegetation is already negatively affected by PPG's contamination (Apr. 10 Rogers Test. 73:21-74:10) and installation of a cap would allow establishment of a more natural habitat because the plants will no longer be limited to pollution-tolerant species (Apr. 9 Bell Test. 94:7-19; Apr. 10 Rogers Test. 75:9-20). Halloran also testified that using diversion is not a normal procedure and that it may prove impossible to prevent groundwater from entering the SLA (Apr. 10 Halloran Test. 96:7-9), but the issue is disputed—Plaintiffs' witness Steven Amter testified that PPG has never undertaken the investigation necessary to characterize conditions upgradient of the Site and that even a cap with a low effectiveness by modern standards would reduce infiltration by at least 95 percent (Apr. 10 Amter Test. 110:11-19, 112:22-25). Halloran also opined that this proposal would require placing collection systems in residents' yards and require that they be given new water supplies (Apr. 10 Halloran Test. 98). However, he did not state that doing so rendered the proposal cost prohibitive.

Plaintiffs contend that the PPG remedy is deficient with respect to the SLA because it

---

[20] ECF No. 417.

fails to address or eliminate the imminent and substantial endangerment to the environment posed by PPG's contamination of sediments. Halloran acknowledged that the PPG remedy does not address sediment contamination. (Apr. 9 Halloran Test. 39:18-24.) Once the contaminated groundwater reaches the Allegheny River or Glade Run, the contaminants that are dissolved in the water either continue downstream—where they can never be recovered—or fall out and wind up in the sediments. (Apr. 9 Bell Test. 97:17-23.) Plaintiffs contend that the available data shows that the concentration of nickel in the sediments in the vicinity of the Site exceeds the relevant EPA screening level. (Apr. 9 Bell Test. 103:19-25; Apr. 10 Rogers Test. 53:6-8.) Plaintiffs state that Dr. Bell's analysis of the pattern of nickel concentrations in the Allegheny River sediments demonstrates that a major source of the nickel in those sediments is PPG's discharge. (Apr. 9 Bell Test. 99:22-101:10; 115:6-14.) Plaintiffs note that USFWS required PPG to relocate its proposed new outfall for its collection and treatment system farther into the Allegheny River and out of the vicinity of the endangered rayed bean mussel because of the risk posed by the nickel in PPG's proposed discharge. (Apr. 9 Bell Test. 102:19-103:16.) However, this relocation of the proposed outfall does nothing to address the contamination already in the sediments. (Apr. 10 Rogers Test. 57:12-15; Apr. 9 Halloran Test. 39:18-24.)

PPG's experts disagree—Dr. Verslycke testified that nickel was not associated with PPG's activities and that the levels detected were consistent with background levels and did not differ statistically in Allegheny River sediments upstream, adjacent to and downstream of the Site. (Apr. 10 Verslycke Test. 14-15, 17-18; PPG Hr'g Exs. 11, 12.) He also noted that USFWS withdrew its concern with respect to nickel (Apr. 10 Verslycke Test. 19; Apr. 9 Bell Test. 102; PPG Hr'g Ex. 13). This issue is disputed and cannot be resolved on the current record.

Halloran testified that PADEP was satisfied that PPG had fully delineated the Site. (Apr.

9 Halloran Test. 27; Apr. 10 Halloran Test. 102.) Plaintiffs experts disagreed that PPG had fully

delineated the Site. (Apr. 9 Bell Test. 104:17-19; Apr.10 Rogers Test. 55:14-16.)  Halloran

admitted that "if there is contamination there [in the sediments] above a level that's unsafe, yes,

this remedy would not address that." (Apr. 9 Halloran Test. 39:23-34.) Dr. Bell testified that

contaminants deposited in the wetlands adjacent to the Allegheny River and Glade Run by PPG's

discharge of contaminated water from the SLA may present an imminent and substantial

endangerment to the environment and that the PPG remedy does not address this contamination.

(Apr. 9 Bell Test. 106:8-107:2.)

      The PPG remedy for the SLA includes interceptor trenches on the southern and eastern

sides of the SLA intended to capture the contaminated groundwater before it emerges from the

SLA and pump it to a treatment facility before discharge to the Allegheny River. (Apr. 9 Bell

Test. 96:1-9.) Plaintiffs state that PPG's PADEP witness admitted that these interceptor trenches

will not eliminate all seepage from the southern and eastern portions of the SLA. As Halloran

testified:

> I agree that the remedy that's in place under the COA, other than I mentioned
> before, that there are seeps that are going to be outside of the collection system
> that may need additional remedy at some point in the future, but the COA
> addresses that, too.

