IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PENNENVIRONMENT and SIERRA CLUB,    )
                                     )
            Plaintiffs,              )
                                     )
    vs.                              )        Civil Action No. 12-342
                                     )        Member Cases: 12-527, 13-1395, 13-
                                     )        1396, 14-229
PPG INDUSTRIES, INC.,                )
                                     )        Magistrate Judge Dodge
            Defendant.               )

## MEMORANDUM OPINION

Plaintiffs PennEnvironment and Sierra Club bring these citizen suits against Defendant PPG Industries, Inc. ("PPG") under section 505 of the Federal Water Pollution Control Act, 33 U.S.C. § 1365(a)(1) (Clean Water Act or CWA), section 7002(a)(1)(B) of the Resource Conservation and Recovery Act, 42 U.S.C. § 6972(a)(1)(B) (RCRA), and section 601(c) of the Pennsylvania Clean Streams Law, 35 P.S. § 691.601(c) (CSL). In their lawsuits, they seek to remedy the alleged imminent and substantial endangerment to health and the environment presented by contamination of a site in Armstrong County, Pennsylvania used and operated by PPG (the "Site"), contamination of surface waters and sediments in the Allegheny River and Glade Run near the Site, and contamination of groundwater associated with the Site.[1]

Pending before the Court are two motions: PPG's Motion for Summary Judgment on Mootness Grounds (ECF No. 480) and Plaintiffs' Fifth Motion for Partial Summary Judgment

---

[1] Plaintiffs also named the Borough of Ford City and Buffalo & Pittsburgh Railroad, Inc. as defendants but indicated that they were not pursuing claims against or seeking specific relief from either of these parties. On March 30, 2021, these defendants were dismissed from the case (ECF No. 469).

(ECF No. 476). For the reasons below, PPG's motion will be denied and Plaintiffs' motion will be granted.

## I.   Relevant Procedural History

On January 13, 2012, Plaintiffs gave notice of their intent to file suit to the Administrator of the Environmental Protection Agency (EPA), the Pennsylvania Department of Environmental Protection (PADEP) and Defendants as required by the CWA, CSL and RCRA. 33 U.S.C. § 1365(b)(1)(A); 35 P.S. § 691.601(e); 42 U.S.C. § 6972(b)(2)(A). (CWA Compl. ¶ 4 & Ex. 1; RCRA Compl. ¶ 4 & Ex. 1.) Plaintiffs filed this action under the CWA and the CSL. Later, additional actions were commenced under the CWA, CSL and RCRA and were eventually consolidated at this case.

On December 10, 2014, the Court granted Plaintiffs' motion for a preliminary injunction to the extent that it sought an order requiring PPG to apply for a National Pollutant Discharge Elimination System ("NPDES") Permit. PPG was ordered to apply for a permit by March 31, 2015 (ECF No. 92). On April 7, 2015, PPG notified the Court that it had submitted its NPDES permit application and that the PADEP had accepted it (ECF No. 212).

The Court granted Plaintiffs' Third Partial Motion for Summary Judgment in August 2015. The Court found that PPG was liable under the CWA and CSL given the evidence that PPG was discharging waste without a NPDES permit.[2] Further, the Court determined that PPG was violating a 2009 Administrative Order issued by the PADEP as to Total Suspended Solids, failing to address contamination and creating an interim system that treated uncontaminated storm water in open

---

[2] Under the CWA, "it is illegal for anyone to discharge pollutants into the Nation's waters except pursuant to a permit." *City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304, 310-11 (1981).

trenches rather than pipes. PPG was also held liable under RCRA because its contamination "may present an imminent and substantial endangerment to health or the environment." (ECF No. 228).

On April 2, 2019, PPG and the PADEP entered into a Consent Order and Agreement ("2019 COA") that set forth compliance obligations and what is described as a civil penalty. (ECF No. 409-1.) The 2019 COA required PADEP's issuance of a final NPDES permit, PPG's compliance with the final NPDES permit, and the payment of stipulated penalties for noncompliance. Further, the 2019 COA required PPG to pay $1.2 million "in settlement of [PADEP's] claim for civil penalties for violations of The Clean Streams Law, including the Department's delegated NPDES program authority under the federal Clean Water Act, and other applicable law … occurring prior to the entry of this Consent Order and Agreement in accordance with the applicable statute of limitations." (*id.* at 31, § VII, ¶ 10). PPG timely paid this amount in full on May 16, 2019. (ECF No. 481 at 2.) As discussed in more detail below, the PADEP issued to PPG a final NPDES permit with an effective date of January 1, 2020 in accordance with the terms of the 2019 COA.

In October 2019, this matter was referred to Magistrate Judge Lenihan in order to conduct a judicial settlement conference, and multiple sessions took place thereafter. As a result of these efforts, the parties filed a joint motion for entry of a consent order March 22, 2021 (ECF No. 467), which was granted (ECF No. 468). Under the terms of the consent order, all claims were resolved except: (i) PPG's liability, if any, for a civil penalty under the Clean Water Act, as well as the amount of any such penalty, and (ii) PPG's liability, if any, for Plaintiffs' litigation costs, including attorneys' fees and expert witness' fees under 33 U.S.C. § 1365(d) and 42 U.S.C. § 6972(e). The Court retains jurisdiction to resolve these issues.  (ECF No. 468 ¶¶ 11, 28-29.)

On June 1, 2021, PPG filed a motion for summary judgment on mootness grounds (ECF

No. 480) and Plaintiffs moved for partial summary judgment on the issue of PPG's CWA liability between August 31, 2015 and December 31, 2019 (ECF No. 476). Both motions have been fully briefed.

## II.   Relevant Background Facts

The Site includes two former PPG waste material disposal areas known as the Solid Waste Disposal Area ("SWDA") and the Slurry Lagoon Area ("SLA"). Leachate and seeps from the SLA and the SWDA flow/seep out at various locations of the Site and then run off and migrate into the Allegheny River and Glade Run. (Defendant's Concise Statement of Material Facts ("DCSMF") ¶¶ 2-3.)[3]

From 1949 until 1970, PPG used parts of the Site to dispose of glass polishing slurry waste and solid waste from its former flat glass manufacturing facility that was across the river in Ford City, Pennsylvania. PPG deposited the slurry waste in three slurry lagoons created in an area on the Site that PPG formerly used as a sandstone quarry. The SLA portion of the Site is comprised of about 77 acres on the western part of the property. (Plaintiffs' Concise Statement of Undisputed Material Facts ("PCSUMF") ¶¶ 1-2.)[4] The SLA is bordered by Route 128 to the north, Glade Run to the west, and the SWDA to the east. The Allegheny River and a railroad track lie to the south of both the SLA and SWDA. On its southern side, the SLA slopes steeply from the top of the slurry lagoon to the Buffalo and Pittsburgh Railroad tracks that run parallel to the Allegheny River. On its western side, the SLA slopes to Glade Run. This slope is known as the Western Slope. A stream which PPG calls the Drainage Ditch runs between the SLA and SWDA. (*Id.* ¶ 3.)