(Apr. 9 Halloran Test. 56:24-57:5.) Moreover, the collection and treatment system proposed by

PPG will require a high level of active maintenance and upkeep for centuries, so long as water is

introduced into the SLA. (Apr. 9 Bell Test. 109-10; Apr. 9 Amter Test. 136-37.) It may require

modification as additional seeps form. See Apr. 9 Amter Test. 136:22-23 (describing formation

of new seeps if the PPG remedy is not maintained); Apr. 10 Flowers Test. 29:9-23. Locating new

seepage and capturing it to prevent exposure will require extensive and regular Site

reconnaissance by PPG. (Apr. 9 Amter Test. 123:3-14 (seeps are not always obvious to visual inspection); Apr. 10 Flowers Test. 29:21-23.)  Plaintiffs note that new seeps have appeared even during the litigation of the pending motion: the draft NPDES permit attached to the COA (PPG Hr'g Ex. 3, Ex. A, 22 outfalls) incorporates five additional seeps/outfalls that were not included in an October 17, 2018 submission (ECF No. 386-3, 17 outfalls).

Remedy for the SWDA

The remedy for the SWDA proposes to place a soil cover on approximately five acres. (ECF No. 392-3, at 1778.) However, Plaintiffs note that the area of the SWDA covers approximately 40 acres and that PPG has not conducted a full delineation to determine the vertical and horizontal extent of the contamination. (Apr. 10 Rogers Test. 73:16-20.) A proper delineation requires that sampling be conducted until all contaminated samples are bounded by non-contaminated samples. (Id. at 69:15-70:24.) Dr. Rogers testified that PPG has never conducted a full delineation of the SWDA. (Apr. 10 Rogers Test. 61, 70.) He explained that numerous areas of the SWDA in which there is known contamination have not been properly bounded by non-contaminated samples. (Id. at 70-71.) Dr. Rogers also explained that there are areas of the SWDA wherein he has personally observed PPG's waste where no sampling has been done at all. (Id. at 63:18-64:5; see also Apr. 9 Bell Test. 108:2-24 (describing his own observations of waste in areas that have not been sampled).

Plaintiffs contend that PPG also fails to address all the areas in which prior sampling has shown metals contamination at concentrations that may present an imminent and substantial endangerment to the environment. For example, PPG fails to address areas in which lead concentrations as high as 14,500 mg/kg have been recorded. (Apr. 10 Rogers Test. 63:3-8.) This value is more than twenty times greater than the high end of the preliminary remediation goal

38

range of 720 mg/kg selected by PPG for the SWDA. (Id. at 60:6-9.) Dr. Rogers described a number of areas in which PPG fails to address high levels of contamination. (Id. at 62-64; 67:12-68:6.)

Dr. Rogers testified that PPG excluded a wealth of historic data from the calculations it used to support its remedial investigation, ecological risk assessment, and selection of remedy under Act 2, including the historic data would have required significantly more cleanup, even under the remediation standards selected by PPG. (Apr. 10 Rogers Test. 64:19-22, 66:19-25.) As Dr. Rogers explained, it is inappropriate to fail to consider historic data—particularly for long-lived contamination such as the metals contamination at the SWDA—absent a compelling reason. (Id. at 64:23-65:10 (providing, as an example of such a reason, the existence of more recent sampling data at that specific location); accord Apr. 10 Verslycke Test. 84:24-85:4 (agreeing with "Dr. Roger's premise that you would have to have an explanation about what data you have included or excluded . . .")

Plaintiffs note that PPG did not proffer any compelling reason justifying exclusion of the historic data. Rather, the only reason offered for excluding the historic data was that those "samples were not collected according to the grid composite scheme" used in PPG's more recent sampling events. (Apr. 10 Rogers Test. 107:2-11 (quoting and discussing the explanation provided in PPG's Act 2 submittal). That is, PPG's only proffered reason for excluding relevant and important data was that it was not collected in accordance with a sampling scheme developed by PPG's experts in this litigation. Plaintiffs contend that this is not a proper basis for excluding the historic samples. (Id. at 107:18-108:5.)

Plaintiffs contend that, even for areas of the SWDA that PPG proposes to remedy, the remedy is not adequate to eliminate the imminent and substantial endangerment posed by the

waste. Dr. Rogers explained that placing six inches of top soil on top of a fabric cover will not be effective because burrowing earthworms will bore down through the cover and plants will draw the heavy metals up and deposit them on the surface when the die.  (Apr. 10 Rogers Test. 72:1-17.) He also testified that PPG had not fully delineated the area to determine the extent of the contamination. (Id. at 72:22-25.)