---

[3] ECF No. 482.
[4] ECF No. 478. PPG contends that all of Plaintiffs' facts are immaterial because, as argued in its motion for summary judgment, Plaintiffs' claim for civil penalties under the CWA are now moot.

4

A. **Groundwater and Seep Discharge**

Groundwater in the SLA originates from two sources: upgradient groundwater and infiltrating precipitation. Once this groundwater enters the SLA, it encounters PPG's waste and becomes contaminated with the contaminants in the waste. This contaminated groundwater is sometimes call leachate. Fractures within the weakly cemented SLA waste provide pathways for the contaminated groundwater to travel. Some of the contaminated groundwater eventually emerges from the waste onto the land surface at locations known as seeps. The seep water is contaminated with metals, including aluminum, antimony, arsenic, chromium, iron, and lead. PPG's discharges also regularly have a high pH. (PCSUMF ¶¶ 4-6.)

The parties disagree regarding certain factual issues. PPG contends that the presence of metals in these seeps is *de minimis* and does not represent an unacceptable risk to human health and the environment. It also asserts that Plaintiffs resolved all claims of any kind related to the presence of metals. Further, PPG asserts, Plaintiffs withdrew their allegations that metals were not appropriately addressed by the final NPDES permit in exchange for a minor clarification about the scope of PPT's reconnaissance of the SLA to seek out and identify high pH seeps, thus ensuring they are incorporated and addressed by the final Site remedy. (PPG's Reply to Plaintiffs' Concise Statement of Material Facts ("DRPCSMF") ¶ 6.)[5] Plaintiffs counter that because the CWA forbids the discharge of "any pollutant" without a permit and because PPG had no permit authorizing its discharges until December 31, 2019, the amount of any particular metal in its discharges is immaterial to PPG's liability. They note that PPG's assertion that the seeps may be remediated in the future is irrelevant to the fact that the seeps were not eliminated during the time period in

---

[5] ECF No. 489.

question. (Plaintiffs' Reply in Support of Their Concise Statement of Material Facts ("PRSCSMF") ¶ 6.)[6]

According to Plaintiffs, once the contaminated groundwater emerges from the seeps, it continues to flow or is conveyed to the waters of the United States, including the Allegheny River, Glade Run, and their associated wetlands. They contend that this also occurred during the period covered by this Court's earlier award of summary judgment (from April 16, 1973 through August 31, 2015) for the same type of violations. These seeps discharge from all sides of the SLA. On the southern side of the SLA, the contaminated groundwater flows into a drainage channel located north of and parallel to the railroad tracks (Railroad Ditch). From the Railroad Ditch, the contaminated water flows through culverts underneath the railroad tracks into the waters of the United States: the Allegheny River and its adjacent wetlands. On the eastern side of the SLA, the contaminated groundwater discharges into the Drainage Ditch, which in turn discharges to the Railroad Ditch and waters of the United States. On the western side of the SLA, contaminated groundwater that emerges at seeps discharges into Glade Run. PPG's contaminated groundwater also emerges at seeps in the SWDA. Some of these seeps discharge into the Drainage Ditch and from there to the Allegheny River. (PCSUMF ¶¶ 7-12.).[7]

In response to an Administrative Order issued by PADEP on March 9, 2009, PPG began

---

[6] ECF No. 492.

[7] PPG objects to the use of the words "discharge," "railroad ditch" and "drainage channel" (DRPCSMF ¶¶ 7-12) but, as Plaintiffs note, these terms have been used in documents submitted by PPG or by PPG's experts. PPG argues in a footnote that, if the Court does not find the civil penalty moot, the Court's prior decision about its liability for discharging without a permit will "need to be revisited" because of the Supreme Court's decision about the definition of "point source" discharges, *County of Maui v. Hawaii Wildlife Fund*, 140 S. Ct. 1462 (2020). PPG did not reserve this issue for further revie and therefore the Court need not determine what effect the *Maui* case would have on this litigation.

in early 2010 to collect some portion of the seepage from the SLA and direct it to an Interim Abatement System (IAS) prior to discharge from Outfall 001 to the southern slope of the SLA. Once discharged from Outfall 001, the waters from the IAS flow down the southern slope of the SLA to the Railroad Ditch and ultimately are discharged through the culverts to the Allegheny River. According to Plaintiffs, the IAS was designed to adjust the pH of the contaminated water it collects. It does not treat or remove metals or other contaminants from the leachate, and thus those contaminants are present in the effluent that discharges from Outfall 001. Further, the IAS does not collect all seeps at the Site. Leachate that is not collected in the IAS continues to discharge to the waters of the United States. (PCSUMF ¶¶ 13-14.)[8] The NPDES permit for the Site, which became effective on January 1, 2020, lists as outfalls twenty-two (22) point source discharges to the waters of the United States, including Outfall 001, that are subject to and require regulation under the CWA and the NPDES permitting program. (*Id.* ¶ 15.)

### B. Stormwater Discharge

Stormwater runoff from the Site is exposed to contamination that originates with PPG's waste. Some of that stormwater is collected in the IAS and discharged through Outfall 001. The contaminated stormwater that is not collected discharges to the Allegheny River, Glade Run and adjacent wetlands. Plaintiffs note that these unpermitted discharges of contaminated stormwater continued until December 31, 2019. (*Id.* ¶ 16.)

---

[8] PPG disputes these statements but cites no record evidence in support of its position. PPG emphasizes that the IAS was an interim remedy that "was never intended to … collect all seeps at the Site." Plaintiffs take the position that PPG is liable during time during which only the IAS was in place.

C.  **Conditions from August 31, 2015 to December 31, 2019**

Plaintiffs assert that although there are planned improvements to the collection and treatment of the contaminated groundwater which should reduce, and possibly eventually eliminate, seep discharges from the Site, those improvements have not been installed. Thus, they claim, the discharges found by the Court in the August 2015 Order continued unabated and unchanged during the time period between the August 2015 Order through December 31, 2019. New seepage continues to be discovered. Stormwater continued to encounter PPG's contamination and discharge from the Site between August 2015 and the end of 2019. (*Id.* ¶¶ 17-19.)

While PPG denies these statements (DRPCSMF ¶¶ 17-19), it cites no evidence of record in support of its position. Moreover, although PPG contends that "all seeps and newly discovered seeps … are covered by the stipulated civil penalties paid by PPG under the 2019 COA," Plaintiffs note that PPG's discharges were not authorized by a NPDES permit between August 31, 2015 and December 31, 2019, the time relevant to their motion. Plaintiffs also assert that 2019 COA does not state that the civil penalties cover all seeps from the Site and did not address all of PPG's violations.  Thus, they argue, the payment in the 2019 COA cannot resolve Plaintiffs' CWA claims. (PRCSMF ¶¶ 17-19.)