Extent of Remedy

Plaintiffs also contend that the remedy is insufficient in that the COA is designed to terminate six months after PPG implements the remedy, but the remedy must be maintained for centuries in order to address the conditions presented by the waste. (PPG Hr'g Ex. 3 at 43 ¶ 42.) Moreover, Plaintiffs note that the obligations of the COA do not really impose any obligations on PPG beyond those already imposed by law: PPG is already required under the CWA to obtain an NPDES permit and abide by its limitations for its discharges from the Site; the penalties imposed under the COA are far less onerous than those established by the CWA; and the COA does not require PPG to set up financial assurances to pay for the remediation, as would be required under RCRA regulations, 40 C.F.R. §§ 265.143-265.144.

PPG responds that, to the extent that the PADEP in the future sees the need to impose financial assurances upon PPG, it can do so, as Halloran testified "we have that ability to require some kind of financial assurance if we feel that it is necessary." (Apr. 9 Halloran Test. 33.) Thus, if the PADEP "thought that PPG was not going to exist as a company or Ford City was going to sell the property, we would want to make sure that whoever is buying that property then would be financially viable to implement what's under the COA." (Id.)  PPG further contends that the cost of the Comprehensive Site-Wide Remedy would be five to six million dollars initially, and then between $300,000 and $500,000 in annual operation and maintenance costs. (Apr. 9

Halloran Test. 34; Apr. 9 O'Hara Test. 64.) PPG notes that this is "modest" cost in comparison to PPG's size and therefore argues that PADEP's determination that financial assurances are not necessary should be given deference. (ECF No. 419 at 29 n.8.) By contrast, PPG contends (without citation to the record) that the cost of the alternate remedy proposed by Plaintiffs would be far greater. PPG has not addressed the points that it will be far less in penalties under the COA than it would under the CWA. In any event, for the reasons explained herein, PPG has not demonstrated that further injunctive relief has been rendered futile because of the Comprehensive Site-Wide Remedy and thus the Court need not resolve the issue of whether the Comprehensive Site-Wide Remedy is insufficient because it does not include the requirement of financial assurances.

<u>Requested Relief that was Considered and Rejected by PADEP</u>

PPG contends that Plaintiffs demand certain mandatory injunctive relief that consists of remedies or actions that PADEP, in its expertise, has rejected or otherwise determined are not appropriate for the Site. PPG notes that Plaintiffs have provided numerous letters to PADEP outlining their comments on the proposed remedy. See ECF No. 396 Ex. B (Oct. 11, 2018 letter from Plaintiffs to PADEP, which incorporated by reference prior letters on delineation, the SLA cap/isolation remedy and sediment remediation).

For example, Plaintiffs seek an isolation remedy in the form of a "RCRA-style" cap for both the SLA and SWDA. (ECF No. 338 at 11.) PPG states that it carefully evaluated an isolation cap remedy for both the SLA and the SWDA and determined that the remedy was unsupportable, as documented in the Revised Treatment Plan Report and the June 2018 Revised Act 2 Submissions. (ECF No. 392 Exs. A, C.) PPG asserts that, if PADEP had determined that an isolation/cap-style remedy were necessary at the SLA or SWDA to protect human health or

the environment, it would not have approved the Comprehensive Site-Wide Remedy and would have required a cap as the selected final remedy, but that did not happen. (Id. Exs. B, D.) PPG notes that Plaintiffs have insisted upon an isolation remedy/RCRA-style cap for years, as set forth in multiple written comment letters and expert materials submitted to PADEP, and therefore PADEP clearly considered all of Plaintiffs' technical arguments in this regard, and, nonetheless, in its expertise, rejected that proposed remedy.

PPG contends that certain of Plaintiffs' requested mandatory injunctive relief is specifically tied to Plaintiffs' failed request for an isolation remedy, namely the relief requested in items Nos. 7, 8, and 9 of Plaintiffs' Amended Pretrial Statement. (ECF No. 338 at 11-12.) PPG notes, however, that the Comprehensive Site-Wide Remedy already includes these requested actions. (ECF No. 392 Exs. A-D.) For example, the trenching and collection system under the approved High pH Remedy will collect and treat all high pH seeps and prevent segregation of uncontaminated stormwater and will be designed to meet the required limits of the NPDES permit. (Id. Exs. A, B.) PPG states that its commitment to re-establishing and improving vegetation are both included as part of the Comprehensive Site-Wide Remedy as well. (Id. Exs. A-D.) However, as explained above, the Court is not required to defer to PADEP's determinations, and therefore the fact that PADEP may have rejected certain alternatives is not dispositive in these proceedings.