D.  **PADEP's Approval of Site-Wide Remedy**

PPG states that, on October 10, 2018, the PADEP approved a "Remedial Investigation Report, Human Health Risk Assessment, Ecological Risk Assessment, and Cleanup Plan" ("Remedial Cleanup Plan") for the remediation of any contamination from waste disposed of at the SLA and the SWDA, which the PADEP determined may pose an unacceptable risk to human

health or the environment (ECF No. 409-1 at 18.) (DCSMF ¶ 5.)[9]  Plaintiffs note that this Court previously held that Plaintiffs presented credible evidence that additional measures may be necessary to satisfactorily address all endangerment posed by PPG's contamination at the Site. (Plaintiffs' Response to Defendant's Concise Statement of Material Facts ("PRDCSMF") ¶ 5.)[10] See ECF No. 420 at 44.

The Remedial Cleanup Plan consists of: (1) an enhanced collection, conveyance, and treatment system that will collect and treat all high pH seeps at the Site and discharge the treated seeps under a final NPDES permit ("High pH Remedy"); and (2) a cleanup plan submitted under Pennsylvania's Land Recycling and Environmental Remediation Standards Act, 35 P.S. §§ 6026.101 et seq. ("Act 2"). The Remedial Cleanup Plan incorporates the High pH Remedy and also sets forth the remediation approach for the other areas of the Site warranting a remedy, soils and groundwater at the SLA and the SWDA and areas in the vicinity ("Act 2 Remedy"). (ECF No. 409-1 at 13-17.) (DCSMF ¶ 6.) Plaintiffs dispute that PPG's remedy would eliminate all seepage from the Site. (PRDCSMF ¶ 6.)

The Remedial Cleanup Plan, and PADEP's approval of it, is memorialized in four documents:

• The Revised Treatment Plan Report (ECF No. 392-1);

• PADEP's Approval of the Revised Treatment Plan Report (ECF No. 392-2);

• The June 2018 Revised Act 2 Submission (ECF No. 392-3); and

• PADEP's Approval of the June 2018 Revised Act 2 Submission (ECF No. 392-4).

---

[9] PPG refers to it as "The Comprehensive Site-Wide Remedy" but the document does not use this phrase.
[10] ECF No. 486.

9

(DCSMF ¶ 7.)

PPG states that one integral aspect of the approved remedy is a revised NPDES permit, which was expanded coextensively, with the approved Remedial Cleanup Plan to address discharges from the Site. (ECF No. 409-1 at 27-29.) (*Id.* ¶ 8.) Plaintiffs dispute PPG's contention. They note that there has been only a single revision to the NPDES permit for the Site. This revision was issued on April 9, 2021 as a condition of settlement between Plaintiffs, PPG and PADEP resolving Plaintiffs' appeal of the NPDES permit issued on December 20, 2019, with an effective date of January 1, 2020. Thus, they assert, this permit is unrelated to the Remedial Cleanup Plan as defined by PPG. (PRDCSMF ¶ 8.)

### E.  Costs Associated with the Remedy

Plaintiffs claim that the nature of PPG's waste and the PPG Remedy are such that it will continue to contaminate the environment significantly into the future, or, in the words of PADEP witness Mr. Halloran, "in perpetuity."[11] At the April 9, 2019 hearing, PPG's witnesses estimated that the PPG Remedy would require up to half a million dollars in operation and maintenance costs on a yearly basis. This annual amount, as properly adjusted for the passage of time, will be required for centuries. More recently, on December 2, 2020, PPG submitted a financial assurance package to PADEP under paragraph 22 of the Consent Settlement. In that package, PPG estimated that the SLA remedy would entail capital costs of at least $9,114,265, as well as yearly operation and maintenance costs of at least $340,321 per year. Finally, Plaintiffs note that the parties have

---

[11] While PPG denies this statement, when Mr. Halloran was asked if, under PADEP's remedy, the SLA waste will continue to contaminate the ground water in the SLA in perpetuity, he answered "yes." (ECF No. 416 at 38.) Two witnesses testified that costs would be required "for centuries." (*Id.* at 91, 109, 136.)

10

proffered expert testimony about the economic benefit derived by PPG from its noncompliance. See, e.g., Plaintiffs' Amended Pretrial Statement (ECF No. 338) at 9 (discussing economic benefit as issue for expert testimony at trial); PPG Amended Pretrial Statement (ECF No. 353) at 7, 14 (discussing economic benefit and naming expert witness Robert H. Fuhrman to testify to same at trial). (PRDCSMF ¶¶ 53-56.)

### F. The 2019 Consent Order and Agreement

As noted above, PPG and PADEP entered into the 2019 COA on April 2, 2019, which contains discharge compliance obligations related to the CWA and the CSL. (ECF No. 409.) By its terms, the 2019 COA supersedes PPG's performance obligations under the 2009 Order. (ECF No. 409-1 at 25.) (DCSMF ¶¶ 9-10.) The parties dispute whether PPG's compliance obligations were "extensive," and Plaintiffs note that the 2019 COA required PPG to continue implementation of interim abatement measures until the discharge was authorized by a NPDES permit. (PRDCSMF ¶¶ 9-10.)

The 2019 COA requires PPG to implement the PADEP-approved comprehensive remedial action plan at the SLA and the SWDA. The 2019 COA also requires PADEP's issuance of a final NPDES permit, PPG's compliance with the final NPDES permit, and the payment of stipulated penalties in the event of noncompliance or where exceedances are anticipated pending full implementation of the remedial action. (DCSMF ¶¶ 11-12.)

According to PPG, the 2019 COA also imposed a civil penalty on PPG in the amount of $1.2 million to specifically redress the alleged violations of the CSL and CWA before the entry of the 2019 COA. (*Id.* ¶ 13.) Plaintiffs dispute that this payment constitutes a "civil penalty" under the CWA because it fails to capture PPG's economic benefit or offer meaningful deterrence. (PRDCSMF ¶ 13.) *See also id.* ¶ 50 (the amount PPG was to pay was redacted in the draft Plaintiffs

received).

G.  **Issuance of the Final NPDES Permit**

In accordance with the 2019 COA, PADEP issued to PPG a final NPDES permit with an effective date of January 1, 2020 ("Final NPDES Permit").[12] Under the Final NPDES Permit, PPG may discharge from the SWDA and the SLA to the Allegheny River and Glade Run in accordance with effluent limitations, monitoring requirements, and other conditions in the permit. Failure to comply with the terms, conditions or effluent limitations of the Final NPDES Permit is grounds for enforcement action; for permit termination, revocation and reissuance, or modification; or, for denial of a permit renewal application. (DCSMF ¶¶ 14-16.)

Prior to issuing the Final NPDES Permit, PADEP published a revised draft permit for public review and comment. By letter dated October 29, 2018, Plaintiffs provided comments on the revised draft NPDES permit. PADEP reviewed, considered and responded to all comments that related to the terms and conditions of the permit. (DCSMF ¶¶ 17-20.) PPG published notice of the first and second drafts of the permit, but not the final draft which would become the issued permit (which contained five more outfalls than did the last draft permit). As a result, Plaintiffs contend that neither they nor the public generally were afforded an opportunity to comment directly on the issued permit. (PRDCSMF ¶¶ 17-19.)