Requested Relief that Conflicts with the Comprehensive Site-Wide Remedy

PPG notes that Plaintiffs also seek a full delineation and removal of contaminants from the sediments in the vicinity of the Site. (ECF No. 338 at 12.) PPG contends that the Comprehensive Site-Wide Remedy, however, does not require further investigation or remediation of sediments in the Allegheny River adjacent to the Site because PPG has already

demonstrated that the Site (specifically the high pH/impacted seeps from the Site) has not caused

any measurable contamination of the sediments in the Allegheny River.  Further, there is no

contamination in the sediments of the Allegheny River that presents any ecological risk,

including to endangered mussel populations.  PPG notes that Plaintiffs have repeatedly raised

this same sediment issue to both PADEP and the USFWS to no avail.  In response to Plaintiffs'

submissions, PPG provided a full technical response and risk analysis to both PADEP and

USFWS, demonstrating that there was no ecological risk, including risk to any mussel

populations, from the metals present in the Allegheny River sediments, and that the very low

levels of metals found in the sediments are not statistically different upstream and downstream of

the Site. (ECF No. 392 Ex. K, Mar. 16, 2018 Letter from Arcadis to USFWS, Attach. A.) PPG

contends that it was the decades of industrial activity along the Allegheny River, and not the Site,

that deposited the low levels of contaminants found in the sediments.  If PADEP had determined

that a further investigation and/or remediation of Allegheny River sediments were necessary to

protect human health or the environment, it would not have approved the Comprehensive Site-

Wide Remedy without first requiring PPG to further study or remediate these sediments.

PPG contends that Plaintiffs have not asked, and are not asking, for any meaningful or

necessary relief beyond what is already encompassed by the Comprehensive Site-Wide Remedy

and what PADEP has already considered and determined in its expertise to be warranted to

protect human health and the environment at the Site.

Plaintiffs respond that PPG does not support its statement that injunctive relief as to

contaminated sediments "fundamentally conflicts" with the PADEP-approved remedial scheme.

PPG does not identify any such conflict. Rather, PPG points to the fact that Plaintiffs submitted

these proposals to PADEP and they were rejected. The Court concludes that Plaintiffs are

correct: PPG has not demonstrated that Plaintiffs' proposals "conflict" with the PADEP-approved remedy, only that their suggestions were made to PADEP and not accepted.

The Court concludes that Plaintiffs have submitted credible expert testimony that further injunctive relief may be "necessary" under RCRA beyond what PPG proposes to do in the Comprehensive Site-Wide Remedy that was approved by PADEP in order to reduce the generation of hazardous waste and to ensure the proper treatment, storage and disposal of that waste to minimize the present and future threat to human health and the environment from PPG's waste at the Site. Plaintiffs have presented expert testimony that: PPG did not fully delineate the waste at the Site; its proposed remedies for the SLA and the SWDA are ineffective and inefficient this because allowing water to contact the waste in the SLA produces contaminated groundwater which must then be treated, the remedy does not address the contamination in sediments and wetlands, interceptor trenches will not eliminate all seepages from the southern and eastern portions of the SLA and in fact new seeps will form for centuries and the collection system for the western slope will not capture all of the seepages, and for the SWDA the soil cover remedy extends over only five acres out of 40, excludes historic data and does not address the fact that earthworms and plants will brings heavy metals back to the surface; viable alternatives (such as a cap and upgradient groundwater diversion system) would address the problems that PPG's proposals do not address; and PPG's approach would require continued maintenance of the remedy for centuries although the COA will terminate six months after the remedy is implemented. PPG has also presented credible expert testimony on these questions, but these competing credible experts will have to be evaluated by the trier of fact. The fact that PPG's motion should be denied does not mean that injunctive relief should be entered in Plaintiffs' favor—as Plaintiffs note, they have not moved for injunctive relief at this time and

thus, unlike the situation in <u>LAJIM</u>, Plaintiffs do not bear the burden of showing harm not already addressed by the PADEP proceeding (although they have pointed to evidence of such harm). Rather, the burden for purposes of this motion falls on PPG, which has failed to demonstrate that PADEP's approval of the Comprehensive Site-Wide Remedy does not, in and of itself, render futile any further injunctive relief that Plaintiffs might obtain in this case upon a resolution of the merits of their RCRA claims.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PENNENVIRONMENT and SIERRA CLUB, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 12-342 |
| | ) | Member Cases: 12-527, 13-1395, |
| PPG INDUSTRIES, INC., BOROUGH OF FORD | ) | 13-1396, 14-229 |
| CITY, and BUFFALO & PITTSBURGH | ) | Magistrate Judge Mitchell |
| RAILROAD, INC., | ) | |
| Defendants. | ) | |
| | ) | |

## ORDER

AND NOW, this 22nd day of May, 2019, for the reasons provided in the Memorandum Opinion,

IT IS HEREBY ORDERED that Defendant PPG Industries, Inc.'s Motion for a Determination that Injunctive Relief Under RCRA is Futile as a Matter of Law (ECF No. 391) is denied without prejudice.


s/Robert C. Mitchell_____
ROBERT C. MITCHELL
United States Magistrate Judge