H.  **Permit Appeal and Settlement**

On February 10, 2020, Plaintiffs appealed the issuance of the Final NPDES Permit to the Pennsylvania Environmental Hearing Board ("EHB"), alleging that PADEP failed "to establish

---

[12] Plaintiffs note that PPG only applied for a NPDES permit after it was compelled to do so and the permit was amended on April 9, 2021. (PRDCSMF ¶¶ 14-16.)

appropriate effluent limitations, to adequately consider non-discharge alternatives, to establish adequate monitoring requirements, and to provide adequate notice to the public of the draft permit conditions." Plaintiffs, PPG, and PADEP later settled the appeal, and the EHB entered an order on April 1, 2021 which terminated Plaintiffs' appeal. (DCSMF ¶¶ 20-21.)

On March 26, 2021, PPG and Plaintiffs entered into a Consent Settlement resolving all claims against PPG under Plaintiffs' consolidated complaints and amended complaints "regarding the waste and the contamination of the surface water, wetlands, sediments, stormwater, groundwater, soil, vegetation, talus, and mulch on and/or in the vicinity" of the Site. (ECF No. 468 ¶ 11.) PPG also voluntarily agreed to include in the Revised Cleanup Plan multiple enhancements as part of the remedy already required by the 2019 COA to bolster it beyond what PADEP had determined was necessary to comprehensively address site conditions. (*Id.* ¶ 15.) (DCSMF ¶¶ 22-23.)

As part of the Consent Settlement, PPG also agreed to take actions to "assure that Plaintiffs have reasonable access to the Site for purposes of Plaintiffs inspecting the remedy and compliance with terms" of the 2019 COA, the First Amendment and the NPDES Permit. (ECF No. 468 ¶ 24.) The only unresolved issues are: "(i) PPG's liability for and the amount of civil penalty, if any, to be imposed under the [CWA], and (ii) PPG's liability for and the amount of litigation costs, if any, including attorneys' fees and expert witness' fees . . . ." (*Id.* ¶ 11) (DCSMF ¶¶ 24-25.)

## III.    Discussion

### A.    <u>Standard of Review</u>

Under the Federal Rules of Civil Procedure, summary judgment is appropriate if there are no genuine disputes as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Summary judgment may be granted against a party who fails to

adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which shows the lack of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Issues of credibility and weighing of evidence are to be decided by the trier of fact, not the court on a motion for summary judgment. *Id.* at 255.

The Court of Appeals has held that "where the movant bears the burden of proof at trial and the motion does not establish the absence of a genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented." *National State Bank v. Federal Rsrv. Bank*, 979 F.2d 1579, 1582 (3d Cir. 1992). In following this directive, a court must take the facts in the light most favorable to the non-moving party and must draw all reasonable inferences and resolve all doubts in that party's favor. *Hugh v. Butler County Fam. YMCA*, 418 F.3d 265, 266 (3d Cir. 2005); *Doe v. County of Centre, Pa.*, 242 F.3d 437, 446 (3d Cir. 2001).

**B.  PPG's Motion for Summary Judgment on Mootness Grounds**

PPG moves for summary judgment on the ground of mootness with respect to Plaintiffs'

14

claim for civil penalties under the CWA.[13] It argues that Plaintiffs' request for a civil penalty is moot because it has already paid a substantial penalty under the CWA in connection with the NPDES permit. Moreover, there are mandatory penalties for its noncompliance with the permit and the COA.

"It is a basic principle of Article III that a justiciable case or controversy must remain extant at all stages of review, not merely at the time the complaint is filed." *Decker v. Northwest Envtl. Def. Ctr.*, 568 U.S. 597, 609 (2013) (quotation omitted). "A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Id.* (quoting *Knox v. Service Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 307 (2012)). "[A]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Knox*, 567 U.S. at 307-08.

The Supreme Court addressed the issue of whether a party's voluntary cessation of conduct renders a case moot, holding that:

> It is well settled that "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *City of Mesquite* [*v. Aladdin's Castle, Inc.*], 455 U.S. [283,] 289, 102 S.Ct. 1070 [(1983)]. "[I]f it did, the courts would be compelled to leave '[t]he defendant ... free to return to his old ways.'" *Id.*, at 289, n.10, 102 S.Ct. 1070 (citing *United States v. W.T. Grant Co.*, 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953)). In accordance with this principle, the standard we have announced for determining whether a case has been mooted by the defendant's voluntary conduct is stringent: "A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *United States v. Concentrated Phosphate Export Assn.*, 393 U.S. 199, 203, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968). The "heavy burden of persua[ding]" the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness. *Ibid.*

---

[13]   Under the terms of the Consent Settlement, the Court maintains continuing jurisdiction to enforce the Consent Settlement. (PRCSMF ¶ 22.)

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) ("*Laidlaw*").[14]

As noted the Court of Appeals for the Third Circuit, "[w]hile the case law speaks largely of voluntary cessation, these principles apply even when the defendant's cessation is not entirely voluntary" and the "burden always lies on the party claiming mootness, whether the case involves voluntary cessation or not." *Hartnett v. Pennsylvania State Educ. Ass'n,* 963 F.3d 301, 306, 307 (3d Cir. 2020).

Neither the Supreme Court nor the Third Circuit has held that in order to avoid dismissal based on mootness, a plaintiff must prove that there is a realistic prospect that a defendant's violations will continue. On the contrary, in a case most closely analogous to this one, the Third Circuit confirmed that a defendant's burden of establishing mootness is a "heavy one." *Natural Res. Def. Council, Inc. v. Texaco Ref. & Mktg., Inc.*, 2 F.3d 493, 502 (3d Cir. 1993). Although claims for injunctive relief had been rendered moot in that case because of intervening events, the Court of Appeals held that claims for damages were not moot. *Id.* at 503. As the court noted, civil penalties are mandatory and attach at the time of the violation. *See* 33 U.S.C. § 1319(d), which provided that a CWA violator "shall" be subject to civil penalties. The Court further noted that holding otherwise "would weaken the deterrent effect of the [CWA] by diminishing incentives for citizens to sue and encourage dilatory tactics by defendants." *Id.* at 503-04 (footnote and citation

---

[14] PPG cites *Laidlaw* for the proposition that mootness is "the doctrine of standing set in a time frame." The Supreme Court explained in its opinion, however, that although it made that statement in the past, it was "not comprehensive" and "there are circumstances in which the prospect that a defendant will engage in (or resume) harmful conduct may be too speculative to support standing, but not too speculative to overcome mootness." *Id.* at 190. *See also id.* at 185 ("civil penalties in Clean Water Act cases do more than promote immediate compliance … they also deter future violations.")

omitted). *See also Hartnett,* 963 F.3d at 306 ("We will understandably be skeptical of a claim of mootness when a defendant yields in the face of a court order and assures us that the case is moot because the injury will not recur, yet maintains that its conduct was lawful all along.")

Thus, the burden falls on PPG to show that Plaintiffs' claim for civil penalties under the CWA is moot.

1. Statutory Framework Regarding Civil Penalties Under the CWA

The CWA provides that any person who violates various provisions of the Act:

> shall be subject to a civil penalty not to exceed $25,000 per day for each violation. In determining the amount of a civil penalty the court shall consider the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require.

33 U.S.C. § 1319(d).[15] See also § 1319(g)(3) (nearly identical list of factors for EPA Administrator or Secretary to consider when determining the amount of an administrative penalty).

No civil penalty may be imposed by a court for a violation for which either the federal or a state government "has commenced or is diligently prosecuting an [administrative] action" for penalties, or for which such an action has already concluded with penalties paid before a citizen suit. 33 U.S.C. § 1319(g)(6)(A, B).

The Act further provides that any violation:

> for which the Administrator, the Secretary, or the State has issued a final order not subject to further judicial review and the violator has paid a penalty assessed under this subsection, or such *comparable* State law, as the case may be, shall not be the subject of a civil penalty action under subsection (d) of this section or section 1321(b) of this title or section 1365 of this title.

---

[15] As discussed herein, this amount has been updated by regulation.

33 U.S.C. § 1319(g)(6)(A)(iii) (emphasis added). Thus, to avoid the civil penalty, a government action must have been brought before a citizen suit and the penalty must have been issued under a state law comparable to the CWA, that is, one containing the elements delineated in § 1319(g). *See Lower Susquehanna Riverkeeper v. Keystone Protein Co.*, 520 F. Supp. 3d 625, 635 (M.D. Pa. 2021) (PADEP consent orders did not preclude a CWA citizen suit because the CSL "lacks appropriate measures to provide the public with notice and the opportunity to participate in the decision-making at issue. This leads to the conclusion that under the 'rough comparability' standard, the [CSL] is not comparable to the [CWA].")[16]  *See also McAbee v. City of Fort Payne*, 318 F.3d 1248, 1254-56 (11th Cir. 2003); *Paper, Allied-Indus., Chem. & Energy Workers Int'l Union v. Continental Carbon Co.*, 428 F.3d 1285, 1294 (10th Cir. 2005);

The CSL's penalty provisions, 35 P.S. § 691.605(a), do not require consideration of the same factors as does the CWA, 33 U.S.C. § 1319(d). *See L.E.A.D. (Lead Env't Awareness Dev.) v. Exide Corp.*, 1999 WL 124473, at *31 (E.D. Pa. Feb. 19, 1999) ("Nowhere in the civil penalty scheme of the CSL … does the public have a meaningful opportunity to participate in the civil penalty phase of the administrative enforcement process.").  In assessing the amount of a penalty, the CWA focuses on the seriousness of the violation, the economic benefit to the violator, the history of non-compliance and any good faith attempts to comply, while the CSL looks at willfulness, damage to the waters and the cost of restoration.

---

[16] The court noted that there are two standards courts have adopted for determining comparability and applied the more restrictive "rough comparability" test (the Third Circuit has not addressed the issue), pursuant to which the court focuses on the three categories of provisions in 33 U.S.C. § 1319(g): penalty assessment, public participation, and judicial review. *Id.* at 634-35.

PPG does not argue that the penalty assessed under the 2019 COA was issued under a state law comparable to the CWA, that is, one containing the elements delineated in § 1319(g). Nonetheless, Plaintiffs contend that PPG's mootness theory would render § 1319(g)(6)'s elimination of the civil penalty only if a final order has been entered and a penalty assessed before the citizen suit was filed entirely superfluous. If a violator could make a payment to the state long *after* a citizen suit had been brought and thereby moot any claim for civil penalties (without considering whether the amount paid was comparable to a CWA civil penalty), there would be no need for the statutory provision precluding civil penalties only if the federal or state government began and was diligently prosecuting an administrative action *before* the citizen suit was filed. As the Supreme Court has held, "[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant ...." *Corley v. United States*, 556 U.S. 303, 314 (2009) (citation omitted).

In addition, the "diligent prosecution bar," 33 U.S.C. § 1365(b)(1)(B), provides that a citizen suit may not be brought "if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State" to remedy the violations at issue. Because no government agency commended a civil or criminal action over PPG's violations of the CWA, this provision does not apply here. *See Environmental Conservation Org. v. City of Dallas,* 529 F.3d 519, 526 (5th Cir. 2008) ("*ECO*") ("The Act is silent as to which mechanisms may be invoked to dispense with citizen suits … that have been properly commenced under Section 1365(b).")

Plaintiffs note that while the citizen suit provision of the CWA allows for the *federal* government to intervene as a matter of right, 33 U.S.C. § 1365(c)(2), and requires that the *federal* government be provided with a copy of the complaint and an opportunity to review and comment

19

upon any settlement of CWA citizen suit before approval by the court, § 1365(c)(3), it does not extend these provisions to the states. *Compare* 42 U.S.C. § 9659(g) (allowing either the federal government or the state or both to intervene as a matter of right in a CERCLA citizen suit). Thus, Plaintiffs contend, the statutory framework shows that, once a CWA citizen suit is filed, the state does not bear primary responsibility over it. *See ECO*, 529 F.3d at 531 (noting the primary enforcement role of the *EPA*, not a state agency).

2.   PPG's Contention that the Civil Penalty Claim is Moot

In support of its motion for summary judgment, PPG argues that there is nothing left for the Court to resolve because Plaintiffs' sole remaining claim is for violations of the CWA without a NPDES permit, a matter that has been permanently resolved by the 2019 COA. It notes that it has already paid a significant civil penalty under the CWA and the 2019 COA imposes mandatory stipulated penalties for future noncompliance with its terms. Thus, it argues, there is no matter for this Court to resolve without upsetting the PADEP's primary enforcement role.

As the Third Circuit has not yet addressed this issue, PPG principally relies on several cases from other jurisdictions in support of its position that its consent decree with PADEP renders the CWA penalty aspect of Plaintiffs' citizen suit moot. These cases are distinguishable from the issues raised here, as discussed below.

After a citizen suit was brought in *ECO*, a case cited by PPG, the EPA issued an administrative compliance order against the city. It encouraged ECO, the citizen-plaintiff, to participate in settlement discussions, but ECO declined to do so. The EPA and the State of Texas then filed a CWA enforcement action and a proposed consent decree that contained the terms of the settlement agreement it had negotiated with the City of Dallas, which triggered a public notice and comment period. ECO submitted comments but declined to intervene in the enforcement

action even though it had a right to do so. The district court entered the consent decree in the EPA enforcement action and then held that ECO's citizen suit was barred by the doctrine of *res judicata*.

The Court of Appeals for the Fifth Circuit affirmed on different grounds, holding that the case was moot "unless ECO (the citizen-suit plaintiff) proves that there is a realistic prospect that the violations alleged in its complaint will continue notwithstanding the consent decree." 529 F.3d at 528 (citing *Comfort Lake Ass'n, Inc. v. Dresel Contracting, Inc.*, 138 F.3d 351, 355 (8th Cir. 1998) and *Atlantic States Legal Found., Inc. v. Eastman Kodak Co.*, 933 F.2d 124, 128 (2d Cir. 1991)).[17] The court found that the voluntary cessation doctrine did not apply because there was court-mandated consent decree and the actions at issue were those of the EPA and the court, not those of the City. *Id.* The court determined that the claim for a civil penalty was moot because the consent decree imposed penalties and ECO's role as a private attorney general was no longer needed to raise the issue.  It noted: "[t]hat ECO might have sought stiffer penalties against the City does not charge the result; ECO is not permitted to upset the primary enforcement role of the EPA by seeking civil penalties that the Administrator chose to forego." *Id.* at 531 (citation omitted). Thus, the Fifth Circuit held that ECO's claim for a civil penalty was mooted by the EPA

---

[17] The Second Circuit later distinguished *Eastman Kodak* because it focused on the mootness of injunctive relief rather than the civil penalties. *See Atlantic States Legal Found., Inc. v. Pan Am. Tanning Corp.*, 993 F.2d 1017, 1021-22 (2d Cir. 1993). In *Texaco*, the Third Circuit adopted the reasoning of the Second Circuit in *Pan American Tanning*—as well as cases from the Fourth and Eleventh Circuits—and did not even mention the Second Circuit's earlier holding in *Eastman Kodak*. The *Eastman Kodak* case has also been criticized. *See Natural Res. Def. Council, Inc. v. Loewengart & Co.*, 776 F. Supp. 996, 1000 (M.D. Pa. 1991) (rejecting the reasoning of *Eastman Kodak* because: "If Congress had intended a citizen's suit to be dismissed when the government took initiative against the polluter at any subsequent time, it could have written the citizen's suit provision that way."); *Public Int. Rsch. Grp. of New Jersey, Inc. v. Elf Atochem N. Am., Inc.*, 817 F. Supp. 1164, 1171 (D.N.J. 1993) (same).

enforcement action.[18]

By contrast, in this case PPG did not face an enforcement action but negotiated the terms of the settlement with PADEP, not the EPA, and there was no public notice and comment period regarding the amount of the penalty. Moreover, as explained above, the Third Circuit has not endorsed the test for mootness that was applied by the Fifth Circuit. And as the Supreme Court has observed, "the voluntary nature of a consent decree is its most fundamental characteristic" because "the parties' agreement ... serves as the source of the court's authority to enter any judgment at all." *Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland,* 478 U.S. 501, 521-22 (1986). Because a consent decree is by its very nature voluntary, the voluntary cessation exception to mootness applies even though a consent decree is "judicially enforceable." *See Already, LLC v. Nike, Inc.*, 568 U.S. 85, 92 (2013) (covenant not to sue was judicially enforceable but still subject to voluntary cessation exception to mootness). Thus, the reasoning in *ECO* that compliance with a consent decree does not constitute voluntary cessation is not persuasive. *See In re Vizio, Inc., Consumer Priv. Litig.*, 2017 WL 11420284, at *5 (C.D. Cal. July 25, 2017) ("Like its policy underpinnings, [*ECO's*] doctrinal holdings do not fit easily with basic constitutional mootness principles.")

PPG also relies upon *Black Warrior Riverkeeper, Inc. v. Cherokee Mining, LLC,* 637 F. Supp. 2d 983 (N.D. Ala. 2009). In that case, the court found that that in order for the plaintiff to continue to pursue the defendant after the entry of a state agency order, it was "obligated to demonstrate that there is a serious prospect that the [Defendant's] violations described in its

---

[18] As explained above, the statutory framework draws a distinction between the actions of the EPA (that is, the federal government) and a state agency such as PADEP in a CWA citizen suit.

complaint will continue to occur notwithstanding the consent decree. [Plaintiff] cannot meet this burden simply by criticizing the consent order as somehow inadequate. . ." *Id.* at 989. The court applied *ECO's* reasoning without even noting the important distinction that *ECO* involved the EPA rather than a state agency. Notably, the same court later held that a citizen suit was not moot because the court was not presented with a record of two-year monitoring by the state agency which would suggest that it was "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Black Warrior Riverkeeper, Inc. v. Shannon, LLC*, 2014 WL 1246473, at *5 (N.D. Ala. Mar. 24, 2014).

In *Comfort Lake Ass'n, Inc. v. Dresel Contracting, Inc.*, 138 F.3d 351 (8th Cir. 1998), another decision cited by PPG, the Eighth Circuit held that "the problem here is not mootness." 138 F.3d at 356. Rather, the Court of Appeals defined the issue as the effect that the defendant's settlement with the state agency had on the citizen suit claim for civil penalties, that is, could the citizen suit collaterally attack the state agency's decision on civil penalties for the very same violations. Ultimately, the court held that the state action, although informal, began prior to the citizen suit, extracted a civil penalty that exceeded penalties imposed in similar cases and was derived by looking at factors much like those which must be considered by a court imposing penalties under the CWA. Therefore, the court did not allow the action for civil penalties to proceed. *Id.* at 357.

The Eighth Circuit later applied the voluntary cessation standard in *Kennedy Building Associates v. Viacom*, 375 F.3d 731, 745 (8th Cir. 2004), holding that a consent agreement did not moot a plaintiff's demand for injunctive relief. Finding that the defendant had not satisfied its "heavy burden," the Eighth Circuit observed that an agreement to take certain steps in the future was not tantamount to actual performance. *Id.* at 745-46. Because the plaintiff was not a party to

the consent agreement, it would have no recourse if the defendant shirked its promises and the state agency failed to enforce the agreement. *Id.* at 745. Even if the defendant had fully complied with the consent order, the court found that the request for injunctive relief remained justiciable because "[r]elief granted in another tribunal" only moots a request for injunctive relief "where the relief granted is complete." *Id.* at 746.

The Plaintiffs in this case were not parties to the 2019 COA, which was negotiated after the citizen suit was filed. PPG has not shown that the amount it paid makes the relief "complete" or that the penalties exceed those imposed in similar cases that considered the same factors that a court would use in imposing CWA penalties.[19] Thus, this case is readily distinguishable from *Comfort Lake*.

Plaintiffs argue that in the cases on which PPG relies, the courts erroneously appeared to believe that the issue turned on whether they "bound" or "obligated" to impose the maximum penalty. *See ECO*, 529 F.3d at 530-31 (case deemed moot because "the district court is not bound to impose the maximum penalty" and thus the penalties imposed in the consent decree were "arguably the same" as the penalties the plaintiff could have achieved in litigation); *Cherokee Mining*, 637 F. Supp. 2d at 990 (the state penalty was "not the maximum" but if the plaintiff succeeded in court, the court "would not be obligated to impose the maximum penalty."). As Plaintiffs observe, however, mootness does not depend on whether a court is bound or obligated

---

[19] In *Comfort Lake,* the court stated that an agreement with a state agency was "entitled to considerable deference if we are to achieve the Clean Water Act's stated goal of preserving 'the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution.'" 138 F.3d at 357 (quoting 33 U.S.C. § 1251(b)). Plaintiffs note that this quote ignored the statute's statement that "public participation in the development, revision, and enforcement of any … effluent limitation … shall be provided for, encouraged, and assisted by the Administrator and the States." 33 U.S.C. § 1251(e). That is, *Comfort Lake* cited one congressional policy, but omitted another.

to impose relief, but on whether "it is impossible for a court to grant any effectual relief whatever." *Decker*, 568 U.S. at 610. As the Supreme Court noted in *Laidlaw*, a court may order more significant civil penalties than a state did. 528 U.S. at 186 n.2. Thus, the mere fact that a defendant has paid penalties to a state does not make it impossible for a federal court to grant further relief.

PPG contends that the fact the fact that civil penalties are less than those sought by Plaintiffs is not a reason to allow their suit to proceed. See *Ohio Valley Env't Coal., Inc. v. Hobet Mining, LLC*, 2008 WL 5377799, at *9 (S.D.W. Va. Dec. 18, 2008) ("If citizens could sue for civil penalties that the government chose to forgo, they would usurp the primary enforcer role and undermine the state's discretion. Because of the discretion granted to state governments as primary enforcers of the act, various courts have been reluctant to allow collateral attacks on civil penalties contained within a binding consent order.").[20] However, the court went on to note that:

> If, however, the penalty imposed is not sufficient to have a deterrent effect, the Court is within its discretion to allow the citizen suit to proceed. *See Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 890 F. Supp. 470 (D.S.C. 1995). A principal purpose of a civil penalty is to "remove or neutralize the economic incentive to violate environmental regulations;" thus, a penalty is unlikely to deter a violator if it does not remove the competitive advantage of continued non-compliance. [*United States*] *v. Smithfield Foods, Inc.*, 191 F.3d 516 (4th Cir. 1999) (internal quotations omitted).

*Id.* The *Hobet* court held that injunctive claims were moot as were any additional civil penalties as of date of the consent decree, but it lacked sufficient information to determine whether civil penalties for ongoing violations after the date of the consent decree were moot. *But see Interfaith Cmty. Org. Inc. v. PPG Indus., Inc.*, 702 F. Supp. 2d 295, 302 (D.N.J. 2010) (distinguishing *Hobet*

---

[20] In this Court's Memorandum Opinion and Order on PPG's motion for partial summary judgment on the ground of mootness based on its application for a NPDES permit, the Court held that PPG's motion should be denied, explicitly distinguishing the *Hobet Mining* case. (ECF No. 228 at 53-54.)

*Mining* because it involved the defendant's agreement to cease permit violations as the plaintiff requested, unlike a case in which PPG's liability could not be established simply by establishing "compliance" or "non-compliance" with preexisting state standards and regulations but had to be determined by a court); *Public Int. Rsch. Grp. of New Jersey, Inc. v. Elf Atochem N. Am., Inc.*, 817 F. Supp. 1164, 1171-72 (D.N.J. 1993) ("The possibility that substantial additional penalties may be imposed … creates a sufficient case or controversy to avoid mootness.") In addition, the suggestion by the court in *Hobet Mining* that the state is the "primary enforcer of the Act" is not supported by the statutory provisions about citizen suits.[21]

Plaintiffs also contend that PPG's payment cannot be equated with a CWA civil penalty because it was not assessed under the CWA process, which states that a court "shall consider" enumerated factors, including the economic benefit resulting from the violation, 33 U.S.C. § 1319(d). That process did not occur in this case. Plaintiffs suggest that this distinguishes this case from the authority on which PPG relies. *See ECO*, 529 F.3d at 523 ("The filing of the consent decree triggered a public notice and comment period"); *Cherokee Mining*, 637 F. Supp. 2d at 986 ("After a required public notice and comment period … ADEM … executed and thereby finalized the proposed order."); *Comfort Lake*, 138 F.3d at 357 (the state "began informal action to enforce the NPDES permit … before [the plaintiff] issued its notice of intent to sue for the same violations" and the action was diligently prosecuted). Thus, in those cases, the government actions began before the complaint was filed, were diligently prosecuted and involved public—and in *ECO*, judicial—oversight.

---

[21] Plaintiffs also note that a civil penalty under the CWA must be deposited into the United States Treasury, *Laidlaw*, 528 U.S. at 175, and that payment to a state such as Pennsylvania is not authorized under the statute.

By contrast, PPG applied for a NPDES permit only after it was required by this Court to do so and only started the process that led to the 2019 COA after the Court found that PPG was liable. Neither PPG nor PADEP took any action to correct PPG's violations of the CWA for a number of years and PADEP failed to compel PPG's compliance with the agency's own edicts. This history hardly supports a conclusion that PADEP diligently prosecuted the action against PPG.

Further, while PPG suggests that PADEP has more expertise than this Court in environmental matters, as Plaintiffs note, "the court does not necessarily need scientific expertise to determine what level of civil penalties would be sufficient to deter future violations." *Ohio Valley Env't Coal. v. Bluestone Coal Corp.*, 2020 WL 5914524, at *2 (S.D.W. Va. Oct. 6, 2020). Plaintiffs further argue that that it is significant that PPG's liability for violations of the CWA has already been established. As the court noted in *Ohio Valley Envtl. Coal., Inc. v. Fola Coal Co., LLC*, 2014 WL 5444392, at *7 (S.D.W. Va. Oct. 23, 2014) (footnote omitted):

> Here, liability has already been determined. While the reissued permits may ensure that there will not be future violations of the water quality standards, they do not erase the fact that this Court has already determined that Defendant did commit violations of the permit as it existed when the complaint was filed and as it existed when liability was determined.

*Id.* at *7 (footnote omitted):

The maximum penalty that may be imposed under the CWA is $114,355,000 for already adjudicated violations through August 31, 2015, or $202,536,700 for all violations through December 31, 2019.[22] Although Plaintiffs do not seek to quantify a civil penalty at this time, they

---

[22] PPG contends that the maximum penalty is "not to exceed $25,000 a day for each violation." (ECF No. 481 at 8) (citing 33 U.S.C. § 1319(d)). This has been updated by regulation and range

contend that the fact that PPG paid such a low percentage of the maximum penalty under the CWA further undermines PPG's position that the penalty it agreed to pay should be seen as the equivalent of a CWA civil penalty.[23] Thus, Plaintiffs assert that the penalty is not enough to have a deterrent effect. They note that, according to PPG's own estimates of the costs to construct and maintain the remedy (initial capital costs of $9,114,265 and yearly operation and maintenance costs of more than $300,000), PPG has avoided paying significant sums for decades and has thus enjoyed an economic benefit far greater than the $1.2 million it paid to PADEP.[24] PPG has not responded to this argument.

Finally, Plaintiffs contend that the PPG payment does not address all of its violations. The 2019 COA states that it addresses penalties "in accordance with the applicable statute of limitations," but does not define the term. The CSL provides for a five-year statute of limitations, 35 P.S. § 691.605(c), and five years before the entry of the 2019 COA is April 2, 2014. The Court, however, may assess penalties for PPG's violations since January 20, 2007, that is, five years and 60 days before the Complaint was filed, which occurred on March 20, 2012. *See NJPIRG v. Powell Duffryn Terminals, Inc.,* 913 F.2d 64, 75-76 (3d Cir. 1990).[25] Thus, Plaintiffs argue, the 2019 COA

---

in this case (based on the date of the violation) from $32,500 to $56,460 per day. See 40 C.F.R. § 19.4; ECF No. 338 at 6-7.

[23] PPG has paid 1% of the maximum penalty for the already adjudicated violations and less than 0.6% of the maximum penalty for all violations that are before the Court.

[24] Plaintiffs also contend that the history of PADEP's involvement with this Site—and unrelated information about the agency's regulation of the fracking industry—shows that PADEP cannot be relied upon to deter, prevent or punish future noncompliance at the Site. They have not explained any relevance to the issues here.

[25] The CWA has no statute of limitations, but courts have held that, since citizens stand in the shoes of the EPA when they bring suit, they should be subject to the same five-year statute of limitations for enforcing a civil fine (plus the 60-day notice period) as would the EPA if it brought suit, 28 U.S.C. § 2462. *See NJPIRG*, 913 F.3d at 74.

does not address the 2,630 days of violations that occurred before April 2, 2014, and thus, even a single violation per day amounts to maximum penalties in excess of $95 million that are unaddressed by the 2019 COA. Further, the 2019 COA explicitly fails to address PPG's CWA violations that postdate the entry of the 2019 COA on April 2, 2019, failing to capture PPG's unpermitted discharges which continued until the NPDES permit became effective on January 1, 2020. Thus, there are another 274 days for which the 2019 COA fails to assess penalties, which would equal a maximum penalty in excess of $15 million assuming only one violation per day.

Based on its review of these issues, the Court concludes that PPG has failed to meet its burden of proving mootness because it previously paid a penalty of $1.2 million to the PADEP. The Third Circuit has never held that a penalty paid to a state agency under a consent decree moots that party's responsibility to pay a civil penalty to the United States under the statute. Moreover, few, if any, courts have held that payment made to a state agency *after* a party has been held liable in a CWA citizen suit moots a party's responsibility for CWA civil penalties that may be imposed by the court in that lawsuit.  PPG has not argued that the amount paid under the 2019 COA is "comparable" to a civil penalty under the CWA, which is assessed after public notice and comment as well as consideration of the issues of economic benefit to PPG by its past noncompliance and meaningful deterrence. Indeed, the amount paid by PPG in connection with the 2019 COA appears to bear no relationship to the amounts that could be assessed in a CWA civil penalty for PPG's violations. Further, because it bears no relationship to the estimated costs of establishing and maintaining the system, the amount paid by PPG does not suggest that it meets the standard for deterrence. Finally, PPG's payment did not account for 2,630 days of violations that occurred before April 2, 2014 or the 274 days after the entry of the 2019 COA on April 2, 2019, during which PPG's unpermitted discharges continued until the NPDES permit became effective on

29

January 1, 2020.

For all of these reasons, PPG's motion for summary judgment on the ground of mootness will be denied.

### C.  Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs seek a determination that PPG is liable for discharging pollutants and stormwater associated with industrial activity without a NPDES permit between August 31, 2015 and December 31, 2019. They request this relief based upon same reasoning for which they sought to hold PPG liable for the period between April 16, 1973 and August 31, 2015, which this Court recognized in granting Plaintiffs' Third Motion for Partial Summary Judgment. PPG's primary response to this motion is to contend that this issue is moot. As discussed above, the Court rejects PPG's contention that this case is moot as it relates to CWA civil penalties.

PPG contends that Plaintiffs were involved in the formulation of the 2019 COA. See ECF No. 409 at 18, BBB (Plaintiffs submitted many comments and objections to the proposed Site-Wide Remedy and PADEP "has fully considered all comments and objections submitted by PennEnvironment and Sierra Club.").[26] Plaintiffs note, however, that although they were provided with a final draft of the 2019 COA, it is undisputed that PPG insisted that it be maintained as confidential and the amount of PPG's payment was redacted from the document provided.

---

[26] While Plaintiffs deny this statement, it is uncontroverted that they provided comments and objections and PADEP stated that it had considered them. Plaintiffs state that "notice of the 2019 COA was never provided to the public (*e.g.*, in the Pennsylvania Bulletin.)" (ECF No. 485 at 12 n.7.) The parties have not addressed whether notice to an environmental organization that has brought a citizen suit under the CWA constitutes "public notice." In any event, the Court need not resolve this issue, as PPG does not dispute that Plaintiffs were unaware of the amount of money PPG would pay until the 2019 COA was made public and thus they did not have "public notice of and reasonable opportunity to comment on" the amount of the penalty.

(PRDCSMF ¶ 50; Defendant's Reply to Plaintiffs' Statement of Additional Facts Material to Motion for Summary Judgment) ("DRPS") ¶ 50.[27]

PPG argues that PADEP has a primary enforcement role to carry out compliance with NPDES permitting in Pennsylvania. "In Pennsylvania, EPA has delegated authority to issue NPDES permits to the Pennsylvania Dept. of Environmental Protection." https://www.epa.gov/npdes-permits/pennsylvania-npdes-permits. But as explained above, regardless of PADEP's role in issuing NPDES permits, PADEP does not have a primary role after a citizen suit has been filed under the CWA as  it has no right to intervene in the suit or to approve a settlement. Contrary to PPG's assertion, Plaintiffs are not challenging PADEP's actions; rather, they dispute PPG's position that the agency's acceptance of $1.2 million from PPG renders moot any CWA civil penalty that this Court might impose for established violations of the Act.

Plaintiffs have established that PPG is liable for discharging pollutants and stormwater associated with industrial activity without a NPDES permit between August 31, 2015 (the day of this Court's prior order on the issue) and December 31, 2019 (the day before PPG's Final NPDES permit became effective). Thus, their motion for partial summary judgment on PPG's liability under the CWA for this time period will be granted.

## IV.    Conclusion

For the reasons discussed, PPG's motion will be denied and Plaintiffs' motion for partial summary judgment will be granted.

---

[27] ECF No. 495.

Appropriate orders will follow.


Dated: February 23, 2022                    s/ Patricia L Dodge
                                            PATRICIA L. DODGE
                                            United States Magistrate Judge